ACCEPTED
12-15-00236-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
11/5/2015 5:03:53 PM
Pam Estes
CLERK

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS

11/5/2015 5:03:53 PM

PAM ESTES
Clerk

# Exhibit "A"

ACCEPTED
12-15-00236-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/30/2015 3:17:18 PM
Pam Estes
CLERK

**Cause No. C1228865**

| | | |
|---|---|---|
| **DOWTECH SPECIALTY** | § | **IN THE DISTRICT COURT** |
| **CONTRACTORS, INC.,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **OF NACOGDOCHES COUNTY** |
| | § | **TEXAS** |
| | § | |
| **CITY OF NACOGDOCHES, TEXAS** | § | |
| **AND AEROMIX SYSTEMS, INC.,** | § | |
| *Defendants* | § | **145TH JUDICIAL DISTRICT** |

_____

## PLAINTIFF'S DESIGNATION OF ITEMS TO BE INCLUDED IN CLERKS RECORD

_____


TO:  Jessica Hill

Deputy District Clerk of Nacogdoches County, Texas

101 W. Main, Suite 120
Nacogdoches, TX 75961
936-560-7740 – Tele
936-560-7839 – Fax

PLAINTIFF, DOWTECH SPECIALTY CONTRACTORS INC., is appealing this case to the 12th Court of Appeals. The trial court signed the final judgment in this case on August 28. Plaintiff filed a notice of appeal on September 16, 2015 and has made arrangements with the clerk to pay the clerk's fee.  Plaintiff requests that the following documents be included in the clerk's record, as specified in Texas Rule of Appellate Procedure 34.5:


12/17/12   Plaintiff's Original Petition

1/25/13   Plea to Jurisdiction, Original Answer, Counterclaim and Cross-Claim of Defendant, City of Nacogdoches, Texas

1

7/2/14      Rule 11 Agreement

8/8/14      Plaintiff's First Amended Petition

8/8/14      Notice of Revocation of Consent to Rule 11 Agreement

11/25/14    Plea to the Jurisdiction and Amended Answer of Defendants

12/1/14     Plea to Jurisdiction, First Amended Answer and Counterclaim of Defendant, City of Nacogdoches, Texas

1/5/15      Plaintiff's Answer to Counterclaims

1/30/15     Defendant's Motion for Partial Summary Judgment

3/12/15     Plaintiff's Supplemental First Amended Petition (with attached Exhibits 1 – 15)

3/12/15      Plaintiff's Motion to Strike Defendant's First Amended Answer (with attached Exhibits 1 – 9)

3/13/15     Plaintiff's First Supplemental Petition

6/3/15      Defendant's Supplemental Motion for Partial Summary Judgment

6/10/15     Plaintiff's Motion for Partial Summary Judgment

6/10/15     Appendix to Plaintiff's Motion for Partial Summary Judgment (with attached Exhibits A – H)

6/23/15     Defendant's Response to Plaintiff's Motion for Partial Summary Judgment

6/24/15     Plaintiff's Combined Response to Defendant's Motion for Partial Summary Judgment and Supplemental Motion for Partial Summary Judgment

6/24/15     Plaintiff's Notice of Intent to Use Summary Judgment Evidence

6/24/15     Affidavit of Bob Click

6/24/15     Exhibits to Affidavit of Bob Click (Exhibit 1- 52 in Volumes 1, 2, and 3)

            FOR THE CLERK'S CONVENIENCE A LIST OF THE 52 EXHIBITS TO THE AFFIDAVIT OF BOB CLICK IS ATTACHED HERETO AS "APPENDIX TO PLAINTIFF'S DESIGNATION"

6/24/15     Affidavit of Gerald Downing

6/24/15     Defendant's Response to Request for Admissions of Plaintiff Dowtech Specialty Contractors, Inc.

6/24/15     Defendant's Response to Plaintiff's Motion to Strike Defendant's First Amended Answer

| | |
|---|---|
| 6/30/15 | Defendant's Objections to Plaintiff's Summary Judgment Evidence Presented in Opposition to Defendant's Motion for Partial Summary Judgment |
| 7/2/15 | Order Sustaining Defendant's First Amended Plea to Jurisdiction |
| 7/24/15 | Plaintiff's Demand for Jury Trial |
| 8/7/15 | Defendant's Motion for Separate Trial |
| 8/19/15 | Plaintiff's Response to Defendant's Motion for Separate Trial |
| 8/21/15 | Plaintiff's Notice of Intent to Use Summary Judgment Evidence |
| 8/21/15 | Second Affidavit of Bob Click |
| 8/25/15 | Defendant's Motion to Strike Second Affidavit of Bob Click |
| 8/25/15 | Plaintiff's Response to Defendant's Objections to Summary Judgment Evidence |
| 8/28/15 | Order on Defendant's Motion for Separate Trial |
| 8/28/15 | Order Granting the Defendant's Motion for Partial Summary Judgment |
| 8/28/15 | Order Denying Plaintiff's Motion for Partial Summary Judgment |
| 8/28/15 | Order on Defendant's Motion to Strike Second Affidavit of Bob Click |
| 8/28/15 | Order Ruling on the Defendant's Objections to the Plaintiff's Summary Judgment Evidence (Plaintiff's Motion) |
| 9/16/15 | Plaintiff's Notice of Appeal, dated September 16, 2015 |
| 9/29/15 | This Plaintiff's Designation of Items to be Included in Clerks Record Dated 9/29/15 |

IN ADDITION TO THE DATED ITEMS SET FORTH ABOVE, REQUEST IS ALSO MADE FOR THE FOLLOWING ITEMS:

1.      The court's docket sheet.

2.      The certified bill of costs.

Respectfully submitted,

LAW OFFICE OF BLAKE C. NORVELL
37 Cypress Point St.
Abilene, Texas 79606
325-695-1708 tel
325-695-1708 fax


/s/ Blake Norvell

By: _____

Blake C. Norvell
State Bar No. 24065828

**ATTORNEY FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 29th day of September, 2015, a true copy of PLAINTIFF'S DESIGNATION OF ITEMS TO BE INCLUDED IN CLERKS RECORD was forwarded to counsel of record via electronic transmission:

THOMAS L. BELANGER
P.O. Box 631248
Nacogdoches, Texas 75963
tom@abal-law.com

/s/ Blake Norvell

_____
BLAKE NORVELL

**"APPENDIX TO PLAINTIFF'S DESIGNATION"**

The Exhibits to the Affidavit of Bob Click which are requested to be in the record are:

1. Selected pages of the Standard Conditions of the construction contract made the basis of this lawsuit.

2. Selected pages of the Special Conditions of the construction contract made the basis of this lawsuit.

3. Selected pages of the Technical Specifications of the construction contract made the basis of this lawsuit.

4. Drawings of the PROPOSED FLOATING BRUSH AERATORS/OXIDATION DITCH dated July 2009 showing the original bridge mount position with the aerators pushing on the swing arms

5. Electrical Expertise Inc. Letter dated October 22, 2009

6. Selected portions of Submittal No. 3 , including:

    a. The submittal cover sheet

    b. The submittal table of contents

    c. The scope of supply document showing four 25 hp aerators with 20-foot swing arms

    d. Selected pages of the Installation, Operation, and Maintenance Manual for the 25-30 HP Aeromix (MONSOON) Paddlewheel Surface Splash Aerator including pages showing features "pulling" a two post mooring and a four post mooring with soft starts or VFDs

    e. Selected Monsoon Drawings

    f. The Aeromix Warranty for the Aerators

7. Selected pages of ECS House Industries, Inc.'s FLOATING BRUSH AERATOR SPECIFICATIONS including a diagram illustrating proper mooring

8. Selected pages from Defendants Responses to Requests for Admissions in this case showing that the Aeromix submittal showed a recommendation for the installation of "soft start" mechanisms and that soft starts are gentle on the equipment (RFA# 94, 101, 103, 220, and 270).

9. A January 8, 2010 e-mail from Catalin Petrescu to Clint Carlile at Dowtech showing the need for swing arms to be bolted to a "structure."

10. Selected pages from Defendants Responses to Requests for admissions in this case showing

    a. August 19, 2010 flexing of the swing arms (RFA # 125)

    b. August 20, 2010 failure of the swing arms (RFA # 127, 128, and 129)

    c. August 30, 2010 Engineer Mark Mann discovered for first time that the aerators must be installed in a "pull" position (RFA #144)

    d. September and October 2010 changes in the contract were made to require a setup wherein the swing arms would be mounted to a mooring cable with the aerators in the pull position (RFA # 160-166)

    e. An October 11, 2010 letter signed by Mark Mann admitted that the aerators had been installed in a "push" configuration (RFA #244)

11. Drawing sheet 4 A of 13 of the PROPOSED FLOATING BRUSH AERATORS/OXIDATION DITCH made in the fall of 2010 (original dated July 2009) showing the swing arms in a tension/pull configuration on a cable mount and showing the clockwise flow of water

12. August 30, 2010 e-mail from Josh Perfetti to Mark Mann regarding the requirement of a "pulling" configuration and Mark Mann's reply insisting on a push configuration

13. September 2, 2010 e-mail from Mark Mann to Dowtech enclosing drawings of a cable and swing arm combination mount

14. Selected pages from Defendants Responses to Requests for admissions in this case showing

   a. On December 17, 2010 the aerators were again started up (RFA #181)

   b. Upon the start up of the aerators after the cable mooring set up, the aerators began to move around in the water and were again shut down (RFA # 184 and 185)

15. Six December 17, 2010 photographs of the aerators in the cable mooring configuration showing lack of stability and sway when in operation

16. A January 6 2012 letter from Mark Mann to Steve Bartlett recommending rejection of work and curiously omitting the initial August 19 and August 20 failure of the push configuration of the swing arms.

17. A January 30, 2012 "Rejection of Work" letter from Rob Atherton to Gerald Downing containing a warning about Civil and Criminal Penalties for installing defective aerators

18. A March 21, 2012 e-mail from Charlie Self to Teresa Picot including an e-mail from Mark Mann indicating the City will withhold payments pending resolution of the "alignment issue"

19. A March 6, 2012 Demand Letter from Charles Self to Steve Bartlett requesting payment and indicating Dowtech's total compliance with the contract

8

20. A March 27, 2012 Correction letter amending the demand letter from Charles Self to Steve Bartlett

21. An August 2, 2012 email from Buddy Harris to Dowtech and From Dowtech to Buddy Harris

22. An August 2, 2012 string of emails from Charlie Self to Teresa Picot and from Doug Reeves to a Gerald indicating the existence of too much torque and the recommendation of soft start mechanisms and offering to install them for free

23. A copy of Plaintiff's Original Petition filed December 17, 2012 in this case.

24. A May 28, 2013 e-mail from Charlie Self to Teresa requesting print of an May 23, 2012 email from Tom Belanger to Charlie Self with handwritten notes.

25. The July 2, 2013 Rule 11 Agreement in which the parties agree that the aerators will be re-engineered and repaired and "re-installed"

26. A Drawing Revision dated August 16, 2013 showing a Tension Mount of the Aerators.

27. A January 13, 2014 email from Doug Reeves to Dowtech and prior e-mails relating to installation of the aerators.

28. A January 14, 2014  12:44 pm email from Doug Reeves to Dowtech relating to non-use of mooring cable

29. A January 14, 2014 1:16 pm email from Doug Reeves to Dowtech relating to inadequacy of mooring cables.

30. A January 14, 2014 1:28 pm email from Doug Reeves to Dowtech relating to swingarm configuration

31. A January 14, 2014 1:46 pm email from Doug Reeves to Dowtech relating to use of a taught mooring cable and indicating that the City had requested they re-engineer the aerators for use in the original bridge mount configuration.

32. Selected pages from Defendants Responses to Requests for Admissions in this case showing the City admitted that Douge Reeves of Aeromix indicated that the city had instructed Aeromix to re-design around the bridge mount configuration (RFA #208)

33. A January 14, 2014 2:40 pm email from Doug Reeves to Dowtech relating to non-compression on bridge mount

34. A January 15, 2014 3:52 pm reply email from Doug Reeves to Dowtech and prior January 15, 2014 3:48 pm e-mail from Dowtech to Doug Reeves relating to change of proposed configuration

35. January 31, 2014 letter from Gerald Downing to Steve Bartlett, Thomas Belanger, and Mark Mann

36. A February 14, 2014 11:17 am reply email from Doug Reeves to Dowtech and prior February 14, 2014 11:15 am e-mail from Dowtech to Doug Reeves relating to the Aeromix $1,000.00 payment required under the Rule 11 Agreement that Dowtech had not received

37. A February 17, 2014 letter from Charles Self to Thomas Belanger regarding problems with original push position and the need for soft starts and breach of Rule 11 agreement

38. A March 18, 2014 letter from myself, Bob Click, to Steve Bartlett and Mark Mann relating to e-mails showing negligence of City

39. A March 19, 2014 letter from Steve Bartlett to Thomas Belanger recognizing that soft starts were recommended but refusing to use soft starts and recognizing that a pull configuration is required, but return to the "original position'

40. An April 2, 2014 1:42 pm reply email from Doug Reeves to Dowtech and prior April 2, 2014 1:42 pm email from Dowtech to Doug Reeves relating to the Aeromix $1,000.00 payment required under the Rule 11 Agreement that Dowtech still had not received

41. An April 4, 2014 email from Doug Reeves to Dowtech indicating that the failure to use soft starts on the aerators is "irresponsible" and showing that the City instructed them to re-engineer for the original bridge mount

42. An April 4, 2014 e-mail from Doug Reeves to me (Bob) relating to the recommended use of soft starts and the City's instruction to re-engineer for a bridge mount configuration

43. An April 15, 2014 letter to Tom Belanger from Charles Self explaining breach of Rule 11 and requesting compliance

44. A May 13, 2014 proposed amendment to the Rule 11 Agreement that purports to waive the 90 day running requirement of the Rule 11, but still allows a 20 day delay in payment and dismissal of claims

45. An undated "Construction Investigation Report" undertaken by me in March but finalized on July 23, 2014

46. A July 25, 2014 letter from Charles Self to Tom Belanger relating to my investigative Report.

47. The August 7, 2014 Notice of Revocation of the Rule 11 agreement

11

48. The August 7, 2014 First Amended Petition indicating breach of the Rule 11 and containing facts sworn to by Gerald Downing

49. The November 25, 2014 Plea to the Jurisdiction and Amended Answer of Defendants

50. The January 5, 2015 Answer to Counterclaims

51. The January 15, 2015 e-mail from Chad House to Dowtech regarding soft starts required on all heavy-duty aerators

52. Plaintiff's March 13, 2015 First Supplemental Petition

# Exhibit "B"

Cause No. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC., *Plaintiff* | § § § § | IN THE DISTRICT COURT |
| v. | § § § | OF NACOGDOCHES COUNTY TEXAS |
| CITY OF NACOGDOCHES, TEXAS AND AEROMIX SYSTEMS, INC., *Defendants* | § § § § | 145TH JUDICIAL DISTRICT |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiff, Dowtech Specialty Contractors, Inc., appeals from the following orders and all adverse interlocutory rulings that merged into the judgment:

1. Order Granting Defendant's Motion for Partial Summary Judgment, dated August 28, 2015

2. Order on Defendant's Motion for Separate Trial, dated August 28, 2015

3. Order Denying Plaintiff's Motion for Partial Summary Judgment, dated August 28, 2015

4. Order on Defendant's Motion to Strike Second Affidavit of Bob Click, dated August, 25, 2015

5. Order Ruling on the Defendant's Objections to the Plaintiff's Summary Judgment Evidence (Plaintiff's Motion), dated August 25, 2015

6. Order Sustaining Defendant's First Amended Plea to Jurisdiction, dated July 2, 2015.

These orders constitute a final judgment on Part One of the trial, as set forth in the first cited order above, and dispose of all matters relating thereto in Cause No. C1228865; in the 145th Judicial

1

1474

District Court of Nacogdoches County, Texas. The Court of Appeals will be the Twelfth Court of Appeals. The trial court, cause number, and style of this case are shown in the caption above. Plaintiff desires to appeal all portions of the judgment.

Respectfully submitted,

LAW OFFICE OF BLAKE C. NORVELL
37 Cypress Point St.
Abilene, Texas 79606
325-695-1708 tel
325-695-1708 fax


/s/ Blake Norvell

By: _____

Blake C. Norvell
State Bar No. 24065828

**ATTORNEY FOR PLAINTIFF**

2

1475

Exhibit "C"

NO. <u>C1228865</u>

| | | |
|---|---|---|
| **DOWTECH SPECIALTY CONTRACTORS, INC.** | § § § | IN THE 145TH JUDICIAL DISTRICT |
| **V.** | § § | COURT OF |
| **CITY OF NACOGDOCHES, TEXAS and AEROMIX SYSTEMS, INC.** | § § § | NACOGDOCHES COUNTY, TEXAS |

## ORDER DENYING PLAINTIFF'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

On August 28, 2015, the Court considered the Plaintiff's Motion for Partial Summary Judgment, the Defendant's response, and argument of counsel. After review of the items mentioned above, the Court is of the opinion that the motion should be denied.

Therefore, it is the Order of this Court that the Plaintiff's Motion for Partial Summary Judgment be DENIED.

Signed and Entered on August 28, 2015.

Campbell Cox II
District Judge

Exhibit "D"

**Cause No. C1228865**

| | | |
|---|---|---|
| DOWTECH SPECIALTY | § | IN THE DISTRICT COURT |
| CONTRACTORS, INC., | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | OF NACOGDOCHES COUNTY |
| | § | TEXAS |
| | § | |
| CITY OF NACOGDOCHES, TEXAS | § | |
| AND AEROMIX SYSTEMS, INC., | § | |
| *Defendants* | § | 145TH JUDICIAL DISTRICT |

### PLAINTIFF'S COMBINED RESPONSE TO
### DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
### AND
### SUPPLEMENTAL MOTION FOR PARTIAL SUMMARY JUDGMENT

TO SAID HONORABLE COURT:

Plaintiff, Dowtech Specialty Contractors, Inc., (hereinafter "Dowtech") files this Combined Response to Defendant's Motion for Partial Summary Judgment and Supplemental Motion for Partial Summary Judgment and would show as follows:

### INTRODUCTION AND SUMMARY

**The plea to the jurisdiction is devoid of any case law or application.** It is a bold, one paragraph fabrication. *See* argument *infra* p. 31.

Defendant's Summary Judgment Motions are short on both law and fact. They state inapplicable, boilerplate propositions of law and then proceed to misconstrue the facts of this case. Other than the plea to the jurisdiction **all arguments in favor of partial summary judgment depend entirely on the continued validity of the Rule 11 agreement.**

The revocation demotes the Rule 11 Agreement to the rank of additional contract terms over which the parties are now bickering. Defendant's motions seem to ignore this fact and

1

repeatedly asserts the "Rule 11 Agreement" as though it carried some special gravitas. But, as the Court stated in *Woody v. Woody,* 429 S.W.3d 792, 796 (Tex. App.—Houston [14th Dist.] 2014), reh'g overruled (May 8, 2014):

> The problem with this contention is that **if a party revokes its consent to a Rule 11 agreement** at any time before judgment is rendered in the case, the agreement can no longer simply be "approved" by the court; instead**, the enforcement mechanism is through a separate breach of contract action.**

*Id*. at 796 (emphasis added). Given the basic rule above, the City has the burden of proving that there is no material fact issue as to its breach of the Rule 11 Agreement.

Filed and submitted herewith are the **affidavits of Dowtech's President**, Gerald Downing and Bob Click, **Dowtech's investigator**, along with **52 exhibits** consisting mostly of product specifications, contract drawings, and **e-mail exchange between the parties**. **The submission is replete with evidence of the City's blatant breach of the Rule 11 Agreement.**

First, in a continuing pattern of recalcitrance, the City interfered with Aeromix's repair of the aerators, by directing Aeromix to omit soft start apparatus, the lack of which caused the initial installation to fail. Fixing the failure was the primary purpose of the Rule 11 Agreement. Defendant presents **no factual argument or evidence whatever relating the refusal to install "soft starts." For this simple reason alone, there is a fact issue for trial and the motion should be denied *ab initio*.** *See* argument *infra* p. 20.

Second, the City also breached the Rule 11 Agreement by directing Aeromix to design its repairs for the original "push" and "bridge mount" configuration. Defendant's own motions admit this was contrary to the mounting required by the Rule 11 agreement.

**Defendant's only argument against this mass of evidence is a March 19, 2014 letter cleverly written to try to cover-up the breach.** Unfortunately, the March 19 letter is "as clear as mud" and the fact issue of breach is alive and well. *See* argument *infra* p. 19.

2

## STANDARD OF REVIEW

This court must take "as true all evidence favorable to" Dowtech, "indulging every reasonable inference and resolving any doubts in" Dowtech's favor. *City of El Paso v. Heinrich,* 284 S.W.3d 366, 378 (Tex. 2009). As will be shown, even under the strictest scrutiny, there are multiple fact issues present with regard to the enforceability of the Rule 11 Agreement.

## FACTUAL SUMMARY

Because of the sheer volume of evidence showing breach of the underlying contract, as well as breach of the Rule 11 Agreement, a factual summary is necessarily inadequate. Thus, plaintiff implores the Court to read the affidavits, and at a minimum, review documents highlighted below.[1]

For ease of understanding, Dowtech has chosen to summarize the facts leading up to the Rule 11 Agreement. This is done for two reasons. First, to assist the Court in understanding the technical issues involved in the construction project and equipment. Second, to give the court a context of the behaviors of the parties leading up to the Rule 11 Agreement. At the point in the chronology where the Rule 11 Agreement is reached, this brief will contain both facts and

---

[1] To the extent that the City objects to any of Dowtech's summary judgement exhibits or testimony, the motion is premature, as an adequate time for discovery has not passed. Even though such correspondence has been properly authenticated pursuant to Tex. R. Ev. 901, Dowtech has not had the opportunity to cross examine witnesses about the correspondence and contract documents involved and reduce the subject matter to testimonial form. Since most of the statement contained in non-Dowtech documents are statements made by a party opponent, they are not hearsay. So, despite the proper use of the evidence in summary judgment, any objection to Dowtech's summary evidence should be immediately followed by a ruling that the motion be denied until discovery is complete. Since the matters contained in any correspondence or records from non-Dowtech entities and are currently unavailable by affidavit, then if there is objection to use of the non-Dowtech generated correspondence, the court should continue the hearing until the close of discovery. Texas Rule of Civil Procedure 166a (g) states:

> **When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Tex. R. Civ. P. 166a (g).

argument. This is because the only significant points of contention in the City's motions are: (1) that there are no facts to support a breach of the Rule 11 Agreement, and (2) that all facts necessary to the Rule 11 Agreement's enforcement are incontrovertible. The facts are as follows:

## 1. THE INITIAL CONTRACT: FIRM ANCHORAGES AND SOFT STARTS
### A. DOWTECH WAS NOT RESPONSIBLE FOR THE DESIGN

Article 6.21 E. of the contract general provisions states clearly that Dowtech "shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents." GENERAL PROVISIONS (Exhibit 1). More specifically, the technical specification portion of the contract indicated that "The aerator and drive shall be installed as shown on the drawings and in strict accordance with the manufactures instructions." One look at Exhbit 4 removes all doubt as to who was responsible for putting the aerators in the original wrong position. The initial drawings clearly show a "push" configuration with the aerator connected to a swing arm which is connected to the bridge:



4

INITIAL CONTRACT DRAWING (Exhibit 4). An arrow on the drawing (shown in the zoom view below) indicates the direction of the water flow, giving one a clear indication that the paddle wheel is pushing on the 20 foot arm.



*Id*. As one can see, there is no room for variation. A push configuration on a 20 foot swing arm connected to the bridge was the configuration mandated by the contract drawings. It is a negligent configuration. Shown below is an Aeromix drawing indicating a more accurate perspective view:



AEROMIX SWING ARM DRAWING (Exhibit 26). The drawing shows how the push configuration might cause the swing arm to collapse, and even contains a warning in the lower left corner: **"Do not install so that the unit is pushing on the Arms or they could collapse."** The diagram also shows that the **water flow direction required for use is the exact opposite** as the City's required contractual configuration. The side view shows clearly that a pushing force on the swing arms would necessarily force the entire aerator downward into the water, increasing the load on its paddles and causing the unit to "submarine." It doesn't take a rocket scientist to figure out that installing the unit in a push configuration could cause problems. Regardless, that is exactly what Dowtech was required to do by the City's licensed engineers.

## B. THE SPECIFIED PRODUCT

Paragraph 8 of the special conditions portion of the contract sets forth the power of the City to specify products to be used by name and brand "equivalent." SPECIAL CONTRACT CONDITIONS (Exhibit 2). The technical specifications for the "floating electric brush aerator" specifically required Dowtech to use "Aeromix, Systems, ECS House Industries, or approved equal" as the product type. FLOATING BRUSH SPECIFICATIONS (Exhibit 3).

With respect to this type of contract specification, Bob Click, a 60 year construction contractor, testified: "In my experience this type language in a construction contract means that the Engineer represents and claims to have superior knowledge of the designated material (in. this case the Aeromix Systems and ECS House Industries 25 hp aerators). BOB CLICK AFFIDAVIT, pp. 9-10, ¶ 5.

Exhibit 6 comprises the submittal documents supplied for approval to the City. It includes the provision of "Four (4) 25HP MONSOON aerators" manufactured by Aeromix. SCOPE OF SUPPLY (Exhibit 6c). The drawings for the 25 Horse Power Paddle Wheel aerator show that a large amount of water will be contacted by the numerous paddles on the rotor. The risk of bolts shearing because of these strong forces is indicated on the lower left of the drawing shown below:



Again, it doesn't take a rocket scientist to figure out that this machine will tend to move around in the water if it is not firmly anchored.

### 1) **Firm Anchoring is Required.**

Included in the approved submittal was the Monsoon Installation, Operation, and Maintenance Manual. The manual showed that the typical and suggested mooring arrangement was to put the unit between two cables and four concrete filled posts. MONSOON MANUAL (Exhibit 6d). This was never tried and never suggested by the City. Even the House Industries aerator specifications require firm anchoring. *See* HOUSE SPECIFICATIONS (Exhibit 7).

The need for firm anchoring was discussed early on. In a January 8, 2010 e-mail, the engineering manager for Aeromix indicated that the swing arms should be "bolted" or "pinned" to a "structure." SWING ARM SYSTEM E-MAIL (Exhibit 9).

8

### 2) Soft Starts are Specified

The Monsoon Manual was bold and clear with a warning triangle:

> ⚠ AEROMIX highly recommends the use of soft starters or VFD's (optional) on units 20HP and higher. These considerably reduce power consumption at startup/operation, and add life to mechanical components, including the drive assembly.

MONSOON MANUAL p. 6 (Exhibit 6d). Variable Frequency Drives or "Soft Starters" are common in electrical engineering applications whenever a motor is pushing a significant load. The City admitted that the warning shown above was given. They also admitted that soft starts were "gentle" on the equipment. *See* REQUEST FOR ADMISSIONS RESPONSES (Exhibit 8) (Nos. 94 and 102**). In an incredulous response, the City admitted the warning shown above was in the Manual, but that it was "not clearly shown."** REQUEST FOR ADMISSIONS RESPONSES (Exhibit 8) (No. 270).

### C. COMPLETE LACK OF DUE DILIGENCE AND NEGLIGENT ENGINEERING
#### 1) Failure to Incorporate Soft Starts

Despite the warning label, the City admitted that "Soft start devices were not included on the engineering plans" because they "were never considered to be a necessary part of the installation by our engineer." This admission is contained in a March 19, 2014 letter from Steve Bartlett, the City engineer to one of the attorneys on the case drafted AFTER the Rule 11 Agreement was made. It was a letter basically explaining that the City was not going to abide by Aeromix repair recommendations. In the letter, the City engineer admitted his prior ignorance and stated that "…we now understand that the operations manual identified the use of soft start devices for Aeromix motors over 20 Hp…" *See* MARCH 19 CITY RESPONSE LETTER (Exhibit 39). **It is very apparent that the City gave no thought to the matter and did not even review the manual submitted.** Furthermore, the City appears to have farmed out its review of the electrical requirements to a third party. ELECTRICAL EXPERTISE INC. LETTER (Exhibit 5). Had the City

9

engineers' office looked at House Aerator specifications, they would have found that House recommended the use of soft starts on all such aerators above 15 horse power. EMAIL FROM CHAD HOUSE (Exhibit 50). The City did not see the warning in the supplied manual. The City did not give any thought to the matter of soft starts. The result was that the Contract documents did not contain a requirement for soft starts.

### 2) **Failure to consider push v. pull**

As shown in the initial contract drawings, the City had no concept of the problem that the "push" configuration would cause. This is despite the City engineers presumed attendance at basic physics courses in high school and college.

## 2. THE FIRST FAILURE: THE PUSH CONFIGURATION COLAPSES.

The first startup was on August 5, 2010. REJECTION OF WORK LETTER (Exhibit 16). It was done with the system in the "push" configuration. *Id*. Within 2 weeks the swing arms began to flex. REQUEST FOR ADMISSIONS RESPONSES (Exhibit 10a) (No. 125). **On the 15th day, the swing arms failed.** REQUEST FOR ADMISSIONS RESPONSES (Exhibit 10b) (Nos. 127, 128, and 129). At that time Mark Mann, the City's project engineer, "discovered" for the first time that the swing arms must be place in the pull position (tension) and not in the push positions (compression). REQUEST FOR ADMISSIONS RESPONSES (Exhibit 10c) (No. 144).

Despite the revelation, engineer Mann was recalcitrant and resistant to design change, even when presented with alternative by Aeromix. In an e-mail dated August 30, 2010, engineer Mann replied to a proposed alternative with the following: "The new aerator can only be installed in the locations as shown on the contract drawings with the units pushing (compression) on the arms because the existing equipment prevents any other location." AUGUST 30, 2010 EMAIL EXCHANGE (Exhibit 12).

10

## 3. FIRST BREACH: THE REWORK WITHOUT PAY

In the months of September and October of 2010 Mr. Mann, began unilaterally dictating changes in Dowtech's work requirements. A propose contract modification was e-mailed to Dowtech on September 2, relocating the aerators to a position with the swing arms reversed in direction and pulling on a steel cable stretched across the water between two steel posts. REQUEST FOR ADMISSIONS RESPONSES (Exhibit 10d) (No. 160).



REVISE CONTRACT DRAWING (Exhibit 11). *See also* SEPTEMBER 2 E-MAIL FROM MANN TO DOWNING WITH DRAWING (Exhibit 13). This was drastically different from the original structural connection to the bridge that had been recommended. It was also not consistent with

11

the only other recommended use of cables for mooring, which did not include the cables being attached to a 20 foot long swing arm:



MONSOON MANUAL p. 4 (Exhibit 6d). A simple 5th grade lesson on the power of leverage would teach that a 20 foot-long swing arm, extending to a single cable, will exert significantly more lateral stresses on the cables than the 0 foot long attachment method shown above.

The changes continued. Mann sent Dowtech and e-mail on September 7 changing the post size from 4 inches to 8 inches in diameter. REQUEST FOR ADMISSIONS RESPONSES (Exhibit 10d) (No. 162). The City understood that the changes would require paying Dowtech more money, as the work was different and additional from that required in the original contract. On September 16, Dowtech informed Mann that the contract modification would cost $41,746.00. In October, with notice to the City, Mann sent a letter to Dowtech demanding they proceed. REQUEST FOR ADMISSIONS RESPONSES (Exhibit 10d) (Nos. 165 and 166). That same month, Mann admitted that the prior failed installation was a "push" configuration. REQUEST FOR ADMISSIONS RESPONSES (Exhibit 10d) (No. 244). Dowtech was never paid for its work in performing the construction of the modification. DOWNING AFFIDAVIT, ¶ 9.

12

In forcing the new design on Dowtech, the City breached the technical specifications of the contract. Part 4 subpart O of the specifications for the floating brush aerator states clearly that **the "Anchoring system shall hold the aerator firmly in position.** FLOATING BRUSH SPECIFICATIONS (Exhibit 3). Experience proved the breach when the new mooring system also failed.

**4. THE SECOND FAILURE: SWAYING CABLES AND MULTIPLE HARD STARTS**

After a December 17 startup attempt, the 20 foot-long swing arm began to sway and "move around in the water." REQUEST FOR ADMISSIONS RESPONSES (Exhibits 14a and 14 b) (No. 181, 184 and 185). This was predictable when the 20 foot arms were attached to a flexible cable. Photographs of the substandard cable-swing arm connection show the failure:



*See* PHOTOGRAPHS OF DECEMBER 17 STARTUP (Exhibit 15). The photograph shows the angular swaying of the units which create a risk of sidewall collision and damage to the aerator. As a result, the cheap fix of "sway cables" was also installed to minimize the risk of side wall

13

collision. REJECTION OF WORK LETTER (Exhibit 16). Over the course of an entire year the second-rate system was tried. From August to December 2010 there were a number of "Revisions to unit mounting arrangements." *Id*. Dowtech completed its work in doing so and was never paid. DOWNING AFFIDAVIT ¶¶ 8 and 9.

## 5. AN ENTIRE YEAR OF ABUSE

"The newly repositioned aerators never operated successfully from December 17, 2010 through December 2011. DOWNING AFFIDAVIT ¶ 9. A letter from the engineers chronicles the numerous incidents which no doubt required a shut down and a hard restart of the aerators:

- August 26, 2010 thru December 5, 2010 – Revisions to unit mounting arrangements
- September 15, 2010 – First Gearbox failure
- January 20, 2011 – Second Gearbox failure
- January 31, 2011 – Third Gearbox failure
- February 2, 2011 – Onsite meeting with Aeromix, SPI and City to discuss gearbox failures and corrective actions.
- February 24, 2011 – Fourth Gearbox failure
- June 27, 2011 – New Gearboxes installed, all 4 units installed in oxidation ditch and tested for operation
- August 3, 2011 – City notification that motor on the northeast aerator is not operating at correct rpm. Bolts have also been sheared at hub and center shaft assembly.
- September 26, 2011 – New motor installed on northwest aerator unit.
- September 27, 2011 – Notification by City that there are bolts sheared/missing in the hub and center shaft assemblies on the northeast aerator unit.
- October 11, 2011 - Flotation pontoons on all units are checked and remounted for level operation. Sheared bolts are removed and replaced. All units are checked and returned to service.
- November 3, 2011 – Notification by City that the shaft and hub connection bolts on northwest aerator have again failed.
- November 22, 2011 – Aeromix Service Representative makes site visit to evaluate sheared bolts and shaft and gearbox alignment. Service report issued indicating that pillow block bearings are not in proper alignment and that three units (northwest, northeast, and southwest) need to be pulled from oxidation ditch and reworked to provide proper alignment. Leak on southwest gearbox is also noted.
- December 16, 2011 – Aeromix Service Contractor completes work to re-align pillow blocks, remove and replace all sheared connection bolts at hub assemblies on three units and correct gearbox leak. All units are completed and returned to service. Service Report issued on performed work. Report also referenced a stress crack in center shaft at the end support hub on northwest unit.
- December 27, 2011 – Notification by City that bolts have again sheared on northeast and southwest aerator units.
- January 3, 2012 – Aeromix furnished action plan for bolt repair with safety wire and higher grade of thread

REJECTION OF WORK LETTER (Exhibit 16). Recommendations were made in this letter to claim that the ultimate failure was the result of "defective" aerators or work rather than the failure to

properly mount the unit and/or the failure to employ soft starts. *Id*.

## 6. THE SECOND BREACH: THE PHONY DEFECT CLAIM

On January 30, 2012 Gerald Downing received an astonishing letter from the City. The letter asserted a contractual rejection of work and claimed defect. REJECTION OF WORK NOTICE (Exhibit 17). The letter demanded "removal and replacement of the aerators with approved alternative aerators" as though the problem was with the aerators. *Id*. In fact, **"they had been damaged by the abuse of constant repositioning and hard starting."** DOWNING AFFIDAVIT ¶ 12 (emphasis added). This was a clear attempt to cover-up the ineptitude of the City's engineers in specifying a "push" configuration with hard starts when a "pull" configuration with soft starts is the recommended configuration. *Id*. This would cost Dowtech an estimated $175,000. *Id*. The demand was absurd, given the refusal to use recommended soft starts, the backwards mounting configuration, and the year of abuse.

The City's Motion even uses the word "defect" deceptively. On page 2 of the original motion the City cites the notice of revocation saying there were "defects" in the aerators. ORIGINAL MOTION p. 2 ¶ 7. That is false. The cited paragraph of the Notice of Revocation uses the word "issues" not defects. NOTICE OF REVOCATION ¶ 2 (Exhibit 47).

"Dowtech, as the general contractor, strictly followed the contract documents and instructions of the City of Nacogdoches' engineers. The engineers were solely responsible for design. Dowtech was a construction contractor." DOWNING AFFIDAVIT ¶ 11. Dowtech did "everything the engineers" told them to do "with speed, precision, and accuracy." *Id*. The phony claim of defective work was clearly a breach.

Numerous ovations were made by Dowtech to resolve the dispute amicably. But it just seemed the City was wanting to pick a fight. In December of 2011, in response to a request for payment, Mark Mann sent an e-mail to Dowtech indicating that it would withhold payment until

15

the "alignment issue" was resolved. *See* DECEMBER 5, 2011 E-MAIL (Exhibit 18). In the same message, **Mann virtually admits that the problem is not actually with Dowtech's work**, because he "would like to avoid moving this into a warranty issue." *Id*. Aeromix's product warranty had been assigned to the City some time before. *See* AEROMIX WARRANTY (Exhibit 6f).

The behavior of the City was indeed bizarre at this point. Despite Aeromix promising to provide a fix and offering to do it for free, the City did not respond to the offer. DEMAND LETTER (Exhibit 19). The City wanted to cover up the ineptitude of its engineers in failing to incorporate soft starts. This became evident when Dowtech received a communication from Doug Reeves, the construction and service manager of Aeromix. Around August 2012, Mr. Reeves e-mailed Gerald Downing to offer **a free installation of "soft starts"** on the units. FREE SOFT STARTS OFFER (Exhibit 22). The e-mail confirmed the diagnoses that Dowtech already knew, the multiple incidents of bolt sheering and gearbox failure were due to "far too much torque on the Monsoon gearbox and shaft during startup of the units." *Id*. Despite this, the City simply would not budge.

## 7. THE LAWSUIT

This lawsuit was brought out of frustration. ORIGINAL PETITION (Exhibit 23). The lawsuit set forth the numerous additional work demands made by the City and makes claim for relief on a number of theories. *Id*.

## 8. THE THIRD BREACH: DEFYING THE TERMS OF THE RULE 11 AGREEMENT

Negotiations ensued. *See* E-MAIL AND NOTES FOR SETTLEMENT (Exhibit 24). The negotiations culminated in the disputed Rule 11 Agreement on July 2, 2013. *See* RULE 11 AGREEMENT (Exhibit 25). The Rule 11 Agreement is short and simple. That is one of its problems. Without much detail, it required the repair of the aerators by Aeromix and the

reinstallation of the aerators by Dowtech. **The Rule 11 Agreement provided payment to Dowtech only if, after the repair and re-installation, the aerators ran trouble free for 90 days**. *Id*. Thus, Dowtech had a significant interest in making sure the repair and reinstallation included the recommended fixes. Any party sabotaging the fixes would potentially be in breach. As soon as the agreement was executed, the parties began to communicate about how the repair and re-install was to be accomplished.

## A. THE CITY'S BREACH OF RE-INSTALL REQUIREMENT

### 1) The common meaning of "re-install" is "to put back from where it came"

Based on the common and ordinary meaning of "re-install," Dowtech expected to simply put the aerators back on the cable from where they were removed. Consistent with this, one month into the process, Aeromix generated a new drawing of the swing arm configuration as a result of its communications with the City. It contained a clear warning about the hazards of the push configuration. AEROMIX SWING ARM DRAWING (Exhibit 26) (shown *supra* p. 6).

### 2) The City ignores the intended meaning and directs a breach

Regardless of the clear meaning of "reinstall," a series of inconsistent communications began to occur. On January 14, 2014 at 12:44 pm, Doug Reeves indicated that the units had been designed to "attach to the **bridge mounts** as originally designed. **No more need for mooring cable**." JANUARY 14, 2014 12:44 PM EMAIL FROM REEVES TO DOWTECH (Exhibit 28) (emphasis added). When questioned about the existing aerators on the other side of the bridge (which would prevent a proper bridge mount) Mr. Reeves again responded "**we were asked to make the original design work and the original bridge mount work** for the customer. A Mooring line stretched across the ditch is not an adequate way to secure the unit." JANUARY 14, 2014 1:16 PM EMAIL FROM REEVES TO DOWTECH (Exhibit 29) (emphasis added). The exchange continues with a comment that the **"original location" was the basis of the "redesign."**

17

JANUARY 14, 2014 1:28 PM EMAIL FROM REEVES TO DOWTECH (Exhibit 230) (emphasis added). The colloquy between Dowtech and Aeromix continued because of what appeared to be an outlandish demand by the City. In discussing the use of the cable (from which the aerators were removed) Mr. Reeves makes if perfectly clear that the City had ordered him to design for mounting on the bridge. He state that use of the cable "is however a change in what we designed around. **We were asked to make the <u>existing bridge mount</u> system work** with the new swing arms." JANUARY 14, 2014 1:48 PM EMAIL FROM REEVES TO DOWTECH (Exhibit 31) (emphasis added). Even the City admits that such communications mean "the four Aeromix 25 hp aerators have been redesigned/re-manufactured for installation into the original location **with the swing arms attached to the bridge**, at the request of Defendant Nacogdoches." REQUEST FOR ADMISSIONS RESPONSES (Exhibit 32) (No. 208) (emphasis added). The fact that such a configuration was destined to fail again was not lost on Aeromix. See JANUARY 14, 2014 2:40 PM EMAIL FROM REEVES TO DOWTECH (Exhibit 33).

### 3) <u>The bad faith refusal to communicate</u>

Confusion and silence soon ensued. The next day, when Dowtech told Aeromix that the city had again changed its mind. Mr. Reeves made it clear that a site visit had been the clear source of his understanding that the City wanted the bridge mount. *See* JANUARY 15, 2014 EMAIL FROM REEVES TO DOWTECH (Exhibit 34). **In an evident act of bad faith, the City failed to respond to multiple formal requests for clarification**. This is a breach of the Rule 11 Agreement all by itself.

On January 13 and email was sent to the city requesting clarification. CLICK CLARIFICATION LETTER ¶ 1 (Exhibit 38). **The e-mail was ignored**. *Id.* Again on January 14, a similar email was sent. *Id.* **That e-mail was ignored**. *Id.* On January 21, 2014 a request for clarification was sent. SELF CLARIFICATION LETTER ¶2 (Ehibit 37). **This letter was ignored**.

18

*Id*. Ten days later, on January 31, 2014 Gerald Downing sent a formal and lengthy letter, quoting the numerous e-mails discussed above and requesting that the City provide "written instructions for re-installation." DOWNING RE-INSTALL LETTER (Exhibit 35). **This letter was ignored.** Two weeks later Dowtech's attorney made a similar demand, expressing great frustration. SELF CLARIFICATION LETTER (Ehibit 37). **This letter was ignored**. Finally, Bob Click wrote a scathing letter to the City listing the events of complete non-response. CLICK CLARIFICATION LETTER ¶ 1 (Exhibit 38). This final letter also set forth the negligence of the City in engineering the backward mount and refusal to employ soft starts. CLICK CLARIFICATION LETTER (Exhibit 38).

### 4) The amazing March 19 Letter

Finally, more than two months after Dowtech began asking for a response, the City sent a letter on March 19, 2014 which purported to answer the concern of the Rule 11 Agreement breaches. *See* MARCH 19 CITY RESPONSE LETTER (Exhibit 39). According to the City, this amazing piece of prose, (no doubt lawyered over two months of radio silence) is somehow "uncontroverted" evidence that the lengthy stream of emails in January mean the opposite of what they clearly say. **It is on the basis of this letter that they claim the "re-install" breach is negated.** At the top of page 3 of its Supplemental Motion, the City selectively quotes from the letter. The City quotes the letter's use of "final" but they try to explain away that the letter cleverly used "final" interchangeably with "original." In an astoundingly weak argument **the City claims it is "clear from the context" that the word "original" means "final."** Wow! A more reasonable interpretation of the letter is that over two months of deliberation, the City decided to try and "finesse" its way out by mixing the two terms.

In another attempt at linguistic hop-scotch, the City cites to an April 15, letter written by Dowtech's counsel, Charles Self. The City then claims that the April 15 letter admits to their

19

interpretation of the March 19 Letter. They neglect to inform the Court that in the same paragraph in which they claim that the admission lies, Mr. Self clearly elucidates that **"There is a conflict in the City's instructions."** Breach of Rule 11 Agreement Notice Letter, p. 3, ¶ 4 (Exhibit 43) (emphasis added). That is the true context of the March 19 letter. It is at best confusing, and most likely a calculated attempt to muddle the pre-existing evidence of breach. It certainly cannot negate any breach, because it left Dowtech without an answer and unable to act as to the "re-install." It is likely, regardless of what approach Dowtech would have taken, that had the aerators failed again, that the City would have asserted a "different" interpretation of the letter and blamed Dowtech for the failure once again. Dowtech had no choice but to revoke the Rule 11 Agreement and press on with this action.

**There is nothing conclusive about either the March 19 letter or the April 15 letter. Therefore, the motions for summary judgment fail.**

### B. The City's Breach of the Repair Requirement – Refusing Soft Starts

The evidence of this breach is independent of the evidence establishing the "re-install" breach. Therefore, the City bears the burden of conclusively negating the evidence of this breach as well. If they fail to do so, the Motions for Summary Judgment also must fail. **Unfortunately for the City, its motions simply ignore this breach, basically admitting that it occurred.** In the 26 pages of briefing filed, the City mentions "soft starts" only once on page 9 of its original Motion. The only argument about the refusal to allow soft starts is that the breach is cured by the city's offer to amend the Rule 11 Agreement which will be debunked *infra* at p. 22.

The admittedly uncontroverted evidence establishes the soft start breach. Pursuant to its repair authority under the Rule 11 Agreement, Aeromix redesigned the gear boxes to accommodate the soft start devices and told Dowtech to install them that way. January 13, 2014 9:02 am Email from Reeves to Dowtech (Exhibit 27). This is consistent with the

20

intentions of all signatories. In the March 19 letter, the City indicates that it contemplated that the replacement aerators would be "improved" versions.

The chronology above indicates that all parties were on notice that the lack of soft starts was a major factor in the failure of the aerators. They were recommended in the installation manual by a conspicuous warning. They were admittedly gentler on the apparatus, and there was no apparent downside to using them. Around August 2012, Mr. Reeves e-mailed Gerald Downing and confirmed that the multiple incidents of bolt sheering and gearbox failure were due to "far too much torque on the Monsoon gearbox and shaft during startup of the units." FREE SOFT STARTS OFFER (Exhibit 22). Despite this, the City simply would not budge. As this Court may recall, Aeromix promised to provide the soft start fix for free but the city never responded. DEMAND LETTER (Exhibit 19). Aeromix informed Dowtech that failure to employ soft starts would be "irresponsible." SOFT START RECOMMENDATION EMAIL (Exhibit 41). The breach of the Rule 11 Agreement in this regard is a continuation of a pattern of conduct which breached the original contract.

Despite its alleged benefit to the City, the March 19 letter is proof of soft start breach. In the letter the City admits negligence by not even knowing about the need for soft starts. *See* MARCH 19 CITY RESPONSE LETTER (Exhibit 39) ("we now understand"). Despite the contemplation that Aeromix would improve the aerators and the understanding that Aeromix would pay for soft start apparatus, the City recalcitrantly stated: "…we do not intend to provide soft start devices at this time." *Id*. The City received multiple admonitions about it being "irresponsible" to omit soft starts. This included a detailed explanation in a letter in which counsel notified the city that "the Rule 11 Agreement has been breached" by the refusal it incorporate soft starts. BREACH OF RULE 11 AGREEMENT NOTICE LETTER, p. 4 ¶3 (Exhibit 43).

21

## 9. THE UNACCEPTED AMENDMENT TO THE RULE 11 AGREEMENT

Another alleged summary judgment saving document is the misrepresented May 13, 2014 proposed amendment to the Rule 11 Agreement. The City asserts that this document is simply a letter in which "the City agreed to waive" the 90 day continuous operation payment condition. ORIGINAL MOTION p. 3. It is not a "waiver of the requirement" as claimed by the City. *See* SUPPLEMENTAL MOTION p. 10. It is not a letter. **It is not a waiver instrument. It is a proposed contract amendment with mutual promises.** *See* PROPOSED RULE 11 AMENDMENT (Exhibit 44). In order to induce Dowtech into accepting the City's refusal to install soft starts (tacitly admitted as a breach), the City waived the 90 days **only in exchange for** allowing payment "within twenty days after reinstallation and start-up." *Id.* (item number 3). This is NO WAIVER. Dowtech would be taking a substantial risk of non-payment if they agreed to wait 20 days after installation without soft starts or proper mooring. Gerald Downing stated in his affidavit that "It was our belief that since the aerators were improperly mounted per the city's instructions, they would likely fail before the expiration of 20 days." DOWNING AFFIDAVIT ¶ 17.

The City cites Mr. Belanger's Affidavit and states on page 9 of its original motion that "the City agreed to pay the Plaintiff in full after re-installation and start up of the aerators." ORIGINAL MOTION p. 9. **This is simply false. There is an undisputed option to pay within 20 days.** Item number 3 of the proposed amendment reads: "The City will pay Dowtech the sum of $75,355.45 **within twenty days after reinstallation** and start-up of the repaired aerators." PROPOSED RULE 11 AMENDMENT (Exhibit 44) (item 3) (emphasis added). This is even admitted at the top of page 4 of the original motion: "…within 20 days after…." ORIGINAL MOTION p. 4.

22

**A. THE PROPOSED AMENDMENT HAS NO EFFECT ON THE SOFT START BREACH**

No argument has been made whatsoever that the City did not breach by refusing the installation of soft starts. The summary judgment evidence is undisputed that the soft starts constituted a breach of the Rule 11. *See* part 8 B *supra*. **The City admits this when they argue against the soft start breach with a singular argument.** On page 9 of its original motion, in a block quote, the City cites the Notice of Revocation, and argues that the sole reason for the revocation was that without the soft starts, "there is little chance for the aeration units to operate continuously for 90 days." ORIGINAL MOTION p. 9. **They then argue that the supposed 90 waiver eliminated the soft start risk to Dowtech.**

But, since the "waiver" does not exist, and the 90 days risk is simply shortened to 20 days, Dowtech still has a valid reason to revoke the Rule 11 Agreement. **Merely shortening the time to pay does not cure the breach.** The motion for summary judgment must be denied for this reason alone.

**B. THE PROPOSED AMENDMENT HAS NO EFFECT ON THE "REINSTALL" BREACH**

The city makes the same argument as above with respect to the breach of requiring the aerators to be installed in their original position. They claim that the supposed 90 day payment waiting period "waiver" renders the risk of an improper mount non-existent. *See* ORIGINAL MOTION p. 10. Since the "waiver" is not existent, and since there is still a risk that a push configuration could cause the system to fail in 20 days or less, there is still risk of being harmed by the breach. This argument should be summarily dismissed.

**C. THE PROPOSED AMENDMENT SIMPLY PROVES THAT THE RULE 11 WAS AMBIGUOUS**

The City also represented that the Proposed Amendment simply "notified Dowtech to install the aerators in the same configuration as they were last installed." *See* SUPPLEMENTAL MOTION p. 9. Again such a reading belies the fact that the amendment requires other

concessions in exchange for agreeing to allow the installation in the last configuration. It is a contract proposal. *See* PROPOSED RULE 11 AMENDMENT (Exhibit 44).

More importantly, one must wonder why such language is included to supposedly satisfy Dowtech and "amend" the Rule 11 Agreement. **If the Rule 11 Agreement was not vague, as to configuration of the re-install, then the "amendment" of it would be unnecessary.**

## 10. THE AEROMIX BREACH

Aeromix also breached the Rule 11 Agreement when it was late on its payment to Dowtech of a $1000.00 contribution for shipping costs. *See* EMAIL PROMISING PAYMENT (Exhibit 36) and EMAIL PROVING MONEY OWED (Exhibit 40). Such a breach allows Dowtech to seek rescission as to Aeromix and casts further doubt on the validity of the agreement as a whole because Dowtech is the only party not in breach.

## 11. THE LAWFUL REVOCATION OF THE RULE 11 AGREEMENT

As a result of the inexplicable recalcitrance of the City in refusing to incorporate soft starts and demanding a compression arrangement, Gerald Downing directed Bob Click to conduct a thorough investigation. Mr. Click's report has multiple findings and is quite thorough. *See* CONSTRUCTION INVESTIGATION REPORT (Exhibit 45). Among other things, the investigation found that the City had "not acted in good faith. *Id.* (finding #40). The report calculated more than $365,000.00 in damages due to the breaches. *Id.* (finding #45). Each and every finding in the report has been adopted by Mr. Click in his affidavit as testimony. CLICK AFFIDAVIT ¶ 7. The report was forwarded to Dowtech's counsel for review and resulted in a final letter attempting to resolve the matter prior to revocation and suit. *See* PRE-REVOCATION SETTLEMENT LETTER (Exhibit 46).

Finally, Dowtech was out of options. Though it stood willing to install the aerators with

soft starts and in the pulling (cable mounted) position, the City simply refused to sanction the soft starts and created a morass of confusion and conflict as to the re-install configuration. So, on August 8, 2014, Dowtech filed with this Court a formal revocation of the Rule 11 Agreement. *See* Notice of Revocation of Consent to Rule 11 Agreement (Exhibit 47). The revocation was based on both the soft start breach and the re-installation breach. *Id.*

**The validity of the revocation has not been negated by summary judgment evidence.** The two clear breaches relating the soft starts and the reinstall configuration are both support by ample evidence. Moreover, **the soft start breach defeats the motion by itself because it was simply neglected by the City in its motions**. The Court should deny the City's motions on the presentation of facts alone. However, a number of other legal and technical arguments also weight in favor of denial.

## LEGAL AND TECHNICAL ARGUMENT

### 1. ORIGINAL MOTION FOR SUMMARY JUDGMENT

#### A. THERE IS REALLY ONLY ONE SUMMARY JUDGMENT ISSUE: BREACH OF THE RULE 11 AGREEMENT

On page 6 of the Original Motion, the city starts to get to the point of its argument. It lists 3 issues. But on close examination they all rely on the validity of the Rule 11 Agreement. Issues 1 and 2 are both predicated on the effectiveness of the Rule 11 agreement as a defense. Issue 1 asks whether Dowtech waived the right to additional damages by signing the Rule 11 Agreement. Underlying this issue is the validity of the Agreement itself. Issue 2 asks a similar question about Dowtech's waiver of attorney's fees by way the Agreement. Again it is predicated on the validity of the Rule 11 Agreement. Issue 3 is simply whether Dowtech breached the Rule 11 Agreement by way of an invalid revocation. Again, if the revocation is valid, then the validity of the Rule 11 is the predicate.

25

The City's Original Motion then proceeds to take up Jurisdiction out of order. *See* ORIGINAL MOTION p. 6. The jurisdiction argument is address separately in this response.

On page 7 of the Original Motion the City gets back on track and discusses the **"Enforceability of Rule 11 Agreement."** ORIGINAL MOTION p. 7 (emphasis added). Again this restates the predicate of the three issues listed earlier. On page 8 through 12 of the Original motion it is argued that the Rule 11 Agreement is established as a matter of law and that the City's claim against Dowtech for breach of the Rule 11 Agreement is established as a matter of law. All issues stated in the Original Motion (except for jurisdiction) are predicated on the enforceability of the Rule 11 Agreement. The motion, albeit disorganized, is correct about its summation of the issues.

At the bottom of page 8 the City states: "Therefore, this Motion hinges on one question: **Does the uncontroverted evidence conclusively negate Dowtech's excuse for revocation of the Rule 11 Agreement?"** Original Motion, pp. 8-9. This is a correct statement of the one dispositive issue presented. And it has been soundly answered in the negative by the summary judgment evidence. The Rule 11 Agreement was breached by the City with respect to the soft starts and the reinstallation.

**B. THERE IS AMPLE EVIDENCE OF THE CITY'S BREACH OF THE RULE 11 AGREEMENT.**

On page 10 of the original motion the City cites *Landrum v. Devenport*, 616 S.W.2d 359 (Tex. Civ. App.—Texarkana 1981, no writ) for the proposition that:

> The essential elements of a suit for breach of contract are (1) the existence of a valid contract; (2) that the plaintiff performed or tendered performance; (3) the defendant breached the agreement; and (4) the plaintiff was damaged as a result of the breach.

*Id*. at 361. Here the application of fact to law is simple: (1) The Rule 11 was a valid contract; (2) Dowtech tendered performance by repeatedly indicating they were ready, willing and able to install the aerators in the position from which they were removed so long as they were equipped

26

with soft starts as repaired by Aeromix (*see e.g.* NOTICE OF REVOCATION ¶ 9, saying Dowtech "continues to stand ready and willing to comply"); (3) the City breached the agreement (*see* FACTUAL SUMMARY, part 8, *supra*, and supporting exhibits); and (4) Dowtech was damaged as a result of the breach (*see, e.g.,* CONSTRUCTION INVESTIGATION REPORT, finding nos. 44-53).

**Under basic contract law, there is a fact issue as to the validity of the Rule 11 Agreement. Summary Judgment should be denied.**

## 2. SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

### A. SUPPLEMENTAL FACTS

The facts recited in the beginning of the Supplemental Motion are basically the same facts which were controverted in FACTUAL SUMMARY, part 8, *supra*. The have all been overwhelmingly controverted above.

### B. SUMMARY JUDGMENT

It should be noted from the outset that the claims and avoidances listed in plaintiff's supplemental petition are not simply plead as to the Rule 11 Agreement. These claims are plead as to the entire contract and the initial wrongful conduct, breaches, negligence and fraud which were committed in 2009, 2010, 2011, 2012, and 2013 and up to date of the Rule 11 Agreement. Therefore, so long as the Rule 11 agreement can be invalidated on ONE basis of breach, then ALL of the claims and avoidance below survive as to the base contract made the basis of the original suit. .

#### 1) **Breach of Contract**

In this argument, the City cites a boiler-plate case for the boiler-plate proposition that a breach must be material. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.,* 134 S.W.3d 195, 198 (Tex. 2004). The City then waxes on about the position of the re-install and the effect of the May 13, 2014 letter in a repeat of arguments already defeated above. Both alleged

27

breaches were highly material in that they created a significant risk that the aerators would not run for 90 days straight without failing. There is ample summary judgment evidence of this.

Next the City cites another boilerplate proposition: "If the alleged breach of contract did not cause the plaintiff's damages, then there can be no recovery for breach of contract." *Clearview Properties, L.P. v. Prop. Texas SC One Corp.,* 287 S.W.3d 132, 139 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Dowtech was damaged as a result of the breach (*see, e.g.,* CONSTRUCTION INVESTIGATION REPORT, finding nos. 44-53). The motion should be denied.

### 2) Rescission for Material Breach

It is axiomatic that most contract actions seek both damages and rescission. If the court needs to consider them in the alternative, so be it. The City's cites *Heffington v. Hellums,* 212 S.W.2d 245, 249 (Tex. Civ. App.—Austin 1948) (writ refused NRE*)* for the general rule that the equitable relief of rescission is not available if an action for damages is sufficient. The citation is ludicrous. In the argument above the City took the position that Dowtech did not have an action in damages. The Court can wait and hear the evidence at trial and submit the appropriate issues with the jury charge.

### 3) Rescission for Mutual Mistake

This argument is simply a rehash of the City's position that the May 13, 2014 letter and the April 15, 2014 letter have some nugatory effect on the morass of confusion created by the City. The City instructed Aeromix repeatedly to install the aerators in the "original bridge mount" position. As shown above, the referenced letters are not the magic pixie dust of sudden clarity. This cause of action is supported by ample summary judgment evidence as shown above.

## 4) Rescission for Fraud

This is another rehash of the evidence under a similar theoretical backdrop. Without mentioning that the argument is not based on a notice or letter, they pretend it is and cite *"Exhibit B to Defendant's Motion, Para 2."* That document is actually the discredited proposed amendment to the Rule 11 Agreement. It can be relied on for nothing to disprove fraud. In fact, the cleverly worded March 19, 2014 letter combined with the slick presentation of the suggested amendment, show a cleverly orchestrated cover-up of and attempt to mislead Dowtech to install the aerators, and then take the blame again in the likely event of a fourth failure.

To suggest there is no substantial injury if the contract is not rescinded is contrary to the evidence. If forced to install pursuant to the Rule 11 Agreement and in light of the City's conduct, the aerators will likely fail and Dowtech will not get paid. Again this is a rehash.

## 5) Ambiguity

There is a large bucket full of evidence that the Rule 11 is ambiguous. The entire string of e-mails in January of 2014 can be understood by any reasonable person to show that no-one knew what "re-install" meant. Simply remember the astoundingly weak argument made about the March 19 letter when the City claimed it was "clear from the context" of the letter that the word "original" means "final." SUPPLEMENTAL MOTION p. 3. This cause of action clearly survives the Motions.

## 6) Unconscionability

There was absolutely NO REASON for the City to refuse the use of soft starts. It was described by Aeromix as "irresponsible." SOFT START RECOMMENDATION EMAIL (Exhibit 41). The likelihood of failure upon reinstallation without soft starts was very high. The 90 day period nearly insured the death of the aerators. Under the circumstances forced by the City's unexplained recalcitrance, the Rule 11 was "grossly" one-sided.

29

### 7) **Ineffective Assistance of Counsel**

Dowtech concedes this argument and consents to the Court granting summary judgment as to this cause of action.

### 8) **Declaratory Relief**

The City concedes that there argument on this claim is merely a "piggy back ride" on other arguments. Since Dowtech has provided ample summary judgment evidence to support the other defenses and avoidances, along with its claim for breach, this claim survives summary judgment.

### 9) **Unclean Hands**

While the City complains that Dowtech supplies no case law to support the application of this theory to the case, the City engages in the same sin. Not one case citation is given to support the claim that unclean hands is not available here. If the Court can trust the theoretical mind of the City's counsel without case law, the Court should put equal trust in Dowtech's counsel and deny the motion pending more evidence and argument.

### 10) **Engineer's Negiligence**

There is ample summary judgment evidence of engineer's negligence. With respect to the execution of the Rule 11 Agreement, it is clear that there was a repeated effort to require Aeromix to configure the aerators for the "bridge-mount" and "push" position. Even though the City engineers knew long beforehand that such a configuration would lead to failure and proximately cause all parties damage. Moreover, if it is "reckless" to insist on hard starts for the aerators, it is certainly negligent.

Remember, these claims also relate to the original case and should not be dismissed because it is impossible for the City to conclusively negate the evidence presented in FACTUAL SUMMARY, part 8, *supra*.

**11) <u>Consideration</u>**

This is a red hearing and a non-issue. Failure of consideration is not plead as a claim or an avoidance. The City simply seized on a one-line comment in the pleadings and assumed it was a cause of action. The Court should neither grant nor deny the motion as to this claim because it is not made.

## PLEA TO THE JURISDICTION

The City's plea to the Jurisdiction is one paragraph long, and cites no authority other than Texas Government Code §271.152, the general waiver of sovereign immunity. It means virtually nothing. The City baldly asserts that Dowtech is not entitled to recover any amount in excess of $75,355.45 because of the doctrine of sovereign immunity. Sovereign immunity does not so limit Dowtech's recovery. The law expressly allows for a Plaintiff to recover the balance owed under the contract, the amount owed for additional work required to carry out the contract, reasonable and necessary attorney fees, and interest. Furthermore, an allegation by the City that the damages asserted by Dowtech are not recoverable under Tex. Loc. Gov't Code §271 is not a proper basis for granting a plea to the jurisdiction. Lastly, since the City asserted a counterclaim against Dowtech in the First Amended Petition for monetary relief, it has waived its sovereign immunity and is now subject to common law claims that would normally be precluded to off-set the City's counterclaim.

Texas allows breach of contract actions against local governmental entities, such as the City. *See generally* Tex. Loc. Gov't Code §271.153. Importantly, a wide array of damages are recoverable against local governmental entities for breach of contract.

First, a Plaintiff in a breach of contract action against a city is entitled to recover the balance owed by the local governmental entity under the contract **as it may have been**

**amended**, including any amount owed as compensation for the increased cost to perform the **work as a direct result of delay or acceleration** caused by the local governmental entity.  Tex. Loc. Gov't Code §271.153(a)(1); *Sharyland Water Sup. v.  City of Alton*, 354 S.W.3d 407 (Tex. 2011).

Second, a Plaintiff in a breach of contract action against a city is entitled to recover the amount owed for **change orders or additional work** required to carry out the contract.  Tex. Loc. Gov't Code §271.153(a)(2); *Learners Online, Inc. v. Dallas ISD*, 333 S.W.3d 636,642 (Tex.App. – Dallas 2009, no pet.); *City of Houston v. Southern Elec. Servs*., 273 S.W.3d 739, 744 (Tex.App – Houston [1st Dist.] 2008, pet. denied); *Zachry Construction Corp. v. Port of Houston Authority*, ___S.W.3d ___ (Tex. 2014).

Third, a Plaintiff in a breach of contract action against a city is entitled to recover **reasonable and necessary attorney fees** that are equitable and just.  Tex. Loc. Gov't Code §271.153(a)(3).  The recovery of reasonable and necessary attorney fees is permitted for contract executed on or after June 19, 2009.  *City of San Antonio v. Lower Colo. River Auth*.,  369 S.W.3d 231 (Tex.App. – Austin 2011, n.p.h.); Acts 2009, 81st  R.S., ch. 1266 sec 8, eff. June 19, 2009.

Fourth, a Plaintiff in a breach of contract action against a city is entitled to recover **interest as allowed by law**, including interest as calculated under Texas Government Code chapter 2251.  Tex. Loc. Gov't Code §271.153(a)(4); *Learner Online*, 333 S.W.3d at 642; *Port Neches-Groves ISDS v. Pyramid Constructors*, L.L.P., 281 S.W.3d 142, 150 (Tex.App. – Beaumont 2009, pet. denied); *Southern Elec. Servs*., 273 SW.3d at 744.

In this case, Dowtech is seeking breach of contract damages that include the balance owed under the contract, the amount owed for additional work required to carry out the contract, reasonable and necessary attorney fees that are equitable and just, and interest as allowed by law.

For example, Dowtech alleges that "[t]hroughout the period after August 5, 2010 Defendant Nacogdoches flagrantly materially breached the contract with Dowtech ordering and demanding that work be performed to cover-up the engineering negligence. Dowtech was never paid for the additional work." These are all damages that Dowtech is allowed to recover under the law, notwithstanding the doctrine of sovereign immunity.

Furthermore, an allegation that the damages are not recoverable because of the doctrine of sovereign immunity is not a proper basis for granting the plea to the jurisdiction. *Lower Colo. River Auth, supra; City of Mesquite v. PKG Contracting, Inc.* 263 S.W.3d 444,448(Tex.App – Dallas 2008, pet. denied).

In a breach of contract action under Tex. Loc. Gov't Code §271, if the governmental entity countersues a plaintiff for monetary relief, such as filing a counterclaim, the plaintiff often is permitted to recover contract damages that would not otherwise be recoverable under chapter 271 to offset the counterclaim of the governmental unit. *City of San Antonio v. KGME, Inc.,* 340 S.W.3d 870, 877 (Tex.App. – San Antonio 2011, no pet.) (holding that after a city countersued plaintiff for breach of contract, plaintiff was permitted to seek common-law damages, including consequential, incidental, and compensatory damages, to offset the city's claim; *City of Irving v. Inform Constr., Inc*., 201 S.W.3d 693, 694 (Tex. 2006); *Water Sup. v. City of Alton*, 354, *supra*. Since the City filed a counterclaim, Dowtech is now permitted to seek common-law damages, including consequential, incidental, and compensatory damages, to offset the city's claim. The City has waived its sovereign immunity.

## CONCLUSION

The City's motions for summary judgment, even when combined, assert basically one argument: that the Rule 11 Agreement is conclusively valid. This admitted underpinning fails in

the face of an overabundance of summary judgment evidence. The City's recalcitrant refusal to accept the one fix that was needed (soft starts) was a breach of the Rule 11 Agreement. The City's blatant direction of Aeromix to configure the aerators for the bridge-mount configuration was also a breach. The motions should be denied, except where conceded.

Respectfully submitted,

LAW OFFICE OF BLAKE C. NORVELL
37 Cypress Point St.
Abilene, Texas 79606
325-695-1708 tel
325-695-1708 fax


/s/ Blake Norvell

By: _____

Blake C. Norvell
State Bar No. 24065828

**ATTORNEY FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

I certify that on this 24th day of June, 2015, a true copy of Plaintiff's Response To Defendant's Motion For Partial Summary Judgment was forwarded to counsel of record via electronic transmission:

THOMAS L. BELANGER
P.O. Box 631248
Nacogdoches, Texas 75963
tom@abal-law.com


/s/ Blake Norvell
_____
BLAKE NORVELL

34

# Exhibit "E"

## Cause No. C1228865

| | | |
|---|---|---|
| **DOWTECH SPECIALTY** | § | **IN THE DISTRICT COURT** |
| **CONTRACTORS, INC.,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **OF NACOGDOCHES COUNTY,** |
| | § | **TEXAS** |
| | § | |
| **CITY OF NACOGDOCHES, TEXAS** | § | |
| **AND AEROMIX SYSTEMS, INC.,** | § | |
| *Defendants* | § | **145**<sup>TH</sup> **JUDICIAL DISTRICT** |

### PLAINTIFF'S NOTICE OF INTENT TO USE SUMMARY JUDGMENT EVIDENCE

Under Texas Rule of Civil Procedure 166a, notice is hereby given that Dowtech Specialty Contractors, Inc. intends to use as summary judgment evidence the following items which are filed herewith:

1. The Affidavit of Bob Click

2. The Exhibits to the Affidavit of Bob Click

3. The Affidavit of Gerald Downing

4. Defendant's Response to Requests for Admissions of Plaintiff Dowtech Specialty Contractors, Inc.

Respectfully submitted,

LAW OFFICE OF BLAKE C. NORVELL
37 Cypress Point St.
Abilene, Texas 79606
325-695-1708 tel
325-695-1708 fax

/s/ Blake Norvell

By: _____

Blake C. Norvell
State Bar No. 24065828
**ATTORNEY FOR PLAINTIFF**

_____
*Notice of SJ Evidence*
*Page 1 of 2*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 24 day of June, 2015, a true copy of Plaintiff's Motion For Partial Summary Judgment was forwarded to counsel of record via electronic transmission:

THOMAS L. BELANGER
P.O. Box 631248
Nacogdoches, Texas 75963
tom@abal-law.com

/s/ Blake Norvell

_____
BLAKE NORVELL

# Exhibit "F"

Cause No. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC., *Plaintiff* | § § § § | IN THE DISTRICT COURT |
| v. | § § § | OF NACOGDOCHES COUNTY, TEXAS |
| CITY OF NACOGDOCHES, TEXAS AND AEROMIX SYSTEMS, INC., *Defendants* | § § § § § | 145TH JUDICIAL DISTRICT |

## AFFIDAVIT OF GERALD DOWNING

STATE OF TEXAS      §
                      §
COUNTY OF TAYLOR    §

BEFORE ME, the undersigned authority, on this day personally appeared GERALD DOWNING who, being by me duly sworn on oath deposed and said:

1. "My name is Gerald Downing. I am over 18 years of age and competent to make this affidavit.

2. "I have personal knowledge of the facts asserted in this affidavit and the facts asserted herein are true and correct.

3. "I am President of Dowtech Specialty Contractors, Inc. and have served in this capacity for 15 years. I have worked in the construction industry for 45 years.

4. "I am a custodian of records of Dowtech. I have knowledge of the record keeping functions of Dowtech. I have read the affidavit of Bob Click submitted in this matter and the exhibits attached thereto in response to the Motions for summary judgment filed by the defendants. All documents attached to his affidavit are exact copies (or exact copies of relevant portions) which are true and correct of business records and correspondence of Dowtech. The documents are either generated by Dowtech and its employees or other parties working with

*Affidavit of Gerald Downing*
*Page 1 of 7*

Dowtech on the construction project made the basis of this suit. Such records are kept in the regular course of business at Dowtech and it is the regular course of business of Dowtech to keep such records of this type. The records and correspondence record acts, events, conditions, opinions and/or diagnoses and were generated at or near the time of the acts, events, conditions, opinions, and/or diagnoses described therein transmitted, recorded or stated by a person with knowledge of such acts, events, conditions, opinions, and/or diagnoses.

5.      "My company entered into a contract for the construction of a Wastewater Treatment Plant, Oxidation Ditch and Clarifier Improvements Project with the City of Nacogdoches, Texas. The specifications were prepared by the engineering firm Schaumburg & Polk, Inc. (hereinafter "SPI"). The construction contract called for Dowtech to furnish and install a total of 4, 25 hp floating electric brush aerators as a part of this project. They were to be Aeromix Systems, ECS House Industries, or approved equal type floating electric brush aerators. In the 'Special Conditions of the Agreement,' the City Engineers specified the type and brand of aerators, indicating that Dowtech need not conduct research as to the type of aerators to be used. In situations such as this, if a particular product or type of product is specified by the engineers, it is assumed that they have researched their equipment requirements and possess superior knowledge about the specified products.

6.      " Eventually, I discovered that the City of Nacogdoches' engineers were not familiar with the product they specified by brand name (i.e., the four, 25 hp Aeromix aerators) and the City of Nacogdoches' engineers did not even perform any type of engineering or technical due diligence on this product. The contract specifications had the Aeromix 25 hp aerators swing arms mounted to the bridge in a "pushing" position (original position). This was the position that the Aeromix 25 hp aerators operated on August 5, 2010 and was accepted by the

City of Nacogdoches as substantially complete and the warranty signed. It was later that I discovered that such mounting was inappropriate and that the aerators were doomed to fail in that position. On or about August 19, 2010, one of the 25 hp aerator's swing arms started flexing and bending. It broke and disconnected on August 20, 2010. After the City of Nacogdoches' engineers, communicated with Aeromix on or about August 30, 2010, they discovered that the Aeromix 25 hp aerator swing arms must "pull." Inasmuch as we rightfully assumed that the City had done its engineering due diligence on the aerator specifications, this came as a shock to Dowtech.

7.    "The City of Nacogdoches' engineers, issued a proposed modification to Dowtech on September 2, 2010 which included the aerators placed in a pull configuration from a mooring cable and requested pricing. On September 16, 2010, Dowtech submitted its pricing for the modification in the amount of $41,746.00 to the City of Nacogdoches' engineers. The modification would relocate the Aeromix 25 hp aerators into a position of "pulling" on a stainless steel cable stretched approximately forty-seven feet between two steel posts with the 20 foot swing arms attached to the cable.

8.    "The City of Nacogdoches' engineers ordered the modification work to proceed on October 11, 2010 in writing. Dowtech completed all work on the modification on December 17, 2010, in strict accordance with the City of Nacogdoches' engineers' drawings and instructions.

9.    "The newly repositioneed aerators never operated successfully from December 17, 2010 through December 2011. Dowtech was never paid for the modification and subsequent work ordered by the City of Nacogdoches.

10. "Mooring (anchoring) of the 25 hp Aeromix aerators from a structure could have also avoided many of the problems associated with the Aeromix aerators. That is precisely what was recommended by the Aeromix *Installation, Operation, and Maintenance Manual*.

11. "Dowtech, as the general contractor, strictly followed the contract documents and instructions of the City of Nacogdoches' engineers. The engineers were solely responsible for design. Dowtech was a construction contractor. Our company did everything the engineers told us to do with speed, precision, and accuracy.

12. "In January 2012, the City of Nacogdoches' engineers Mann and Bourque sent a letter to the City Engineer Steve Bartlett. The letter claimed the aerators were defective (when in fact they had been damaged by the abuse of constant repositioning and hard starting). The letter also recommended that the alleged defective aerators be removed and replaced. The City of Nacogdoches' City Attorney sent a demand letter on January 30, 2012 to Dowtech, demanding that the alleged defective aerators be removed and replaced. I believe this was a clear attempt to cover-up the ineptitude of the City of Nacogdoches' engineers in specifying a "push" configuration with hard starts when a "pull" configuration with soft starts is the recommended configuration and use of the Aeromix aerators in question. This would cost Dowtech an estimated $175,000.

13. "After significant effort was expended to resolve this matter amicably, our company was forced to file this lawsuit to collect its just due payments.

14. "During the pendency of all this, Aeromix, Dowtech, and the City entered into a Rule 11 Agreement purporting to have resolved the matter. That agreement is attached to the affidavit of Bob Click.

15.    "As we were performing our obligations under the agreement, we learned that the City and Aeromix were communicating without Dowtech in the loop about repairing and re-engineering the aerators to be mounted in the original "bridge mount" configuration.

16.    "We learned of the breach in January of 2014 after having returned the repaired aerators to Nacogdoches.   We discovered that the City had requested that Aeromix redesign / repair the four, 25 hp aerators to be mounted to the original bridge mount position, not re-installed into the position from which removed as required under the Rule 11 Agreement. Dowtech also discovered that Aeromix had complied with the City's request.  Dowtech promptly notified the City of Nacogdoches of the breach. We rightly viewed this as a breach which would create two problems.  First we would be forced to spend more time and money mounting the aerators in a different position from the "re-install" required by the Rule 11 Agreement.  Second, the configuration was doomed to fail and created greater risk that Dowtech would never get paid.

17.    "In May 2014, the City of Nacogdoches attempted to amend the Rule 11 Agreement, in an effort to cover up its engineering negligence, but Dowtech rejected the proposed amendment and never agreed to the terms of it.   The city had claimed that they had waived the 90 day wait requirement but that simply was not true.  The supposed waiver was attached to a host of other obligations under the proposed amendment.  Most importantly, the attempted May 2014 amendment to the Rule 11 agreement required Dowtech to wait for 20 days for payment after startup. It was our belief that since the aerators were improperly mounted per the city's instructions, they would likely fail before the expiration of 20 days.  Thus, the amendment would put Dowtech at significant risk of not getting paid after startup.

18. "Furthermore, the City of Nacogdoches attempted to deceive our company by not informing it that a flagrant material breach of the Rule 11 Agreement (requiring the aerators to be installed in the original bridge mount position) had taken place. Indeed, the City of Nacogdoches acted dishonestly by attempting to conceal this important fact that violated the Rule 11 Agreement from Dowtech, as Dowtech only discovered the City of Nacogdoches was materially breaching the Rule 11 Agreement through communications with Aeromix. This was discovered as a result of the investigation which I instructed Bob Click to perform. Installing the aerators in the original bridge mount position would cost Dowtech substantially more money and manpower than re-installing them in the position from which they were removed.

19. "Dowtech picked up the aerators January 10, 2014, but in breach of the Rule 11 Agreement did not receive the Aeromix $1,000.00 payment required by the Rule 11 Agreement until after April 2, 2014.

20. "Dowtech would not have entered into the Rule 11 Agreement if it had known that Aeromix would comply with The City of Nacogdoches' request that the aerators be redesigned / repaired for installation in the original bridge mount position, breaching the Rule 11 Agreement.

21. "Dowtech did exactly what the City of Nacogdoches' engineers instructed it to do

22. "Dowtech's responsibility for the aerators ended on August 5, 2010, when the four aerators were installed precisely as the contract required, accepted by the City of Nacogdoches as substantially complete, and the Aeromix warranty was signed.

23. "Dowtech was forced to make numerous trips to Nacogdoches relating to the aerators after August 5, 2010 and, as a result, suffered significant financial loss.

24. "Because of the reasons mentioned above, Dowtech filed a Notice Of Revocation Of Consent To Rule 11 Agreement.

Further, affiant sayeth naught."

_____
Gerald Downing

SUBSCRIBED AND SWORN TO before me on the 23rd day of June 2015, to certify which, witness my hand and official seal.

_____
Notary Public, State of Texas

DONNA SUE ALSTON
My Commission Expires
December 20, 2018

Exhibit "G"

## Cause No. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY | § | IN THE DISTRICT COURT |
| CONTRACTORS, INC., | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | OF NACOGDOCHES COUNTY, |
| | § | TEXAS |
| | § | |
| CITY OF NACOGDOCHES, TEXAS | § | |
| AND AEROMIX SYSTEMS, INC., | § | |
| *Defendants* | § | 145TH JUDICIAL DISTRICT |

## AFFIDAVIT OF BOB CLICK

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TAYLOR | § |

BEFORE ME, the undersigned authority, on this day personally appeared BOB CLICK who, being by me duly sworn on oath deposed and said:

1. "My name is Bob Click. I am over 18 years of age and competent to make this affidavit.

2. "I have personal knowledge of the facts asserted in this affidavit and the facts asserted herein are true and correct.

3. "I am an employee of Dowtech Specialty Contractors, Inc. and I have authority to access, generate, and file the business records of Dowtech Specialty Contractors, Inc. I have knowledge of the record keeping functions of Dowtech. All documents attached to this affidavit are exact copies (or exact copies of relevant portions) which are true and correct Dowtech business records and correspondence to and from Dowtech. The documents are either generated by Dowtech and its employees or other parties working with Dowtech on the construction project made the basis of this suit. Such records are kept in the regular course of business at Dowtech and it is the regular course of business of Dowtech to keep such records of this type. The records

and correspondence record acts, events, conditions, opinions and/or diagnoses and were generated at or near the time of the acts, events, conditions, opinions, and/or diagnoses described therein transmitted, recorded or stated by a person with knowledge of such acts, events, conditions, opinions, and/or diagnoses.

The attached Exhibits are:

1. Selected pages of the Standard Conditions of the construction contract made the basis of this lawsuit.

2. Selected pages of the Special Conditions of the construction contract made the basis of this lawsuit.

3. Selected pages of the Technical Specifications of the construction contract made the basis of this lawsuit.

4. Drawings of the PROPOSED FLOATING BRUSH AERATORS/OXIDATION DITCH dated July 2009 showing the original bridge mount position with the aerators pushing on the swing arms

5. Electrical Expertise Inc. Letter dated October 22, 2009

6. Selected portions of Submittal No. 3 , including:

   a. The submittal cover sheet

   b. The submittal table of contents

   c. The scope of supply document showing four 25 hp aerators with 20-foot swing arms

   d. Selected pages of the Installation, Operation, and Maintenance Manual for the 25-30 HP Aeromix (MONSOON) Paddlewheel Surface Splash Aerator

including pages showing features "pulling" a two post mooring and a four post mooring with soft starts or VFDs and .

    e. Selected Monsoon Drawings

    f. The Aeromix Warranty for the Aerators

7. Selected pages of ECS House Industries, Inc.'s FLOATING BRUSH AERATOR SPECIFICATIONS including a diagram illustrating proper mooring

8. Selected pages from Defendants Responses to Requests for Admissions in this case showing that the Aeromix submittal showed a recommendation for the installation of "soft start" mechanisms and that soft starts are gentle on the equipment (RFA# 94, 101, 103, 220, and 270).

9. A January 8, 2010 e-mail from Catalin Petrescu to Clint Carlile at Dowtech showing the need for swing arms to be bolted to a "structure."

10. Selected pages from Defendants Responses to Requests for admissions in this case showing

    a. August 19, 2010 flexing of the swing arms (RFA # 125)

    b. August 20, 2010 failure of the swing arms (RFA # 127, 128, and 129)

    c. August 30, 2010 Engineer Mark Mann discovered for first time that the aerators must be installed in a "pull" position (RFA #144)

    d. September and October 2010 changes in the contract were made to require a setup wherein the swing arms would be mounted to a mooring cable with the aerators in the pull position (RFA # 160-166)

    e. An October 11, 2010 letter signed by Mark Mann admitted that the aerators had been installed in a "push" configuration (RFA #244)

11. Drawing sheet 4 A of 13 of the PROPOSED FLOATING BRUSH AERATORS/OXIDATION DITCH made in the fall of 2010 (original dated July 2009) showing the swing arms in a tension/pull configuration on a cable mount and showing the clockwise flow of water

12. August 30, 2010 e-mail from Josh Perfetti to Mark Mann regarding the requirement of a "pulling" configuration and Mark Mann's reply insisting on a push configuration

13. September 2, 2010 e-mail from Mark Mann to Dowtech enclosing drawings of a cable and swing arm combination mount

14. Selected pages from Defendants Responses to Requests for admissions in this case showing

    a. On December 17, 2010 the aerators were again started up (RFA #181)

    b. Upon the start up of the aerators after the cable mooring set up, the aerators began to move around in the water and were again shut down (RFA # 184 and 185)

15. Six December 17, 2010 photographs of the aerators in the cable mooring configuration showing lack of stability and sway when in operation

16. A January 6 2012 letter from Mark Mann to Steve Bartlett recommending rejection of work and curiously omitting the initial August 19 and August 20 failure of the push configuration of the swing arms.

17. A January 30, 2012 "Rejection of Work" letter from Rob Atherton to Gerald Downing containing a warning about Civil and Criminal Penalties for installing defective aerators

18. A March 21, 2012 e-mail from Charlie Self to Teresa Picot including an e-mail from Mark Mann indicating the City will withhold payments pending resolution of the "alignment issue"

19. A March 6, 2012 Demand Letter from Charles Self to Steve Bartlett requesting payment and indicating Dowtech's total compliance with the contract

20. A March 27, 2012 Correction letter amending the demand letter from Charles Self to Steve Bartlett

21. An August 2, 2012 email from Buddy Harris to Dowtech and From Dowtech to Buddy Harris

22. An August 2, 2012 string of emails from Charlie Self to Teresa Picot and from Doug Reeves to Gerald Downing indicating the existence of too much torque and the recommendation of soft start mechanisms and offering to install them for free

23. A copy of Plaintiff's Original Petition filed December 17, 2012 in this case.

24. A May 28, 2013 e-mail from Charlie Self to Teresa requesting print of an May 23, 2012 email from Tom Belanger to Charlie Self with handwritten notes.

25. The July 2, 2013 Rule 11 Agreement in which the parties agree that the aerators will be re-engineered and repaired and "re-installed" (also Defendant's Exhibit "A")

26. A Drawing Revision dated August 16, 2013 showing a Tension Mount of the Aerators.

27. A January 13, 2014 email from Doug Reeves to Dowtech and prior e-mails relating to installation of the aerators.

28. A January 14, 2014 12:44 pm email from Doug Reeves to Dowtech relating to non-use of mooring cable

29. A January 14, 2014 1:16 pm email from Doug Reeves to Dowtech relating to inadequacy of mooring cables.

30. A January 14, 2014 1:28 pm email from Doug Reeves to Dowtech relating to swingarm configuration

31. A January 14, 2014 1:46 pm email from Doug Reeves to Dowtech relating to use of a taught mooring cable and indicating that the City had requested they re-engineer the aerators for use in the original bridge mount configuration.

32. Selected pages from Defendants Responses to Requests for Admissions in this case showing the City admitted that Douge Reeves of Aeromix indicated that the city had instructed Aeromix to re-design around the bridge mount configuration (RFA #208)

33. A January 14, 2014 2:40 pm email from Doug Reeves to Dowtech relating to non-compression on bridge mount

34. A January 15, 2014 3:52 pm reply email from Doug Reeves to Dowtech and prior January 15, 2014 3:48 pm e-mail from Dowtech to Doug Reeves relating to change of proposed configuration

35. January 31, 2014 letter from Gerald Downing to Steve Bartlett, Thomas Belanger, and Mark Mann

36. A February 14, 2014 11:17 am reply email from Doug Reeves to Dowtech and prior February 14, 2014 11:15 am e-mail from Dowtech to Doug Reeves relating to the Aeromix $1,000.00 payment required under the Rule 11 Agreement that Dowtech had not received

37. A February 17, 2014 letter from Charles Self to Thomas Belanger regarding problems with original push position and the need for soft starts and breach of Rule 11 agreement

38. A March 18, 2014 letter from myself, Bob Click, to Steve Bartlett and Mark Mann relating to e-mails showing negligence of City

39. A March 19, 2014 letter from Steve Bartlett to Thomas Belanger recognizing that soft starts were recommended but refusing to use soft starts and recognizing that a pull configuration is required, but return to the "original position' (Defendant's Exhibit "C")

40. An April 2, 2014 1:42 pm reply email from Doug Reeves to Dowtech and prior April 2, 2014 1:42 pm email from Dowtech to Doug Reeves relating to the Aeromix $1,000.00 payment required under the Rule 11 Agreement that Dowtech still had not received

41. An April 4, 2014 email from Doug Reeves to Dowtech indicating that the failure to use soft starts on the aerators is "irresponsible" and showing that the City instructed them to re-engineer for the original bridge mount

42. An April 4, 2014 e-mail from Doug Reeves to me (Bob) relating to the recommended use of soft starts and the City's instruction to re-engineer for a bridge mount configuration

43. An April 15, 2014 letter to Tom Belanger from Charles Self explaining breach of Rule 11 and requesting compliance (Defendant's Exhibit "J")

44. A May 13, 2014 proposed amendment to the Rule 11 Agreement that purports to waive the 90 day running requirement of the Rule 11, but still allows a 20 day delay in payment and dismissal of claims (Defendant's Exhibit "B")

45. An undated "Construction Investigation Report" undertaken by me in March but finalized on July 23, 2014

46. A July 25, 2014 letter from Charles Self to Tom Belanger relating to my investigative Report.

47. The August 7, 2014 Notice of Revocation of the Rule 11 agreement (Defendants Exhibit "D")

48. The August 7, 2014 First Amended Petition indicating breach of the Rule 11 and containing facts sworn to by Gerald Downing (Defendant's Exhibit "E")

49. The November 25, 2014 Plea to the Jurisdiction and Amended Answer of Defendants (Defendant's Exhibit "F")

50. The January 5, 2015 Answer to Counterclaims (Defendant's Exhibit "G")

51. The January 15, 2015 e-mail from Chad House to Dowtech regarding soft starts required on all heavy-duty aerators

52. Plaintiff's March 13, 2015 First Supplemental Petition (Defendant's Exhibit "K")

To the extent this Court considers any non-Dowtech generated document to be improper summary judgment evidence, I cannot present the factual matters which are obviously reflected in such documents because I cannot state such factual matters as the person who generated the document. I can only rely on the facts reflected in such documents and testify that the documents are what they purport to be as reflected in the list above.

4.      "I have over 60 years experience in the construction industry. I have completed numerous construction projects including bridges, roads, utilities, sewer treatment plants, sewer mains, pump stations, jet fueling systems, commercial buildings, highways, and numerous other wide-ranging major construction projects. My life has been in the construction industry and I have a personal library with numerous volumes of construction and construction-related books and publications. I am familiar with the common knowledge and customs of the industry.

5.      "Dowtech entered into a construction contract with the City of Nacogdoches to perform work at the Wastewater Treatment Plant, Oxidation Ditch and Clarifier Improvements Project per the drawings and specifications prepared by the engineering firm Schaumburg & Polk, Inc. (hereinafter "SPI"). The construction contract, page 780 – 2 of 3 paragraph 4 (Selected pages of which are attached as Exhibit #3) pertaining to the FLOATING ELECTRIC BRUSH AERATOR, states, in part, the following: 'A. General: The Contractor shall furnish and install a total of 4, 25 hp floating electric brush aerators as a part of this project. Aeromix Systems, ECS House Industries, or approved equal shall manufacture the floating electric brush aerators.' Furthermore, the governing provisions of the construction contract are contained in the 'Special Conditions of the Agreement.' Paragraph 8 of the 'Special Conditions of the Agreement,' which pertains to MATERIALS AND WORKMANSHP, states, in part, the following: 'Where material or equipment are specified by a trade or brand name, it is not the intention of the Owner to discriminate against an equivalent product of another manufacturer, but rather to set a definite standard of equality or performance . . . unless a substitute shall be approved in writing by the Engineer, and the Engineer shall have the right to require the use of such specifically designated material, article, or process.' In my experience this type language in a construction contract means that the Engineer represents and claims to have superior

knowledge of the designated material (in this case the Aermomix Systems and ECS House Industries 25 hp aerators).

6.    "In March 2014, a thorough and detailed investigation undertaken by me, an employee of Dowtech with over sixty years of experience in the construction industry, brought to light newly discovered evidence clearly indicating an engineering conspiracy aimed at covering up the negligence of the City of Nacogdoches' engineers.

7.    "Attached as Exhibit #45 is a true and correct copy of my *Construction and Investigation Report* pertaining to this matter. I generated my *Construction and Investigation Report* on July 23, 2014.  The contents of my *Construction and Investigation Report* are true and correct, to the best of my knowledge, and are based on my personal knowledge.  I hereby adopt the contents of my *Construction and Investigation Report* as my testimony under oath before this Court.    The matters stated in the Construction Investigation Report are true and correct to the best of my knowledge and I have personal knowledge or investigative knowledge of the matters set forth therein.

8.    "The City of Nacogdoches' engineers Mark Mann, P.E. (hereinafter "Mann"), and Ricky Bourque, P.E. (hereinafter "Bourque"), of SPI exercised great effort and authority to wrongfully blame Dowtech in an attempt to cover their own negligence and gross negligence. Furthermore, I discovered that the City of Nacogdoches' engineers were not familiar with a product they specified by brand name (*i.e.*, the four, 25 hp Aeromix aerators) and the City of Nacogdoches' engineers did not even perform any type of engineering or technical due diligence on this product.    Indeed, my written investigative report explains in detail the City of Nacogdoches' engineers' negligent actions.  Furthermore, as set forth in my report, I discovered

that Dowtech had unknowingly been the victim of the on-going engineering conspiracy. "I discovered in my investigation that the contract documents had the Aeromix 25 hp aerators swingarms mounted to the bridge in a "pushing" position (original position). This was the position that the Aeromix 25 hp aerators operated on August 5, 2010 and was accepted by the City of Nacogdoches as substantially complete and the warranty signed. On or about August 19, 2010 one of the 25 hp aerator's swing arms started "flexing" and "broke / disconnected." The City of Nacogdoches' engineers, in communication with Aeromix on or about August 30, 2010, discovered that the Aeromix 25 hp aerator swing arms must "pull." This is clear evidence that the City of Nacogdoches had specified the Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

9. "It is important to understand that if person is standing in the middle of the oxidation ditch or "race track" facing North, as shown in exhibit 11 the water flows clockwise.

10. "The City of Nacogdoches' engineers, in an effort to hide their negligent conduct, issued its proposed modification to Dowtech on September 2, 2010 and requested pricing. On September 16, 2010, Dowtech submitted its pricing for the modification in the amount of $41,746.00 to the City of Nacogdoches' engineers. The proposed modification would relocate the Aeromix 25 hp aerators into a position of "pulling" on a stainless steel cable stretched approximately forty-seven feet between two steel posts.

11. "The City of Nacogdoches' engineers ordered the modification work to proceed on October 11, 2010 in writing. Dowtech completed all work on the modification on December 17, 2010, in strict accordance with the City of Nacogdoches' engineers' drawings and instructions. The four Aeromix 25 hp aerators never operated successfully in this position from

December 17, 2010 through December 2011. Dowtech was never paid for the modification and subsequent work ordered by the City of Nacogdoches.

12. "Furthermore, in January 2014, I, through my investigation, discovered that the usage of a stainless steel cable stretched approximately forty-seven feet between two steel posts, which was the design mandated by the City of Nacogdoches' engineers, does not constitute the "substantial structure" that is required for an Aeromix 25 hp aerator to pull and operate properly; most certainly not without the usage of soft starters (hereinafter "soft starts") and proper mooring (anchoring) of the aerators. Indeed, Doug Reeves (hereinafter "Reeves"), the Construction & Service Manager at Aeromix, stated the following on January 14, 2014: "A Mooring line stretched across the ditch is not an adequate way to secure the unit." See Exhibit # 29

13. "The Vice President of Engineering & Operations at Aeromix, Bob Mangaudis, confirmed that a 25 hp aerator must pull on a "substantial structure" and did not know of a single location in the United States in which a 25 hp aerator was operating on a cable, as the City of Nacogdoches' engineers mandated. This fact is discussed in my *Construction and Investigation Report,* which is attached as Exhibit #45

14. "I also discovered that Aeromix recommends the use of soft starts or Variable Frequency Drives (herinafter "VFDs") on aeration units of 20 hp or greater, as is clearly indicated on page 6 of the Aeromix Installation, Operation, and Maintenance Manual. See Exhibit 6d. I also discovered that mooring (anchoring) of the 25 hp aerator is required, as per page 4 of the Aeromix Manual. See Exhibit 6d. Even though the City of Nacogdoches' engineers were using 25 hp Aeromix aerators, which they specified by brand name, they failed to utilize soft starts and they failed to use mooring (anchoring). The City of Nacogdoches' engineers have

never referenced soft starts in their drawings and specifications. Indeed, the City of Nacogdoches' City Engineer Steve Bartlett, P.E., (hereinafter "Bartlett") confirms the rejection of the soft starts. Attached as Exhibit #5d is a true and correct copy of excerpts form the Aeromix Systems *Installation, Operations, and Maintenance Manual* pertaining to the 25 hp aerators at issue. Attached as Exhibit #39 is as true and correct copy of a letter dated March 19, 2014 from Bartlett to Attorney Tom Belanger which was produced during this litigation.

15. "The use of soft starts by the City of Nacogdoches' engineers could have avoided some, if not all, of the problems with the 25 hp Aeromix aerators. Indeed, in a phone conversation in 2014 with me, Reeves of Aeromix confirmed that problems associated with the Aeromix aerators could have been avoided had the City of Nacogdoches' engineers simply utilized soft starts, as Aeromix clearly recommends. See Exhibit #6d. This is discussed in my *Construction and Investigation Report*, which is attached as Exhibit #45.

16. "Mooring (anchoring) of the 25 hp Aeromix aerators could have also avoided many of the problems associated with the Aeromix aerators and is recommended by the Aeromix *Installation, Operation, and Maintenance Manual*. In my investigation reviewing the contract documents, I never found any correspondence from the City of Nacogdoches' engineers indicating that they understood their own contract specifications that the Aeromix 25 hp aerators should be anchored firmly in position. In fact, the City of Nacogdoches' engineers' contract specifications, page 780 – 3 of 3, states the following: 'O. <u>Anchoring System</u>: Anchoring system shall hold the aerator firmly in position. The type of anchoring system to be used is determined by the placement of the aerator(s) as indicated on the ENGINEER'S Plans . . . The anchoring system shall not restrict the unit's floatation and shall allow for continuous aerator operation with fluctuations in the water surface elevation up to (plus / minus) three feet (± 3ft).' See Exhibit #3.

17.     In January 2015, Dowtech also discovered that House recommends soft starts with aerators over 15 hp.   This indicates that the City of Nacogdoches' engineers specified Aeromix aerators or House aerators by brand name without performing or conducting any type of engineering or technical due diligence.  This also shows the City of Nacogdoches' engineers were negligent for not permitting the Aeromix 25 hp aerators to be anchored.  This is demonstrated by Exhibit #6d, which is a true and correct copy of excerpts form the Aeromix Systems *Installation, Operations, and Maintenance Manual.*  This is also demonstrated by Exhibit #7, which is a true and correct copy of excerpts form ECS House Industries, Inc.'s Floating Brush Aerator Specification.

18.     "Even The City of Nacogdoches' City Engineer admitted to not having conducted and due diligence on the aerators in his March 19, 2014, letter in response to Dowtech's January 31, 2014 letter.  See Exhibit #39.

19.     "Simply put, the Aeromix 25 hp aerators were not defective, as alleged by the City of Nacogdoches in its pleadings, and the problems experienced were the sole result of the City of Nacogdoches' negligent engineers who misused and abused the Aeromix aerators by (1) failing to have the aerator pull on a substantial structure, (2) failing to utilize soft starts or VFD's, and (3) failing to utilize mooring (anchoring) of the aerator.

20.     "Dowtech, as the general contractor, strictly followed the contract documents and instructions of the City of Nacogdoches' engineers, who were solely responsible for the design plan, on this project.  Dowtech did everything the engineers told it to do with speed, precision, and accuracy.

21. "In January 2012, the City of Nacogdoches' engineers Mann and Bourque sent a SPI letter to The City of Nacogdoches City Engineer Bartlett recommending that the alleged defective aerators be removed and replaced. The City of Nacogdoches' City Attorney sent its demand letter on January 30, 2012 to Dowtech, demanding that the alleged defective aerators be removed and replaced, in an attempt to cover-up the City of Nacogdoches' engineers' negligent conduct, at the expense of Dowtech at an estimated cost of $175,000 "In December 2012, after making every effort to resolve this matter amicably, Dowtech filed suit for breach of contract to collect the money owed.

22. "In July 2013, Dowtech, the City of Nacogdoches, and Aeromix (who was a Defendant in this case at the time) entered into a Rule 11 Agreement. A true and correct copy of the Rule 11 Agreement between three parties --- Dowtech, Aeromix, and the City of Nacogdoches --- is attached as Exhibit #25

23. "The July 2, 2013 Rule 11 Agreement represents the entire agreement between the parties and has never been amended or supplemented. In May 2014, the City of Nacogdoches attempted to amend the Rule 11 Agreement, in an effort to cover up the engineering negligence, but Dowtech rejected the proposed amendment and never agreed to the terms of it.

24. "Dowtech received no consideration whatsoever for entering into the Rule 11 Agreement.

25. "It is common knowledge in the construction industry that the term 're-install' or 're-installation' in means to be placed back into the position from which they were removed.

26. "Installing the aerators in the original bridge mount position would cost Plaintiff Dowtech substantially more money and manpower than re-installing them in the position from which they were removed.

27. "In January 2014, after having returned the repaired aerators to Nacogdoches, Dowtech discovered that the City of Nacogdoches had flagrantly materially breached the Rule 11 Agreement by requesting that Aeromix redesign / repair the four, 25 hp aerators to be mounted to the original bridge mount position, not re-installed into the position from which removed under the Rule 11 Agreement. Dowtech also discovered that Aeromix had complied with the City of Nacogdoches' request. Dowtech promptly notified the City of Nacogdoches of this discovery on January 31, 2014. See Exhibit #35

28. "In violation of the Rule 11 Agreement, the City of Nacogdoches ordered Aeromix to design / repair the aerators to be installed in the original bridge mount position. Attached as Exhibit #42 is a true and correct copy of the e-mail that was sent to me at Dowtech from Doug Reeves of Aeromix Systems on April 4, 2014 indicating the instuctions by the city to repair and re-engineer the aerators for the original "bridge mount" configuration.

29. "Dowtech picked up the aerators January 10, 2014, but did not receive the Aeromix $1,000.00 payment required by the Rule 11 Agreement until after April 2, 2014. See Exhibit # 36 and # 40

30. "In violation of the Rule 11 Agreement, Defendant Aeromix was more than 90 days late in paying Dowtech. See Exhibit # 40

31. "Dowtech would not have entered into the Rule 11 Agreement if it had known that Aeromix would substantially delay payment. See Exhibit # 25

32. "Aeromix also flagrantly materially breached the Rule 11 Agreement by complying with the City of Nacogdoches' request that the aerators be redesigned / repaired for installation in the original bridge mount position rather than the position from which they were removed, as required under the Rule 11 Agreement.

33. "Dowtech would not have entered into the Rule 11 Agreement if it had known that Aeromix would comply with the City of Nacogdoches' request that the aerators be redesigned / repaired for installation in the original bridge mount position, breaching the Rule 11 Agreement.

34. "There is no dispute that the construction contract states that the engineers are responsible for the design, not the general contractor. *See* Standard General Conditions of the Construction Contract paragraph 6.21, Delegation of Professional Design Services: 'E. Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.' Thus, it is clear that under the terms of the construction contract Dowtech is not liable for the negligence of the engineers. See Exhibit #45

35. "Dowtech did exactly what the City of Nacogdoches' engineers instructed it to do. See Exhibit #45.

36. "Dowtech's responsibility for the aerators ended on August 5, 2010, when the four aerators were installed precisely as the contract required, accepted by the City of Nacogdoches as substantially complete, and the Aeromix warranty was signed. See Exhibit # 6f

37. "The City of Nacogdoches' engineers took advantage of Dowtech's excellent reputation with "threats" (1) to withhold liquidated damages of $500 per calendar day and (2) to verbally call the bonding company, demanding and forcing Dowtech to perform additional work

after August 5, 2010 related to the aerators, thereby materially breaching the construction contract and increasing the costs. See Exhibit #45

38. "Furthermore, The City of Nacogdoches' engineers withheld contract payments in ransom, demanding and forcing Dowtech to perform additional work after August 5, 2010 related to the aerators, thereby materially breaching the contact and increasing the costs. See Exhibit # 45

39. "Dowtech was forced to make numerous trips to Nacogdoches relating to the aerators after August 5, 2010 and, as a result, suffered significant financial loss. See Exhibit # 45

40. "Because of the reasons mentioned above, Dowtech filed a Notice Of Revocation Of Consent To Rule 11 Agreement. See Exhibit #47

41. "Again, in January 2014, after having returned the repaired aerators to Nacogdoches, Dowtech discovered that the City of Nacogdoches had flagrantly materially breached the Rule 11 Agreement by requesting that Aeromix redesign / repair the four, 25 hp aerators to be mounted to the original bridge mount position, not re-installed into the position from which removed as required under the Rule 11 Agreement. Dowtech also discovered that Aeromix had complied with the City of Nacogdoches' request. Dowtech promptly notified the City of Nacogdoches of this discovery on January 31, 2014. See Exhibit # 35 and #38

42. "To be clear, the original position shown on the construction contract drawing was with the aerators mounted to the bridge. This was not the position from which the Aeromix aerators had been removed and shipped to Aeromix for repairs under the Rule 11 Agreement.

Further, affiant sayeth naught."



Bob Click

SUBSCRIBED AND SWORN TO before me on the 23rd day of June 2015, to certify which, witness my hand and official seal.

_Roberta Lee Slate_

Notary Public, State of Texas

ROBERTA LEE SLATE
My Commission Expires
March 24, 2019

# Exhibit "H"

# EXHIBIT 1

# CONTRACT DOCUMENTS, AND TECHNICAL SPECIFICATIONS

## FOR THE

## CITY OF NACOGDOCHES
### NACOGDOCHES COUNTY, TEXAS

## VOLUME II
## WASTEWATER TREATMENT PLANT
## OXIDATION DITCH AND CLARIFIER IMPROVEMENTS

### CITY COMMISSION

| | |
|---|---|
| Roger Van Horn | Mayor |
| Don Partin | Commissioner |
| Billy Huddleston, Jr. | Commissioner |
| William Sanders, Jr. | Commissioner |
| Shelley Brophy | Commissioner |
| James P. Jeffers | City Manager |

*Prepared By:*

**SPI SCHAUMBURG & POLK, INC.**
Firm Registration No. F-00520

8865 College Street, Beaumont, Texas 77707
(409) 866-0341 ph    (409) 866-0337 fax



July 2009

# STANDARD
# GENERAL CONDITIONS
# OF THE
# CONSTRUCTION CONTRACT

Prepared by

**ENGINEERS JOINT CONTRACT DOCUMENTS COMMITTEE**

and

Issued and Published Jointly By

  

PROFESSIONAL ENGINEERS IN PRIVATE PRACTICE
*a practice division of the*
NATIONAL SOCIETY OF PROFESSIONAL ENGINEERS

---

AMERICAN COUNCIL OF ENGINEERING COMPANIES

---

AMERICAN SOCIETY OF CIVIL ENGINEERS

This document has been approved and endorsed by



The Associated General Contractors of America



Construction Specifications Institute

EJCDC C-700 Standard General Conditions of the Construction Contract.
Copyright © 2002 National Society of Professional Engineers for EJCDC. All rights reserved.
00700 - 0

Copyright ©2002

National Society of Professional Engineers
1420 King Street, Alexandria, VA 22314

American Council of Engineering Companies
1015 15th Street, N.W., Washington, DC 20005

American Society of Civil Engineers
1801 Alexander Bell Drive, Reston, VA 20191-4400

These General Conditions have been prepared for use with the Suggested Forms of Agreement Between Owner and Contractor Nos. C-520 or C-525 (2002 Editions). Their provisions are interrelated and a change in one may necessitate a change in the other. Comments concerning their usage are contained in the EJCDC Construction Documents, General and Instructions (No. C-001) (2002 Edition). For guidance in the preparation of Supplementary Conditions, see Guide to the Preparation of Supplementary Conditions (No. C-800) (2002 Edition).

44. *Subcontractor*—An individual or entity having a direct contract with Contractor or with any other Subcontractor for the performance of a part of the Work at the Site.

45. *Substantial Completion*—The time at which the Work (or a specified part thereof) has progressed to the point where, in the opinion of Engineer, the Work (or a specified part thereof) is sufficiently complete, in accordance with the Contract Documents, so that the Work (or a specified part thereof) can be utilized for the purposes for which it is intended. The terms "substantially complete" and "substantially completed" as applied to all or part of the Work refer to Substantial Completion thereof.

46. *Successful Bidder*—The Bidder submitting a responsive Bid to whom Owner makes an award.

47. *Supplementary Conditions*—That part of the Contract Documents which amends or supplements these General Conditions.

48. *Supplier*—A manufacturer, fabricator, supplier, distributor, materialman, or vendor having a direct contract with Contractor or with any Subcontractor to furnish materials or equipment to be incorporated in the Work by Contractor or any Subcontractor.

49. *Underground Facilities*—All underground pipelines, conduits, ducts, cables, wires, manholes, vaults, tanks, tunnels, or other such facilities or attachments, and any encasements containing such facilities, including those that convey electricity, gases, steam, liquid petroleum products, telephone or other communications, cable television, water, wastewater, storm water, other liquids or chemicals, or traffic or other control systems.

50. *Unit Price Work*—Work to be paid for on the basis of unit prices.

51. *Work*—The entire construction or the various separately identifiable parts thereof required to be provided under the Contract Documents. Work includes and is the result of performing or providing all labor, services, and documentation necessary to produce such construction, and furnishing, installing, and incorporating all materials and equipment into such construction, all as required by the Contract Documents.

52. *Work Change Directive*—A written statement to Contractor issued on or after the Effective Date of the Agreement and signed by Owner and recommended by Engineer ordering an addition, deletion, or revision in the Work, or responding to differing or unforeseen subsurface or physical conditions under which the Work is to be performed or to emergencies. A Work Change Directive will not change the Contract Price or the Contract Times

but is evidence that the parties expect that the change ordered or documented by a Work Change Directive will be incorporated in a subsequently issued Change Order following negotiations by the parties as to its effect, if any, on the Contract Price or Contract Times.

1.02   *Terminology*

A. The following words or terms are not defined but, when used in the Bidding Requirements or Contract Documents, have the following meaning.

B. *Intent of Certain Terms or Adjectives*

1. The Contract Documents include the terms "as allowed," "as approved," "as ordered", "as directed" or terms of like effect or import to authorize an exercise of professional judgment by Engineer. In addition, the adjectives "reasonable," "suitable," "acceptable," "proper," "satisfactory," or adjectives of like effect or import are used to describe an action or determination of Engineer as to the Work. It is intended that such exercise of professional judgment, action or determination will be solely to evaluate, in general, the Work for compliance with the requirements of and information in the Contract Documents and conformance with the design concept of the completed Project as a functioning whole as shown or indicated in the Contract Documents (unless there is a specific statement indicating otherwise). The use of any such term or adjective is not intended to and shall not be effective to assign to Engineer any duty or authority to supervise or direct the performance of the Work or any duty or authority to undertake responsibility contrary to the provisions of Paragraph 9.09 or any other provision of the Contract Documents.

C. *Day*

1.      The word "day" means a calendar day of 24 hours measured from midnight to the next midnight.

D. *Defective*

1. The word "defective," when modifying the word "Work," refers to Work that is unsatisfactory, faulty, or deficient in that it:

a. does not conform to the Contract Documents, or

b. does not meet the requirements of any applicable inspection, reference standard, test, or approval referred to in the Contract Documents, or

c. has been damaged prior to Engineer's recommendation of final payment (unless responsibility for the protection thereof has been assumed by Owner at Substantial Completion in accordance with Paragraph 14.04 or 14.05).

...ing to the performance of the Work, provided that such claim, cost, loss, or damage is attributable to ...ily injury, sickness, disease, or death, or to injury to or ...struction of tangible property (other than the Work itself), including the loss of use resulting therefrom but only to the extent caused by any negligent act or omission of Contractor, any Subcontractor, any Supplier, or any individual or entity directly or indirectly employed by any of them to perform any of the Work or anyone for whose acts any of them may be liable .

B. In any and all claims against Owner or Engineer or any of their respective consultants, agents, officers, directors, partners, or employees by any employee (or the survivor or personal representative of such employee) of Contractor, any Subcontractor, any Supplier, or any individual or entity directly or indirectly employed by any of them to perform any of the Work, or anyone for whose acts any of them may be liable, the indemnification obligation under Paragraph 6.20.A shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for Contractor or any such Subcontractor, Supplier, or other individual or entity under workers' compensation acts, disability benefit acts, or other employee benefit acts.

C. The indemnification obligations of Contractor under Paragraph 6.20.A shall not extend to the liability of Engineer and Engineer's officers, directors, partners, employees, agents, consultants and subcontractors arising out of:

1. the preparation or approval of, or the failure to prepare or approve, maps, Drawings, opinions, reports, surveys, Change Orders, designs, or Specifications; or

2. giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.

6.21    *Delegation of Professional Design Services*

A. Contractor will not be required to provide professional design services unless such services are specifically required by the Contract Documents for a portion of the Work or unless such services are required to carry out Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. Contractor shall not be required to provide professional services in violation of applicable law.

B. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of Contractor by the Contract Documents, Owner and Engineer will specify all performance and design criteria that such services must satisfy. Contractor shall cause such services or certifications to be provided by a properly licensed professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to Engineer.

C. Owner and Engineer shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided Owner and Engineer have specified to Contractor all performance and design criteria that such services must satisfy.

D. Pursuant to this Paragraph 6.21, Engineer's review and approval of design calculations and design drawings will be only for the limited purpose of checking for conformance with performance and design criteria given and the design concept expressed in the Contract Documents. Engineer's review and approval of Shop Drawings and other submittals (except design calculations and design drawings) will be only for the purpose stated in Paragraph 6.17.D.1.

E. Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

ARTICLE 7 - OTHER WORK AT THE SITE

7.01    *Related Work at Site*

A. Owner may perform other work related to the Project at the Site with Owner's employees, or via other direct contracts therefor, or have other work performed by utility owners. If such other work is not noted in the Contract Documents, then:

1. written notice thereof will be given to Contractor prior to starting any such other work; and

2. if Owner and Contractor are unable to agree on entitlement to or on the amount or extent, if any, of any adjustment in the Contract Price or Contract Times that should be allowed as a result of such other work, a Claim may be made therefor as provided in Paragraph 10.05.

B. Contractor shall afford each other contractor who is a party to such a direct contract, each utility owner and Owner, if Owner is performing other work with Owner's employees, proper and safe access to the Site, a reasonable opportunity for the introduction and storage of materials and equipment and the execution of such other work, and shall properly coordinate the Work with theirs. Contractor shall do all cutting, fitting, and patching of the Work that may be required to properly connect or otherwise make its several parts come together and

EJCDC C-700 Standard General Conditions of the Construction Contract.
Copyright © 2002 National Society of Professional Engineers for EJCDC. All rights reserved.

...of tests, revise or revoke any such payment recommendation previously made, to such extent as may be necessary in Engineer's opinion to protect Owner from loss because:

    a. the Work is defective, or completed Work has been damaged, requiring correction or replacement;

    b. the Contract Price has been reduced by Change Orders;

    c. Owner has been required to correct defective Work or complete Work in accordance with Paragraph 13.09; or

    d. Engineer has actual knowledge of the occurrence of any of the events enumerated in Paragraph 15.02.A.

C. *Payment Becomes Due*

1. Ten days after presentation of the Application for Payment to Owner with Engineer's recommendation, the amount recommended will (subject to the provisions of Paragraph 14.02.D) become due, and when due will be paid by Owner to Contractor.

D. *Reduction in Payment*

1. Owner may refuse to make payment of the full amount recommended by Engineer because:

    a. claims have been made against Owner on account of Contractor's performance or furnishing of the Work;

    b. Liens have been filed in connection with the Work, except where Contractor has delivered a specific bond satisfactory to Owner to secure the satisfaction and discharge of such Liens;

    c. there are other items entitling Owner to a set-off against the amount recommended; or

    d. Owner has actual knowledge of the occurrence of any of the events enumerated in Paragraphs 14.02.B.5.a through 14.02.B.5.c or Paragraph 15.02.A.

2. If Owner refuses to make payment of the full amount recommended by Engineer, Owner will give Contractor immediate written notice (with a copy to Engineer) stating the reasons for such action and promptly pay Contractor any amount remaining after deduction of the amount so withheld. Owner shall promptly pay Contractor the amount so withheld, or any adjustment thereto agreed to by Owner and Contractor, when Contractor corrects to Owner's satisfaction the reasons for such action.

3. If it is subsequently determined that Owner's refusal of payment was not justified, the amount wrongfully withheld shall be treated as an amount due as determined by Paragraph 14.02.C.1.

14.03    *Contractor's Warranty of Title*

    A. Contractor warrants and guarantees that title to all Work, materials, and equipment covered by any Application for Payment, whether incorporated in the Project or not, will pass to Owner no later than the time of payment free and clear of all Liens.

14.04    *Substantial Completion*

    A. When Contractor considers the entire Work ready for its intended use Contractor shall notify Owner and Engineer in writing that the entire Work is substantially complete (except for items specifically listed by Contractor as incomplete) and request that Engineer issue a certificate of Substantial Completion.

    B. Promptly after Contractor's notification, Owner, Contractor, and Engineer shall make an inspection of the Work to determine the status of completion. If Engineer does not consider the Work substantially complete, Engineer will notify Contractor in writing giving the reasons therefor.

    C. If Engineer considers the Work substantially complete, Engineer will deliver to Owner a tentative certificate of Substantial Completion which shall fix the date of Substantial Completion. There shall be attached to the certificate a tentative list of items to be completed or corrected before final payment. Owner shall have seven days after receipt of the tentative certificate during which to make written objection to Engineer as to any provisions of the certificate or attached list. If, after considering such objections, Engineer concludes that the Work is not substantially complete, Engineer will within 14 days after submission of the tentative certificate to Owner notify Contractor in writing, stating the reasons therefor. If, after consideration of Owner's objections, Engineer considers the Work substantially complete, Engineer will within said 14 days execute and deliver to Owner and Contractor a definitive certificate of Substantial Completion (with a revised tentative list of items to be completed or corrected) reflecting such changes from the tentative certificate as Engineer believes justified after consideration of any objections from Owner.

    D. At the time of delivery of the tentative certificate of Substantial Completion, Engineer will deliver to Owner and Contractor a written recommendation as to division of responsibilities pending final payment between Owner and Contractor with respect to security, operation, safety, and protection of the Work, maintenance, heat, utilities, insurance, and warranties and guarantees. Unless Owner and Contractor agree otherwise in writing and so inform Engineer in writing prior to Engineer's issuing the definitive certificate of Substantial

EJCDC C-700 Standard General Conditions of the Construction Contract.
Copyright © 2002 National Society of Professional Engineers for EJCDC. All rights reserved.

# EXHIBIT 2

# SPECIAL CONDITIONS OF THE AGREEMENT

### 1. GENERAL

The provisions of this Section of the specifications shall govern in the event of any conflict between them and the "General Conditions of Agreement".

### 2. OWNER

The word "Owner" in these specifications shall be understood as referring to the City of Nacogdoches, Texas.

### 3. ENGINEER

The word "Engineer" in these specifications shall be understood as referring to Schaumburg & Polk, Inc., Consulting Engineers, 8865 College Street, Beaumont, Texas, 77707, Engineer of the Owner, or such other Engineer, as may be authorized by said Owner to act in any particular position.

### 4. CONTRACTOR

The word "Contractor" in these specifications shall be understood as denoting the General Contractor signing this contract.

### 5. SUBLETTING

The Contractor will not be permitted to assign, sell, transfer or otherwise dispose of the contract or any portion thereof, or his rights, title or interest therein without the approval of the Owner. The Contractor will not be permitted to sublet any portion of the contract without the approval of the Owner and the Engineer. No sub-contract will, in any case, relieve the Contractor of his responsibility under the contract and bond.

The Contractor shall perform with his own organization and with the assistance of workmen under his immediate superintendence, work of a value not less than 50 percent of all work embraced in the contract exclusive of items not commonly found in contracts for similar work, or which require highly specialized knowledge, craftsmanship and/or equipment not ordinarily available in the organization of Contractors performing work of the character embraced in the contract.

### 6. DEBARMENT AND SUSPENSION

This contract is subject to 40 CFR Part 32 regarding the debarment and suspension of firms, persons, and affiliates. The Contractor shall not enter into any agreement with any firm, person, or affiliate who is listed on the current Master List of debarments, suspensions, voluntary exclusions, and other federal determinations of ineligibility.

SCHAUMBURG & POLK, Inc.
BEAUMONT · HOUSTON · TYLER

## 7. TRADE NAMES

Except as specifically specified otherwise, wherever in the specifications an article or class of material is designated by a trade name, or by the name or catalog number of any maker, patentee, manufacturer, or dealer, such designation shall be taken as intending to mean and specify the articles described or another equal thereto in quality, finish, and serviceability for the purpose intended as may be determined and judged by the Engineer in his sole discretion.

## 8. MATERIALS AND WORKMANSHIP

Unless otherwise specified, all materials shall be new. No material which has been used by the Contractor for any temporary purpose whatever is to be incorporated in the permanent structure without written consent of the Engineer.

Where material or equipment are specified by a trade or brand name, it is not the intention of the Owner to discriminate against an equivalent product of another manufacturer, but rather to set a definite standard of equality or performance and to establish an equitable basis for the evaluation of bids. Where the words "equivalent", "proper" or "equal to" are use, they shall be understood to mean that the thing referred to shall be proper, the equivalent of, or equal to some other thing, in the opinion or judgement of the Engineer.

Unless otherwise specified, all materials shall be the best of their respective kinds and shall be in all cases fully equivalent to approved samples. Notwithstanding that the words "or equal to" or other such expressions may be used in the specifications in connection with material, manufactured article, or process, the material, article, or process specifically designated shall be used, unless a substitute shall be approved in writing by the Engineer, and the Engineer shall have the right to require the use of such specifically designated material, article or process.

## 9. CASUALTY INSURANCE

The Contractor shall within one week after signing the contract, and before any work shall start, furnish the Owner with certificates of insurance satisfactory to the Owner indicating the existence of the following coverages:

1.  Statutory Worker's Compensation Insurance.

2.  Commercial General Liability (XCU and completed operations coverage must be included).

    a.  Combined Single Limit $500,000
    b.  General Aggregate $1,000,000

3.  Commercial Automobile Liability (Owned, hired and non-owned vehicles)

4.  Contractual Liability Insurance covering the indemnity provision of this Contract in same amount and coverage as provided for Commercial General Liability Policy, specifically referring to this Contract by date, job number, and location;

G:\NACOG\8066_WWTP_Imp\Oxidation Ditch\Con Doc\SCAWP.doc



SCHAUMBURG & POLK, INC.
BEAUMONT • HOUSTON • TYLER

# EXHIBIT 3

1. SCOPE: Floating brush aerators are equipped with all necessary equipment and materials to meet t specified requirements in the proposed wastewater treatment process.

2. SUBMITTALS: The Contractor shall submit to the Engineer for approval, submittals showing full details all aeration equipment and appurtenances. The submittals shall be supported by such notes or writte directions as may be necessary.

This submission shall be made as soon as feasible after Contract award. The Contractor shall furnish th Engineer with 8 copies of the submission as approved. He shall also provide approved copies sufficient f the use of his own forces.

The information required on the submittals shall include, but not necessarily be limited to, the following

A. Full and complete specifications covering the proposed equipment and appurtenances to b furnished, including certified test results demonstrating job specific oxygen transfer capabilities.

B. Detail drawings showing plan and elevation dimensions of the proposed equipment ar appurtenances to be furnished.

C. Assembly, installation, and adjustment instructions.

D. Nearest location of factory maintenance and service facilities that will be available to service th equipment offered.

E. Full and complete specifications for each motor or motor drive unit, or gear reducer proposed to b furnished as a component part of the equipment

F. Such weights of the equipment as necessary including the heaviest piece to be handled durin construction.

G. Warranty as specified herein.

H. Troubleshooting guide.

I. Electrical requirements, including power and control wiring schematics.

Failure to submit the above data as set forth shall be cause for rejection of the submittal and equipment

3. GENERAL REQUIREMENTS:

A. General: Aeration units and appurtenances shall be adaptable to the layout shown on the drawing: and shall be of new and current manufacture. Units shall operate without objectionable noise o abnormal vibration over the specified operating range. All rotating parts shall be balanced throug precise machining and precision rotor and shaft alignment.

Units shall have a nameplate that will include the manufacturer's name, serial number, model number, size, gear reducer speed, and horsepower.

B. Performance: Each aerator shall be rated to transfer oxygen at the specified minimum rates into tap (potable) water at the standard conditions of zero dissolved oxygen, one atmosphere pressure, and a temperature of 20 degrees Centigrade. Units shall be designed to operate continuously within a wastewater environment.

## 4. FLOATING ELECTRIC BRUSH AERATOR:

A. **General:** The Contractor shall furnish and install a total of 4, 25hp. floating electric brush aerators as a part of this project. Aeromix Systems, ECS House Industries, or approved equal shall manufacture the floating electric brush aerators.

B. **Oxygen Transfer:** The aerator design shall have been tested and received certified documentation of its capability to transfer oxygen at a minimum Standard Oxygen Transfer Rate (SOTR) of 50 lbs. of Oxygen per Hour and minimum Standard Aeration Efficiency (SAE) of 3.00 lbs. Oxygen per horsepower per hour (lbs $O_2$/hp/hour) as determined by ASCE clean water test procedures for the standard conditions of 68 degree F water temperature, 1 atmosphere pressure, and 0 PPM dissolved oxygen in the water; and shall have demonstrated this at a 90% motor load or less.

C. **Horizontal - Rotor Assembly:** The floating electric brush aerator assembly shall include a 304 stainless steel rotor pipe. The rotor size and number of blades and blade configuration shall be sufficient to meet the requirements of Section B. Other length and brush configurations shall be acceptable if Oxygen Transfer and balance requirements are met. The brushes shall be welded or bolted in a spiral configuration to achieve superior balance and rotation. The rotor shall be factory balanced and shall be 304 stainless steel.

D. The rotor shall have welded in inner-plates that shall allow both the drive and tail shafts the ability to be bolted to the rotor. The drive shaft and tail shaft shall be fabricated from stainless steel. The drive shaft and tail shaft diameters shall be sized by the manufacturer.

E. Lifting mechanisms shall be provided so the complete unit can be removed and installed with balance.

F. **Rotor Bearing:** The tail bearing shall be a stainless steel, concentric collar ball, tapered-roller, or pillow block bearing assembly. A water lubricated bearing is not acceptable. All bearings used in rotor construction shall have a minimum design life (L10) of at least 100,000 hours.

G. **Electric Motor:** Each aerator shall use a US Motors, Emerson, or TECO-Westinghouse premium efficiency severe-duty motor. The motor shall be 3 phase, 60 Hertz, 1750 RPM, 230/460V with a 1.25 service factor. Motor is to run at 100% to 90% of its rated full load during normal operation. Motor shall be totally enclosed, fan cooled (TEFC), rated for severe corrosive-duty, NEMA Class F insulation, coated cast iron construction, and stainless steel hardware and nameplate. Manufacturer shall provide cable from motor to walkway.

H. **Electric Motor Certification:** The aerator manufacturer shall provide certification that the nameplate data affixed to the aerator's electric motor is valid.

I. **Gear Reducer:** A constant-duty AGMA Class III DODGE or approved equal Gear Reducer shall be used. The gear reducer shall be deck mounted. The gear reducer shall not be connected to the motor using any type of V-belt driven system.

J. A stainless steel motor and gear reducer cover shall be attached with hinges for easy maintenance.

K. **Floatation Tanks:** Each unit shall have (2) two –stainless steel tanks. The drive-end and tail end floats shall be sized by the manufacturer for this specific application. All floats shall be seam welded and pressure checked before leaving assembly. Unstable floatation designs are not acceptable. Rocking or oscillating floatation tanks shall not be acceptable.

L.  **Framework:** The main frame of the aerator shall be fabricated from stainless steel. The frame shall be welded and bolted together with stainless steel hardware.

M.  **Floatation Attachment:** Each float shall be attached to the mainframe using stainless steel bands and connected to the frame with stainless steel hardware. The frame shall be connected to the anchoring system in such a manner that external forces, resulting from wave action and other external movement, are not transferred to the Floatation attachment.

N.  **Adjusting Linkage:** Each unit shall have adjusting linkage attached to each corner of the main frame. Adjusting linkage shall be capable of changing the operating depth of the horizontal rotor blades; the horsepower requirement and amperage draw, and provide aerator leveling. Adjusting linkage shall be fabricated from 304 stainless steel rods with brass adjusting nuts. Adjusting linkage shall not be connected directly to the anchoring system nor shall it mechanically depend upon the anchoring system for it to be effective.

O.  **Anchoring System:** Anchoring system shall hold the aerator firmly in position. The type of anchoring system to be used is determined by the placement of the aerator(s) as indicated on the ENGINEER'S Plans. Anchoring system shall be fabricated from 304 stainless steel. The anchoring system shall not restrict the unit's floatation and shall allow for continuous aerator operation with fluctuations in the water surface elevation up to (plus/minus) three feet (±3ft.).

P.  **Support Legs.** The aerators shall be supplied with a rigid support system of legs or frames to allow the unit to rest on the bottom of the treatment unit when completely empty. The supports shall be of sufficient t size and dimensions to allow the unit to lower into a resting position with no damage to equipment.

5. CONTROL: The floating electric brush aerator(s) shall normally operate continuously in the oxidation ditch with manual and/or automatic start/stop control.

6. INSTALLATION: The aerator and drive shall be installed as shown on the drawings and in strict accordance with the manufacturer's instructions. A factory representative shall be on-site during start-up to verify proper installation of the rotors.

7. TESTING: After completion of the equipment installation, the rotor shall be run continuously for a period of 24 hours.

8. OPERATION AND MAINTENANCE MANUALS: Manufacturer shall provide 3 copies of the operation and maintenance manuals.

9. WARRANTY: The equipment manufacturer shall warranty its equipment as free of defects in material and workmanship; and that it will replace or repair (F.O.B., factory) any part (or parts) returned that have failed under normal use and service within (12) months following operation start-up and acceptance.

# EXHIBIT 4





# EXHIBIT 5



## ELECTRICAL
## EXPERTISE Inc.
F-2490

P.O. Box 9837
Longview, Texas 75608
903-297-7811

October 22, 2009

Schaumburg & Polk, Inc.
320 S. Broadway, Suite 200
Tyler, TX 75702

RE:     City of Nacogdoches WWTP
        Floating Aerator Submittal #3

Attn:   Justin Fenley, EIT:

Dear Sir:

I have reviewed the above referenced submittal information from an electrical standpoint
and I suggest that it be marked—"Furnish as Noted". The following notes shall apply:

Note 1.     Each motor shall be totally enclosed fan cooled (TEFC), ball bearing type, with
            enough power for starting and continuously operating the mechanism without
            overloading.     The electrical distribution system has the capacity to
            accommodate 30 HP motors; the submittal indicates that the proposed motors
            are rated 25 HP. The acceptance of the 25 HP motors shall be determined by
            others.

Note 2.     Each motor shall be rated 1,725 RPM, NEC starting Code "M", suitable for
            operation on 230/460 volt, 3 phase, 60 Hertz power, and connected for 460
            volt operation.

Note 3.     Each flanged motor shall be of the "SEVERE DUTY" classification and
            suitable for hostile environments. Motors shall have NEMA Design Class B
            insulation and a 1.15 Service Factor.

Should you have any questions or desire more information, please call.

Sincerely,

Willard W. Jordan, PE

# EXHIBIT 6a

# SUBMITTAL COVER SHEET

**SUBMITTAL NO. 3**
Package No. _____
Revision No. _____

SUBMITTAL NAME: AERATOR

PROJECT DESCRIPTION: WWTP IMPROVEMENTS OXIDATION DITCH & CLARIFIER

PROJECT NUMBER: _____ CONTRACT NUMBER: _____

PROJECT SITE: CITY OF NACOGDOCHES, TX

NO. OF COPIES: _6_____

DATE: 10-12-2009

SPEC. ITEM SHT _780_

**CONTRACTOR:**
DOWTECH SPECIALTY CONTRACTORS
4703 CR 527
BAIRD, TEXAS 79504

**OWNER'S REPRESENTATIVE:**
MARK MANN

**Contractor**

☒ **Submittals checked for compliance**
☒ **Submittals sent (ENGINEER)**

By _Gerald T Downie_    10-12-09
        Date

**Architect/Engineer**

☐ **No exceptions taken**
☐ **Furnish with revisions as noted**
☐ **Revise and resubmit**
☐ **Rejected – See Remarks**

By _____ Date _____

☐ **Reviewed**
☐ **Exceptions noted**
☐ **Submit additional data**
☐ **Revise and resubmit**
☐ **Rejected – See Remarks**

By _____ Date _____

**Submittals reviewed and distributed as follows:**

___ Architect/Engineer
___ Contractor
___ Project File
___ Project Inspector
___ Construction Manager
___ Project Manager

Distributed By _____ Date _____

COMMENTS: _____
_____
_____
_____
_____
_____

By ._____ Date _____

# EXHIBIT 6b

# TABLE OF CONTENTS

Scope of Supply

Section 1

MONSOON Operation and Maintenance Manual

Section 2

MONSOON Drawings

Section 3

Bearings Operation and Maintenance Manual

Section 4

Gearbox Motor Operation and Maintenance Manual

Section 5

Couplings Operation and Maintenance Manual

Section 6

Warranty

Section 7

The information provided in these submittals is confidential and is being provided solely for your use in confirming the technical aspects of equipment being supplied. This information shall not be communicated to others without the expressed written consent of an Aeromix employee

# EXHIBIT 6c



# SCOPE OF SUPPLY


"Specialists in Aeration and Mixing Equipment"

## <u>72981 - City of Nacogdoches, TX</u>

### <u>Instructions</u>:

1. Please, carefully review scope of supply listed below.
   This is exactly what Aeromix is furnishing
2. If there are any exceptions or corrections from that shown,
   Make changes in red pen or pencil and comment below
3. If necessary, make any comments in space provided below.
4. Sign and Date where appropriate at bottom of this page
5. Make copies of checklist and mail/fax to Aeromix

### <u>Scope of Supply:</u>

A. Aeration equipment is to be furnished as specified in this submittal and this Scope of Supply. Any equipment and/or accessories shown in submittal but not specified in this Scope of Supply is for reference only.

1. Four (4) 25HP MONSOON aerators with stainless steel floats
   230/460v 3PH 60Hz motor
2. Four (4) 20ft MONSOON Swing Arms
3. Shipping and Handling Freight prepaid
4. One (1) One year Warranty
5. One-Day Start Up by Aeromix Representative

### *<u>Pontoon float system furnished unassembled field assembly required</u>*

B. Installation Accessories:

**No other installation accessories such as control panels, mooring posts, electric wiring hangers or supports etc. are to be furnished and should be supplied by others.**

# EXHIBIT 6d

# 25-30 HP (18.7 - 22.4 kW)MONSOON™ Paddlewheel Surface Splash Aerator

# Installation,Operation,and Maintenance Manual



©2009, AEROMIX Systems, Inc.

**AEROMIX**

*Rugged Solutions in Water and Wastewater*

# TABLE OF CONTENTS

Safety Precautions                                      1
Section 1: Features                                     2
Section 2: Operating Principle                          3
Section 3: Assembly                                     3
Section 4: Standard Mooring Options                     3-4
Section 5: Mooring Accessories                          5
Section 6: Wiring the Aerator                           5-6
Section 7: Start Up                                     6-7
Section 8: Aligning the Coupling                        7
Section 9: Maintenance Schedule                         8
Section 10: Troubleshooting                             9
Section 11: Service Policy                              10
APPENDIX A
APPENDIX B
APPENDIX C

## SAFETY PRECAUTIONS

**ANY EQUIPMENT THAT INVOLVES WATER, ELECTRICITY AND MOVING PARTS IS POTENTIALLY DANGEROUS!**

 Owners and equipment operators are responsible to ensure that everyone follows local safety rules and the rules listed in this manual. AEROMIX is not responsible for injury or property damage caused by unsafe equipment operation.

1. Read this manual before operating the equipment.

2. Always keep yourself and others away from the impeller when the aerator is operating.

 3. Never let anyone swim in a pond which has an aerator operating.

4. When installing an aerator make sure the impeller is clear of any submerged items such as mooring or electrical cable.

 5. Make sure the electrical circuits are locked out (disconnected) whenever equipment is being handled or serviced.

6. If the aerator is used for de-icing, make sure signs are posted in accordance with state or local laws advising of thin ice and open water.

 7. See additional safety precautions regarding the coupling flanges in Appendix A.

# SECTION 1: FEATURES

- Low Speed Surface Aerator with oxygen transfer rates as high as: OTR = 84 lbs $O_2$/hr (38 Kg $O_2$/hr).
  *Oxygen transfer test reports available upon request*
- High oxygen transfer efficiencies: OTE = 3.20 lbs $O_2$/Hp hr (1.65 Kg $O_2$/kW hr)
- This model is available in 5-30 Hp (3.7-22 kW) versions
- All wetted parts are stainless steel
- The aerator creates a tremendous water/air area by "pulling" water up from superficial layers (relative to turbine submergence) and forcing it to travel a curved pattern due to the torque tube rotational motion. Like any other surface aerator, mixing and oxygen transfer rates relate to submergence: superficial submergence translate into higher oxygen transfer rates and lower mixing. Conversely deeper submergence translates into higher mixing and lower oxygen transfer rates
- Units can be operated alone or in groups to create an efficient flow patter that allows good mixing and adequate aeration
- Adjustable blade submergence 3"-10" (76-305 mm)

\* DRAWING BELOW IS FOR REFERENCE ONLY\*



Staggered SS Blades Provide Maximum Efficiency and Uniform Rotor Loading

Precision Machined Weldless SS Torque Tube Assembly (Caged Design)

Sliding Splash Drive Cover

Mounted Double Row, Sealed, Corrosion-Resistant, Self- Aligning, Tapered Roller Bearing

Mounted Sliding Bearing Splash Shield

Mounted Sliding Bearing Splash Shield

Fixed Low Level Protection and Land Support

Built-in Lifting Lugs and Swing Arm Brackets

Tall Frame Tubes Serve as Blade Guards for Large Debris

## SECTION 2: OPERATING PRINCIPLE

The rotating blades turn slowly, but efficiently scoop water into the air. This scooping and mixing action breaks the water droplets into a fine mist and throws it into the air, generating high levels of oxygen transfer. The horizontal pumping action then pushes the highly aerated water out into the basin while drawing water low in dissolved oxygen from deep within the basin and from behind the MONSOON aerator, resulting in extremely high basin oxygen transfer conditions.

## SECTION 3: ASSEMBLY INSTRUCTIONS

1. Put float assembly on MONSOON frame. Use middle adjusting holes at start-up. See drawing in the back of this manual.

## SECTION 4: STANDARD MOORING OPTIONS

A float mooring system is more flexible for positioning aerators than most other mounting systems. The most common ways of mooring floats are mooring to posts on shore or mooring to anchors.

The MONSOON is normally equipped to be moored to the shore by concrete anchors or filled galvanized posts. In most cases, third parties supply the posts, anchors and eyebolts/nuts, however these are also available from AEROMIX as an option. Special modifications can be made to allow the floats to be mounted at different angles. Size the mooring cable per motor horsepower by using the chart in Appendix B, Table 1. Tables 2 and 3 provides the maximum cable length and maximum unsupported distance for different cable sizes. Although AEROMIX studies and designs the mooring posts it supplies, in cases where other parties furnish these we recommend a registered professional engineer checks the equipment and site conditions and designs the mooring posts.



Two-Post Mooring

Four-Post Mooring

*DRAWINGS FOR
REFERENCE ONLY



Mooring Post
Concrete
Filled and
Capped

Mooring Post
Nut and
Eyebolt

Mooring Post
Concrete
Base

Two typical mooring post installations show the easiest ways to secure mooring cable. The cable is linked to the post and secured with three wire rope clips. Each mooring post installation is different depending on the soil type and cable loading. A standard setup uses a ten foot long, galvanized pipe. This is typically filled with concrete and buried five to six feet (1.5-1.8m) deep with a two foot (0.6m) wide concrete footing.

-4-

# SECTION 5: MOORING ACCESSORIES

Mooring cable is available from AEROMIX in a variety of sizes. A Chart in Appendix B shows recommended mooring cable sizes. Wire rope clips (also known as cable clamps) and thimbles are sized for different diameters of mooring cable.



Wire Rope Clip



Thimble



Turnbuckle



Eye Bolt



Quick Links

# SECTION 6: WIRING THE AERATOR

 ALL WIRING MUST BE DONE BY A QUALIFIED ELECTRICIAN IN ACCORDANCE WITH LOCAL ELECTRICAL CODES. AEROMIX is not responsible for motors that have failed due to improper wiring.

## 6.1: RECOMMENDED ELECTRICAL ACCESSORIES

Electrical accessories such as power cable, watertight electrical cable fittings, cable ties, and control panels are normally not supplied; however, these accessories can be ordered separately through AEROMIX.

 **AEROMIX highly recommends the use of soft starters or VFD's (optional) on units 20HP and higher. These considerably reduce power consumption at startup/operation, and add life to mechanical components, including the drive assembly.**

Each aerator should have its own starter complete with heaters or adjustable overload protection for the rated current. A fused disconnect should also be provided on the main circuit. Check with all local and electrical codes before ordering. Circuit breakers for added over current protection are available upon request (optional).

## 6.2 CABLE SELECTION

Waterproof 4 conductor SEO type electrical cable must be used to connect the aerator motor to the electrical control box when three phase power is used. Three wire cable is recommended for single phase power. Refer to the electrical cable selection chart in Appendix B to determine proper wire size.

## 6.3: ELECTRICAL CONNECTION

Connect the electrical cable to the aerator motor following the wiring diagram inside the motor junction box cover or on the motor nameplate. If illegible, the wiring diagram can be found at the motor manufacturer's website.

 **Wiring diagrams for DOL (Direct On Line) and Delta change from model to model. Incorrectly wiring a motor will seriously damage the motor and void the warranty.**

 **Make sure a proper ground is always provided and securely attached to the motor grounding lug. Failure to do so will void the motor warranty and could cause serious injury.**

A watertight cable fitting must be used to affix the electrical cable to the motor junction box. This clamp is available from AEROMIX as an option, or can be supplied by your electrician. Support the electrical cable in a way which provides slack to allow the aerator to be adjusted.

Make sure the electrical cable is secured well away from the aerator rotating parts. After installation, check that the proper voltage is being provided and check for ground continuity.

## SECTION 7: START-UP

An AEROMIX factory technician or representative is recommended to be on site for all start-ups. A start-up data sheet must be completed and mailed to AEROMIX Systems in order to validate warranty coverage. Start-up must cover these three areas:

1. Training all operators on proper equipment use by going over this manual.
2. Check for adequate mooring.
3. Check for proper rotation. (Clockwise when viewed from motor end.)
4. Adjust submergence to adjust amperage, mixing & oxygen transfer.
5. Check gear oil level, oil pump operation, and pressure switch (if applicable).

EXHIBIT 6e

# MONSOON DRAWINGS



12.00
7.50
55.75
7.06
61.50
1.75
4.00
25
196.0
[4978]
Detail N
Direction
of flow
34
244.0
[6198]
197.25 [5010.2]
36*
2*
14*
11*
17*
DETAIL M
SCALE 1 / 10
13
12
9
6
9
DETAIL N
SCALE 1 / 5

57.33 [1456.1]
Detail M
14.08 (4pl)
adjustable: 11.58-16.58
[294.1-421.1]
14.09 (4pl)
adjustable: 11.58-16.58
[294.1-421.1]
80.25 [2038.4]

Inch [mm]

**Note: Use Anti Seize on all stainless threads to prevent shearing bolts**

| | | | |
|---|---|---|---|
| DRAWN CP | DATE 6/2/2009 | AEROMIX "Specialists in Aeration and Mixing Equipment" 7135 MADISON AVE W GOLDEN VALLEY MN 5427 U.S.A. PHONE: (800)879-3677, FAX: (763)746-8408 | PROPERTY OF AEROMIX SYS. THIS DRAWING IS INTENDED FOR LIMITED USE AND CANNOT BE REPRODUCED, COPIED, LOANED, DISTRIBUTED OR EXHIBITIED WITHOUT PRIOR -WRITTEN- CONSENT FROM AEROMIX SYSTEMS. |
| CHECKED CP | DATE | MATERIAL | MANUFACTURING NOTES (WHERE APPLICABLE): - BREAK CORNERS AND SHARP EDGES - REMOVE BURRS - CLEAN AND PASSIVATE WELDS |
| ENG APRV'D | DATE | SURFACE FINISH | |
| MFG APRV'D | DATE | DEFAULT TOLERANCES FRACTIONAL +/- 1/64 DECIMAL X.X +/- 0.1 X.XX +/- 0.03 X.XXX +/- 0.005 ANGULAR +/- 1° | TITLE Kit Monsoon 25-30HP PaddleWheel Aerator |
| ORDER NO | CUSTOMER | THIRD ANGLE PROJECTION SCALE: VIEW LEVEL | SIZE A |
| NAME OR LOCATION Beni Suef | | DRAWING/PART NUMBER 06020902 | SHEET 1 OF 5 |



Cover sits on top of frame
Cover rest in tabs welded to frame
Cover slides into place and sits on the top of the frame
Float assemblies side onto frame from below

**Note: use Anti Seize on all Stainless threads to prevent shearing bolts**

| | | | |
|---|---|---|---|
| DRAWN CP | DATE 6/2/2009 | AEROMIX "Specialists in Aeration and Mixing Equipment" 7135 MADISON AVE W GOLDEN VALLEY MN 5427 U.S.A. PHONE: (800)879-3677. FAX: (763)746-8408 | PROPERTY OF AEROMIX SYS. THIS DRAWING IS INTENDED FOR LIMITED USE AND CANNOT BE REPRODUCED, COPIED, LOANED, DISTRIBUTED OR EXHIBITED WITHOUT PRIOR -WRITTEN- CONSENT FROM AEROMIX SYSTEMS. |
| CHECKED fishburnk | DATE | MATERIAL | MANUFACTURING NOTES (WHERE APPLICABLE): - BREAK CORNERS AND SHARP EDGES - REMOVE BURRS - CLEAN AND PASSIVATE WELDS |
| ENG APRV'D | DATE | SURFACE FINISH | |
| MFG APRV'D | DATE | DEFAULT TOLERANCES FRACTIONAL +/- 1/64 DECIMAL X.X +/- 0.1 X.XX +/- 0.03 X.XXX +/- 0.005 ANGULAR +/- 1° | TITLE Kit Monsoon 25-30HP PaddleWheel Aerator |
| ORDER NO | CUSTOMER | | |
| NAME OR LOCATION | | THIRD ANGLE PROJECTION SCALE: VIEW LEVEL / SIZE A | DRAWING/PART NUMBER 06020902 SHEET 2 OF 5 |



33
34
32
Detail P
P
Direction of Flow

4 11 11 14
3 11 11 14
DETAIL Y
SCALE 1 / 15
35
8
12
DETAIL P
SCALE 1 / 10
10*
1*
23*
24*
30
DETAIL V
SCALE 1 / 10
28
20
21
29
22*
27
DETAIL U
SCALE 1 / 5

**NOTE: Check these bolts monthly**

**Note: Use Anti Seize on all stainless threads to prevent shearing bolts**

30
Detail U
Detail Y
Detail V

| | | | |
|---|---|---|---|
| DRAWN CP | DATE 6/2/2009 | AEROMIX "Specialists in Aeration and Mixing Equipment" 7135 MADISON AVE W GOLDEN VALLEY MN 5427 U.S.A. PHONE: (800)879-3677, FAX: (763)746-8408 | PROPERTY OF AEROMIX SYS. THIS DRAWING IS INTENDED FOR LIMITED USE AND CANNOT BE REPRODUCED, COPIED, LOANED, DISTRIBUTED, OR EXHIBITED WITHOUT PRIOR -WRITTEN- CONSENT FROM AEROMIX SYSTEMS. |
| CHECKED CP | DATE | MATERIAL | MANUFACTURING NOTES (WHERE APPLICABLE): - BREAK CORNERS AND SHARP EDGES - REMOVE BURRS - CLEAN AND PASSIVATE WELDS |
| ENG APRV'D | DATE | SURFACE FINISH | |
| MFG APRV'D | DATE | DEFAULT TOLERANCES FRACTIONAL +/- 1/64 DECIMAL X.X +/- 0.1 X.XX +/- 0.03 X.XXX +/- 0.005 ANGULAR +/- 1° | TITLE Kit Monsoon 25-30HP PaddleWheel Aerator |
| ORDER NO | CUSTOMER | THIRD ANGLE PROJECTION SCALE: VIEW LEVEL | SIZE A |
| NAME OR LOCATION Beni Suef | | DRAWING/PART NUMBER 06020902 | SHEET 3 OF 5 |



DETAIL W
SCALE 1/6

Detail W

Note: Use Anti Seize on all stainless
threads to prevent shearing bolts

Detail H

Detail F

DETAIL F
SCALE 1/15

DETAIL H
SCALE 1/30

PROPERTY OF AEROMIX SYS. THIS DRAWING
IS INTENDED FOR LIMITED USE AND CANNOT BE
REPRODUCED, COPIED, LOANED, DISTRIBUTED
OR EXHIBITED WITHOUT PRIOR -WRITTEN-
CONSENT FROM AEROMIX SYSTEMS.

MANUFACTURING NOTES (WHERE APPLICABLE):
- BREAK CORNERS AND SHARP EDGES
- REMOVE BURRS
- CLEAN AND PASSIVATE WELDS

TITLE
Kit Monsoon 25-30HP
PaddleWheel Aerator

DRAWING/PART NUMBER
06020902

SHEET 4 OF 5

| | | |
|---|---|---|
| DRAWN | CP | DATE 8/2/2009 |
| CHECKED | CP | DATE |
| ENG APRV'D | | DATE |
| MFG APRV'D | | DATE |
| ORDER NO | | CUSTOMER |
| NAME OR LOCATION | | Bent Buef |

MATERIAL

SURFACE FINISH

DEFAULT TOLERANCES
FRACTIONAL DECIMAL ANGULAR
+/- 1/64 .XX +/- .01 +/- 1
.XXX +/- .005

THIRD ANGLE
PROJECTION

SIZE A

SCALE: VIEW LEVEL

"Specialists in Aeration and Mixing Equipment"
7135 MADISON AVE W GOLDEN VALLEY MN 5427 U.S.A. PHONE: (800)879-3677, FAX: (763)746-8409

# EXHIBIT 6f

# Warranty

AEROMIX Systems, Incorporated proudly warrants all products manufactured by it to be free of defects in material or workmanship for a period of eighteen months from shipment, or twelve months from date of installation, whichever occurs first. We will repair or replace any item which fails within the warranty period when it is returned freight prepaid to our plant in Minneapolis, MN, USA or to an authorized local repair center. This warranty is subject to the conditions set forth below. Equipment or accessories not manufactured by AEROMIX Systems, Incorporated, but supplied by us, such as; motors, control panels, etc., carry the full warranty supplied by the manufacturer of that equipment. The Purchaser assumes Original Buyer responsibility. Any warranty claim for that equipment must be made directly to the original manufacturer.

This warranty is subject to the following conditions:

1. Purchaser understands, agrees and accepts this warranty. Such acceptance shall be indicated by all applicable parties signing and returning a copy of this document to AEROMIX. Warranty period begins as stated above but is not activated or valid until all material is paid for in full to AEROMIX and the signed original has been returned to AEROMIX. AEROMIX will then return a copy of the official, activated warranty statement to all signing parties.

2. This warranty is made for the benefit of Purchaser (municipality or end user) and when applicable to the Purchaser's agent (contractor) only. This warranty is non-transferable and non-assignable.

3. Any repaired or replacement item supplied under this warranty shall be warranted as provided herein only for the remainder of the warranty period applicable to the original purchase.

4. This warranty expressly excludes defects or damage caused by Acts of God such as, but not limited to; falling objects, external forces, explosion, fire, riot, civic commotion, acts of war, or vandalism. It also excludes; mishandling by Purchaser, excess wear, excessive corrosion, fatigue, abuse, or failure caused by lack of maintenance, or caused by freight damage, improper storage, contact with foreign objects, use in highly corrosive, highly abrasive or high temperature solutions, excess foam, or use in solutions with high levels of large suspended solids.

5. AEROMIX shall have the absolute discretion to either repair or replace the failed item. The work so performed shall be done using AEROMIX practices and materials. AEROMIX, herewith reserves the right to approve and/or negotiate any contract for any such work not performed by AEROMIX.

6. IT IS UNDERSTOOD AND AGREED THAT AEROMIX'S LIABILITY HEREIN, WHETHER IN CONTRACT, IN TORT, UNDER ANY WARRANTY, IN NEGLIGENCE OR OTHERWISE, SHALL NOT EXCEED THE COSTS OF THE PURCHASE PRICE PAID TO AEROMIX AND UNDER NO CIRCUMSTANCES SHALL AEROMIX, BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, LIQUIDATED, CONSEQUENTIAL, OR OTHER TYPES OF DAMAGES INCLUDING ON-SITE LABOR. THIS WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESSED OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR APPLICATION.

7. All claims made under this warranty must be made to AEROMIX within thirty (30) days after Purchaser shall have reasonably discovered the subject defect. AEROMIX, must be given a reasonable opportunity to inspect any material claimed to be defective. Upon determination by AEROMIX, that a claimed failure is covered under this warranty, and should AEROMIX choose to have the Purchaser handle the repair locally, the Purchaser shall obtain two (2) competitive bids for the work involved. AEROMIX, shall have the right to obtain additional bids at its sole cost. If AEROMIX elects to have any repair performed pursuant to any such bid,

AEROMIX shall pay Purchaser the full amount of such bid, after receiving a written release from Purchaser of further claims concerning the specific complained condition. The Purchaser agrees to "render friendly assistance" during the claim processing period.

8.  This warranty will be effective only if normal maintenance as set forth in the Operations Manual is followed. AEROMIX reserves the right to ask for and review maintenance records to support the Purchaser's claim.

9.  During the warranty period the purchaser is responsible for shipping to and from designated repair facility along with any site related costs associated with removal and reinstallation of equipment.

10. No terms or conditions other than those stated herein, and no agreement or understanding, oral or written, in any way purporting to modify this warranty shall be binding on AEROMIX, unless made in writing and signed by its authorized representative. Further, the seller's salespeople and the seller's agents may have made oral statements about the merchandise described in this warranty. Such statements do not constitute warranties, shall not be relied on by the buyer and are not part of the contract for sale or warranty. The entire warranty is embodied in this writing. This warranty shall be governed by and construed and enforced in accordance with the laws of the State of Minnesota (USA). AEROMIX, Purchaser, Purchaser's Agent and End User agree that any legal action commenced relative to this warranty will be venued in the courts, State or Federal, located in the State of Minnesota (USA).

11. Wastewater characterization is an important element in the evaluation of existing facilities for optimizing performance and available treatment capacity. Without comprehensive wastewater characterization, facilities may either be under-or overdesigned, resulting in inadequate or inefficient treatment.

Typical domestic wastewater characterization parameters and typical values:

| Component | Concentration, mg/L |
|---|---|
| COD | 430 |
| BOD | 190 |
| TSS | 210 |
| VSS | 160 |
| TKN | 40 |
| $NH_4$-N | 25 |
| $NO_3$-N | 0 |
| Total phosphorus | 200 (as $C_aCO_3$) |

Any application non typical to this component chart requires customer to inform AEROMIX or the Warranty can be voided.

Accepted by:

Purchaser:

Name (Print) _____

Signature _____

Company _____

Address _____

_____

Date _____

AEROMIX Systems, Incorporated

Name (Print) _____

Signature _____

Title _____

Date _____

Purchaser's Agent or Contractor (if applicable):

Name (Print) _Grant Carho_

Signature _____

Company _Dawtech Specialty Cont_

Address _4703 CR 527_

_Baird, TX 79504_

Date _8/5/10_

End User (if different from Purchaser):

Name (Print) _DAVID WOLFGANG_

Signature _David Wolfgang_

Company _City of Dublin Rocks_

Address _2496 OFm 1245_

_Dne, TX 75961_

Date _08-05-10_

# EXHIBIT 7

# ECS House Industries, Inc.

3720 Highway 1 South, Cherry Valley, Arkansas 72324

## FLOATING BRUSH AERATOR SPECIFICTIONS

## Section I:

### A. GENERAL

1. The design, fabrication, supply, and installation of the aeration system shall be as specified herein.

2. Floating brush aerators shall be equipped with all necessary equipment and materials to meet the specified requirements in the proposed wastewater treatment process.

### B. QUALIFICATIONS

1. The aeration equipment manufacturer shall be approved by the Engineer and Owner. Manufacturers must have approval by both the Engineer and Owner to bid this project two (2) months prior to the advertised bid date.

2. The aeration system supplier shall be experienced in wastewater treatment processes and shall be prepared to demonstrate the effect on the client's process of the aeration systems supplied through documented analysis relating to flow, hydraulic retention time, and biological contact. Certified Oxygen Transfer & Mixing Tests performed by an independent third party shall be made available to the Engineer & Owner. These tests should support the aeration system design, and show the aeration system can provide the oxygen & mixing necessary for proper and effective wastewater treatment.

3. The floating brush aeration system Design Engineer shall have documented water and wastewater treatment and design experience for a minimum of fifteen (15) years.

4. Aerator assemblies and appurtenances shall be manufactured and designed according to the layout shown on the drawings. Aerators shall operate without objectionable noise or abnormal vibration. All rotating parts shall be balanced through precise CNC machining and precision rotor and shaft alignment. "Bolted-In", Piloted stub shaft assemblies are a requirement for each Floating Brush Aerator. Any other form of rotor & shaft alignment or assembly is not acceptable. Aerators shall have a nameplate that will include the manufacturer's name, serial number, model number, size, gear reducer speed, and horsepower.

## C. SUBMITTALS

1. The Manufacturer shall provide the Contractor submittals showing full details of all aeration equipment and appurtenances.

2. This submission shall be made as soon as feasible after Contract award or Approved Purchase Order is agreed upon between the Contractor and Manufacturer. The Manufacturer shall provide the Contractor with four (4) copies of the submittal for approval by the Engineer. After submittal approval, the Manufacturer shall receive an approved copy of the submittal for their records. Manufacturing of aeration equipment & systems will begin after the submittals are approved.

3. The information required on the submittals shall include, but not necessarily be limited to the following:

   a. Full and complete specifications covering the proposed equipment and appurtenances to be furnished, including certified aeration design provided by Floating Brush Aeration Design Engineer. The design shall show the mixing and oxygen capabilities of the Floating Brush Aerator.
   b. Detail drawings showing plan and elevation dimensions of the proposed equipment and appurtenances to be furnished.
   c. Assembly, Installation, and adjustment instructions.
   d. The location of the floating brush aerator manufacturer. This facility shall be able to provide product service, product support, and parts to the Owner. This factory shall be within 110 miles of the proposed wastewater treatment facility.
   e. Full and complete specifications for the complete drive-train system that operates the floating brush aerators.
   f. Provide Floating Brush Aerator assembled weight, and the weights of individual pieces that will be unloaded & installed.
   g. Provide Manufacturing warranty as specified herein.
   h. Floating Brush Aerator troubleshooting guide.
   i. Electrical requirements, including power and control wiring schematics. Failure to submit the above data as set forth shall be cause for rejection of the submittal and equipment.

## D. OPERATION & MAINTENANCE MANUALS

1. Upon the Engineer's approval of submittals the manufacture shall provide four (4) copies of the operation and maintenance manuals to the Contractor.

2. The O&M manuals shall include details of all components, installation instructions, start-up procedures, and operation and maintenance procedures. The O&M Manuals shall include all lubrication specifications and lubrication maintenance details. The O&M manuals shall include specific instructions for receiving and handling, assembly, mooring, wiring, installation, repair, service and storage.

# Section 2

## A. PRODUCT DESCRIPTION & MANUFACTURER

1. The Contractor shall furnish and install a total of XXXXXXXXXXXXX Floating Brush Aerators as a part of this project. The Floating Brush Aerators shall be manufactured by ECS House Industries, Inc., Cherry Valley, Arkansas.

## B. FLOATING BRUSH AERATOR ROTOR ASSEMBLY

1. The XX hp floating brush aerator rotor shall have a X" standard wall rotor pipe. The rotor shall be XXX" in length. The rotor shall have XXX brushes that are X" wide x XX" long. The brushes shall have a 133-degree V-shaped angle. The brushes shall be robotically welded, on both sides, in a spiral configuration to achieve superior balance and rotation. The rotor assembly shall be constructed of 304L Stainless Steel or TGIC Powder Coated, Mild Steel.

2. The rotor assembly shall have welded-in CNC machined inner plates that allow both the drive and non-drive end shafts the ability to be bolted-into the rotor. The bolt-in shafts are the "male" parts and the machined inner plates are the "female" parts. This is a definition of a piloted, bolt-in shaft assembly. A welded-flange on the outer diameter of the rotor pipe or torque tube with a bolted-on shaft is not acceptable. The drive and non-drive end shaft shall be fabricated from 316 stainless steel.

## C. DRIVE TRAIN: TRIPLE-SEAL PROTECTION SYSTEM

1. The "Triple-Seal Protection" (TSP) system prevents wastewater, solids in the wastewater, and corrosive wastewater gases from entering the drive-train enclosure. The TSP ensures that the drive-train (flange bearing, gear reducer, paraflex coupler, & electric motor) will not be exposed to the elements described above. This type of protection system is a necessity for a floating brush aerator. Any floating brush aerator that does not have the TSP described below cannot be considered an equal and will not be an accepted manufacturer for this project or future projects.

2. The TSP system begins as the 316 stainless steel drive shaft enters the drive-train enclosure through inner & outer seal plates. The XXhp floating brush aerator shall have a XXX" diameter drive shaft.

3. The inner and outer seal plates shall have spring loaded, non-metallic, double-lip nitrile seals. The outer seal is additionally protected with a v-ring shaft seal and protective stainless steel collar over the v-ring shaft seal. The cavity between the inner and outer seal plates are grease filled through a port on the side of the outer seal plate. Internally, the XXhp drive shaft is supported by a XXX" piloted flange bearing that is bolted internally to the drive case with a spacer ring that permits a close fit and aligns the shaft seals.

4. The piloted, flange bearing shall have a minimum L10 rating life of 100,000 hours. The piloted, flange bearing and gear reducer output hub bearings support the weight of the drive-end rotor assembly. This reduces the weight The XXhp drive shaft reduces diameter to XXX" to permit mounting of the gear reducer to the drive shaft via a tapered bushing assembly.

5. A "Spring Loaded Grease Feeder" (SLGF) shall be provided with each floating brush aerator to lubricate the piloted, flange bearing. The SLGF provides grease to the bearing as needed. The SLGF requires a manual grease refill. The frequency for this refill is located in the O&M Manual.

6. The TSP housing is fabricated from 304L stainless steel. The housing consists of : welded drive case, drive case cover with a glued neoprene seal and hinge linkage, vented motor mounting bracket, motor height adjusting brackets with stainless steel adjusting bolts, vent hole splash prevention angle, 16 gauge, 304L stainless steel motor cover, stiffening angles bolted to the upper case sides and ends, and anti-rotation angles that lock the gear reducer into position after the motor and gear reducer input shafts are aligned. The stiffening angle closest to the rotor assembly shall provide an adjustable hinge point for compression of the seal around the top edge of the enclosure, enclosure sides, and motor bracket.

7. The motor bracket bolts directly to the TSP housing to provide room for installation and removal of the shaft mounted gear reducer. The motor is sealed to the TSP housing with silicone. This assembly ensures that the C-Face motor can be removed without having to reposition the gear reducer.

8. The 304L stainless steel cover of the TSP housing shall be held closed with two stainless steel clamp latches mounted on stainless steel blocks bolted to the TSP housing sides. The latching force shall be adjustable to maximize sealing of the cover. The stainless steel clamp catches shall be bolted to the TSP cover flange. When in the raised position for service and inspection, the cover shall be held open with manually inserted stainless steel pins with lanyard in the hinge linkage.

9. The TSP housing shall be bolted to the framework in four (4) places provided by four (4) angle brackets bolted to the TSP housing sides.

## D. GEAR REDUCER

1. The gear reducer shall be a constant-duty AGMA Class III DODGE gear reducer. The gear reducer shall be directly mounted to the rotor assembly's drive shaft with a tapered-bushing assembly. The shaft mounted helical gear reducer shall have tapered roller bearings. Ball bearings in the gear reducer are not acceptable.

2. The XXhp floating brush aerator will have the TAX model gear reducer. The TAX gear reducer shall be rated for XXhp @ 1750 RPM input speed, providing a minimum 2.0 service factor.

3. The input shaft and output hub seals shall be non-corrosive, non-metallic, stainless steel spring loaded double lip, nitrile seals. The output hub shall have two seals on each side.

4. A cooling fan shall be mounted to input shaft of the gear reducer. A keyed hub on the input shaft will provide rotating power for the fan.

## E. PARAFLEX COUPLING

1. The input shaft of the gear reducer shall be connected to the motor shaft with a Dodge Paraflex Coupler. This direct-driven assembly between the electric motor and gear reducer via a Paraflex coupler provide a "Dampened Drive System" (DDS). The DDS absorbs start-up forces and allows for 4° of misalignment. The coupler shall be high speed and the coupler element shall be constructed of high density reinforced rubber. The gear reducer shall produce a nominal rotor speed of 70 RPM. The gear reducer shall not be connected to the motor using any type of V-belt driven system or a "low speed coupled" direct driven system.

2. The XXhp floating brush aerator uses a PXXX Dodge Model Coupler.

## F. ELECTRIC MOTOR

1. Each floating brush aerator shall use a premium efficiency, severe-duty C-face motor with mounting feet. The motors shall be XXhp, 3-phase, 60 Hertz, 230/460 volt, 1750 RPM with a 1.25 operating service factor when motor is operating at 90% of rated full load during normal operation.

2. Motor shall be totally enclosed, fan cooled (TEFC), rated for severe corrosive-duty, NEMA Class F insulation, cast iron construction with an epoxy coating, and stainless steel hardware and nameplate. (Premium efficiency; meets or exceeds the requirements of EPACT '92 and Canadian Federal Efficiency Levels defined in CSA C390-93. Full load efficiency of all ratings is certified under the EEV Program of the CSA.)

## G. ELECTRIC MOTOR CERTIFICATION

1. The aerator manufacturer shall provide certification that the nameplate data affixed to the aerator's electric motor is valid, specific data applicable to that particular motor

## H. NON-DRIVE END ROTOR BEARING

1. The non-drive end bearing shall be a grease lubricated, stainless steel, eccentric collar, ball-bearing assembly. The bearing shall have a 304L stainless steel inspection cover and an auxiliary, non-corrosive seal mounted in a 304L stainless steel seal plate on the rotor assembly side of the non-drive end bearing bracket.

2. The eccentric collar shall have a stainless steel, rear cover mounted above and around the non-drive end bearing bracket sides.

3. The bearing shall have an L10 bearing life over 100,000 hours.

4. A "Spring Loaded Grease Feeder" (SLGF) shall be provided with each floating brush aerator to lubricate the non-drive end bearing. The SLGF provides grease to the bearing as needed. The SLGF requires a manual grease refill. The frequency for this refill is located in the O&M Manual.

5. Plastic bearings that may or may not use wear sleeves or bushings will not be acceptable. Water lubricated bearings are also not acceptable.

## I. FLOATATION ASSEMBLY

1. Each floating brush aerator shall have (2) two, 16 gauge, 304L stainless steel tanks. All stainless steel floats shall be seam welded and pressure checked after fabrication. The stainless steel floats shall be foam filled with "closed celled" two part foamular foam.

2. The XXhp drive-end tank shall be XX' long x XX" diameter, and the non-drive end tank shall be XX' long x XX" diameter.

## J. FLOATATION ATTACHMENT BANDS

1. Each floatation tank shall be attached to the floating brush aerator mainframe using 304L stainless steel bands. The bands are connected to the mainframe with stainless steel pins and 304L stainless steel bolted brackets. The mainframe shall be connected to the anchoring system in such a manner that external forces, resulting from wave action and other external movement, are not transferred to the floatation attachment bands.

2. Each floatation tank shall have adjusting linkage attached to each corner of the aerator main frame. Adjusting linkage shall be capable of changing the operating depth of the horizontal rotor blades; the horsepower requirement and amperage draw, and provide aerator leveling. Adjusting linkage shall be fabricated from 304L stainless steel rods with brass adjusting nuts. Adjusting linkage shall not be connected directly to the anchoring system nor shall it mechanically depend upon the anchoring system for it to be effective.

## K. AERATOR MAIN FRAME

1. The main frame of the aerator shall be fabricated from 304L stainless steel or TGIC Powder Coated, Mild Steel, and shall use X" schedule 40 pipe & 3/16" plate. The frame shall be welded and bolted together with stainless steel hardware.

## L. ANCHORING SYSTEM

1. The anchoring system shall hold the aerator firmly in position. The type of anchoring system to be used is determined by the placement of the floating brush aerator(s), and the wastewater application.

2. The anchoring system shall be fabricated from 304L stainless steel or TGIC Powder Coated, Mild Steel. The anchoring system shall not restrict the unit's floatation and shall allow for continuous aerator operation with fluctuations in the water surface elevation up to (plus/minus) three feet (±3ft.).

3. The anchoring system for this lagoon application shall consist of two (2) parallel mooring arms, one (1) cross-brace assembly, and two (2) vertical bank stake poles in order to anchor to the levee of the lagoon.

## M. POWDER COATING SPECIFICATIONS

1. GENERAL: As an ALTERNATE to a 100% STAINLESS STEEL FLOATING BRUSH AERATOR manufactured by ECS House Industries, Inc., the following aerator part(s) and/or assemblies can be manufactured from ASTM A36 Mild Steel, and Powder Coated after the part(s) and/or assemblies are completely fabricated. The remaining aerator parts(s) and/or assemblies shall be manufactured from stainless steel.

   a. Rotor Assembly: This includes rotor pipe, brushes, drive and non-drive end shafts, and machined, rotor inner plates.
   b. Triple Seal Protection Housing: This includes the entire TSP case, cover, housing, and inner & outer seal plates
   c. Aerator Main Frame: This includes the pipe and plate material for the aerator main frames.

2. Powder Paint Description: All metals that have been specified to be TGIC Powder Coated shall follow the process below in order to achieve a superior coating system. Polyester TGIC coatings utilize the epoxy functional cross-linker TGIC (triglycidylisocyanurate). Use of this low molecular weight, multifunctional cross-linker enables polyester TGIC formulations to contain 90% or greater resin within the binder system. All powder coating shall use this type of TGIC formulation with a minimum thickness of three (3) mils.

3. Metal Shot-Blast Process: The cleaning process shall begin with the steel components being steel shot blasted to an SSPC-6 commercial gray quality (Manual steel shot blast for touch up if required). The BCP shot blast room is utilized for compressed air cleaning to remove shot from crevices and horizontal surfaces of steel components.

4. Four-Stage Wash: The components then shall enter a four (4) stage batch washing system consisting of:
   a. Combination Cleaner Phosphate Coater 180 seconds
   b. 1st Fresh Water rinse 120 seconds
   c. 2nd Fresh Water rinse 60 seconds
   d. Non-chrome seal rinse 60 seconds

5. Batch Dry-Off: The metal part (s) shall dry in the IHEI batch dry-off oven at 225 degree Faranheit to flash off any moisture remaining on the steel components.

6. Electrostatic Application: Electrostatic applications of TGIC powders are manually applied in an environmental room that controls humidity at less than 50%. The environmental room shall have a grounded booth for the applications of TGIC powder.

7. Powder Curing: Curing of these components shall be accomplished in a 450 degree maximum temperature curing oven. The oven has three load bar locations to permit proper curing time that may vary from 40 to 55 minutes (these times are dependent on metal thickness).

8. Quality Control: Coating thickness shall be checked prior to unloading the steel components with a thickness meter. If the proper thickness is not met (3 mils minimum), the steel components go to an 850-degree F oven where the powder-paint is burned off and easily removed from the metal. After this, the metal goes through the system again.

# Section 3

## A. EXECUTION

1. The floating brush aerators shall be installed as shown on the drawings and in strict accordance with the manufacturer's instructions.

2. The floating brush aerator supplier, through their field service technician or representative, shall provide service to verify the proper installation and supervision of equipment start-up. Operation and maintenance instruction shall be given to the Engineer/Owner through the use of illustrated material within the manual.

3. Installation supervision and start-up services shall be provided only to the extent required to comply with the manufacturer's warranty conditions.

4. After completion of the equipment installation, testing of the floating brush aerators shall be done continuously for a period of 24 hours.

## B. WARRANTY

ECS House Industries, Inc. will warranty its equipment as free of defects in material and workmanship for a period of twelve (12) months to the original purchaser subject to the restrictions and conditions listed herein. Warranty period will begin upon delivery to the original purchaser or its designee. ECS House Industries, will replace or repair any part built and manufactured by ECS House Industries, Inc. within the warranty period that have failed under normal use subject to the restrictions and conditions listed herein. ECS House Industries, Inc. will not be responsible for shipping or handling on parts returned for warranty. All parts returned for warranty replacement or repairs must be returned within thirty (30) days of failure, have proper serial number and should have a RMA number attached. All motors, bearings, gear reducers, chains, sprockets, or any other part or component purchased by ECS House Industries, Inc. will be subject to the original warranty and warranted separately by their respective manufacturer. Some, but not all, original manufacturer's warranties are listed on the following pages. ECS House Industries, Inc. is not obligated to bear the cost of labor, lodging, and removal of equipment from water and/or wastewater, meals or transportation of any warranty provided herein.

**RESTRICTIONS, LIMITATIONS, AND CONDITIONS.** ECS House Industries, Inc. expressly limits the repair or replacement of defective material, parts or workmanship to be performed at ECS House Industries, Inc. facility or another place designated by ECS House Industries, Inc. No warranty will be honored by ECS House Industries, Inc. when in the sole opinion of ECS House Industries, Inc. there is loss or damage resulting from any cause beyond the control of ECS House Industries, Inc. including, but not limited to, abuse, neglect, alterations or modifications, an accident, unauthorized repairs or attempted repairs, improper installation, or damages from acts of God or governments, floods or fires, or other parties, specifically including, but not limited to purchaser. ECS House Industries, Inc. will not be responsible for failures of any kind due to ph levels that vary outside normal limits or abnormal water density in any application. All warranties as stated herein will be null and void upon failure of any kind that is determined by ECS House Industries, Inc. to have been caused by lack of routine maintenance and proper fluid changes as required by the operator's manual and the original equipment manufacturer. All warranties stated herein will be null and void upon any failure due to foreign objects coming in contact with any ECS House Industries, Inc. equipment. All serial numbers shall remain intact and together as recorded and coordinated by ECS House Industries, Inc. All parts replaced during the warranty period shall be purchased from ECS House Industries, Inc. and be of the correct part for the correct model. ECS House Industries, Inc. shall not be liable for any damage caused by corrosion to any material, part, or workmanship during the warranty period or any other time. This warranty is subject to any existing conditions of supply which may directly affect our ability to obtain materials or manufacture replacement parts. Any repair or replacement under this warranty shall not extend the original warranty expiration date.

**LIMITED WARRANTY AND LIABLITY.** ECS House Industries, Inc. shall have no obligation or liability of any kind whatsoever and shall not be liable for lack of oxygenating, loss of product or crop, time or delays, special or consequential damages of any kind of damage whatsoever arising out of the use of or failure of any product manufactured or sold by ECS House Industries, Inc. during the warranty period or anytime thereafter due to corrosion, bacteria, amoeba, or any cause whatsoever. ECS House Industries, Inc makes no other warranty,

expressed or implied, and, specifically, ECS House Industries, Inc disclaims any implied warranty or merchantability or fitness for a particular purpose.

If any provision of this Warranty or the application thereof to any party or circumstance shall to any extent be invalid or unenforceable, the remainder of this Warranty, or the application of such provision to parties or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each provision of this Warranty shall be valid and enforceable as to the fullest extent permitted by law. This warranty shall become null and void upon the dissolution of ECS House Industries, Inc. This warranty supersedes and voids any and all previous warranty statements and guarantees issued by ECS House Industries, Inc.



ECS
House
Industries

P.O. Box 87, Cherry Valley, AR 72324

MOOREING ARM
STAKE DETAIL

ECS HOUSE

DRAWN BY:
KASEY MOORE

| SIZE | DATE 4/8/10 | CHECKED BY: | SHEET |
| SCALE NONE | | KM | REV |

# EXHIBIT 8

## NO. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC. Plaintiff, | § § § § | IN THE DISTRICT COURT |
| V. | § § § | 145TH JUDICIAL DISTRICT |
| CITY OF NACOGDOCHES, TEXAS and AEROMIX SYSTEMS, INC., Defendants. | § § § § | OF NACOGODCHES COUNTY, TEXAS |

## DEFENDANT'S RESPONSE TO REQUESTS FOR ADMISSIONS OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

TO: DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through Plaintiff's attorney of record, BLAKE NORVELL

NOW COMES CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. pursuant to Rule 198 of the Texas Rules of Civil Procedure. The CITY OF NACOGDOCHES makes the following General Objection to all of the Requests for Admissions:

## GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11 Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-installed the aerators as agreed. Submission of these Requests for Admissions is a breach of the Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to respond to this or any discovery that violates the Rule 11 Agreement. Furthermore, Dowtech has submitted a total of 276 separate requests for Admissions which is excessive, abusive,

1

87.     Defendant Nacogdoches violated a condition of the contract by failing to permit the Aeromix 25 hp aerators to be anchored/moored.

**RESPONSE:** DENIED

88.     Defendant Nacogdoches failed to permit the Aeromix 25 hp aerators to be anchored/moored.

**RESPONSE:** DENIED

89.     The WWTP contract documents require the anchoring of the 25 hp aerator to hold firmly in position.

**RESPONSE:** DENIED

90.     Aeromix recommended the mooring/anchoring of the aerator.

**RESPONSE:** ADMITTED

91.     Defendant Nacogdoches never permitted the Aeromix 25 hp aerator to be anchored to hold firmly in position per the WWTP contract documents.

**RESPONSE:** DENIED

92.     The Aeromix 25 hp aerator have never been anchored to a substantial structure.

**RESPONSE:** DENIED

93.     None of the four Aeromix 25 hp aerators have never been anchored to a substantial structure.

**RESPONSE:** The City of Nacogdoches objects to the Request #93 because it is not possible to admit or deny a double negative statement.

94.     Aeromix recommended soft starts or Variable Frequency Drives (hereinafter "VFDs") for aerators of 20 hp or higher.

**RESPONSE:** ADMITTED

95.     The other name brand aerator in the WWTP contract documents, ECS House Industries (hereinafter "House"), requires the anchoring of its aerator to be held firmly in position.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

14

96.     Defendant Nacogdoches was grossly negligent in its refusal to permit the anchoring of the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

97.     Defendant Nacogdoches was negligent in its refusal to permit the anchoring of the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

98.     Defendant Nacogdoches' refusal to permit the anchoring of the Aeromix 25 hp aerators was in contradiction of the recommendation of Aeromix.

**RESPONSE:** DENIED

99.     Defendant Nacogdoches refusal to permit the anchoring of the Aeromix 25 hp aerators was in contradiction of the contract documents.

**RESPONSE:** DENIED

100.     The other name brand, House, recommends soft starts on aerators 15 hp and higher.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

101.     After a detailed review of the WWTP contract documents, no requirement for soft starts can be found.

**RESPONSE:** ADMITTED

102.     Soft starts start equipment in a gentle manner.

**RESPONSE:** ADMITTED

103.     Soft starts save power.

**RESPONSE:** DENIED

104.     Defendant Nacogdoches was grossly negligent in its refusal to use soft starts with the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

15

214. Plaintiff Dowtech never at any time breached the Rule 11 Agreement.

**RESPONSE: DENIED**

215. Defendant Nacogdoches City Engineer Steve Bartlett, P.E., R.P.L.S. (hereinafter "Bartlett"), in his letter of March 19, 2014 in response to Plaintiff Dowtech's letter of January 31, 2014 (hereinafter "Bartlett's letter"), admitted that Defendant Nacogdoches performed no inquiry with Aeromix to discover the 25 hp aerator's performance or function prior to specifying by brand name.

**RESPONSE: DENIED**

216. Bartlett's letter admits that the 25 hp Aeromix aerators were relocated to a pull position.

**RESPONSE: ADMITTED**

217. Bartlett's letter admits requesting Aeromix to re-design/re-manufacture the 25 hp aerators for installation into the original position.

**RESPONSE: DENIED**

218. Bartlett's letter in stating "a mechanical torque reduction device for equipment" is referring to Variable Frequency Drives (hereinafter "VFDs").

**RESPONSE: ADMITTED**

219. Bartlett never investigated the Aeromix 25 hp aerator failures.

**RESPONSE: DENIED**

220. Aeromix recommend the use of soft starts or VFDs.

**RESPONSE: ADMITTED**

221. Plaintiff Dowtech billed Defendant Nacogdoches on October 13, 2011 for the final payment on the WWTP contract in the amount of $91,619.78

**RESPONSE: ADMITTED**

222. Defendant Nacogdoches never paid to Plaintiff Dowtech the $75,355.45 billed as part of the final payment on October 13, 2011 for the WWTP contract.

**RESPONSE: ADMITTED to the extent that Nacogdoches never paid such amount.**

29

266. Defendant Nacogdoches has had the submittal of Aeromix Systems, Inc. (hereinafter "Aeromix Submital") submitted by Plaintiff Dowtech in hand since before October 22, 2009.

**RESPONSE**: ADMITTED

267. The Aeromix Submital submitted by Plaintiff Dowtech includes the Installation, Operation, and Maintenance Manual.

**RESPONSE**: ADMITTED

268. The Aeromix submittal had a copy of the warranty attached to it.

**RESPONSE**: ADMITTED

269. The Aeromix submittal clearly showed the recommendation of mooring/anchoring the aerators.

**RESPONSE**: DENIED

270. The Aeromix submittal clearly showed the recommendation for the installation of soft starters or VDFs.

**RESPONSE**: ADMITTED, except not clearly shown

271. The Aeromix submittal clearly showed the 25 hp aerator "pulls."

**RESPONSE**: DENIED

272. The warranty of the Aeromix 25 hp aerators was transferred from Plaintiff Dowtech to Defendant Nacogdoches on August 5, 2010.

**RESPONSE**: DENIED

273. Any warranty item of the four Aeromix 25 hp aerators after August 5, 2010 was the responsibility of Defendant Nacogdoches and Aeromix.

**RESPONSE**: DENIED

274. Any warranty item of the four Aeromix 25 hp aerators after August 5, 2010 was not the responsibility of Plaintiff Dowtech.

**RESPONSE**: DENIED

35

# EXHIBIT 9

**dowtech**

From:     "Catalin Petrescu" <petrescu.catalin@aeromix.com>
To:       <dowtech@windstream.net>
Sent:     Friday, January 08, 2010 3:22 PM
Subject:  For Clint

Hello Clint,

Josh -my colleague- has asked me to discuss with you the attachment of our swing arm system for the Monsoon aerator. Unfortunately the phone number I called several times rang busy and there is no voicemail associated with it.

The end of those arms can be pinned/bolted    most to any structure, provide there is an adequate distance in between the attachment points. Your method of attachment would work just fine, provided there will be two "C" channels mounted on the wall, placed 49.00" (+/- 0.50") apart. I will be out of the office the second half of next week therefore we can only discuss this further over the phone next Mo-Tue, if needed.

--

Best regards,

Catalin Petrescu
MSME, MBA
Engineering Manager

Aeromix Systems Inc.
7135 Madison Ave West
Golden Valley, MN 55427
P: (763) 746-8400
F: (763) 746-8408
www.aeromix.com

Confidentiality Notice: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

# EXHIBIT 10a

| DOWTECH SPECIALTY | § | IN THE DISTRICT COURT |
| CONTRACTORS, INC. | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| V. | § | 145TH JUDICIAL DISTRICT |
| | § | |
| CITY OF NACOGDOCHES, TEXAS | § | |
| and AEROMIX SYSTEMS, INC., | | |
| Defendants. | § | OF NACOGODCHES COUNTY, |
| | | TEXAS |

## DEFENDANT'S RESPONSE TO REQUESTS FOR ADMISSIONS OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

TO: DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through Plaintiff's attorney of record, BLAKE NORVELL

NOW COMES CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. pursuant to Rule 198 of the Texas Rules of Civil Procedure. The CITY OF NACOGDOCHES makes the following General Objection to all of the Requests for Admissions:

## GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11 Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-installed the aerators as agreed. Submission of these Requests for Admissions is a breach of the Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to respond to this or any discovery that violates the Rule 11 Agreement. Furthermore, Dowtech has submitted a total of 276 separate requests for Admissions which is excessive, abusive,

1

121. On August 5, 2010, Plaintiff Dowtech had completed all work on the Aeromix 25 hp aerators.

**RESPONSE:** ADMITTED insofar as work that was required up to that date, but DENIED as to work that was subsequently required.

122. On August 5, 2010, Defendant Nacogdoches had accepted as complete all work on the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

123. On August 5, 2010, Defendant Nacogdoches accepted the four Aeromix 25 hp aerators as substantially complete and ready for service.

**RESPONSE:** DENIED

124. On August 5, 2010, Defendant Nacogdoches did not voice any concerns to Plaintiff Dowtech pertaining to the Aeromix 25 hp aerators.

**RESPONSE:** ADMITTED

125. On August 19, 2010, one of the Aeromix 25 hp aerator's swing arms started flexing.

**RESPONSE:** ADMITTED that the swing arms started flexing, but exact date swing arms began flexing is not known.

126. On August 19, 2010, Mann telephoned Plaintiff Dowtech to demand a response to the aerator swing arm that was flexing.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

127. On August 20, 2010, one of the swing arms of the Aeromix 25 hp aerator that was flexing broke and came loose.

**RESPONSE:** ADMITTED

128. On August 20, 2010, one of the swing arms of the Aeromix 25 hp aerator came loose.

**RESPONSE:** ADMITTED

18

# EXHIBIT 10b

NO. C1228865

| DOWTECH SPECIALTY CONTRACTORS, INC. Plaintiff, | § § § § | IN THE DISTRICT COURT |
| | § | |
| V. | § | 145TH JUDICIAL DISTRICT |
| | § | |
| CITY OF NACOGDOCHES, TEXAS and AEROMIX SYSTEMS, INC., Defendants. | § § | |
| | § | OF NACOGODCHES COUNTY, TEXAS |

## DEFENDANT'S RESPONSE TO REQUESTS FOR ADMISSIONS OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

TO: DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through Plaintiff's attorney of record, BLAKE NORVELL

NOW COMES CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. pursuant to Rule 198 of the Texas Rules of Civil Procedure. The CITY OF NACOGDOCHES makes the following General Objection to all of the Requests for Admissions:

## GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11 Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-installed the aerators as agreed. Submission of these Requests for Admissions is a breach of the Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to respond to this or any discovery that violates the Rule 11 Agreement. Furthermore, Dowtech has submitted a total of 276 separate requests for Admissions which is excessive, abusive,

1

121. On August 5, 2010, Plaintiff Dowtech had completed all work on the Aeromix 25 hp aerators.

**RESPONSE:** ADMITTED insofar as work that was required up to that date, but DENIED as to work that was subsequently required.

122. On August 5, 2010, Defendant Nacogdoches had accepted as complete all work on the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

123. On August 5, 2010, Defendant Nacogdoches accepted the four Aeromix 25 hp aerators as substantially complete and ready for service.

**RESPONSE:** DENIED

124. On August 5, 2010, Defendant Nacogdoches did not voice any concerns to Plaintiff Dowtech pertaining to the Aeromix 25 hp aerators.

**RESPONSE:** ADMITTED

125. On August 19, 2010, one of the Aeromix 25 hp aerator's swing arms started flexing.

**RESPONSE:** ADMITTED that the swing arms started flexing, but exact date swing arms began flexing is not known.

126. On August 19, 2010, Mann telephoned Plaintiff Dowtech to demand a response to the aerator swing arm that was flexing.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

127. On August 20, 2010, one of the swing arms of the Aeromix 25 hp aerator that was flexing broke and came loose.

**RESPONSE:** ADMITTED

128. On August 20, 2010, one of the swing arms of the Aeromix 25 hp aerator came loose.

**RESPONSE:** ADMITTED

18

129. On August 20, 2010, one of the swing arms of the Aeromix 25 hp aerator broke.

**RESPONSE:** ADMITTED that the swing arm broke, but the exact date unknown.

130. Plaintiff Dowtech responded immediately to Mann's August 19, 2010 demand regarding the aerator with the flexing swing arm that broke and came lose by determining that the arm would have to be replaced.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

131. The swing arm of the Aeromix 25 hp aerator that was flexing broke and came loose constitutes a warranty or performance issue.

**RESPONSE:** ADMITTED

132. Defendant Nacogdoches breached the contract on August 19, 2010 demanding Plaintiff Dowtech perform additional work on the Aeromix 25 hp aerator without compensation.

**RESPONSE:** DENIED

133. Defendant Nacogdoches, on August 19, 2010, demanded Plaintiff Dowtech perform additional work on the Aeromix 25 hp aerator without compensation.

**RESPONSE:** DENIED, because the work was not additional work and was compensated.

134. Defendant Nacogdoches breached the contract each and every time it demanded Plaintiff Dowtech perform additional work on the Aeromix 25 hp aerators after August 19, 2010.

**RESPONSE:** DENIED

135. Defendant Nacogdoches requested Plaintiff Dowtech perform additional work on the Aeromix 25 hp aerators after August 19, 2010.

**RESPONSE:** DENIED, because the work was not additional.

136. Defendant Nacogdoches had knowledge at all times relevant that Plaintiff Dowtech was performing additional work on the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

137. Defendant Nacogdoches was aware that Plaintiff Dowtech performed additional work on the Aeromix 25 hp aerators after August 19, 2010.

**RESPONSE:** DENIED

# EXHIBIT 10c

| | | |
|---|---|---|
| **DOWTECH SPECIALTY** | § | **IN THE DISTRICT COURT** |
| **CONTRACTORS, INC.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **145TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF NACOGDOCHES, TEXAS** | § | |
| **and AEROMIX SYSTEMS, INC.,** | | |
| **Defendants.** | § | **OF NACOGODCHES COUNTY,** |
| | | **TEXAS** |

## DEFENDANT'S RESPONSE TO
## REQUESTS FOR ADMISSIONS
## OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

**TO:** DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through Plaintiff's attorney of record, BLAKE NORVELL

**NOW COMES** CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. pursuant to Rule 198 of the Texas Rules of Civil Procedure. The CITY OF NACOGDOCHES makes the following General Objection to all of the Requests for Admissions:

### GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11 Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-installed the aerators as agreed. Submission of these Requests for Admissions is a breach of the Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to respond to this or any discovery that violates the Rule 11 Agreement. Furthermore, Dowtech has submitted a total of 276 separate requests for Admissions which is excessive, abusive,

1

138. Regarding the Aeromix 25 hp aerators, Plaintiff Dowtech is not responsible for warranty or performance issues.

**RESPONSE:** DENIED

139. Regarding the Aeromix 25 hp aerators, Plaintiff Dowtech is not responsible for warranty issues.

**RESPONSE:** DENIED

140. Regarding the Aeromix 25 hp aerators, Plaintiff Dowtech is not responsible for performance issues.

**RESPONSE:** ADMITTED

141. Responding to Mann's August 19, 2010 demand regarding the aerator with the flexing swing arm that broke and came lose cost Plaintiff Dowtech money.

**RESPONSE:** DENIED insofar as the statement that "cost Plaintiff Dowtech money" means that Dowtech spent money that it was not contractually obligated to spend.

142. It costs Plaintiff Dowtech money to respond to Mann's demands.

**RESPONSE:** OBJECTION because the statement does not identify the particular demand made by Mann. Subject to such objection, DENIED insofar as the statement that "cost Plaintiff Dowtech money" means that Dowtech spent money that it was not contractually obligated to spend.

143. Responding to Mann's demands costs Plaintiff Dowtech loss of time.

**RESPONSE:** OBJECTION because the statement does not identify the particular demand made by Mann. Subject to such objection, DENIED insofar as the statement that "cost Plaintiff Dowtech loss of time" means that Dowtech spent time that it was not contractually obligated to spend.

144. Mann in communication with Aeromix on or around August 30, 2010 discovered that the Aeromix 25 hp aerator must be installed into a position with its swing arms pulling.

**RESPONSE:** ADMITTED

145. Mann had discovered that Defendant Nacogdoches was grossly negligent in requesting that the Aeromix 25 hp aerators be used by brand name.

**RESPONSE:** DENIED

20

# EXHIBIT 10d

| | | |
|---|---|---|
| **DOWTECH SPECIALTY** | § | **IN THE DISTRICT COURT** |
| **CONTRACTORS, INC.** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **V.** | § | **145TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF NACOGDOCHES, TEXAS** | § | |
| **and AEROMIX SYSTEMS, INC.,** | | |
| **Defendants.** | § | **OF NACOGODCHES COUNTY,** |
| | | **TEXAS** |

## DEFENDANT'S RESPONSE TO
## REQUESTS FOR ADMISSIONS
## OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

**TO:**   DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through
Plaintiff's attorney of record, BLAKE NORVELL

**NOW COMES** CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the

Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC.

pursuant to Rule 198 of the Texas Rules of Civil Procedure.  The CITY OF NACOGDOCHES

makes the following General Objection to all of the Requests for Admissions:

### GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions

propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11

Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in

abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-

installed the aerators as agreed.  Submission of these Requests for Admissions is a breach of the

Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to

respond to this or any discovery that violates the Rule 11 Agreement.  Furthermore, Dowtech has

submitted a total of 276 separate requests for Admissions which is excessive, abusive,

1

154. Mann was negligent in specifying the four Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

**RESPONSE:** DENIED

155. Bourque was grossly negligent in his supervision of Mann.

**RESPONSE:** DENIED

156. Bourque was negligent in his supervision of Mann.

**RESPONSE:** DENIED

157. Bourque failed to supervise Mann.

**RESPONSE:** DENIED

158. Mann telephoned Plaintiff Dowtech on September 2, 2010 to state that the WWTP contract was going to be modified and to request pricing.

**RESPONSE:** DENIED

159. Mann e-mailed the proposed WWTP contract modification to Plaintiff Dowtech on September 2, 2010.

**RESPONSE:** ADMITTED

160. The proposed WWTP contract modification, e-mailed to Plaintiff Dowtech on September 2, 2010, relocated the four Aeromix 25 hp aerators to pulling on a stainless steel cable (hereinafter "cable") stretched between two steel posts.

**RESPONSE:** ADMITTED

161. Mann proposed relocating the four Aeromix 25 hp aerators to pulling on a stainless steel cable (hereinafter "cable") stretched between two steel posts.

**RESPONSE:** DENIED

162. On September 7, 2010, Mann sent Plaintiff Dowtech an e-mail changing the post size from "4" to "8".

**RESPONSE:** ADMITTED

22

163.  On September 7, 2010, Mann sent Plaintiff Dowtech an e-mail regarding the post size.

**RESPONSE:** ADMITTED

164.  On September 16, 2010, Plaintiff Dowtech sent an e-mail to SPI marked "Attention Mark Mann" indicating the price for the WWTP contract modification would be $41,746.

**RESPONSE:** ADMITTED

165.  On October 11, 2010, an SPI letter signed by Mann, with a copy mailed to Defendant Nacogdoches, demanded that Plaintiff Dowtech proceed with the modification of the work on the WWTP.

**RESPONSE:** ADMITTED insofar as the letter requested a plan for revised mounting of the units.

166.  Defendant Nacogdoches received the October 11, 2010 letter from SPI, signed by Mann, demanding that Plaintiff Dowtech proceed with the modification.

**RESPONSE:** ADMITTED insofar as the letter requested a plan for revised mounting of the units.

167.  Defendant Nacogdoches never instructed Plaintiff Dowtech not to proceed with the modification work as ordered by Mann at SPI in the October 11, 2010 letter.

**RESPONSE:** ADMITTED

168.  At all times relevant, Defendant Nacogdoches' City Engineer had knowledge that SPI was demanding and directing Plaintiff Dowtech perform additional work.

**RESPONSE:** DENIED

169.  At all times relevant, Defendant Nacogdoches' City Engineer had knowledge that Mann was demanding and directing Plaintiff Dowtech perform additional work.

**RESPONSE:** DENIED

170.  Defendant Nacogdoches never at any time directed or instructed Plaintiff Dowtech in writing or verbally not to follow SPI's directions to perform additional work.

**RESPONSE:** ADMITTED

23

# EXHIBIT 10e

## NO. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC. Plaintiff, | § § § § | IN THE DISTRICT COURT |
| V. | § § | 145TH JUDICIAL DISTRICT |
| CITY OF NACOGDOCHES, TEXAS and AEROMIX SYSTEMS, INC., Defendants. | § § § | OF NACOGODCHES COUNTY, TEXAS |

## DEFENDANT'S RESPONSE TO REQUESTS FOR ADMISSIONS OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

TO:   DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through Plaintiff's attorney of record, BLAKE NORVELL

NOW COMES CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. pursuant to Rule 198 of the Texas Rules of Civil Procedure. The CITY OF NACOGDOCHES makes the following General Objection to all of the Requests for Admissions:

### GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11 Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-installed the aerators as agreed. Submission of these Requests for Admissions is a breach of the Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to respond to this or any discovery that violates the Rule 11 Agreement. Furthermore, Dowtech has submitted a total of 276 separate requests for Admissions which is excessive, abusive,

1

241.	The SPI's letter dated October 11, 2010, signed by Mann, admitted that the four Aeromix 25 hp aerators (hereinafter "aeration units") were tested on August 5, 2010.

**RESPONSE:** ADMITTED

242.	The SPI's letter dated October 11, 2010, signed by Mann, admitted that the aeration units were put into use following August 5, 2010.

**RESPONSE:** ADMITTED

243.	The SPI's letter dated October 11, 2010, signed by Mann, admitted that the aeration units had been accepted as substantially complete August 5, 2010.

**RESPONSE:** DENIED

244.	The SPI's letter dated October 11, 2010, signed by Mann, admitted that the aeration units had been installed in compression ("push") position.

**RESPONSE:** ADMITTED

245.	The SPI's letter dated October 11, 2010, signed by Mann, admitted that the aeration units could only be placed into a position of "pulling" tension.

**RESPONSE:** DENIED

246.	The SPI's letter dated October 11, 2010, signed by Mann, admits the negligence of SPI in the specifying of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** DENIED

247.	The SPI's letter dated October 11, 2010, signed by Mann, admits the negligence of Mann in the specifying of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** DENIED

248.	The SPI's letter dated October 11, 2010, signed by Mann, admits the negligence of Bourque in the supervision of Mann in the specifying of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** DENIED

249.	The SPI's letter dated October 11, 2010, signed by Mann, admits the negligence of Defendant Nacogdoches in the specifying of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** DENIED

32

# EXHIBIT 11



OXIDATION DITCH PLAN
SCALE 1"= 20'



PROPOSED FLOATING BRUSH AERATOR

PLAN SCALE 1/4" = 1'-0"

DETAIL 1 SCALE N.T.S.

DETAIL 1 SCALE N.T.S.

DETAIL 2 SCALE N.T.S.

EAST SIDE WALK/AERATOR SHOWN
WEST SIDE SIMILAR



CONSTRUCTION PLANS
FOR
CITY OF NACOGDOCHES, TEXAS

WASTEWATER TREATMENT PLANT

OXIDATION DITCH & CLARIFIER
IMPROVEMENTS

SCHAUMBURG & POLK, INC.
BEAUMONT • HOUSTON • TYLER
FIRM REGISTRATION #F000060
8865 College Street, Beaumont, Texas 77707
409.866.0341 | P - 409.866.0957 F
© Copyright 2008

PROPOSED
FLOATING BRUSH AERATORS/
OXIDATION DITCH

| | |
|---|---|
| DATE | JULY 2008 |
| SCALE | AS SHOWN |
| DRAWN BY | T. WEBER |
| DESIGNED BY | M. MANN |
| CHECKED BY | M. MANN |
| SHEET | 4A OF 13 |

PROPOSED FLOATING BRUSH AERATOR
ELEVATION  SCALE 1/4" = 1'-0"

EAST SIDE WALK/AERATOR SHOWN
WEST SIDE SIMILAR

# EXHIBIT 12



Mark Mann <mmann@spi-eng.com>

# City of Nacogdoches, TX

2 messages

**Josh Perfetti <perfetti.joshua@aeromix.com>**
To: mmann@spi-eng.com

**Mon, Aug 30, 2010 at 9:56 AM**

Hello,

I spoke with customer support and they wanted you to view the attached drawing. It shows that the MONSOON has to be mounted pulling on the swing arms. They want to know if this is an option??

Thanks.

—

Josh Perfetti
AEROMIX Systems, Inc.
Regional Sales Manager
Toll Free: 1-800-879-3677
Fax: 763-746-8408
Direct: 763-746-9288
perfetti.joshua@aeromix.com
Web: www.aeromix.com

Be sure to visit AEROMIX at WEFTEC 2010 in New Orleans, Louisiana - Booth 1426, Hall D.

Confidentiality Notice: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

📄 **Swing arms.pdf**
90K

---

**Mark Mann <mmann@spi-eng.com>**
To: Josh Perfetti <perfetti.joshua@aeromix.com>
Cc: dowtech <dowtech@windstream.net>

**Mon, Aug 30, 2010 at 10:20 AM**

Josh,

Per our conversation this morning, and the conversations you have had with Dowtech, the new units installed are being added to an EXISTING UNIT WITH EXISTING EQUIPMENT AND FLOW PATTERN. The new units are being installed as supplimental to the exisitng aerator units so they must match the same flow pattern. The new aerators can only be installed in the locations as shown on the contract drawings with the units pushing (compression) on the arms because the existing equipment prohibits any other location.

I see the attached drawings, however there was no comment or mention of this requirement in the submittal package of the equipment during the project, nor any comments pertaining to this made during bidding.

The units must run with the arms in compression.

Please coordiante with Dowtech if you have any further questions.

[Quoted text hidden]

—

Mark Mann, P.E.
Project Manager

Schaumburg & Polk, Inc.
8865 College Street
Beaumont, Texas 77707
409-866-0341
Fax 866-0337

# EXHIBIT 13



Mark Mann <mmann@spi-eng.com>

# Mounting Details

2 messages

---

**Mark Mann <mmann@spi-eng.com>**
To: dowtech <dowtech@windstream.net>

Thu, Sep 2, 2010 at 2:15 PM

Gerald,

Please find attached details to mount the cables to the oxidation ditch using 4" galv post brackets for the SS cable.

Brett with Water Tech indicated that Aeromix is suppling the cable. You may need to verify if they are suppling the turnbuckles and cable clamps also.

Please let me know if you need anything else.

--
Mark Mann, P.E.
Project Manager

Schaumburg & Polk, Inc.
8865 College Street
Beaumont, Texas 77707
409-866-0341
Fax 866-0337

---

naco mount dtl.pdf
328K

---

**Mark Mann <mmann@spi-eng.com>**
To: Glenn Harris <gharris@spi-eng.com>

Thu, Sep 2, 2010 at 3:24 PM

For your information.

[Quoted text hidden]

---

naco mount dtl.pdf
328K

# SPI SCHAUMBURG & POLK, INC.

8865 College Street • Beaumont, Texas 77707
Ph (409) 866-0341 • Fax (409) 866-0337

| PROJECT: Oxidation Ditch | SHEET 1 |
| CLIENT: Nacogdoches | |
| By: MM | Checked By: | Date: 9/2/11 | Project #: 9086 | OF 3 |

Ex. Cnc.
Weir
EL. 243.83

4" ∅ Galv Expand Post / Mount to Walkway
Dn.-1

SS Cable - Elev. 245.20

Base Plate - 232.3' ±

Al Liner

∇ Hwe
± 246.5

Ex. Hlo 245.5 TL

4" ∅ Galv Post
Set in Concrete
Dn.-2

**SPI** SCHAUMBURG · POLK, INC

8865 College Street · Beaumont, Texas 77707
Ph (409) 866-0341 · Fax (409) 866-0337

PROJECT: Oxidation Ditch

CLIENT: Nacogdoches

By: MM  Checked By:  Date: 9/2/10  Project #:

SHEET 2

OF 3

Center Walk

Ex. Aerators

Walk Way

8'-0"

8'-0"

Top of ff. Liner

Swing Arm

SS Cable

Provide SS
Wire Rope Clips (2)
to Secure Aerator
Location on Cable
at Each Arm Location.



4"⌀ SCH 40 GALV POST

CAP

¼" ℄ 2" RADIUS w/ 1"⌀ HOLE FOR CABLE

(4) ¾" X 6" SS CINCH ANCHOR

WIRE EYE BOLT, CLIP, & TURN BUCKLE (ALL STAINLESS STEEL)

(4) ¾" SS CINCH ANCHORS

4"

8"

¼ 4" X 4 - ¼" GALV

DTL - 1

SS WIRE EYE BOLT, CLIP, & TURNBUCKLE

CAP

4"⌀ SCH 40 GALV POST

¼" ℄ 2" RADIUS w/ 1"⌀ HOLE

NG ELEV 1- .2445

60"

24"⌀ SHAFT OF 3000 PSI CONCRETE

DTL - 2

# EXHIBIT 14a

NO. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC. Plaintiff, | § § § | IN THE DISTRICT COURT |
| | § | |
| V. | § | 145TH JUDICIAL DISTRICT |
| | § | |
| CITY OF NACOGDOCHES, TEXAS and AEROMIX SYSTEMS, INC., Defendants. | § § | |
| | § | OF NACOGODCHES COUNTY, TEXAS |

## DEFENDANT'S RESPONSE TO REQUESTS FOR ADMISSIONS OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

TO:   DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through Plaintiff's attorney of record, BLAKE NORVELL

NOW COMES CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. pursuant to Rule 198 of the Texas Rules of Civil Procedure. The CITY OF NACOGDOCHES makes the following General Objection to all of the Requests for Admissions:

## GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11 Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-installed the aerators as agreed. Submission of these Requests for Admissions is a breach of the Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to respond to this or any discovery that violates the Rule 11 Agreement. Furthermore, Dowtech has submitted a total of 276 separate requests for Admissions which is excessive, abusive,

1

180. Defendant Nacogdoches never paid Plaintiff Dowtech for the work it performed between September 16, 2010 and December 17, 2010 pertaining to the WWTP.

**RESPONSE:** DENIED

181. Plaintiff Dowtech started up the four Aeromix 25 hp aerators on December 17, 2010.

**RESPONSE:** ADMITTED

182. On the December 17, 2010 start-up, Defendant Nacogdoches still refused to permit the 25 hp Aeromix aerators to be anchored/moored despite the WWTP contract documents.

**RESPONSE:** DENIED

183. On the December 17, 2010 start-up, Defendant Nacogdoches still refused to permit the 25 hp Aeromix aerators to be anchored/moored despite Aeromix's recommendation in favor of anchoring/mooring.

**RESPONSE:** DENIED

184. Upon starting the 25 hp Aeromix aerators on the December 17, 2010, the aerators were moving around in the water.

**RESPONSE:** ADMITTED

185. After the December 17, 2010 start-up, Defendant Nacogdoches ordered the shut-down of the aerators on or around December 18, 2010.

**RESPONSE:** ADMITTED, except the exact date of shut-down order not known.

186. Mann ordered Plaintiff Dowtech to return on the January 6, 2011 to tie-off the aerators per his direction.

**RESPONSE:** DENIED

187. Plaintiff Dowtech did return on the January 6, 2011 and worked on January 6, 2011 and January 7, 2011 to tie-off the aerators per Mann's instruction.

**RESPONSE:** DENIED

188. Defendant Nacogdoches has never paid Plaintiff Dowtech for the return and tie-off of the 25 hp Aeromix aerators in January 2011.

**RESPONSE:** DENIED

25

# EXHIBIT 14b

## NO. C1228865

| | | |
|---|---|---|
| **DOWTECH SPECIALTY CONTRACTORS, INC.** **Plaintiff,** | § § § § | **IN THE DISTRICT COURT** |
| **V.** | § § | **145TH JUDICIAL DISTRICT** |
| **CITY OF NACOGDOCHES, TEXAS and AEROMIX SYSTEMS, INC., Defendants.** | § § § § | **OF NACOGODCHES COUNTY, TEXAS** |

## DEFENDANT'S RESPONSE TO REQUESTS FOR ADMISSIONS OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

**TO:** DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through Plaintiff's attorney of record, BLAKE NORVELL

NOW COMES CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. pursuant to Rule 198 of the Texas Rules of Civil Procedure. The CITY OF NACOGDOCHES makes the following General Objection to all of the Requests for Admissions:

### GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11 Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-installed the aerators as agreed. Submission of these Requests for Admissions is a breach of the Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to respond to this or any discovery that violates the Rule 11 Agreement. Furthermore, Dowtech has submitted a total of 276 separate requests for Admissions which is excessive, abusive,

1

180. Defendant Nacogdoches never paid Plaintiff Dowtech for the work it performed between September 16, 2010 and December 17, 2010 pertaining to the WWTP.

**RESPONSE:** DENIED

181. Plaintiff Dowtech started up the four Aeromix 25 hp aerators on December 17, 2010.

**RESPONSE:** ADMITTED

182. On the December 17, 2010 start-up, Defendant Nacogdoches still refused to permit the 25 hp Aeromix aerators to be anchored/moored despite the WWTP contract documents.

**RESPONSE:** DENIED

183. On the December 17, 2010 start-up, Defendant Nacogdoches still refused to permit the 25 hp Aeromix aerators to be anchored/moored despite Aeromix's recommendation in favor of anchoring/mooring.

**RESPONSE:** DENIED

184. Upon starting the 25 hp Aeromix aerators on the December 17, 2010, the aerators were moving around in the water.

**RESPONSE:** ADMITTED

185. After the December 17, 2010 start-up, Defendant Nacogdoches ordered the shut-down of the aerators on or around December 18, 2010.

**RESPONSE:** ADMITTED, except the exact date of shut-down order not known.

186. Mann ordered Plaintiff Dowtech to return on the January 6, 2011 to tie-off the aerators per his direction.

**RESPONSE:** DENIED

187. Plaintiff Dowtech did return on the January 6, 2011 and worked on January 6, 2011 and January 7, 2011 to tie-off the aerators per Mann's instruction.

**RESPONSE:** DENIED

188. Defendant Nacogdoches has never paid Plaintiff Dowtech for the return and tie-off of the 25 hp Aeromix aerators in January 2011.

**RESPONSE:** DENIED

25

Exhibit "I"

# EXHIBIT 15













# EXHIBIT 16

January 6, 2012

Mr. Steve Bartlett, P.E., R.P.L.S.
City Engineer
City of Nacogdoches
PO Box 635030
Nacogdoches, Texas

Re:    City of Nacogdoches
       Wastewater Treatment Plant Improvements
       Oxidation Ditch and Clarifier Improvements

Dear Mr. Bartlett,

The Notice to Proceed for this contract was issued to Dowtech Specialty Contractors and contract time began on November 3, 2009. The aeration units for the Oxidation Ditch were tested and reviewed by the manufacturer's representative on August 5, 2010 and placed into service. Subsequent to the start up date the units could not be placed in continuous service pending revisions to the mounting of the units to allow the units to "pull" instead of "push" on the swing arms. Sway cables were also required to be installed which was accomplished on December 5, 2010. Since that time numerous problems and failures have occurred. Attached to this letter are email correspondences between the City, Schaumburg & Polk, Dowtech, and Aeromix with regards to the referenced sequence of occurrences. Also included are copies of the service reports that are referenced in the timeline. The following is a brief timeline of the occurrences.

- August 26, 2010 thru December 5, 2010 – Revisions to unit mounting arrangements
- September 15, 2010 – First Gearbox failure
- January 20, 2011 – Second Gearbox failure
- January 31, 2011 – Third Gearbox failure
- February 2, 2011 – Onsite meeting with Aeromix, SPI and City to discuss gearbox failures and corrective actions.
- February 24, 2011 – Fourth Gearbox failure
- June 27, 2011 – New Gearboxes installed, all 4 units installed in oxidation ditch and tested for operation
- August 3, 2011 – City notification that motor on the northeast aerator is not operating at correct rpm. Bolts have also been sheared at hub and center shaft assembly.
- September 26, 2011 – New motor installed on northwest aerator unit.
- September 27, 2011 – Notification by City that there are bolts sheared/missing in the hub and center shaft assemblies on the northeast aerator unit.
- October 11, 2011 - Flotation pontoons on all units are checked and remounted for level operation. Sheared bolts are removed and replaced. All units are checked and returned to service.
- November 3, 2011 – Notification by City that the shaft and hub connection bolts on northwest aerator have again failed.
- November 22, 2011 – Aeromix Service Representative makes site visit to evaluate sheared bolts and shaft and gearbox alignment. Service report issued indicating that pillow block bearings are not in proper alignment and that three units (northwest, northeast, and southwest) need to be pulled from oxidation ditch and reworked to provide proper alignment. Leak on southwest gearbox is also noted.
- December 16, 2011 – Aeromix Service Contractor completes work to re-align pillow blocks, remove and replace all sheared connection bolts at hub assemblies on three units and correct gearbox leak. All units are completed and returned to service. Service Report issued on performed work. Report also referenced a stress crack in center shaft at the end support hub on northwest unit.
- December 27, 2011 – Notification by City that bolts have again sheared on northeast and southwest aerator units.
- January 3, 2012 – Aeromix furnished action plan for bolt repair with safety wire and higher grade of thread

A review of the field conditions on January 4, 2012, indicates the problem does not appear to be related to bolts backing out, and the solution proposed by Aeromix does not appear to remedy the problem. It is our opinion that the units provided have failed to perform in accordance with the contract based and the inability to operate the units without reoccurring problems on a frequent basis. Schaumburg & Polk is hereby rejecting the work associated with the provided aerators in accordance with Article 13 of the General Conditions of the contract documents. We recommend that the City of Nacogdoches provide written notice to Dowtech under Article 13.06 of the General Conditions that this work is considered defective, and should be removed from the job. Dowtech should also be notified that the work is to be replaced, and all labor to remove and install new equipment be furnished at no additional cost to the City per Article 13 of the General Conditions, and Section 21 of the Special Conditions.

If you have any questions, please contact us.

Sincerely,
**Schaumburg & Polk, Inc.**

Mark Mann, P.E.
Project Manager

Ricky J. Bourque, P.E.
Vice President

Attachments

Cc:     Mr. Gerald Downing, Dowtech Specialty Contractors
         Mr. Rob Atherton, City Attorney, City of Nacogdoches

# EXHIBIT 17

# CITY OF NACOGDOCHES

P. O. Drawer 631248
Nacogdoches, Texas 75963-1248
936-564-4315

**ROB ATHERTON**
City Attorney

THOMAS L. BELANGER
Assist. City Attorney

STEPHANIE STEPHENS
Assist. City Attorney

January 30, 2012

*Certified Mail Number 7011 0110 0000 9762 0298*
*Return Receipt Requested*

Dowtech Specialty Contractors
**ATTN: Gerald Downing, President**
4703 CR 527
Baird, Texas 79504

> Re: Contract with City of Nacogdoches dated September 15, 2009, for Wastewater Treatment Plant Improvements Oxidation Ditch and Clarifier Improvements (the "Contract")

Dear Mr. Downing:

As set forth in the letter of January 6, 2012, by Schaumburg & Polk, Inc. to City Engineer, Steve Bartlett, of which you were copied (copy attached), Schaumberg & Polk ("S & P") as project engineer, has rejected the work under the Contract associated with the provided aerators in accordance with Article 13 of the General Conditions of the Contract.

This is written notice from the City of Nacogdoches to Dowtech under Article 13.06 of the General Conditions of the Contract that the work related to the provided aerators is defective and rejected. Demand is here made for the removal and replacement of the aerators with approved alternative aerators. This removal and replacement work should be done as soon as possible to avoid all claims, losses, and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) arising out of such removal and replacement, including but not limited to all costs of repair, removal, and replacement of the work of others.

In doing the removal and replacement work, you should take no action which would void or impair the City's warranty and guarantee on said work.

T:\Jan\CITY\LTRS\Misc\DowtechSpecialty.wpd\Page 1

The removal of the condemned work should also be done in compliance with the provisions of Special Conditions Section 21.

Further note that proper functioning of the aerators is essential to the public health, safety, and welfare of the citizens of Nacogdoches as well as downstream persons. The defective aerators may also result in violation of permits held by the City with resulting civil or criminal penalties.

If you have any questions about Schaumburg & Polk's prior letter or the contents or requirements of this letter, please feel free to call either myself or City Engineer Steve Bartlett, or have your legal counsel contact me.

Sincerely,

Rob Atherton

Rob Atherton
City Attorney

RA/jr

cc:     Dowtech Specialty Contracts (Via first class mail)
        Jim Jeffers, City Manager (Via email)
        Steve Bartlett, City Engineer (Via email)
        Schaumburg & Polk, Inc. (Via first class mail)
        **Attn.: Mark Mann, P.E.**
        **Attn: Ricky J. Bourque, P.C.**

# EXHIBIT 18

**From:** Charlie Self [cself@whittenfirm.com]
**Sent:** Wednesday, March 21, 2012 1:39 PM
**To:** 'Teresa Picot'
**Subject:** FW: NAcogdoches Aerators

same

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Wednesday, March 21, 2012 11:54 AM
**To:** Charlie Self
**Subject:** Fw: NAcogdoches Aerators

1/9/12

----- Original Message -----
**From:** Mark Mann
**To:** Josh Perfetti
**Cc:** Felix Crepeau ; sbartlett@barwin.net ; dowtech
**Sent:** Monday, January 09, 2012 5:26 PM
**Subject:** NAcogdoches Aerators

Josh,

I recieved your voice mail on the units in Nacogdoches. Per my email last week, I just want to remind you that the units are not accesible at the moment. You will need to wait until you hear from the City that the units can be accessed before you finalize any plans or schedule any personnel to visit the site.

If you have any questions please let me know.

--
Mark Mann, P.E.
Project Manager

Schaumburg & Polk, Inc.
8865 College Street
Beaumont, Texas 77707
409-866-0341
Fax 866-0337

1

# EXHIBIT 19

# WHITTEN, HACKER, HAGIN, ANDERSON, ALLEN & SELF, P.C.

ATTORNEYS AT LAW
500 CHESTNUT, SUITE 1402
ABILENE, TEXAS 79602

CHARLES C. SELF, III
Tel. (325) 672-7824
Fax (325) 672-2158
cself@whittenfirm.com

PLEASE REPLY TO:
Post Office Box 208
Abilene, Texas 79604

March 6, 2012

CMRRR#7011 0470 0002 1348 7452

Mr. Steve Bartlett, P.E., RPLS
City Engineer
City of Nacogdoches
P. O. Box 635030
Nacogdoches, Texas

> Re: City of Nacogdoches
> Waste Water Treatment Plant Improvements
> Oxidation Ditch and Clarifier Improvements;
> Letter of January 6, 2012 from Schaumburg & Polk, Inc.

Dear Mr. Bartlett:

Please be advised that this law firm represents Dowtech Specialty Contractors, Inc. In the course of such representation we have been provided with the above referenced letter wherein Mr. Mark Mann, Projects Engineer of the above referenced project, forwarded his letter along with certain information to you in regards to the above referenced project. Our client wanted to add to the information he has provided to you so that a more thorough picture of this entire project can be viewed.

We note the time line as laid out in Mr. Bartlett's letter. Our client has a number of comments and/or questions in regards to same.

Our client would agree that notice to proceed was issued and contract of time began on or about November 3, 2009. Our client would further agree that on or about August 5, 2010, the aeration units were tested and reviewed by the manufacturer's representative, Mr. Brett Pate, of Water and Wastewater Technical Services, Inc.

It should be noted that the units were Aeromix units. As you may recall, at the initial design stage of this project the only aeration units to be considered were those provided by ECS House Industries. This was changed at the direction of the City of Nacogdoches, to include Aeromix Systems. Subsequently, Aeromix Systems was the low bidder on the contract and therefore, their aeration units were accepted.



Mr. Mann has laid out in his timeline, a number of problems that have occurred with the aeration units. What that time line fails to take into the account is that Dowtech, on numerous occasions, has made trips to this property in an attempt to fix this problem. Oftentimes, those trips have been made at no cost to anyone other than Dowtech.

What the timeline also fails to discuss is that, on or about January 31, 2011, Dowtech suggested a plan that called for possible replacement of the aeration units. At that time, the City refused to consider same, stating that they were "good units."

In reviewing the above referenced letter, we note in the last paragraph that Schaumburg & Polk is recommending that the City provide Dowtech written notice under Article 13.06 of the General Conditions that the work is considered defective and should be removed from the job. It is assumed that this is to be done at Dowtech's cost. My client strongly disagrees with this suggestion.

Mr. Mann references the general conditions of the contract. In reviewing the General Conditions, I note that work is defined in paragraph #51, page 7 of the General Conditions. It is defined as follows:

> "51. *Work.* Entire construction or the various separately identifiable parts hereof required to be provided under the Contract Documents. Work includes and is the result of performing or providing all labor, services and documentation necessary to produce such construction, and furnishing, installing, and incorporating all materials and equipment into such construction, all as required by the Contract Documents."

We note that Mr. Mann suggests that the notice be provided to Dowtech should contain the phrase that the work is considered defective. As you are aware, that term is also defined as the general conditions of the contract. Specifically, Section 1.02 d., once again on page 7 of the General Conditions of the Contract, defines defective as follows:

D. Defective

1. The word "defective," when modifying the word "Work," refers to work that is unsatisfactory, faulty, or deficient in that it:

   a. does not conform to the Contract Documents, or

   b. does not meet the requirements of any applicable inspection, reference standard, test, or approval referred to in the Contract Documents, or

   c. has been damaged prior to Engineer's recommendation of final payment (unless responsibility for the protection thereof has been assumed by Owner at Substantial completion in accordance with Paragraph 14.04 or 14.05)."

A review of the definition of defective as contained in the General Conditions of the Contract leads my client to the conclusion that the work, as defined above, does not meet such defective definition. This is especially true in light of the fact of the numerous times Aeromix has been on site and offered fixes to the problem.

There is no dispute that Dowtech installed the aeration units preferred by the City of Nacogdoches exactly as they were required to be installed. When the aeration units needed to be re-engineered, Dowtech did same, only after instructed by the Project Engineer and Aeromix.

It is our understanding that at present, two of the four units are functioning with no problems. More importantly, it is also our understanding that Aeromix has offered to replace the other two units with new units. This would certainly appear to solve any problems that the City is experiencing at little, if any, cost to the City.

Based upon Aeromix's offer, it seems that any complaint of the City has been addressed, provided the City allows Aeromix the opportunity to stand behind their product and service and/or replace same. We do not understand why the City would consider any other alternative. Further, we see no reason for the City to refuse to allow Aeromix the opportunity to do so.

My client informs me that they are owed the balance of the contract, approximately $75,355.45. Please advise as to when payment will be made. Failure to promptly do so will result in charges for interest being added thereto.

Thank you for your attention to this matter. Should you have any questions or comments, please do not hesitate to contact me.

Sincerely,

WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.

By: _____
Charles C. Self, III

CCS:tp

C:   Gerald Downing
     Dowtech Specialty

C:   Peter Gross
     Aeromix

# EXHIBIT 20

# WHITTEN, HACKER, HAGIN, ANDERSON, ALLEN & SELF, P.C.

## ATTORNEYS AT LAW
### 500 CHESTNUT, SUITE 1402
### ABILENE, TEXAS 79602

CHARLES C. SELF, III
Tel. (325) 672-7824
Fax (325) 672-2158
cself@whittenfirm.com

PLEASE REPLY TO:
Post Office Box 208
Abilene, Texas 79604

March 27, 2012

CMRRR#:7011 2970 0003 2106 2656

Mr. Steve Bartlett, P.E., RPLS
City Engineer
City of Nacogdoches
P. O. Box 635030
Nacogdoches, Texas 75963-5030

**Re:** **City of Nacogdoches; Waste Water Treatment Plant Improvements Oxidation Ditch and Clarifier Improvements;**

Dear Mr. Bartlett:

As you are aware, I forwarded a letter to you on March 27, 2012 on behalf of Dowtech Specialty Contractors, Inc.

In the very first paragraph on page 2 of that letter, I stated that our client is due a final payment of $73,355.45. I went on to state in that letter, approximately two paragraphs down, to demand the amount of $75,355.45.

I regret the error. The amount contained in the first paragraph, $73,355.45 is incorrect. The correct amount, as contained the last full paragraph of the letter dated March 27, 2012 is actually $75,355.45.

I certainly regret the error.

Thank you for your attention to this matter. Should you have any questions or comments, please do not hesitate to contact me.

Sincerely,

WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.

By: _____
Charles C. Self, III

CCS:tp

C:     Gerald Downing
        Dowtech Specialty

COPY

# EXHIBIT 21

| | |
|---|---|
| **From:** | Charlie Self [cself@whittenfirm.com] |
| **Sent:** | Thursday, August 02, 2012 4:38 PM |
| **To:** | teresa@whittenfirm.com |
| **Subject:** | FW: suggested fix at nacogdoches |

Print/bring

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Thursday, August 02, 2012 3:04 PM
**To:** Charlie Self
**Subject:** Fw: suggested fix at nacogdoches

---- Original Message ----
**From:** Buddy Harris
**To:** dowtech
**Cc:** Doug Reeves
**Sent:** Thursday, August 02, 2012 2:32 PM
**Subject:** RE: suggested fix at nacogdoches

Hi---Yes I will---sending this request to our Construction Mgr.who you also talked to—Doug Reeves.

Buddy Harris
Ass't President
Direct 763-746-9299
Mobile 612-819-3127
Fax 763-746-8408
1-800-879-3677
Harris.buddy@aeromix.com
Skype:aeromix.harris.buddy
www.aeromix.com

 RWL Water GROUP

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Thursday, August 02, 2012 1:58 PM
**To:** Buddy Harris
**Cc:** Charlie Self
**Subject:** suggested fix at nacogdoches

BUDDY, can you send me an email stating what you told me by phone on the fix at nacogdoches. thanks

Confidentiality Notice: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

1

# EXHIBIT 22

x

| | |
|---|---|
| **From:** | Charlie Self [cself@whittenfirm.com] |
| **Sent:** | Thursday, August 02, 2012 4:39 PM |
| **To:** | teresa@whittenfirm.com |
| **Subject:** | FW: suggested fix at nacogdoches |

Print/bring

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Thursday, August 02, 2012 3:04 PM
**To:** Charlie Self
**Subject:** Fw: suggested fix at nacogdoches

----- Original Message -----
**From:** Doug Reeves
**To:** Buddy Harris ; dowtech
**Sent:** Thursday, August 02, 2012 2:44 PM
**Subject:** RE: suggested fix at nacogdoches

Gerald,

It was nice to talk with you on the phone this afternoon, and thank you for being polite and listening to my thoughts. After reviewing the project file and photos from the site I feel that far too much torque exists on the Monsoon gearbox and shaft during startup of the units. I feel that once the existing units are repaired that if Aeromix would be allowed to install soft starts on the units, this would relieve the torque on the units and eliminate the bolt sheering issue you have seen, and gearbox failures. I would propose that Aeromix would do this work at our cost, if the city would work with us to establish an agreement of acceptable performance once the rework is complete. I understand that you have likely been down this road in past communications, however I can assure you I was brought in to rectify situations like what you are experiencing.

Regards,

Doug Reeves
**Construction & Services Manager**
**Leader Project Management**
AEROMIX
7135 Madison Avenue West
Golden Valley, MN 55427-3601
E-Mail: reeves.doug@aeromix.com
Skype: aeromix.reeves.doug
Work: 763-746-9264
Cell: 815-584-6618

 

For all of your AEROMIX parts needs please visit our new online store at http://store.aeromix.com/ and receive free shipping on all online domestic orders and ½ off shipping on all online international orders through 2012! Please check back frequently as new parts are being added daily.

**From:** Buddy Harris
**Sent:** Thursday, August 02, 2012 2:32 PM
**To:** dowtech
**Cc:** Doug Reeves
**Subject:** RE: suggested fix at nacogdoches

Hi---Yes I will---sending this request to our Construction Mgr.who you also talked to—Doug Reeves.

Buddy Harris
Ass't President
Direct 763-746-9299
Mobile 612-819-3127
Fax 763-746-8408
1-800-879-3677
Harris.buddy@aeromix.com
Skype:aeromix.harris.buddy
www.aeromix.com



**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Thursday, August 02, 2012 1:58 PM
**To:** Buddy Harris
**Cc:** Charlie Self
**Subject:** suggested fix at nacogdoches

BUDDY, can you send me an email stating what you told me by phone on the fix at nacogdoches.  thanks

Confidentiality Notice: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

**From:** Charlie Self [cself@whittenfirm.com]
**Sent:** Thursday, August 02, 2012 4:38 PM
**To:** teresa@whittenfirm.com
**Subject:** FW: Fw: suggested fix at nacogdoches

Print/bring

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Thursday, August 02, 2012 3:47 PM
**To:** Charlie Self
**Subject:** Fw: Fw: suggested fix at nacogdoches

----- Original Message -----
**From:** Mark Mann
**To:** dowtech
**Cc:** sbartlett@barwin.net
**Sent:** Thursday, August 02, 2012 3:32 PM
**Subject:** Re: Fw: suggested fix at nacogdoches

Gerald,

We have not been in the loop on this since the City Attorney took over. You probably need to have your attorney or you send this request in a letter to the City Attorney for reveiw by them.

Thanks.

On Thu, Aug 2, 2012 at 3:04 PM, dowtech <dowtech@windstream.net> wrote:

----- Original Message -----
**From:** Doug Reeves
**To:** Buddy Harris ; dowtech
**Sent:** Thursday, August 02, 2012 2:44 PM
**Subject:** RE: suggested fix at nacogdoches

Gerald,

It was nice to talk with you on the phone this afternoon, and thank you for being polite and listening to my thoughts. After reviewing the project file and photos from the site I feel that far too much torque exists on the Monsoon gearbox and shaft during startup of the units. I feel that once the existing units are repaired that if Aeromix would be allowed to install soft starts on the units, this would relieve the torque on the units and eliminate the bolt sheering issue you have seen, and gearbox failures. I would propose that Aeromix would do this work at our cost, if the city would work with us to establish an agreement of acceptable performance once the rework is complete. I understand that you have likely been down this road in past communications, however I can assure you I was brought in to rectify situations like what you are experiencing.

Regards,

1

Doug Reeves

*Construction & Services Manager*

*Leader Project Management*

AEROMIX

7135 Madison Avenue West
Golden Valley, MN 55427-3601
E-Mail: reeves.doug@aeromix.com
Skype: aeromix.reeves.doug
Work: 763-746-9264

Cell: 815-584-6618

 

For all of your AEROMIX parts needs please visit our new online store at http://store.aeromix.com/ and receive free shipping on all online domestic orders and ½ off shipping on all online international orders through 2012! Please check back frequently as new parts are being added daily.

---

**From:** Buddy Harris
**Sent:** Thursday, August 02, 2012 2:32 PM
**To:** dowtech
**Cc:** Doug Reeves
**Subject:** RE: suggested fix at nacogdoches

Hi---Yes I will---sending this request to our Construction Mgr.who you also talked to—Doug Reeves.

Buddy Harris

Ass't President

Direct 763-746-9299

Mobile 612-819-3127

Fax <u>763-746-8408</u>

<u>1-800-879-3677</u>

<u>Harris.buddy@aeromix.com</u>

Skype:aeromix.harris.buddy

<u>www.aeromix.com</u>



**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Thursday, August 02, 2012 1:58 PM
**To:** Buddy Harris
**Cc:** Charlie Self
**Subject:** suggested fix at nacogdoches

BUDDY, can you send me an email stating what you told me by phone on the fix at nacogdoches.  thanks

Confidentiality Notice: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

--
Mark Mann, P.E.
Project Manager

Schaumburg & Polk, Inc.
8865 College Street
Beaumont, Texas  77707
409-866-0341
Fax  866-0337

# EXHIBIT 23

NO. C1228865

| | § | IN THE DISTRICT COURT |
|---|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC. | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| v. | § | OF NACOGDOCHES COUNTY, TEXAS |
| | § | |
| CITY OF NACOGDOCHES, TEXAS AND AEROMIX SYSTEMS, INC., | § | |
| | § | |
| | § | |
| DEFENDANTS | § | 14th _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

Comes now DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff in the above entitled and numbered cause (hereinafter referred to as Plaintiff) complaining of the City of Nacogdoches, (hereinafter referred to as Defendant Nacogdoches) and Aeromix Systems, Inc. (hereinafter referred to as Defendant Aeromix), and for causes of action would respectfully show this Court the following:

### I. DISCOVERY CONTROL PLAN

1.      Plaintiff intends to conduct discovery under Level 2, Rule 190.3 of the Texas Rules of Civil Procedure.

### II. PARTIES

2.      Plaintiff, Dowtech Specialty Contractors, Inc. is a corporation organized and existing under the laws of the State of Texas with its principal location in Baird, Callahan County, Texas.

3.      Defendant, Nacogdoches is a municipality located in Nacogdoches County, Texas, may be served with process by serving its City Secretary, Lila Fuller, at 202 East Pilar Street, Nacogdoches, Texas, 75961, under the authority of Texas Civil Practice and Remedies Code § 17.024(a).

COPY

4.     Defendant Aeromix Systems, Inc. is a corporation organized and existing under the laws of the State of Minnesota, with its principal office being located in Minneapolis, Minnesota, and it may be served with process by serving its Chief Executive Officer, Peter Gross at 7135 Madison Avenue, Minneapolis, Minnesota 55427.

## III. JURISDICTION AND VENUE

4.     This Court has jurisdiction of this matter for the reason that the Texas Legislature waived Defendant's immunity from suit when it enacted Tex. Loc. Gov't Code § 271.151 et seq. allowing Plaintiff to sue Defendant Nacogdoches for breach of contract and related causes of action and the facts which are the subject of this lawsuit occurred in Texas. In addition, this Court has jurisdiction against Defendant Aeromix for the reason that Defendant Aeromix does business in Texas.

5.     Venue of this matter is mandatory in Nacogdoches County under Texas Civil Practice and Remedies Code § 15.0151 because this suit involves as a party a municipality located in a County, which has a population of less than 100,000 people. Venue is further proper in Nacogdoches County because all or substantially all of the cause of action accrued in Nacogdoches County.

## IV. FACTS

### 1. PROJECT HISTORY

6.     Plaintiff was the general contractor on a project known as the Wastewater Treatment Plant, Oxidation Ditch and Clarifier Improvements Project (the Nacogdoches project). This project was undertaken by Defendant Nacogdoches in Nacogdoches County, Texas, for the benefit of Defendant Nacogdoches and the citizens thereof.

7.     As part of the Nacogdoches project, Plaintiff installed four aeration units which were manufactured by Defendant Aeromix Systems Inc. (hereinafter referred to as Defendant

Aeromix). Defendant Aeromix apparently was the preferred provider of Defendant, Nacogdoches. The aeration units were installed according to the plans and specifications provided by Defendant Nacogdoches' engineer on the project, Schaumburg & Polk, and also installed according to such plans and specifications as were provided by Defendant Aeromix. At the installation of the project, Defendant Aeromix's agent, Mr. Brett Pate of Water & Wastewater Technical Services, Inc., the Texas representative of Defendant Aeromix, approved the installation prior to the start-up of the units and gave the go ahead for the units to be used as installed. Such installation was also supervised and/or approved by Defendant Nacogdoches' engineer. This occurred on or about August 5, 2010.

8. On or about August 19, 2010, Defendant Nacogdoches reported to Plaintiff a flexing condition in one of the units. Shortly thereafter, one of the mooring arms of the units disconnected and caused damage to the aeration units.

9. Plaintiff advised Defendant Aeromix of these problems. Defendant Aeromix instructed Plaintiff to mount the aeration units in the opposite direction so that they would pull (put into tension the mooring arms as opposed to pushing), which Plaintiff did. Once again, such installation was approved by Defendant Nacogdoches' engineer.

10. The re-worked aerators were activated on December 17, 2010. However, Defendant Nacogdoches expressed concern regarding movement of the aerators. Apparently, after consultation between Defendant Aeromix and Defendant Nacogdoches' engineers, a new type of anchoring system for the aerators was devised and once again, Plaintiff was requested to do the work on same. Plaintiff traveled to the job site and ran temporary anchors so Defendant Nacogdoches could see how different type anchor points would affect the aerators. Immediately thereafter, the gear boxes on the aerators began to fail. Eventually, all four gear boxes of the

aerators failed. At this point Defendant Aeromix hired McKinney and Moore, a construction company near Nacogdoches to pull the aerators and replace all gear boxes and reset the aerators.

11. In September of 2011, the engineer on the project contacted Plaintiff to advise that the number two (2) aerator was not operating correctly. Plaintiff dispatched its employee to the site and found that bolts on the shaft had sheared off. Plaintiff pulled and repaired the aerators and then reset same. While on site, Plaintiff noticed that there were many things that were not completed by McKinney and Moore so that the project could be finalized. Plaintiff completed all items so that Defendant Nacogdoches was satisfied.

12. At a later time, beginning in October of 2011, Plaintiff was once again called to the project to perform service work on the aerators. This necessitated four additional days on the aerators. At all times material hereto, Defendant Aeromix has been ready, willing and able to repair and/or provide service to the aerators. It is Plaintiff's belief that Defendant Nacogdoches has, on occasion, refused same.

## 2. NON-PAYMENT BY DEFENDANT CITY OF NACOGDOCHES

13. In a letter dated January 6th, 2012, Defendant Nacogdoches' engineer from Schaumburg & Polk advised Defendant Nacogdoches that two of the aerators were faulty and/or defective, thereby failing to perform in accordance with the contract. Because of the faulty and/or defective condition of these two aerators, Defendant Nacogdoches' engineer rejected the work associated with the aerators pursuant to Article 13 of the General Conditions of the contract between Plaintiff and Defendant. It was Defendant's position that Plaintiff must remove and replace all work performed on the job, with all costs paid by Plaintiff.

14. In a letter dated on or about January 30th, 2012, Plaintiff received official, written notice from Defendant Nacogdoches, that Plaintiff's work had been rejected as defective and

demanded that Plaintiff remove and replace the aerators with all costs paid by Plaintiff.

15. Upon receiving this notice from Defendant Nacogdoches, Plaintiff notified Defendant Aeromix of Defendant Nacogdoches' determination that the aerators and accompanying work were defective. In a letter dated on or about February 20th, 2012, Defendant Aeromix President, Peter Gross, informed Plaintiff that Aeromix would stand behind its warranty of the defective aerators and replace them for free, after said aerators had been returned to Aeromix. It is Plaintiff's belief that Defendant Nacogdoches rejected this offer.

16. Upon learning that Defendant Aeromix would stand behind its warranty, in a letter dated on or about March 6th, 2012, Plaintiff informed Defendant Nacogdoches of the following:

   a. That Plaintiff objected to Defendant's claim that Plaintiff's work was defective. Plaintiff asserted that Plaintiff's work could not be defective pursuant to certain definitions and other applicable language contained within the contract between Plaintiff and Defendant Nacogdoches;

   b. That Defendant Aeromix stands ready, willing and able to make good on their warranty and replace the two defective aerators at little to no cost to Defendant Nacogdoches thereby satisfying Defendant Nacogdoches' need to replace the defective aerators; and

   c. That in consideration for the services, materials and labor Plaintiff has provided for the Nacogdoches Project, Defendant Nacogdoches had promised, and became bound and liable to pay Plaintiff, the sum of $75,355.45.

20. Defendant Nacogdoches has acknowledged that the sum of $75,355.45 is due and owing to Plaintiff. In an email dated December 5th, 2011, Defendant Nacogdoches' engineer

from Schaumburg and Polk stated to Plaintiff that Defendant Nacogdoches would pay Plaintiff the remaining balance of $75,355.45 owed to Plaintiff, ten (10) days after the alignment issue with the aerators had been corrected. (A copy of this email, redacted, is attached hereto as Exhibit "A").

21.     On or about March 27th, 2012, Plaintiff sent Defendant Nacogdoches a letter demanding payment of the $75,355.45, plus interest, due and owing to Plaintiff, for the work Plaintiff had performed on the Nacogdoches Project. This demand letter is attached as Exhibit "B" and incorporated by reference herein. Plaintiff reminded Defendant Nacogdoches that Defendant Nacogdoches' engineer had stated to Plaintiff that payment would be received ten (10) days after the mooring issue with the aerators had been corrected. Plaintiff corrected this issue, but has still not been paid.

22.     Besides a single letter stating Defendant Nacogdoches would look into the issue, Plaintiff has not received any reply to its demand letter for payment from Defendant Nacogdoches. Defendant Nacogdoches has failed and refused and continues to fail and refuse to pay Plaintiff the balance, due and owing to Plaintiff, pursuant to the contract entered into between the parties, for the work performed by Plaintiff on the Nacogdoches Project.

## V. CAUSES OF ACTION

### (1) QUANTUM MERUIT

### ALTERNATIVE CLAIM)

23.     Plaintiff would incorporate the facts as set forth above.

24.     Plaintiff provided Defendant Nacogdoches with valuable services, materials and labor as the general contractor of the Nacogdoches Project. Defendant accepted the services, materials and labor that Plaintiff had provided.

25.    Plaintiff provided the services, materials and labor for Defendant Nacogdoches' benefit. As the general contractor, Plaintiff initiated the installation of the aerators and once installed, maintained the same, which benefited Defendant Nacogdoches.

26.    Defendant Nacogdoches had reasonable notice that the Plaintiff expected compensation for the services, materials and labor as Plaintiff had contracted with Defendant, Nacogdoches to be paid for installing and maintaining the aerators.

27.    Because Plaintiff expected compensation, Defendant Nacogdoches' acceptance of the services, materials and labor without payment resulted in the following damages to Plaintiff:

a)    Plaintiff provided services, materials and labor in excess of the amount of $75,355.45. Although Defendant Nacogdoches has paid Plaintiff some monies for the services, materials and labor provided, Defendant Nacogdoches has not paid Plaintiff the $75,355.45 still due and owing to Plaintiff. Plaintiff requests that Defendant Nacogdoches be ordered to pay to Plaintiff.

28.    Plaintiff further seeks unliquidated damages within the jurisdictional limits of this Court.

29.    Attorney's Fees. As a result of Defendant Nacogdoches' failure to pay to Plaintiff the amount as previously set forth herein, Plaintiff has been compelled to seek the services of the undersigned firm of attorneys to recover this debt. Plaintiff would further show that more than thirty (30) days will have expired at the time of trial since said debt has been presented to Defendant Nacogdoches for payment, and that as of the date of filing of this petition, payment for this just amount owing has not been tendered to Plaintiff by Defendant Nacogdoches. Plaintiff would show that it will necessarily incur the expense of reasonable attorney's fees to prosecute its claim; and, pursuant to Section 38.001, et seq., of the Texas Civil Practice and

Remedies Code, Plaintiff herein seeks reimbursement for such fees expended in its behalf.

## (2) SUIT ON SWORN ACCOUNT

## (ALTERNATIVE CLAIM)

30.    Plaintiff would incorporate the facts as set forth above.

31.    Plaintiff provided services, materials and labor to Defendant Nacogdoches on an open account.  Defendant Nacogdoches accepted the services, materials and labor becoming bound to pay Plaintiff its designated charges.  The prices charged for such services, materials and labor were just and true because they are the usual, customary and reasonable prices that Plaintiff normally charges and that are normally charged by similarly situated Plaintiffs in providing such services, materials and labor.  The designated charges were also reasonable and customary according to the terms of the parties' contract.

32.    Plaintiff attaches hereto the affidavit of Gerald Downing, agent of Plaintiff Downing Specialty Contractors, Inc. and incorporates it by reference herein.  The account accurately sets forth the services, materials and labor Plaintiff provided to Defendant Nacogdoches, the date of delivery and performance, and the cost of such services, materials and labor.  The account represents a record of the series of transactions that is similar to records Plaintiff systematically keeps in the ordinary course of business.  All services, materials and labor furnished by Plaintiff were reasonable and necessary, and the amounts charged by Plaintiff for same are reasonable charges.

33.    This claim is just and true, and after applying all just and lawful offsets, payments and credits to the amounts charged by Plaintiff, the amount remains unpaid.  The amount is a liquidated amount, in the sum of $75,355.45.

34.     Plaintiff attaches to this petition its verification, as Exhibit "C", stating that the charges are reasonable and necessary and swearing and/or affirming as to same.

35.     As set forth above, Plaintiff has been damaged in the amount of $75,355.45 for which Plaintiff herein sues.

36.     Attorney's Fees. As a result of Defendant Nacogdoches' failure to pay to Plaintiff the amount as previously set forth herein, Plaintiff has been compelled to seek the services of the undersigned firm of attorneys to recover this debt. Plaintiff would further show that more than thirty (30) days will have expired at the time of trial since said debt has been presented to Defendant for payment, and that as of the date of filing of this petition, payment for this just amount owing has not been tendered to Plaintiff by Defendant Nacogdoches. Plaintiff would show that it will necessarily incur the expense of reasonable attorney's fees to prosecute its claim; and, pursuant to Section 38.001, et seq., of the Texas Civil Practice and Remedies Code, Plaintiff herein seeks reimbursement for such fees expended in its behalf.

## (3) BREACH OF CONTRACT

### (ALTERNATIVE CLAIM)

37.     On or about November 3rd, 2009, Plaintiff and Defendant Nacogdoches executed a valid and enforceable written contract. Plaintiff attaches a copy of the contract as Exhibit "D" and incorporates by reference herein. The contract stated that Plaintiff would be general contractor on the Nacogdoches Project and provide services, materials and labor for the installation and maintenance of aerators. The contract stated that Defendant Nacogdoches would pay Plaintiff for its work as general contractor.

38.     Plaintiff tendered performance of Plaintiff's contractual obligations. Plaintiff performed its job as general contractor of the Nacogdoches Project by providing services,

materials and labor to install and maintain aerators for the Nacogdoches Project.

39. Defendant Nacogdoches materially breached the contract by failing to pay Plaintiff for its performance and provision of services, materials and labor in accordance with the terms of the contract.

40. Defendant Nacogdoches' breach caused injury to Plaintiff, which resulted in the following damages:

a) Plaintiff has provided services, materials and labor in the total amount of $75,355.45, for which Plaintiff requests that Defendant Nacogdoches be ordered to pay to Plaintiff.

41. Plaintiff seeks liquidated damages in the amount of at least $75,355.45, which is within the jurisdictional limits of this Court.

42. Attorney's Fees. As a result of Defendant Nacogdoches' failure to pay to Plaintiff the amount as previously set forth herein, Plaintiff has been compelled to seek the services of the undersigned firm of attorneys to recover this debt. Plaintiff would further show that more than thirty (30) days will have expired at the time of trial since said debt has been presented to Defendant for payment, and that as of the date of filing of this petition, payment for this just amount owing has not been tendered to Plaintiff by Defendant Nacogdoches. Plaintiff would show that it will necessarily incur the expense of reasonable attorney's fees to prosecute its claim; and, pursuant to Section 38.001, et seq., of the Texas Civil Practice and Remedies Code, Plaintiff herein seeks reimbursement for such fees expended in its behalf.

### (4) PROMISSORY ESTOPPEL

### (ALTERNATIVE CLAIM)

43. Defendant promised Plaintiff that Defendant Nacogdoches would pay Plaintiff for

the services, materials and labor it provided as the general contractor on the Nacogdoches Project.

44. Plaintiff relied on Defendant Nacogdoches' promise by providing services, materials and labor at the up-front cost to Plaintiff for the installation and maintenance of the aerators for the Nacogdoches Project.

45. Defendant Nacogdoches knew or reasonably should have known that Plaintiff would rely on Defendant's promise. Defendant Nacogdoches and Plaintiff entered into a valid and enforceable written contract, which its terms provided that in exchange for Plaintiff providing services, materials and labor as general contractor for the Nacogdoches Project, Defendant Nacogdoches would pay Plaintiff an agreed upon rate and or sum.

46. Injustice to Plaintiff can only be avoided if Defendant Nacogdoches' promise is enforced. Plaintiff has provided Defendant with services, materials and labor at the up-front cost to Plaintiff. If Defendant Nacogdoches' promise is not enforced, then Plaintiff will go uncompensated for the work Plaintiff did at the request of Defendant Nacogdoches and for Defendant Nacogdoches' benefit.

47. Plaintiff's reliance on Defendant Nacogdoches' promise caused injury to Plaintiff, which resulted in the following damages:

a) Plaintiff has provided services, materials and labor in the total amount of $75,355.45, for which Plaintiff requests that Defendant Nacogdoches be ordered to pay to Plaintiff.

48. Plaintiff seeks unliquidated damages within the jurisdictional limits of this Court.

49. Attorney's Fees. As a result of Defendant Nacogdoches' failure to pay to Plaintiff the amount as previously set forth herein, Plaintiff has been compelled to seek the services of the

undersigned firm of attorneys to recover this debt. Plaintiff would further show that more than thirty (30) days will have expired at the time of trial since said debt has been presented to Defendant for payment, and that as of the date of filing of this petition, payment for this just amount owing has not been tendered to Plaintiff by Defendant Nacogdoches. Plaintiff would show that it will necessarily incur the expense of reasonable attorney's fees to prosecute its claim; and, pursuant to Section 38.001, et seq., of the Texas Civil Practice and Remedies Code, Plaintiff herein seeks reimbursement for such fees expended in its behalf.

## (5) BREACH OF IMPLIED WARRANTY

### (ALTERNATIVE CLAIM)

50.    Plaintiff would incorporate the facts as set forth above.

51.    As set forth above, Defendant Aeromix sold four aerators to Plaintiff for use and/or installation in the Nacogdoches project. At the time of the sale of such goods, Defendant Aeromix had knowledge that Plaintiff Dowtech was buying the goods for a particular purpose and relying upon Defendant Aeromix's skill and/or judgment to select goods that fit that purpose. Defendant Aeromix delivered the goods that were unfit for Plaintiff's particular purpose in that they would not do the job as required, once installed. In addition, once installed, the aerators continued to malfunction and/or have problems. On numerous occasions, Plaintiff Dowtech notified Defendant Aeromix of these problems. The problems have yet to be cured. The failure to cure these problems has resulted in damages to Plaintiff Dowtech in that Plaintiff Dowtech has yet to be paid monies due on the project as set forth and/or referenced above and Plaintiff Dowtech has incurred out of pocket costs in an attempt to remedy this situation. Such amounts are in excess of the minimum jurisdictional limits of this Court and Plaintiff brings suit as against Defendant Aeromix for same.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon final hearing Plaintiff recover:

1. Judgment against Defendant Nacogdoches in the amount of $75,355.45, as the total amount due and owing for the services, materials and labor furnished and delivered to Defendant Nacogdoches by Plaintiff;

2. Judgment against Defendant Nacogdoches for reasonable attorney's fees expended by Plaintiff to recover its damages as set forth in this Petition;

3. Judgment against Defendant Nacogdoches for pre-judgment interest at the rate allowed by law.

4. Judgment against Defendant Nacogdoches for post-judgment interest as allowed by law;

5. Judgment against Defendant Nacogdoches for costs of court; and

6. Alternatively, Judgment against Defendant Aeromix for actual damages as set forth above

7. Such other and further relief both general and special, both at law and in equity, as Plaintiff may be shown to be justly entitled to receive.

Respectfully submitted,

CHARLES C. SELF, III
State Bar No. 18007550
WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.
P. O. Box 208
Abilene, Texas 79604
(325) 672-7824
(325) 672-2158 - Fax

| | |
|---|---|
| **From:** | Charlie Self [cself@whittenfirm.com] |
| **Sent:** | Wednesday, March 21, 2012 1:40 PM |
| **To:** | 'Teresa Picot' |
| **Subject:** | FW: Nacogdoches Final Pay Est. |

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Wednesday, March 21, 2012 11:53 AM
**To:** Charlie Self
**Subject:** Fw: Nacogdoches Final Pay Est.

----- Original Message -----
**From:** Mark Mann
**To:** dowtech
**Sent:** Monday, December 05, 2011 2:09 PM
**Subject:** Re: Nacogdoches Final Pay Est.

Donna,

I spoke with the City on this. The following is response from City Engineer:

"Since the price of the 4 aerators ($142,800) far exceeds the outstanding 5% retainage ($36,145) and also the remaining balance due on the whole contract, my thought is to withhold the remaining $75,355.45 until the alignment issue is resolved. The aerators are a critical item to this project and the repeated failures we have had could be construed as liquated damages. I would be in agreement to releasing the remaining funds within 10 days or less upon completion of the alignment correction. I would like to avoid moving this into a warranty issue until the bolt problems is solved"

Let me know if you have any questions.

On Fri, Dec 2, 2011 at 9:24 AM, dowtech <dowtech@windstream.net> wrote:
Mark,

We were wondering where the final pay est. for Nacogdoches is.? The 14 of Dec. will be 2 months since we turned it in. Would you check on it for us.

Thanks,
Donna Alston
Dowtech Specialty Contractors, Inc.
325-893-4684

--
Mark Mann, P.E.
Project Manager


**EXHIBIT** A

Schaumburg & Polk, Inc.

1

8865 College Street
Beaumont, Texas  77707
409-866-0341
Fax  866-0337

# WHITTEN, HACKER, HAGIN, ANDERSON, ALLEN & SELF, P.C.

ATTORNEYS AT LAW
500 CHESTNUT, SUITE 1402
ABILENE, TEXAS 79602

CHARLES C. SELF, III
Tel. (325) 672-7824
Fax (325) 672-2158
cself@whittenfirm.com

PLEASE REPLY TO:
Post Office Box 208
Abilene, Texas 79604

March 27, 2012

CMRRR#:7011 2970 0003 2106 2656

Mr. Steve Bartlett, P.E., RPLS
City Engineer
City of Nacogdoches
P. O. Box 635030
Nacogdoches, Texas 75963-5030

Re: City of Nacogdoches; Waste Water Treatment Plant Improvements
Oxidation Ditch and Clarifier Improvements;

Dear Mr. Bartlett:

As you are aware, I forwarded a letter to you on March 27, 2012 on behalf of Dowtech Specialty Contractors, Inc.

In the very first paragraph on page 2 of that letter, I stated that our client is due a final payment of $73,355.45. I went on to state in that letter, approximately two paragraphs down, to demand the amount of $75,355.45.

I regret the error. The amount contained in the first paragraph, $73,355.45 is incorrect. The correct amount, as contained the last full paragraph of the letter dated March 27, 2012 is actually $75,355.45.

I certainly regret the error.

Thank you for your attention to this matter. Should you have any questions or comments, please do not hesitate to contact me.

Sincerely,

WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.

By: _____
Charles C. Self, III

CCS:tp

C: Gerald Downing
Dowtech Specialty

EXHIBIT B



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

   Mr. Steve Bartlett, P.E., RPLS
   City Engineer
   City of Nacogdoches
   P. O. Box 635030
   Nacogdoches, Texas  75963-5030

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Timothy J. Watt_    ☐ Agent   ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

_Timothy Watts_   3/30

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

   7011 2970 0003 2106 2656

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

UNITED STATES POSTAL SERVICE     EAST TEXAS TX 757

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

- Sender: Please print your name, address, and ZIP+4 in this box •

   Charles C. Self, III
   WHITTEN, HACKER, HAGIN
   ANDERSON, ALLEN & SELF, P.C.
   P.O. Box 208
   Abilene, Texas  79604

   Re: Dowtech Specialty - Nacogdoches

RECEIVED APR 04 2012

# WHITTEN, HACKER, HAGIN, ANDERSON, ALLEN & SELF, P.C.

ATTORNEYS AT LAW
500 CHESTNUT, SUITE 1402
ABILENE, TEXAS 79602

CHARLES C. SELF, III
Tel. (325) 672-7824
Fax (325) 672-2158
cself@whittenfirm.com

PLEASE REPLY TO:
Post Office Box 208
Abilene, Texas 79604

March 27, 2012

CMRRR#:7011 2970 0003 2106 2595

Mr. Steve Bartlett, P.E., RPLS
City Engineer
City of Nacogdoches
P. O. Box 635030
Nacogdoches, Texas 75963-5030

> Re:  City of Nacogdoches
>      Waste Water Treatment Plant Improvements
>      Oxidation Ditch and Clarifier Improvements;

Dear Mr. Bartlett:

As you are aware, this law firm represents Dowtech Specialty Contractors, Inc. (Dowtech). Please recall our prior letter of March 6, 2012 received by your office on March 9, 2012.

As you will recall from our prior letter, we closed same by reminding you, in your capacity as engineer for the City of Nacogdoches, that Dowtech was owed the balance of the monies due to it pursuant to the terms of the general conditions of the contract and special conditions of same. As of the date of this letter, approximately two weeks after the date of your receipt of our prior letter, our client has neither received the monies due and owing to it or even been provided with the courtesy of a reply to our prior letter. It is based upon this that this letter is being sent to you.

As was discussed at length in our March 6th letter, Dowtech has followed the exact requirements called for in the controlling documents, including the plans and specifications concerning the project. The only deviation from such plans and specifications were done only after being instructed to do so either by you, the project engineer, and/or Aeromix. Dowtech has complied with all requirements of the controlling documents.

In addition, as set forth in our prior letter, any problem with the aerators which the City and/or the Project Engineer now claim, are capable of being remedied and Aeromix has represented that they are ready, willing, and able to do the same, up to and including replacing units if necessary. In fact, in mid January of 2012, Aeromix offered to have its field service technician on site to provide any fix and/or repair. However, Aeromix has not been notified to do so.

COPY

Be that as it may, our client is due final payment of $73,355.45. This includes the five percent retainage of $36,145.00. It is our understanding that Mr. Mann has in the past indicated that he would be in agreement to releasing the remaining funds upon completion of any alignment correction. However, as it now stands, it is our understanding that the City is refusing to allow Aeromix to complete any alignment correction. The result of same is that our client is not being provided with the funds due and owing to them.

As we set forth in our prior letter of March 6, 2012, since the monies have not been forthcoming, we believe that not only is Dowtech entitled to that sum, but also entitled to interest on same. We would expect the City to calculate interest due and owing on the balance and forward same to us upon the final payment.

The purpose of this letter is to demand final payment in the amount of $75,355.45 which is due and owing to Dowtech pursuant to the terms of the agreements. Dowtech will expect payment of same within ten (10) days of the date of this letter. Should the City fail to do so in a timely manner, then and in that event we have been instructed by our client to file suit seeking recovery of these monies along with interest, attorneys fees, costs of court and any other costs associated with the collection of these monies. We are hopeful we can avoid same.

Thank you for your attention to this matter. Should you have any questions or comments, please do not hesitate to contact me.

Sincerely,

WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.

By: _____
Charles C. Self, III

CCS:tp

C:     Gerald Downing
       Dowtech Specialty

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Steve Bartlett, P.E., RPLS
City Engineer
City of Nacogdoches
P. O. Box 635030
Nacogdoches, Texas 75963-5030

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Timothy Watt_ ☐ Agent ☐ Addressee

B. Received by (Printed Name) _Timothy Wett_    C. Date of Delivery 3-29

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
   ☐ Certified Mail ☐ Express Mail
   ☐ Registered ☐ Return Receipt for Merchandise
   ☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
   (Transfer from service label)    7011 2970 0003 2106 2595

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

UNITED STATES POSTAL SERVICE    TEXAS ...
TX 757 2 1
29 MAR 2012 PM

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

RECEIVED APR 02 2012

- Sender: Please print your name, address, and ZIP+4 in this box -

Charles C. Self, III
WHITTEN, HACKER, HAGIN
ANDERSON, ALLEN & SELF, P.C.
P.O. Box 208
Abilene, Texas 79604

Re: Dowtech Specialty - Nacogdoches

## VERIFICATION

THE STATE OF TEXAS     §
                           §

COUNTY OF CALLAHAN     §

      BEFORE ME, the undersigned authority on this day personally appeared Gerald Downing, agent for Dowtech Specialty Contractors, Inc., who, being by me first duly sworn, upon his oath, deposes and says that he has personal knowledge of the facts contained in Plaintiff's Original Petition attached hereto, and that the annexed account was made in the regular course of business of said Plaintiff; that a balance of $75,355.45, is due and owing to Plaintiff by the Defendant and is, within his knowledge just and true, and that all just and lawful offsets, payments and credits have been allowed.

_____
Gerald Downing

      SUBSCRIBED AND SWORN TO BEFORE ME, on this the ___20th___ day of July, 2012.

_____
Notary Public, State of Texas



DONNA SUE ALSTON
My Commission Expires
December 20, 2014

# EXHIBIT C

# EXHIBIT 24

| | |
|---|---|
| **From:** | Charlie Self [cself@whittenfirm.com] |
| **Sent:** | Tuesday, May 28, 2013 9:20 AM |
| **To:** | 'Teresa' |
| **Subject:** | FW: Dowtech v. City of Nacogdoches |

Please print

**From:** Tom Belanger [mailto:tom@abal-law.com]
**Sent:** Thursday, May 23, 2013 6:19 PM
**To:** Charles C. Self III
**Subject:** Dowtech v. City of Nacogdoches

Charles, I have not heard from you in awhile. It seems to me that now is the best time to try to settle with Aeromix because if the claims against Aeromix are dismissed on June 11, then Aeromix will retreat to Minnesota and count on our clients not wanting to litigate up there. On the other hand, I do not think that Aeromix will be willing to agree to anything worthwhile. If the City or Dowtech pays to ship the units to and from Minnesota, as proposed by Aeromix, without any guarantee that the units will be fixed, that seems like a major waste of money in view of Aeromix's utter ineptitude. Any suggestions?

Tom Belanger
Adams, Belanger, Atherton & LoStracco, P.C.
305 E. Main St.
Nacogdoches, TX 75961
(936) 564-4315
(936) 560-0280 Fax
tom@abal-law.com

CONFIDENTIALITY NOTICE: This e-mail message, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, you may NOT use, disclose, copy, or disseminate this information. Please contact the sender by reply e-mail immediately and destroy all copies of the original message including all attachments.

Your cooperation is greatly appreciated.

*Pecken*

- City will not pay
- If it comes back, working for 90 days.
- Ship the three there, 4 back.
- Aeromix to prepare for shipping
- Antbors
- Our unit was taken
- 12/18/12 - email.

# EXHIBIT 25

# ADAMS, BELANGER, ATHERTON & LoSTRACCO

*A Professional Corporation*

305 E. MAIN
P.O. DRAWER 631245
NACOGDOCHES, TEXAS 75963
(936) 564-4315
FAX (936) 560-0280

S.M. ADAMS, JR. (1918-2001)
ROB ATHERTON
THOMAS L. BELANGER
JAMES R. LoSTRACCO, JR.

July 2, 2013

Mr. Harris Stamey
Porter Hedges LLP
Attorney at Law
1000 Main Street, 36th Floor
Houston, Texas 77002

**VIA EMAIL**

Mr. Charles C. Self, III
Whitten, Hacker, Hagin, Anderson,
     Allen & Self, P.C.
Attorney at Law
P. O. Box 208
Abilene, Texas 79604

**VIA EMAIL**

RE:    No. C1228865; *Dowtech Specialty Contractors, Inc. v. City of Nacogdoches, Texas, and Aeromix Systems, Inc.;* In the 145th Judicial District Court of Nacogdoches County, Texas

Gentlemen:

This letter will serve as a Rule 11 Agreement for settlement of the claims against Aeromix Systems, Inc. ("Aeromix"), in this lawsuit. The terms of the settlement are as follows:

    (1)    Dowtech Specialty Contractors, Inc. ("Dowtech"), will dismiss its claims against Aeromix in this lawsuit without prejudice.

    (2)    The City of Nacogdoches ("City"), will dismiss its claims against Aeromix in this lawsuit without prejudice.

    (3)    Dowtech will, at its expense, transport the remaining three Monsoon Aerator units from Nacogdoches to Aeromix's facility in Minneapolis, Minnesota, prior to August 1, 2013.

    (4)    In consideration for dismissing the claims against Aeromix without prejudice, Aeromix will agree to repair all four aerators (the unit already at Aeromix's facility and the three to be transported by Dowtech to Aeromix's facility) at its facility in Minnesota, with Aeromix covering the cost of all parts and factory labor required for the repairs.

    (5)    Aeromix estimates that it will need 10-12 weeks to complete the repairs due to the lead time required to obtain replacement parts including new gearboxes for the units.

    (6)    Upon completion of Aeromix repairs to the aerators, Aeromix will notify Dowtech and the City in writing, and Dowtech will promptly, at its expense, pick up the aerators at Aeromix's facility and transport the units back to Nacogdoches for re-installation at the City's facility.

(7)     Upon Dowtech picking up the repaired aerators at Aeromix's facility, Aeromix will pay Dowtech $1,000.00 toward the cost of transporting the aerators to and from Aeromix's facility.

(8)     Aeromix will provide that the one-year warranty from suppliers covering the major replacement parts, including the gearboxes, will pass through to the City.

(9)     Upon returning the repaired aerators to the City's facility, Dowtech will re-install and start-up the aerators.

(10)     Pending repair and re-installation of the aerators, the claims between Dowtech and the City in this lawsuit will be held in abeyance and will not be set for trial.   If the aerators operate for a continuous period of 90 days after re-installation, then the City will release the remaining funds claimed by Dowtech in the amount of $75,355.45, and the claims between Dowtech and the City in this lawsuit will be dismissed with prejudice.

(11)     Upon dismissal with prejudice of the claims between Dowtech and the City, each party will be responsible for its own attorney's fees and court costs incurred in this lawsuit.

(12)     After repair of the aerators and re-installation, if the aerators fail to operate for a continuous period of 90 days, Dowtech and the City reserve all claims against each other and against Aeromix, and this lawsuit will proceed, except without Aeromix as a party.

(13)     On or before July 12, 2013, an agreed order will be entered in this lawsuit dismissing Dowtech's and the City's claims against Aeromix without prejudice.  Each party agrees to execute any other documents necessary to carry out the terms of this letter agreement.   If such agreed order dismissing the claims against Aeromix is not entered on or before July 12, 2013, Aeromix reserves the right to re-set the hearings on its Special Appearance and Motion for Dismissal.

If this letter correctly sets forth the agreement of the parties, please sign below and this letter will be filed among the papers in this case as a Rule 11 Agreement.

ADAMS, BELANGER, ATHERTON
& LoSTRACCO, P.C.


THOMAS L. BELANGER,
Attorney for the City

TB:mh
c:     Mr. Rob Atherton

AGREED TO:


HARRIS STAMEY, Attorney for Aeromix


CHARLES C. SELF, III, Attorney for
Dowtech

# EXHIBIT 26



| REVISION HISTORY | | | |
|---|---|---|---|
| REV | DESCRIPTION | DATE | APPROVED |
| 1 | INITIAL RELEASE | 8/16/2013 | GHS |

Water Flow
93.88
[2385]
Direction of Rotation
240.00
[6096]

Notes:
1) Swing Arms are designed so that the rotation of the blades on the Monsoon will pull on the Arms. Do not install so that the unit is pushing on the Arms or they could collapse.
2) Maximum difference in height between the water and the mounting of the end of the Swing Arms to a cable or bridge is 14.5 ft[ [4.4M].
3) Use Anti Sieze on all Stainless threads to prevent shearing.
4) Units are Inch [mm]
5) Cable Clips to attach to mooring cable not included.

| | | | |
|---|---|---|---|
| DRAWN fishburn.kim | DATE 8/16/2013 | RWL Water | PROPERTY OF AEROMIX SYS. THIS DRAWING IS INTENDED FOR LIMITED USE AND CANNOT BE REPRODUCED, COPIED, LOANED, DISTRIBUTED, OR EXHIBITED WITHOUT PRIOR-WRITTEN-CONSENT FROM AEROMIX SYSTEMS. 7135 MADISON AVE W GOLDEN VALLEY MN 55427 U.S.A. PHONE: (800)879-3677, FAX: (763)746-8408 |
| CHECKED fishburnk | DATE | MATERIAL | MANUFACTURING NOTES (WHERE APPLICABLE): - BREAK CORNERS AND SHARP EDGES - REMOVE BURRS - CLEAN AND PASSIVATE WELDS |
| ENG APRV'D | DATE | SURFACE FINISH | |
| MFG APRV'D | DATE | DEFAULT TOLERANCES FRACTIONAL +/- 1/64 DECIMAL X.X +/- 0.1 X.XX +/- 0.03 X.XXX +/- 0.005 ANGULAR +/- 1° | TITLE Kit: Swing Arm, Monsoon, 20 ft |
| ORDER NO | CUSTOMER | THIRD ANGLE PROJECTION / SCALE: VIEW LEVEL; SIZE A | DRAWING/PART NUMBER 81039K; SHEET 1 OF 4 |
| NAME OR LOCATION | | | |

# EXHIBIT 27

From: "Doug Reeves" <reeves.doug@aeromix.com>
To: "dowtech" <dowtech@windstream.net>
Sent: Monday, January 13, 2014 9:02 AM
Attach: Bonfig br_iom_cafs_atx_eng_r01_0.pdf
Subject: RE: Nacogdoches Need Instruction for Installation

Attached is the info on the new gearboxes. The units can go in exactly as they were with the use of soft starts. The manual will provide a guide for installation. Questions can be directed to our Mechanical Engineer Garth Saul at 763-746-9297 which is his direct line. He would be happy to assist with any questions.

Regards,

Doug Reeves | Construction & Services Manager
Leader Project Management

RWL
Water AEROMIX
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

From: dowtech [mailto:dowtech@windstream.net]
Sent: Monday, January 13, 2014 8:47 AM
To: Doug Reeves
Subject: Re: Nacogdoches Need Instruction for Installation

Doug,

Need installation instructions ASAP!

Please send today without any further delay.

Also. advise who will be Aeromix representative at start up include phone numbers.

Donna
Dowtech
325-893-4684

> ─── Original Message ───
> From: Doug Reeves
> To: dowtech
> Sent: Thursday, January 09, 2014 10:50 AM
> Subject: RE: Nacogdoches Need Instruction for Installation
>
> I will speak with Engineering on installation. Roads are fine in MN we have not had snow, just cold weather. The next week or so are supposed to be real good weather.
>
> Regards,

1/13/2014

# EXHIBIT 28

**dowtech**

From: "Doug Reeves" <reeves.doug@aeromix.com>
To: "dowtech" <dowtech@windstream.net>
Sent: Tuesday, January 14, 2014 12:44 PM
Subject: RE: Nacogdoches

I sent to our Engineer. I did note the comment about attaching to the mooring cable. The units are designed to attached to the bridge mounts as originally designed. No more need for the mooring cable.

Regards,

Doug Reeves | Construction & Services Manager
Leader Project Management

**RWL**
**Water** AEROMIX
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

From: dowtech [mailto:dowtech@windstream.net]
Sent: Tuesday, January 14, 2014 12:18 PM
To: Doug Reeves
Subject: Nacogdoches

1/14/2014

# EXHIBIT 29

**dowtech**

From:       "Doug Reeves" <reeves.doug@aeromix.com>
To:         "dowtech" <dowtech@windstream.net>
Sent:       Tuesday, January 14, 2014 1:16 PM
Subject:    RE: Nacogdoches

I cannot comment on any existing units that are in place. We were asked to make the original design work and the original bridge mount work for the customer. A Mooring line stretched across the ditch is not an adequate way to secure the unit.

Regards,

Doug Reeves | Construction & Services Manager
        Leader Project Management

RWL
Water AEROMIX
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

From: dowtech [mailto:dowtech@windstream.net]
Sent: Tuesday, January 14, 2014 12:53 PM
To: Doug Reeves
Subject: Nacogdoches

Doug,

Please see attached. As you should recall there are existing aerators on the upstream side of the bridges.

Dowtech

1/14/2014

# EXHIBIT 30

**From:** "Doug Reeves" <reeves.doug@aeromix.com>
**To:** "dowtech" <dowtech@windstream.net>
**Sent:** Tuesday, January 14, 2014 1:28 PM
**Subject:** RE: Nacogdoches

Upon speaking with engineering the units must be installed so that the aerator pulls on the swingarm. Mechanically there is not a way due to the force of the unit that any swingarm would support the pressure of the unit pushing into the swingarm. If the site has existing units in place are these replacements or backups? Why does the city have our new units and replacement units? I would think are units would need to go back into their original location. This is the basis of our redesign.

Regards,

Doug Reeves | Construction & Services Manager
Leader Project Management

RWL
Water AEROMIX
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Tuesday, January 14, 2014 12:53 PM
**To:** Doug Reeves
**Subject:** Nacogdoches

Doug,

Please see attached. As you should recall there are existing aerators on the upstream side of the bridges.

Dowtech

1/14/2014

# EXHIBIT 31

**dowtech**

From: "Doug Reeves" <reeves.doug@aeromix.com>
To: "dowtech" <dowtech@windstream.net>
Sent: Tuesday, January 14, 2014 1:46 PM
Subject: RE: Nacogdoches

I checked with Engineering on hardware and I was told that it shipped separately yesterday. Engineering advised that the mooring cable can be used if desired, however it must be fully taunt with absolutely no slack. The mounting bracket can be used from the old swing arms to mount to the cable. This is however a change in what we designed around. We were asked to make the existing bridge mount system work with the new swing arms.

Regards,

Doug Reeves | Construction & Services Manager
Leader Project Management

**RWL**
**Water** **AEROMIX**
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

From: dowtech [mailto:dowtech@windstream.net]
Sent: Tuesday, January 14, 2014 10:11 AM
To: Doug Reeves
Subject: Nacogdoches

Please forward to your Engineer. Please advise ASAP.

1/14/2014

# EXHIBIT 32

## NO. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY | § | IN THE DISTRICT COURT |
| CONTRACTORS, INC. | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | 145TH JUDICIAL DISTRICT |
| | § | |
| CITY OF NACOGDOCHES, TEXAS | § | |
| and AEROMIX SYSTEMS, INC., | | |
| Defendants. | § | OF NACOGODCHES COUNTY, TEXAS |

## DEFENDANT'S RESPONSE TO REQUESTS FOR ADMISSIONS OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

**TO:** DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through Plaintiff's attorney of record, BLAKE NORVELL

NOW COMES CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. pursuant to Rule 198 of the Texas Rules of Civil Procedure. The CITY OF NACOGDOCHES makes the following General Objection to all of the Requests for Admissions:

## GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11 Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-installed the aerators as agreed. Submission of these Requests for Admissions is a breach of the Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to respond to this or any discovery that violates the Rule 11 Agreement. Furthermore, Dowtech has submitted a total of 276 separate requests for Admissions which is excessive, abusive,

1

206. The four Aeromix 25 hp aerators have been re-design/re-manufactured for the original bridge mount, not for the re-install into the position from which they were removed.

**RESPONSE:** DENIED

207. Defendant Nacogdoches requested of Aeromix that the aerators be re-design/re-manufacture to be installed in their original position mounted to the bridge.

**RESPONSE:** DENIED

208. Doug Reeves (hereinafter "Reeves"), Construction and Service Manager of Aeromix, informed Plaintiff Dowtech that the four Aeromix 25 hp aerators have been re-designed/re-manufactured for installation into the original location with the swing arms attached to the bridge, at the request of Defendant Nacogdoches.

**RESPONSE:** ADMITTED

209. Plaintiff Dowtech has advised Defendant Nacogdoches that Reeves had advised of the breach of the Rule 11 Agreement in that Defendant Nacogdoches requested and Aeromix complied to re-design/re-manufacture the 25 hp aerators to be mounted to the bridge in the original location.

**RESPONSE:** ADMITTED

210. Plaintiff Dowtech advised Defendant Nacogdoches that Reeves asserted that Defendant Nacogdoches requested that Aeromix re-design/re-manufacture the 25 hp aerators to be mounted to the bridge in the original location.

**RESPONSE:** ADMITTED

211. Plaintiff Dowtech advised Defendant Nacogdoches that Reeves asserted that Aeromix complied with Defendant Nacogdoches' request to re-design/re-manufacture the 25 hp aerators to be mounted to the bridge in the original location.

**RESPONSE:** ADMITTED as to what Dowtech advised Nacogdoches, but DENIED that Nacogbdoches made such request to Aeromix.

212. Aeromix breached the Rule 11 Agreement.

**RESPONSE:** DENIED

213. Defendant Nacogdoches breached the Rule 11 Agreement.

**RESPONSE:** DENIED

28

# EXHIBIT 33

**dowtech**

From:     "Doug Reeves" <reeves.doug@aeromix.com>
To:       "dowtech" <dowtech@windstream.net>
Sent:     Tuesday, January 14, 2014 2:40 PM
Subject:  RE: Nacogdoches

I cannot remember what side of the bridge the mounts were on. To keep it simple the arms have to be in tension and not compression. If they can mount to the bridge and achieve this would be the best mounting option. If there is no way to mount to the bridge and keep the arms in tension instead of compression the cable should be used, or a bridge mount moved to the opposite side of the bridge.

Regards,

Doug Reeves | Construction & Services Manager
Leader Project Management

RWL
Water AEROMIX
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

From: dowtech [mailto:dowtech@windstream.net]
Sent: Tuesday, January 14, 2014 2:21 PM
To: Doug Reeves
Subject: Re: Nacogdoches

Doug,

I'm confused you say that the aerators can not push on the bridge, but this is exactly what the original design does. That was the whole purpose Aeromix and Schaumburg and Polk requested to go with the cabling design. Please advise.

—— Original Message ——
From: Doug Reeves
To: dowtech
Sent: Tuesday, January 14, 2014 1:46 PM
Subject: RE: Nacogdoches

I checked with Engineering on hardware and I was told that it shipped separately yesterday. Engineering advised that the mooring cable can be used if desired, however it must be fully taunt with absolutely no slack. The mounting bracket can be used from the old swing arms to mount to the cable. This is however a change in what we designed around. We were asked to make the existing bridge mount system work with the new swing arms.

Regards,

1/14/2014

# EXHIBIT 34

**dowtech**

This seems to have changed from when we visited the site, but we so no reason the units cannot go back in same postions as long as the mooring cable is pulled extremely tight to allow for minimal up and down movement of the cable.

Regards,

Doug Reeves | Construction & Services Manager
Leader Project Management

RWL
Water  AEROMIX
ı.ɔoɔɔ

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Wednesday, January 15, 2014 3:48 PM
**To:** Doug Reeves
**Subject:** Nacogdoches

Doug,

Please note that the City of Nacogdoches wants the units placed back into the same position from where removed.

Please confirm that this is correct.

Donna Alston
Dowtech
325-893-4684

1/15/2014



**RWL**
**Water**  AEROMIX
 GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Thursday, January 16, 2014 7:56 AM
**To:** Doug Reeves
**Subject:** Nacogdoches - Aeromix Rep. at Start up

Doug,

Please advise that Aeromix will have a representative to assit in the installation, check out and start up.

We both need this to be completed in a timely manner and correctly that the city can use for some time to come.

Please advise ASAP.

Donna
Dowtech
325-893-4684

1/16/2014

# EXHIBIT 35

1-31-2014
Dowtech Specialty Contractors, Inc.
4703 CR 527
Baird, TX 79504
Ph. 325-893-4684
dowtech@windstream.net

Mr. Steve Bartlett, P.E.
City Engineer
City of Nacogdoches
Ph. 936-559-2522
bartletts@ci.nacogdoches.tx.us

Mr. Thomas L. Belanger
Adams, Belanger, Atherton & LoStracco
tom@abal-law.com
Fax: 936-560-0280

Mr. Mark Mann, P.E.
Project Manager
Schaumburg & Polk, Inc.
Ph. 409-866-0341
mmann@spi-eng.com

Re: City of Nacogdoches
    Wastewater Treatment Plant
    Oxidation Ditch and Clarifier Improvements
    Aeromix Equipment

All equipment has been delivered to the site excepting bolts / connectors. Bolts and connectors being shipped by Aeromix.

Notified by Aeromix bolts (hardware) being shipped on 1-14-2014.

Will the City of Nacogdoches (City) advise Dowtech Specialty Contractors, Inc (Dowtech) that the bolts (hardware) is on site.

Dowtech is prepared to re-install the Aeromix aerators back into the same position from which removed. We are awaiting written instructions from the City.

At this point, Aeromix is not being very helpful as can be seen from the following emails.

Aeromix insists that if the equipment goes back in at the same location soft starts must be used. Please review the following emails and give Dowtech the City's written instructions for re-installation:

   Aeromix 01-13-2014 in part: " The units can go in exactly as they were with the use of soft starts."

Aeromix 01-14-2014 12:44 pm in part: "The units are designed to attached to the bridge mounts as originally designed. No more need for the mooring cable."

Aeromix 01-14-2014 1:16 pm is part: "We were asked to make the original design work and the original bridge mount work for the customer."

Aeromix 01-14-2014 1:28 pm in part: "I would think are units would need to go back into their original location. This is the basis of our re-design."

Aeromix 01-14-2014 1:46 pm in part: "Engineering advised that the mooring cable can be used if desired, however it must be fully taunt with absolutely no slack. The mounting bracket can be used from the old swing arms to mount to the cable. This however a change in what designed around. We were asked to make the existing bridge mount system work with the new swing arms."

Aeromix 01-14-2014 2:40 pm in part: "To keep it simple the arms have to be in tension and not compression. If they can mount to the bridge and achieve this would be the best mounting option. If there is no way to mount to the bridge and keep the arms in tension instead of compression the cable should be used, or a bridge mount moved to the opposite side of the bridge."

Aeromix 01-15-2014 in part: "This seems to have changed from when we visited the site, but we so no reason the units cannot go back in same postion as long as the mooring cable is pulled extremely tight to allow for minimal up and down movement of the cable."

Dowtech 01-16-2014 in part: "Please advise that Aeromix will have a representative to assist in the installation, check out and start up."

Aeromix 01-16-2014 in part: "Please note highlighted item 9 of the agreement."

Dowtech 01-16-2014 in part: "Please advise the name and telephone numbers of Aeromix representative in Texas that has experience with this type of equipment."

Aeromix 01-16-2014 in part: "I am unaware of a sales rep in the TX area that would have the technical knowledge. Questions on the Monsoon can be directed to myself or Joe Tomczak who is our product manager for Aerators 763-746-9273."

Clearly, someone from the City requested that Aeromix re-design its equipment to go back into the position of original intent. This is what Aeromix claims and supported by emails.

2

The meaning of the Aeromix emails are very clear to Dowtech, install the redesigned equipment at the original position shown on the drawings. (Not re-installing at the same position from which the Aeromix equipment was removed.)

Dowtech has spent over $45,000.00 and still spending at the City's directions trying to make the Aeromix equipment perform at the alternate position from which the equipment was removed. Notice, this work was performed after the City's acceptance of the Aeromix equipment, warranty and placed into operation. Dowtech used the exact equipment specified by the City. This was not a part of the Contractual Obligations, and Dowtech expects to be paid by the City.

Further, Aeromix continues with its original recommendation of soft starts. Dowtech agrees that soft starts should be installed by, and at the expense of, the City.

Please advise the City of Nacogdoches written instructions for re-installation.

Respectfully Submitted,

Gerald Downing
President
Dowtech Specialty Contractors, Inc.

Charles Self, Attorney
cself@whittenfirm.com

3

# EXHIBIT 36

**From:** "Doug Reeves" <reeves.doug@aeromix.com>
**To:** "dowtech" <dowtech@windstream.net>
**Sent:** Friday, February 14, 2014 11:17 AM
**Subject:** RE: Nacogdoches

Hi Donna,

I am not familiar with the legal agreement in its entirety, however I will speak with our CFO immediately and make sure this is paid immediately.  I will keep you advised.

Regards,

_____

Doug Reeves | Construction & Services Manager
          Leader Project Management

RWL
Water  AEROMIX
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

**From:** dowtech [mailto:dowtech@windstream.net]
**Sent:** Friday, February 14, 2014 11:15 AM
**To:** Doug Reeves
**Subject:** Nacogdoches

Doug,

We have not received the $1,000.00 from Aeromix per Rule 11 Agreement.

Donna Alston
Dowtech Specialty Contractors, Inc.
325-893-4684

# EXHIBIT 37

# WHITTEN, ... ... ...
## AND ...RS...JN, ... ... ... ... ...

ATTORNEYS AT LAW
500 CHESTNUT STREET, SUITE 1402
ABILENE, TEXAS 79602

CHARLES C. SELF, III
Tel: (325) 672-7824
Fax: (325) 672-2158
cself@whittenfirm.com

PLEASE REPLY TO:
P.O. Box 208
Abilene, Texas 79604

February 17, 2014

tom@abal-law.com
Mr. Thomas L. Belanger
Adams, Belanger, Atherton & LoStracco, P.C.
P. O. Box 631248
Nacogdoches, Texas 75963-1248

> Re: Dowtech Speciality Contractors, Inc. v. City of Nacogdoches and Aeromix Systems, Inc.; No.C1228865; In the 145th District Court of N... ...hes County, Texas

Dear Tom:

No doubt, you have been provided copies of my client's correspondence in regards to the above referenced matter. As you can tell from such correspondence, my client has become quite frustrated with what has gone on in this matter.

Specifically, my client forwarded letters on January 21, 2014 and January 31, 2014. Copies of same are attached hereto for your review. As of this date, there has been no reply to the letters. This, as you can imagine, has added to my client's frustrations.

As presently situated, Dowtech is prepared and ready to return and re-install the Aeromix System's aerators into the same position from which they were removed. We are awaiting notification from the City of Nacogdoches that the bolts I... ...ar... ...ed. This is certainly within compliance with the Rule 11 Agreement.

My client's frustration stems from the fact that it appears, based upon the email correspondence he has seen between Aeromix and the City and/or its engineers, Shaumberg & Polk, Inc., that changes have been made to the installation process and possibly the entire agreement between the parties. It appears from the emails that the City has made demands upon Aeromix to redesign and/or re-engineer the aerators to go back into their original position. As you are aware, the original position of the installed aerators greatly contributed to the problems with same. My client bases this thought upon a series of emails of January 14, 2014 which discuss putting the aerators back as originally designed and attached to the bridge mounts. It is my client's belief that this will ultimately lead to failure of the aerators. In addition, there has been some discussion in regards to soft starts. It is our understanding that Aeromix has recommended that soft starts be installed. In fact, Aeromix recommended this at the beginning of this project. However, it once again appears that the City is refusing to install same, allow same to be installed, and/or unwilling to pay for same. Without such soft starts, once again, it is my client's belief that in all likelihood the aerators will fail.

It is my client's belief that for the successful operation of the Aeromix aerators, they should be installed in their original position for which Aeromix re-designed and/or re-engineered them. This was course at the direction of the City. In addition, it is my client's belief that soft starts should be furnished and installed as per the Aeromix recommendation.

It is our belief that the spirit, if not in fact to the letter, of the Rule 11 Agreement is being violated by this recalcitrant position being taken by the City.

Please contact me when you have the opportunity to that we may discuss this matter going forward.

Sincerely,

WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.

By: _____
   Charles C. Self, III

CCS:tp

w/enc.

C:  Gerald Downing

# EXHIBIT 38

3-18-2014
Dowtech Specialty Contractors, Inc.
4703 CR 527
Baird, TX 79504
Ph. 325-893-4684
dowtech@windstream.net

Mr. Steve Bartlett, P.E.
City Engineer
City of Nacogdoches
Ph. 936-559-2522
bartletts@ci.nacogdoches.tx.us

Mr. Mark Mann, P.E.
Project Manager
Schaumburg & Polk, Inc.
Ph. 409-866-0341
mmann@spi-eng.com

Re: City of Nacogdoches
    Wastewater Treatment Plant
    Oxidation Ditch and Clarifier Improvements
    Aeromix Equipment

To date, have had no response to Dowtech Specialty Contractors, Inc. (Dowtech) emails
01-13-2014, 01-14-2014, letters of 01-21-2014, 01-31-2014 and my telephone
conversation with Mr. Steve Bartlett 01-15-2014.

Dowtech is prepared and ready to return and re-install the Aeromix Systems, Inc.
(Aeromix) aerators into the same position from which removed when notified by the City
of Nacogdoches (City) that the bolts have arrived, per the Rule 11 Agreement
(Agreement) drafted by the City.

To be very clear, it appears from the Aeromix emails that the City and/or its engineers,
Schaumburg & Polk, Inc. (SPI) have made substantial changes in the Agreement. The
City has every right to make these changes, but not at the continuing expense of
Dowtech.

Clearly, the emails show the City made demands upon Aeromix to re-design and/or re-
engineer the aerators to go back into their original position (not the position from which
removed) per the following emails:

"- - - - - - - - - - . The units are designed to attached to the bridge mounts as originally
designed. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ." 01-14-2014 12:44 pm

1

"_____. We were asked to make the original design work and the original bridge mount work for the customer. _____ _____." 01-14-2014  1:16 pm

"_____ _____. I would think are units would need to go back into their original location. This is the basis of our redesign." 01-14-2014  1:28 pm

"_____ ___ _____. We were asked to make the existing bridge mount system work with the new swing arms." 01-14-2014  1:46 pm

These emails have all been furnished to the City and SPI in their entirety.

Clearly for the successful operation of the Aeromix aerators should be installed in their original position for which Aeromix re-designed and/or re-engineered at the directions of the City along with the City furnished and installed soft starts. NOT, BACK INTO THE POSITION FROM WHICH REMOVED. This is not the responsibility of Dowtech under the Contract and/or Agreement. Clearly, the City breached the Agreement.

The Aeromix aerators were specified by name brand for use on this contract by the City. See TECHNICAL SPECIFICATIONS, Page 780 – 2 of 3.

The City represented under SPECIAL CONDITIONS OF THE AGREEMENT Page SCA- 2 of 18 that the Aeromix aerators would in fact "_____ _____ set a definite standard of equality or performance _____ _____." This is the governing provision of the contract. Clearly, the City represented to all bidders that it had superior knowledge of the Aeromix aerators.

All bidders on this contract including Dowtech would have relied upon the City's representations in the furnishing and installing of the Aeromix aerators.

Dowtech had no prior knowledge or experience with the  Aeromix aerators and strictly relied upon the City's representation to it detriment.

Why the City rejected the Aeromix highly recommendation to use soft starts is unknown, but it appears that every problem with the Aeromix aerators comes from the City's failure to install the soft starts.

Having reviewed the file, find that August 5, 2010 was a historical date in the life of this contract (the City, SPI, Aeromix and Dowtech had their representatives at the project site) (1)all work had been substantial completed. (2) the 4, 25 hp. Aeromix aerators had been furnished and installed per the contract requirements (3) the City, SPI and Aeromix representatives had inspected, checked and approved the installation of the 4, 25 hp. Aeromix aerators for operation (4) the 4, 25 hp. Aeromix aerators had been tested per the contract requirements with representatives of Aeromix, City, SPI and Dowtech being

witness to the testing and results (5) the testing period confirmed that the 4, 25 hp. Aeromix aerators met and complied with the requirements of the contract (6) the City's representatives were furnished with a copy of the Aeromix Installation, Operation and Maintenance Manual (7) the City's representatives were instructed in the installation, operation and maintenance of the Aeromix 25 HP MONSOON Paddlewheel Surface Splash Aerators (8) Dowtech signed the Aeromix Warranty as Contractor (9) The City's representative signed the Aeromix Warranty as End User (10) the City and SPI accepted the 4, 25 hp. Aeromix aerators as complete per the contract requirements (11) the City continued the usage of the 4, 25 hp. Aeromix aerators and (12) the City was clearly operating the 4, 25 hp. Aeromix aerators under the warranty agreement after August 6, 2010.

Any and all warranty and/or engineering problems with the 4, 25 hp. Aeromix aerators after August 5, 2010 was the sole responsibility of the City and/or Aeromix and no other.

SPI's actions and/or inactions pertaining to the contract, warranty and/or engineering problems with the 4, 25 hp. Aeromix aerators was controlled by the City. This is made clear by SPI's actions and/or inactions along with various emails.

Having reviewed all of the City, SPI and Aeromix letters/emails related to/referenced/pertaining and/or failures including and more specific the SPI letter to the City dated January 6, 2012 with a listing of Aeromix problems along with dates. In my opinion each and every problem of the 4, 25 hp. Aeromix aerators comes from, is caused by, related to and/or contributed to by the failure of the City to furnish and install soft starts per the highly recommendation of Aeromix.

The City was clearly negligent in its failure to furnish and install soft starts. After problems started in the early stages with the 4, 25 hp. Aeromix aerators, the City was clearly on notice that the soft starts as recommended by Aeromix was in fact required. The City failed and refused to install the soft starts. The City was in fact gross negligent in its refusal to install soft starts.

Further, the City breached the contract with Dowtech numerous times in its arbitrary actions demanding, directing and forcing work to be performed beyond the intented scope of the contract in an effort to try and cover-up its own gross negligence, all the time knowing that Dowtech would suffer monetary losses.

It is time the City takes responsibility for the actions and/or inactions of SPI and the City (1) pay the remaining $75,355.45 along with interest to Dowtech without any delay, and (2) enter into good faith negotiations without any delay with Dowtech for its cost in using Aeromix (make Dowtech whole) (Breakdown on Dowtech's monetary loss attached). If you need any additional information please call me.


Please advise Dowtech, the City of Nacogdoches written instructions for re-installation.

I am willing to come to Nacogdoches and meet, negotiate to resolve any and all issues in order that Dowtech will be paid in full by the City.

3

Please, let me know your thinking.

Respectfully Submitted,

Bob Click
Dowtech Specialty Contractors, Inc.
325-893-9116

C: Charles Self, PC

4

# EXHIBIT 39



# Nacogdoches
*the oldest town in Texas*

March 19, 2014

Mr. Tom Belanger
Adams, Belanger, Atherton & LoStracco, P.C.
305 E. Main St.
Nacogdoches, TX 75961

Re: City of Nacogdoches WWTP Aeromix Aerators

Mr. Belanger:

This letter is our response to questions from Mr. Downing of Dowtech Specialities in his letter dated January 31, 2014 regarding the use of an electrical soft start device, and also comments via email from Aeromix pertaining to the mounting hardware and direction of installation for the floating aerators.

While we now understand that the operations manual identified the use of a soft start device for Aeromix motors over 20 Hp, neither Aeromix nor Dowtech made this clear during the bid phase or when the equipment submittals were reviewed. Soft start devices were not included on the engineering plans that were reviewed by both entities and thus should have served as notice that they were never considered to be a necessary part of the installation by our engineer based on their experience with many other similar devices. No discussions, suggestions, or qualifications as to the necessity of the soft starters for proper operation of the aerators, was ever presented to our engineer by Aeromix or by Dowtech.

Soft Start devices are generally used to reduce the starting amperage applied to a motor, avoiding voltage drops especially in under sized circuits that may be strained by this initial load. This tapering of the electrical load can result in an energy cost savings and also extended motor life. Our electrician has verified that the electrical supply circuits used for the Aeromix aerators are more than ample to handle the starting amperage with no impact to our system, and have resulted in acceptable voltage variations within the tolerances allowed by the motors. We generally do not consider soft starters to be a substitute for a mechanical torque reduction device for equipment. Our typical operation of these aerators is for constant use and they would be rarely turned off or restarted. Since the electrical startup cycles will be minimal for the life of these aerators, we do not intend to provide soft start devices at this time.

Aeromix has commented that the aerators need to be repositioned within the basin and turned where they pull, not push, on the swing arm mounts. Between August and December of 2010, Aeromix worked with our engineer to customize the mounts for these units to fit the specific needs of our basin. Not only was Aeromix aware of the mounting direction, they designed specialized mounts and cable moorings to fit our requirements. We feel that the final design configuration and mounting system meets our needs, and we are requesting that the repaired and reconfigured aerators be returned to their original position using the mounting hardware supplied by Aeromix and installed by Dowtech. Modifying the aerator locations, direction and mounting locations at this point is not acceptable.

**City of Nacogdoches** • 202 E. Pilar – P.O. Drawer 635030 • Nacogdoches, TX 75963
(936)559-2502 • Fax (936)559-2912 • www.ci.nacogdoches.tx.us
Home of Stephen F. Austin State University • www.sfasu.edu



### Nacogdoches
*the oldest town in Texas*

Our desire is to replace the original four (4) Aeromix aerator units with the improved versions, reconnected to the original electrical supply cables at the basin, without further modification from the original design.

Please contact me if you have any questions.

Sincerely,

Steve Bartlett, PE, RPLS
Nacogdoches City Engineer

cc: Rob Atherton, City Attorney

City of Nacogdoches • 202 E Pilar – P.O. Drawer 635030 • Nacogdoches, TX 75963
(936)559-2502 • Fax (936)559-2912 • www.ci.nacogdoches.tx.us
Home of Stephen F Austin State University • www.sfasu.edu

# EXHIBIT 40

**dowtech**

From:     "Doug Reeves" <reeves.doug@aeromix.com>
To:       "dowtech" <dowtech@windstream.net>
Sent:     Wednesday, April 02, 2014 1:42 PM
Subject:  RE: Nacogdoches Rule 11 Agreement

Thank you. I will get this to Accounting and get the check out right away.

Regards.

Doug Reeves | Construction & Services Manager
          Leader Project Management

RWL
Water   AEROMIX
  GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

From: dowtech [mailto:dowtech@windstream.net]
Sent: Wednesday, April 02, 2014 1:42 PM
To: Doug Reeves
Subject: Nacogdoches Rule 11 Agreement

Doug,

Attached is the Rule 11 Agreement where it shows Aeromix to pay Dowtech $1,000.00 toward the cost of transporting the aerators to and from Aeromix Facility.

Donna Alston
Dowtech
325-893-4684

4/2/2014

# EXHIBIT 41

—— Original Message ——
From: Doug Reeves
To: dowtech (dowtech@windstream.net)
Sent: Friday, April 04, 2014 1:43 PM
Subject: Soft Start Response

Bob,
I did review the letter from the city and it talks allot about what was done years ago in the project. We all understand that what was done did not work thus the reason to redesign and reengineer. Soft starts may not have been recommended when the units were first sold however they are being recommended now. In either case the control panels for the units were not in the Aeromix scope and we would not have supplied these with the units.

We are not suggesting that a soft start be used as a substitute for a mechanical torque reduction device. It is common practice to install soft starts on electric motors over 10 hp. This is what I have put in place since coming aboard with Aeromix. I believe 9 out of 10 electricians would review this system and recommend a soft start be installed as a security measure. Soft Starts provide additional protection for expensive electrical motors at a very small cost. They also provide electrical cost savings as their letter indicates. Not adding this added layer of protection seems irresponsible considering the benefits they could provide at a very low cost.

As for the location of the units. When I visited the site to review the situation I specifically asked the question of how the site would like the units to be mounted. We were told that the best solution would be to use the existing bridge mounts and put them back in their original location. This is what we used to base our redesign around. The swingarms cannot function in compression as it is mechanically not possible without a potential for failure.

Regards,

Doug Reeves | Construction & Services Manager
Leader Project Management

RWL
Water    AEROMIX
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

1

# EXHIBIT 42

Bob,
I did review the letter from the city and it talks allot about what was done years ago in the project. We all understand that what was done did not work thus the reason to redesign and reengineer. Soft starts may not have been recommended when the units were first sold however they are being recommended now. In either case the control panels for the units were not in the Aeromix scope and we would not have supplied these with the units.

We are not suggesting that a soft start be used as a substitute for a mechanical torque reduction device. It is common practice to install soft starts on electric motors over 10 hp. This is what I have put in place since coming aboard with Aeromix. I believe 9 out of 10 electricians would review this system and recommend a soft start be installed as a security measure. Soft Starts provide additional protection for expensive electrical motors at a very small cost. They also provide electrical cost savings as their letter indicates. Not adding this added layer of protection seems irresponsible considering the benefits they could provide at a very low cost.

As for the location of the units. When I visited the site to review the situation I specifically asked the question of how the site would like the units to be mounted. We were told that the best solution would be to use the existing bridge mounts and put them back in their original location. This is what we used to base our redesign around. The swingarms cannot function in compression as it is mechanically not possible without a potential for failure.

Regards,

Doug Reeves | Construction & Services Manager
Leader Project Management

RWL
Water   AEROMIX
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

1

# EXHIBIT 43

# WHITTEN, HACKER, HAGIN, ANDERSON, ALLEN & SELF, P.C.

ATTORNEYS AT LAW
500 CHESTNUT STREET, SUITE 1402
ABILENE, TEXAS 79602

PLEASE REPLY TO:
P O Box 208
Abilene, Texas 79604

CHARLES C SELF III
Tel (325) 672 7824
Fax (325) 672-2156
self@whittenfirm.com

April 15, 2014

Mr. Thomas L. Belanger
Adams, Belanger, Atherton & LoStracco, P.C.
P. O. Box 631248
Nacogdoches, Texas 75963-1248

Re:     Dowtech Speciality Contractors, Inc. v. City of Nacogdoches and Aeromix Systems, Inc.; No.C1228865; In the 145th District Court of Nacogdoches County, Texas

Dear Tom:

I am in receipt of a letter apparently emailed to you from Steve Bartlett, the Nacogdoches City Engineer, and copied to Robert Atherton, the City Attorney. As you will recall, that letter is dated March 19th 2014. I note that I received same by email on March 25th 2014.

Upon my receipt, I forwarded same on to my client for their review and comment. We have now had the opportunity to get together to discuss same and they raise a number of concerns with the letter. Prior to doing so, I believe a general discussion of the governing documents of this matter is in order.

As you will recall, at the beginning of this process. the City of Nacogdoches issued a document titled "Standard General Conditions of the Construction Contract". This contains what I would refer to as "boilerplate" language concerning this construction contract. As I believe Mr. Bartlett would agree, the language of the Standard General Conditions of the Construction Contract is overruled and/or over-ridden by language contained in the "Special Conditions of the Agreement" (SCA), an eighteen page document which is also part of the original contract documents.

In reviewing page 2 of the SCA, particularly paragraph 8, titled Materials and Workmanship, my client pointed out the following language:

"Where material or equipment are specified by a trade or brand name, it is not the intention of the owner (the City of Nacogdoches) to discriminate against an equivalent product or another manufacturer, but rather to set a definite standard of equality or performance and to establish an equitable basis for the evaluation of bids. Where the words "equivalent" "proper", or "equal" are used, they should be understood to mean that the thing referred to shall be the proper, the equivalent of, or equal to some other thing in the opinion of, or judgment of the engineer."

This language appears to establish that the City of Nacogdoches, in recommending Aeromix or House aerators, had knowledge of the operations, and more importantly, knowledge of the quality of Aeromix aerators. This is an established presumption based upon paragraph 8, page 2 of the SCA.

We must also review the warranty. As you will recall, at the conclusion of the installation of the aerators, the warranty was transferred to the City of Nacogdoches by Dowtech once the aerators were started. In fact, the language of the warranty clearly states in paragraph 2:

"The warranty is made for the benefit of the purchaser (municipality or end user) and when applicable to the Purchasers' agent (contractor) only."

That warranty was signed by David Wolfgang, an employee of the City of Nacogdoches, Texas. The warranty was signed on August 5th 2010, thus transferred on that date.

As Mr. Bartlett would readily agree, the warranty was not signed until the aerators were up and running. Once the warranty was signed, Nacogdoches accepted the warranty. There is no retreat from such acceptance.

Concerning the letter of March 19th 2014, my client is troubled by the following language:

"While we now understand that the operations manual identifies the use of soft start devices for Aeromix motors over 20 hp, neither Aeromix nor Dowtech made this claim clear during the bid phase or when the equipment submittals were reviewed."

This is an incorrect and confusing statement. Dowtech does not have the duty to "make clear" the use of soft starts. Dowtech was not the engineer on this project. Further, as set forth above, the City of Nacogdoches and/or its third party engineers, clearly specified Aeromix aerators. Pursuant to paragraph 8, page 2 of the SCA, the City Engineer or its third party engineer was charged with superior knowledge of the Aeromix aerators at the time of such specification, and more importantly, charged with knowledge of their operational requirements. Dowtech was not and at no point would have been charged with such knowledge. Nor did Dowtech have any obligation or duty to acquire such knowledge or impart same to the City of Nacogdoches.

Going further into the letter, the next paragraph that causes my client concern, is the following:

"Soft start devices were not included on the engineering plans that were reviewed by both entities and thus should have served as notice that they were never considered to be a necessary part of the installation by our engineer based on their experience with many other similar devices. No discussions, suggestions, or qualifications as to the necessity of the soft starters for proper operation of the aerators, was ever presented to our engineer by Aeromix or by Dowtech."

Once again, as set forth above, the City of Nacogdoches is charged with superior knowledge in regards to the Aeromix aerators, having specifically designated them in the contract documents. Dowtech is not. Dowtech had no duty to advise as to same. Dowtech's only responsibility in this entire matter was to follow all plans and specifications concerning installation of the aerators. Dowtech did so.

Equally troubling to my client is the fact that it appears, from the letter, that it is the City of Nacogdoches position that soft starts will not be needed, since the aerators will not be started very often. This is contrary to Aeromix's own recommendation that such soft starts should be used for both start up and operation of the aerators. To claim otherwise gives the impression that the City Engineer knows more about the operation of Aeromix aerators than Aeromix itself. I don't believe anyone agrees with that position.

Additionally, there has been much discussion regarding the "original position" of the aerators. It appears from the various emails that the City of Nacogdoches demanded that Aeromix redesign/re-engineer the aerators to be placed back into the position shown on the drawings. (Not back into the position from which they were removed). The City's letter demands that the aerators be placed back into the position from which they were removed. (Not back into the position shown on the drawings). There is a conflict with the City's instructions.

I would direct your attention to an email that my client forwarded to me on April 2, 2014 from Mr. Doug Reeves of Aeromix. Mr. Reeves states:

"... it is highly recommended that soft starts are installed on each of the monsoon units at Nacogdoches, Texas. Although I cannot guarantee failure without these installed, my experience tells me that the chance of failure is highly increased without them. The torque generated by these units on an instant start up will shorten the life of mechanical components such as bearings, etc. In my experience I have always recommended or installed soft starts on any electric motor larger than 10 hp. This also saves on electrical costs. The soft starts control the amperage on start up and on units that start and stop often, they can add costs savings to the utility bills."

My client's frustration stems from the fact that it appears this situation is being set up for failure and my client has no input into how the aerators will be installed.

Finally, I direct your attention to an email of April 4th 2014 from Mr. Doug Reeves addressed to my client. I am attaching a copy of that email for your review. In reviewing that, I note that not only is Aeromix strongly suggesting soft starts be added, but goes even further by stating:

"Not adding this added layer of protection (soft starts) seems irresponsible considering the benefits they could provide at a very low cost."

Mr. Reeves goes on to state, in addressing the reinstallation of the aerators,

"We were told that the best solution would be to use the existing bridge mounts and put them back in their original location. This is what we used to base our redesign around. The swing arms cannot function in compression as it is mechanically not possible without a potential for failure."

It appears to my client, based upon the information that has been provided by Aeromix in regards to the soft starts and the installation, and what my client sees as a disregard of such information by the City of Nacogdoches, that the City of Nacogdoches is setting this matter up for failure. As such, we do not believe the City of Nacogdoches is acting in good faith, and in fact it is my client's belief that the City of Nacogdoches is in breach of the Rule 11 Agreement. As I believe I had previously stated, the agreement has already been breached by the failure of Aeromix to have paid my client the monies required under such Rule 11. Couple this with the City of Nacogdoches' position in regards to soft starts and the reinstallation of these aerators, and it is my client's position that the Rule 11 Agreement has been breached.

Should you wish to discuss this matter further, please contact me. Otherwise, we are being instructed by my client to move forward with the case by filing a motion to have the Rule 11 Agreement declared invalid and to instead proceed with the lawsuit against the City to recoup all of the damages incurred by Dowtech.

Thank you for your attention to this matter. Should you have any questions or comments, please do not hesitate to contact me.

Sincerely,

WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.

By: _____
Charles C. Self, III

CCS:tp

w enc.

C: Gerald Downing

Bob,
I did review the letter from the city and it talks allot about what was done years ago in the project. We all understand that what was done did not work thus the reason to redesign and reengineer. Soft starts may not have been recommended when the units were first sold however they are being recommended now. In either case the control panels for the units were not in the Aeromix scope and we would not have supplied these with the units.

We are not suggesting that a soft start be used as a substitute for a mechanical torque reduction device. It is common practice to install soft starts on electric motors over 10 hp. This is what I have put in place since coming aboard with Aeromix. I believe 9 out of 10 electricians would review this system and recommend a soft start be installed as a security measure. Soft Starts provide additional protection for expensive electrical motors at a very small cost. They also provide electrical cost savings as their letter indicates. Not adding this added layer of protection seems irresponsible considering the benefits they could provide at a very low cost.

As for the location of the units. When I visited the site to review the situation I specifically asked the question of how the site would like the units to be mounted. We were told that the best solution would be to use the existing bridge mounts and put them back in their original location. This is what we used to base our redesign around. The swingarms cannot function in compression as it is mechanically not possible without a potential for failure.

Regards,

_____
Doug Reeves | Construction & Services Manager
Leader Project Management

RWL
Water AEROMIX
GROUP

7135 Madison Avenue West
Golden Valley, MN 55427
P: 763-746-9264 | F: 763-746-8408 | Skype: aeromix.reeves.doug
E: reeves.doug@aeromix.com
www.aeromix.com

1

# EXHIBIT 44

# ADAMS, BELANGER, ATHERTON & LoSTRACCO

*A Professional Corporation*

305 E. MAIN
P.O. DRAWER 631248
NACOGDOCHES, TEXAS 75963
(936) 564-4315
FAX (936) 560-0280

ATTORNEYS AT LAW

S.M. ADAMS, JR. (1918-2001)
ROB ATHERTON
THOMAS L. BELANGER
JAMES R. LoSTRACCO, JR.

May 13, 2014

VIA EMAIL

Mr. Charles C. Self, III
Whitten, Hacker, Hagin, Anderson,
    Allen & Self, P.C.
Attorney at Law
P. O. Box 208
Abilene, Texas 79604

RE:     No. C1228865; *Dowtech Specialty Contractors, Inc. v. City of Nacogdoches, Texas, and Aeromix Systems, Inc.;* In the 145th Judicial District Court of Nacogdoches County, Texas

Charles:

This letter will amend the Rule 11 Agreement of the parties in the above lawsuit dated July 2, 2013 (the "Rule 11 Agreement"). Aeromix Systems, Inc., is not a party to this amendment because it has been dismissed as a party to this lawsuit.

The City of Nacogdoches (the "City") and Dowtech Specialty Contractors, Inc. ("Dowtech") agree to amend the Rule 11 Agreement as follows:

(1)     Dowtech has delivered the repaired aerators to the City's sewer plant.

(2)     Dowtech will reinstall and start-up the repaired aerators. The repaired aerators will be reinstalled in the same configuration as they were last installed by Dowtech.

(3)     The City will pay Dowtech the sum of $75,355.45 within twenty days after reinstallation and start-up of the repaired aerators.

(4)     Upon reinstallation and start-up of the repaired aerators, and payment of the sum of $75,355.45 to Dowtech, the claims between Dowtech and the City in this lawsuit will be dismissed with prejudice.

(5)     The City waives the requirement in the Rule 11 Agreement, as to Dowtech but not as to Aeromix, that the aerators operate for a continuous period of ninety days after reinstallation.

(6)     Except as amended by this letter, the Rule 11 Agreement will continue in effect.

ADAMS, BELANGER, ATHERTON
& LoSTRACCO, P.C.

THOMAS L. BELANGER,
Attorney for the City

TB:mh

c:      Mr. Rob Atherton

AGREED TO:


_____
CHARLES C. SELF, III, Attorney for
Dowtech

# Exhibit "J"

JESSICA HILL

# EXHIBIT 45

Mr. Charles Self
Whitten, Hacker, Hagin, Anderso‘
Allen, & Self, P.C.
Attorneys at Law
500 Chestnut Street, Suite 1402
Abilene, TX 79602

Re: Dowtech Specialty Contractors, Inc. v. City of Nacogdoches, Texas
Construction Investigation Report – Conclusion:
July 23, 2014

After a complete review of the contract file, come to the following conclusions:

UNKNOWN to Dowtech Specialty Contractors, Inc. (Dowtech) its officers, employees and attorney, Dowtech has been the VICTIM of an on going engineering conspiracy to cover-up the engineering negligence of the City of Nacogdoches, Texas (City) and the engineering firm of Schaumburg & Polk, Inc. (SPI), Mr. Mark Mann, PE (Mann) and Mr. Ricky J. Bourque, PE (Bourque) vice president in the specifying of the four (4) Aeromix Systems, Inc. (Aeromix) 25 hp Aerators by brand name without performing or conducting any type of engineering or technical due diligence.

Under the provisions of SPECIAL CONDITIONS OF THE AGREEMENT (SCA) (the governing provisions of the entire contract) page SCA-2 of 18 para. 8. MATERIALS AND WORKMANSHIP which states in part:

"Where material or equipment are specified by a trade or brand name, it is not the intention of the Owner to discriminate against an equivalent product of another manufacturer, but rather to set a definite standard of equality or performance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ."

"Equality" - The quality or state of being equal.
"Performance" – The execution of an action – the ability to perform: EFFICIENCY – the manner in which a mechanism performs (engine) (Webster's Ninth New Collegiate Dictionary).

The Aeromix 25 hp aerator is engineered and manufactured to be installed into a position of "pulling" on the swing arms. If the 25 hp aerator is installed into a position of "pushing" on the swing arms, the swing arms may collapse. Aeromix recommends the use of soft starters or VFD's with the use of the 25 hp aerators. (Exhibit #11 & #6 page -6-)

The specification prepared by SPI and approved by the City for the Wastewater Treatment Plant – Oxidation Ditch and Clarifier Improvements (WWTP) specified the usage of the four (4) Aeromix 25 hp aerators by brand name page 780- 2 of 3 Technical Specifications to be installed into a position shown on the drawings without the usage of soft starters or VFD's. (Exhibit #3)

SPI and the City had engineered and approved using the Aeromix 25 hp aerators into a

position of "pushing" on the swing arms. **Engineered for failure at the on-set.** Clearly showing that SPI had specified and the City had approved the four (4) Aeromix 25 hp aerators without performing or conducting any type of engineering or technical due diligence. (Exhibit #11)

Dowtech is a very successful general contractor with an excellent reputation with owners, engineers, other contractors and the general public. Dowtech strive to maintain and is extremely proud of their construction record.

Dowtech does no engineering and relies upon the city and it's engineers to provide the engineering expertise of each and every construction project. Dowtech relied upon the City and SPI to its detriment.

Dowtech followed the drawings and specifications (1) furnished (2) installed and (3) tested the four (4) Aeromix 25 hp aerators and completed this part of the contract on August 5, 2010. The City and SPI accepted the four (4) Aeromix 25 hp aerators on August 5, 2010 with the City signing the Aeromix warranty at that time. At the City signing and agreeing to the Aeromix warranty, all problems with warranty was the sole responsibility of the City and Aeromix. (Exhibit #4)

On or about August 20, 2010 one of the Aeromix 25 hp aerators arms began "flexing" and "broke/disconnected" and Mann telephone Dowtech to make the necessary repairs. Dowtech responded by checking the other units and tightening bolts. The arm would have to be replaced. (Exhibit #8)

Mann at that time started communication with Aeromix and on or about August 30, 2010 discovered that the 25 hp aerator could only be placed into a position of "pulling" on the swing arm. In my opinion, the engineering conspiracy had its origin. Mann, Bourque and possible others knew at that time of their engineering negligence, but was never going to admit it. (Exhibit #11)

Mann and possible others made an engineering decision to re-position the four (4) Aeromix 25 hp aerators into a "pulling" position, pulling on a stainless steel (ss) cable stretched approximately forty seven (47') feet across the WWTP oxidation ditch between two steel posts. SPI and Mann did the engineering drawings and email to Dowtech. Mann had telephoned Dowtech earlier that the contract would be modified and pricing was requested. (Exhibit #12 & #17)

(Mr. Doug Reeves construction & service manager of Aeromix would state in 2014, that Aeromix would never recommend that the 25 hp aerator "pull" on a ss cable (not substantial for operation) and most certainly not without the usage of soft starts.) (Had several telephone conversations in June 2014 with Aeromix, Mr. Bob Mangaudis (Mangaudis) VP Engineering & Operations, USA Operations 1. Mangaudis could not tell me one (1) location in the USA where its 25 hp aerator is operating on a cable such as Nacogdoches, Texas and 2. Mangaudis stated "that the 25 hp aerator must "pull" upon a substantial structure)

On September 16, 2010 Dowtech submitted to Mann its pricing in the relocation of the four (4) Aeromix 25 hp aerators into a "pulling" position in the total amount of

$41,746.00. _Dowtech expected to be paid._ (Exhibit #17)

Dowtech received the October 11, 2010 letter from SPI with the "threat" of liquidated damages and demanding a written plan to be approved by SPI and the City for the dates and completion time of the revised mounting of the four (4) Aeromix 25 hp aerators to a "pulling" on the ss cable engineered and approved by SPI and the City. This would become the standard operating procedure of Mann, Bourque, SPI and the City (Threats and Demands). (Exhibit #18 & #19)

Dowtech responded and reinstalled the four (4) Aeromix 25 hp aerators into a "pulling" position on ss cable engineered by SPI and approved by the City. Again, the installation of the Aeromix 25 hp aerators without the usage of soft starts or VFD's as recommended by Aeromix. (Exhibit #9 Work Memo - Nacogdoches)

The City for reason or reasons UNKNOWN have continually refused and rejected the soft starts or VFD's. Clearly negligence on the part of the City.

Both the positioning of the four (4) Aeromix 25 hp aerators and the usage of soft starts or VFD's is beyond the control of Dowtech.

Soon after Dowtech installed and repositioned the four (4) Aeromix 25 hp aerators to a "pulling" on a ss cable engineered and directed by SPI, problems again with the 25 hp aerators. (Exhibit #29)

The City of Nacogdoches, Texas (1) did not modify the Dowtech Contract per Mann's telephone call and email 9-17-2010 Exhibit #17 (2) directed that Dowtech perform the work (3) never paid Dowtech for the work it directed to be performed and (4) breached the contract causing Dowtech to suffer monetary losses.

Dowtech had discussions with Mann about using the mooring plan recommended by Aeromix page -4- of its operation and maintenance manual for the stabilizaion of the four (4) 25 hp aerators. Mann stated that the City rejected the mooring plan recommended by Aeromix as it did not permit the 25 hp aerator to settle to floor level when the water is drained. Showing that SPI and the City approved the usuage of the four (4) Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence. (Exhibit #6 page -4-)

The proper mooring of the 25 hp aerators would have prevented many of the problems after the relocating into a "pull" position along with the recommended soft starts.

Throughout this NIGHTMARISH contract, SPI and the City have made continual "threats" of liquidated damages in the amount of $500.00 per calender day, "will call Dowtech's bonding company" and placed demands upon Dowtech to perform work under this contract without any monetary compensation to cover-up the engineering negligence.

SPI, Mann and Bourque actions were EMBOLDEN by the "cheering on" by Mr. Steve Bartlett, PE (Bartlett) City Engineer. It appears that Bartlett assumed this position with the City in December 2010.

Bartlett email to Mann 6-20-2011 in response to Mann's earlier email with an up date of Aeromix sending two new motors for replacement.

"Move forward as described.

I am, however, expecting an earthquake and/or a hurricane to overturn the truck delivering the 2 replacement motors, which will subsequently wash out to sea. Please contact me when they are recovered. I also do not want to discount the possibility of alien attacks where the motors will be abducted on to a space ship for research.

Thanks Mark...... Hang in there." (Exhibit #42)

In my opinion, Bartlett should have been conducting an investigation into "Why so many problems with the four (4) Aeromix 25 hp aerators specified by brand name?"

Further noting, Bartlett has continually rejected the usage of soft starts with the Aeromix 25 hp aerators recommend by Aeromix. City letter March 19, 2014. (Exhibit #2)

However, in my opinion Bartlett became an aider and abetter to the engineering conspiracy to cover-up the engineering negligence and never at anytime investigated the problems.

EMBOLDEN Mann and Bourque on January 6, 2012 sent to Bartlett a letter recommending notice to Dowtech that the City was rejecting the Aeromix 25 hp aerators. City Attorney for the City of Nacogdoches, Texas, Mr Rob Atherton, (Atherton) in his letter dated January 30, 2012 to Dowtech with SPI letter date January 6, 2012 attached made demands upon Dowtech stating in part:

"_ _ _ _ _ _ _ Schaumburg & Polk ("S&P") as project engineer, has rejected the work under the contract associated with the provided aerators in accordance with Article 13 of the General Conditions of the Contract.

_ _ _ _ _ _ _ _ _ that the work related to the provided aerators is defective and rejected. Demand is here made for the removal and replacement of the aerators with approved alternative aerators. This removal and replacement should be done as soon as possible to avoid all claims, losses, and damages _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

The defective aerators may also result in violation of permits held by the City with resulting civil or criminal penalties.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ." (Exhibit # 73)

Mr. Gerald Downing (Downing) president of Dowtech had believed that the City of Nacogdoches, Texas was threatening him with criminal charges being filed. In my

opinion, it appears as a "threat of criminal filings" in Atherton's letter of January 30, 2012. Why else mention to Dowtech "criminal penalties"? Again, the City is trying to move Dowtech to perform at their directions with "threats". Downing had committed no criminal act. Downing had spent countless sleepless nights worrying and countless man hours trying to bring this Contract to a successful conclusion.

Atherton failed to investigate and/or to mention in his letter of January 30, 2012 that there is no contractual provision under the contract that is superior or over-riding of the provision when specified by brand name, **NONE**. There is no provision under the contract where the City can demand removal and replacement of the four (4) Aeromix 25 hp aerators which have been specified by brand name.

Under the terms and conditions of the contract, Dowtech had no contractual obligation to warrant or make repairs or replace the four (4) Aeromix 25 hp aerators for the engineering negligence of the City of Nacogdoches, Texas, Schaumburg & Polk, Mann, Bourque and possible others in an engineering conspiracy in a cover-up. The City, SPI. Mann, Bourque and others have acted in bad faith.

Dowtech was never paid for the work it was demanded and forced to perform for the City of Nacogdoches, Texas.

The City has continually failed to pay Dowtech its earned contract balance of $75,355.45; thereby, breaching the contract.

All problems created by the City and SPI:

The City represented to all bidders including Dowtech that it had knowledge of the Aeromix 25 hp aerators "_ _ _ _ _ _ _ _ definite standard of equality or performance _ _
_ _ _ _ _ _ _ _." para. 8 MATERIALS AND WORKMANSHIP page SCA – 2 of 18; when in fact the City or its engineers had no knowledge of the Aeromix 25 hp aerator function/equality/performance/usage and specified it negligently; and

The Aeromix 25 hp must be installed into a position of "pulling" on the swing arms; and

If the Aeromix 25 hp aerator is installed into a position of "pushing" on the swing arms, the swing arms may collapse such as on 8-20-2010 (Exhibit #8) this contract; and

The City had negligently (without knowledge of how the Aeromix 25 hp aerator must be positioned to "pull" on the swing arms) positioned the Aeromix 25 hp aerator to "push" on the swing arms; and

Aeromix had recommended that soft starters or VFD's be used with the 25 hp aerator (to accelerate in a gentle manner) manual page -6-; with the City rejecting the usage of soft starts; and

Aeromix had specified the mooring of the 25 hp aerator page -4- of manual for which the City has continually rejected according to Mann in his conversation with Downing, because this mooring will not permit the 25 hp aerator to lower to the floor when water is drained; and

After City changed to put the 25 hp aerator into a "pull" position on a ss cable (not substantial structure for a 25 hp aerator without soft starts and proper mooring) still had problems from the City's decisions; and

Every problem with the Aeromix 25 hp aerator stems from the City failures in specifying the Aeromix 25 hp aerator by brand name without performing or conducting any type of engineering or technical due diligence; and the City's failure to follow the recommendations of Aeromix.

In my many years of construction experience, have never seen or witnessed a product specified by <u>brand name</u> so <u>MISUSED</u> and <u>ABUSED</u> by professional engineers and the City. Nor, such <u>WRONGFUL</u> acts against a contractor.

<u>Throughout this NIGHTMARISH contract, Dowtech has worked diligently and tirelessly to protect its excellent reputation.</u>

In my opinion, Dowtech has <u>UNKNOWINGLY</u> been the <u>VICTIM</u> of an on-going <u>engineering conspiracy</u> to cover up <u>engineering negligence</u> which has caused the City of Nacogdoches, Texas to breach the contract numerous times causing Dowtech to suffer monetary losses and damages to its reputation.

This conclusion is supported by the Findings and the Construction Investigation Report attached.

In Closing:

All of these problems and grief could have been avoided with a simple (1) telephone call, or (2) fax message, or (3) email to Aeromix with a simple question:

"Does your 25 hp. Aerator "push" or "pull" on the swing arms?"

Why didn't someone from the City make this <u>inquiry</u> prior to specifying the four (4) Aeromix 25 hp aerators by <u>brand name</u>?

<u>The citizens of the City of Nacogdoches, Texas should hold that person or firm accountable, issue a public written apology to Dowtech.</u>

<u>And pay Dowtech all of its monetary losses.</u>

Respectfully Submitted,

Bob Click
(325) 893-9116


Note: Have underlined certain statements for emphasis.

<u>Construction Investigation Report Amend:</u>
By: Bob Click

Dowtech Specialty Contractors, Inc. v. City of Nacogdoches, Texas

From review of the file, (1) findings, and (2) opinion supported by facts:

<u>Finding #1:</u> The City of Nacogdoches, Texas (City) employed the services of Schaumburg & Polk, Inc. (SPI) to perform the engineering services for the Wastewater Treatment Plant – Oxidation and Clarifier Improvements (WWTP);

<u>Finding #2:</u> The City is responsible for the actions and/or in-actions of SPI;

<u>Finding #3:</u> Dowtech Specialty Contractors, Inc., (Dowtech) was the low bidder on the WWTP and was awarded the contract;

<u>Finding #4:</u> The City specified the usage of four (4) Aeromix Systems, Inc., (Aeromix) 25 hp aerators by brand name;

<u>Finding #5: The City had specified the four (4) Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence;</u>

<u>Finding #6:</u> Dowtech, general contractor, has an excellent reputation with owners, engineers, other contractors, general public and always striving to maintain;

<u>Finding #7:</u> Dowtech performs no engineering services and relies upon the various cities to perform all engineering required on a contract;

<u>Finding #8:</u> Dowtech relied upon the City of Nacogdoches, Texas for all engineering services on the WWTP and the specifying of the Aeromix 25 hp aerators by <u>brand name</u>;

<u>Finding #9:</u> The City's specifications on the WWTP represented to all bidders including Dowtech that (1) Furnishing (2) installation (3) testing and (4) assignment of warranty would complete the installation of the four (4) Aeromix 25 hp aerators;

<u>Finding #10:</u> What happened to Dowtech would have happened to any general contractor receiving the award of this contract;

<u>Finding #11:</u> Upon award of the contract, Dowtech went to work performing in accordance with the contract documents;

<u>Finding #12:</u> Dowtech (1) purchased (2) installed and (3) tested the four (4) Aeromix 25 hp aerators per the contract;

<u>Finding #13:</u> On August 5, 2010 the City accepted the four (4) Aeromix 25 hp aerators for operation and signed the Aeromix warranty;

Finding #14: After acceptance of the four (4) Aeromix 25 hp aerators on August 5, 2010, signing of the warranty, all warranty problems with the four (4) Aeromix 25 hp aerators was the sole responsibility of the City and Aeromix;

Finding #15: Aeromix had recommended the use of soft starters or VFD's with the 25 hp aerators;

Finding #16: The City specifications did not require the installation of soft starters or VFD's and none were installed;

Finding #17: On or about August 20, 2010 the arm from one of the Aeromix 25 hp aerators started "flexing" and "broke/disconnected";

Finding #18: Dowtech was called by Mr. Mark Mann, P.E. (Mann) engineer with SPI to make repairs to the "flexing" arm;

Finding #19: Mann in communication with Aeromix on or about August 30, 2010 discovered that the 25 hp aerator could only be placed into a position of "pulling" on the swing arms;

Finding #20: Unknown to Dowtech, its officers and employees this was the start of an engineering conspiracy (the act of conspiring together – Webster's Ninth Collegiate Dictionary (Webster's) on a construction contract with the City to cover-up the engineering negligence of SPI, Mann, Mr. Rick J. Bourque, P.E. (Bourque) vice president, the City and possible others in the specifying of the Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence;

Finding #21: The Aeromix 25 hp aerator is engineered and manufactured to "pull" on the swing arms;

Finding #22: The City had placed the four (4) Aeromix 25 hp aerators into a position of "push" without the usage of soft starters or VFD's;

Finding #23: The City had "engineered" the four (4) Aeromix 25 hp aerators to "FAIL";

Finding #24: The City has continually rejected the use of soft starts or VFD's;

Finding #25: The City rejected the use of the Aeromix 25 hp aerator "mooring" recommendation because it would not permit the aerator to settle to floor level when water is drained;

Finding #26: Mr. Doug Reeves (Reeves) construction & services manager of Aeromix stated in 2014 "the installation of soft starts could have prevented some, if not all of the problems with the Aeromix 25 hp aerators";

Finding #27: Throughout this contract Dowtech has worked diligently and tirelessly to protect its reputation;

<u>Finding #28:</u> No complaints against the work of Dowtech;

<u>Finding #29:</u> That the engineering conspiracy was to protect the reputation of SPI with its on-going contracts with the City;

<u>Finding #30:</u> Mann, Bourque and SPI are the known <u>CO-CONSPIRATORS</u> with others aiding and abetting either knowingly or ignorantly;

<u>Finding #31:</u> The City failed to exercise <u>good faith</u> over-sight of SPI, Mann, Bourque and possible others;

<u>Finding #32:</u> The City <u>MISUSED</u> and <u>ABUSED</u> the Aeromix 25 hp aerators;

<u>Finding #33:</u> The City, SPI, Mann and Bourque continual use of "threats" of liquidated damages ($500.00 per day / seven (7) days per week) to force Dowtech to respond to their demands;

<u>Finding #34:</u> The City used "<u>verbal threats</u>" of calling Dowtech's bonding company to force Dowtech to respond;

<u>Finding #35:</u> The City of Nacogdoches, Texas used the "<u>threat</u>" to file criminal charges against Mr. Downing (Downing) president of Dowtech to try and force Dowtech to respond to their demands;

<u>Finding #36:</u> The on-going <u>engineering conspiracy</u> to cover-up the <u>engineering negligence</u> of the City. SPI, Mann, Bourque and possible others have caused the City of Nacogdoches, Texas to <u>breach the contract</u> numerous times causing Dowtech to suffer monetary losses and damages to its reputation;

<u>Finding #37:</u> The on-going <u>engineering conspiracy</u> was <u>UNKNOWN</u> to Dowtech, its officers, employees and attorney. This finding is a conclusion from a review of all documentation viewed, for which there is no document or evidence found that raised a question or showed any suspicion;

<u>Finding #38:</u> That Dowtech has suffered monetary losses, damages and damages to its reputation;

<u>Finding #39:</u> SPI, Mann and Bourque have not acted in <u>good faith;</u>

<u>Finding #40:</u> The City of Nacogdoches, Texas has not acted in <u>good faith;</u>

<u>Finding #41:</u> Dowtech never at any time breach the contract;

<u>Finding #42:</u> Downing is the president and chief operating officer of Dowtech over-seeing a multimillion dollar yearly volume in general contracting;

<u>Finding #43:</u> In my opinion, Downing has been forced by the City's actions and/or in-actions on this Contract to spend countless actual man hours estimated at 2,923, <u>TABLE</u>

Page 3

**#1 ESTIMATED MAN HOURS – DOWNING** unbilled trying to protect Dowtech's reputation and responding to the various contract problems from December 1, 2010 to June 24, 2014;

Finding #44: Downing does not work by the hour; however, in my opinion have estimated his hourly rate at $125.00 per hour to calculated Dowtech's actual damages from the City's breach of contract actions;

Finding #45: In my opinion, Dowtech has incurred an estimated total of $365,375.00 for the cost of Downing responding to the breach of contract problems created by the City on this contract;

Finding #46: In my opinion, the countless man hours spent by Downing was not known nor anticipated at the bidding of this contract;

Finding #47: Mr. Clint Carlile (Carlile) general superintendent of Dowtech helping over-see the work on this contract, desperately trying to bring to a successful completion;

Finding #48: In my opinion; Carlile has had been forced to spend countless man hours desperately trying to complete this contract, over-coming the City of Nacogdoches numerous breach of contract which has been estimated at 1,820 man hours TABLE #2 ESTIMATED MAN HOURS – CARLILE;

Finding #49: Mr. Carlile is paid at the rate of $30.00 per hour (furnished by Dowtech);

Finding #50: In my opinion, the cost to Dowtech for Carlile 1,820 man hours is $54,600.00;

Finding #51: The cost of Carlile insurance, workman compensation, liabilty, social security to Dowtech is 25% of the cost of labor (per information furnished by Dowtech) which is a total dollar value calculated at a cost to Dowtech of $13,650.00;

Finding #52: In my opinion, the total cost to Dowtech for Carlile in reference to the City breach of contract is $68,250.00;

Finding #53: In my opinion, the countless man hours spent by Carlile on the contract was not known nor anticipated at the bidding of this contract.

<u>Brief Background:</u>

Have worked in the construction industry over sixty years with experience in management, estimating, claims on all types of construction projects. Came to work for Dowtech in August 2013. Worked primarily through February 2014 on several request for compensation and performance time extensions on the Federal Correctional Institution (FCI) Fort Worth, Texas and worked with the Rule 11 Agreement (Agreement) shipping the aerators to/from Aeromix.

<u>Engineering Conspiracy UNKNOWN to Dowtech:</u>

From (1) Downing instructions to me regarding the Rule 11 Agreement in early January 2014, "Need to buy some time, before having to re-install the aerators at Nacogdoches. Couldn't have come at a worse time. Needing to complete the FCI project. Do what you can." (2) review of the contract file including emails (3) review of court documents (4) review of communication between Dowtech and its attorney and (5) conversations with Downing, and other employees, the later part of March 2014 came to the conclusion that Dowtech had been the <u>VICTIM</u> of any on-going <u>engineering conspiracy</u> to cover-up for the <u>engineering negligence</u> by the City, SPI, Mann, Bourque and possible others.

Informed Downing the later part of March 2014 my preliminary findings, that in my opinion Dowtech was the <u>VICTIM</u> of an on-going <u>engineering conspiracy</u> to cover up the <u>engineering negligence</u> of SPI and Mann. <u>In my opinion, Downing was completely surprised, no person at Dowtech had any thoughts or knowledge of the on-going engineering conspiracy.</u>

<u>City Breaches Rule 11 Agreement:</u>

Under the Rule 11 Agreement Dowtech (1) had loaded and shipped the aerators to Aeromix for the repairs (2) upon notification from Aeromix that the aerators were ready (repairs complete) (3) had shipped to Nacogdoches, Texas and unloaded (4) as the

Aeromix communications to Dowtech revealed that the City had requested that Aeromix re-engineer/re-design the aerators to be placed back into their original position (not back into the position from which removed) (5) knew it was not Dowtech's responsibility to place back into the original position under the Rule 11 Agreement and (6) notified the City with its letter of 1-31-2014 with emails from Aeromix attached as Exhibit #1.

Dowtech in the letter of 1-31-2014 requested that the City advise when the bolts from Aeromix arrived to re-install.

City replied with its letter of 3-19-2014, received by Dowtech on 3-25-2014 attached Exhibit #2 (1) demanding re-install same position from which removed (2) no soft starts and (3) no mention of the bolts have arrived.

<u>Clearly, the City has breached the Rule 11 Agreement in requesting that Aeromix re-</u>

engineer/re-design the 25 hp aerators to be placed back into their original position not back from position of removal.

It appears the City had no intent of honoring its contractual obligations.

Supporting Information:

The City employed the services of SPI to prepare the contract documents for the WASTEWATER TREATMENT PLANT – OXIDATION DITCH CLARIFIER IMPROVEMENTS (WWTP) and appears to me the City is responsible for the actions and/or in-actions of SPI and others who have aided and abetted this on-going engineering conspiracy.

The City took bids, Dowtech was the low bidder and received award of the contract.

The contract performance time was 240 calendar days with time extension provisions for delays beyond the control of the contractor. The contract provided for liquidated damages in the amount of $500.00 per calendar day for the contractors failure to timely complete.

The contract performance time started 11-2-2009.

Dowtech started work on the contract with the intentions to complete on time/on budget.

What happened to Dowtech on this contract would have happened to any bidder that would have received this contract.

For your information, attaching the pertinent parts of the contract specifications including cover- page, Standard General Conditions of the the Construction Contract, Special Conditions of the Agreement both in their entirety along with Technical Specifications ITEM 780 – FLOATING ELECTRIC BRUSH AERATOR PAGES 780- 1 of 3, 780 – 2 0f 3 and 780 – 3 of 3 attached as Exhibit #3.

"A. General: The Contractor shall furnish and install a total of 4, 25 hp floating electric brush aerators as a part of this project. Aeromix Systems, ECS House Industries, or approved equal shall manufacture the floating electric brush aerators."

Note, the four (4) Aeromix 25 hp aerators were specified by brand name for use on this contract. Dowtech, purchased, furnished and installed per the contract documents.

Special Conditions of the Agreement (SCA) page SCA-1 of 18 para. 1. GENERAL

"The provisions of this Section of the specifications shall govern in the event of any conflict between them and the "General Conditions of Agreement".

This specifications is the governing specifications.

Page SCA – 2 of 18 para. 8. MATERIALS AND WORKMANSHIP stating in part:

"
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Where material or equipment are specified by a trade or brand name, it is not the intention of the Owner to discriminate against an equivalent product of another manufacturer, but rather to set a definite standard of equality or performance _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _, unless a substitute shall be approved in writing by the Engineer, and the Engineer shall have the right to require the use of such specifically designated material, article or process."

Clearly, SPI and the City represented to all bidders including Dowtech that the Aeromix 25 hp aerators "_ _ set a definite standard of equality or performance _ _ _ _." Knowing that all bidders including Dowtech would rely upon these representations in the preparation and submittal of its bid.

The City represented to all bidders including Dowtech that it had working knowledge of the performance and operation of the Aeromix 25 hp aerator and that the installation of the four (4) aerators would comply with the terms and conditions of the contract.

Under the contract, the City could have demanded Aeromix or ECS House Industries and no other.

In my opinion, many of the problems could have been prevented following the recommendations of Aeromix with (1) soft starts and (2) proper mooring of the 25 hp aerator.

The on-going engineering conspiracy to cover-up the engineering negligence will become very evident:

August 5, 2010:

August 5, 2010 was a very important day in the life of this contract:

1) Aeromix, SPI, City and Dowtech had representatives at the construction site; and

2) Mr. Brett Pate (Pate) represented Aeromix, Mann represented the City & SPI, Mr. David Wolfgang (Wolfgang) represented the City with others and Mr. Clint Carlile (Carlile) represented Dowtech; and

3) Mann and Wolfgang inspected, accepted and witness the testing of the four (4) Aeromix 25 hp aerators; and

4) Mann and Wolfgang accepted for the City of Nacogdoches the four (4) Aeromix 25 hp aerators for service; and

5) Pate instructed the City employees in the operation and maintenance of the Aeromix 25 hp aerators using the 25-30 hp (18.7 – 22.4 kw) Monsoon Paddle wheel Surface Splash Aerator Installation, Operation and Maintenance Manual (Manual). Each City employees had his own manual for the instructions. Aeromix had shipped directly to the City the manuals. The information regarding Manuals was given by Pate via telephone 3-27-2014; and

6) The City accepted the four (4) Aeromix 25 hp aerators as completed and Wolfgang for the City signed the Aeromix warranty; and

7) Upon the City's acceptance, signing of the warranty, any warranty problems with the four (4) aerators became the sole responsibility of the City and Aeromix; and

8) Dowtech had every reason to believe that this part of the contract had been successfully completed and accepted by the City; and

9) Under the terms and conditions of the contract, Dowtech had completed the contract requirements for the installation of four (4) Aeromix 25 hp aerators.

<u>Warranty:</u>

After August 5, 2010 the City is operating the four (4) Aeromix 25 hp aerators under the warranty agreement:

1) Pate email 8-12-2010 to City and Dowtech with signed copy of warranty and test results attached as Exhibit #4.

2) Mann email 8-16-2010 in 5 pages to Mr. Steve Caudle (Caudle) City water Utilities Superintendent attached to Exhibit #5 which states in part page 3 of 5:

"If you want to begin use go ahead since the manufacturer has ok'ed and the warranty will be inplace."

<u>Mann, SPI and the City have clearly acknowledged that the four (4) Aeromix 25 hp aerators are operating under the Aeromix warranty.</u>

The Aeromix warranty for which the City had accepted, requires for any part or parts needing repairs or replacement under the warranty (1) City must dismantle/unhook/disconnect (2) City must prepare for shipment (3) City must box or crate for shipment (4) City must take or call freight company (5) City must pay the freight billing for shipment to Aeromix in Minnesota (6) upon the Aeromix repair or replacement and shipment to the City (7) City must unload if extra large object (8) City must un-box or un-crate and (9) reinstall/re-hook/reconnect, part or parts.

<u>Engineering Negligence</u> Failure to require use of <u>and specify use of soft starts:</u>

<u>Aeromix recommends the use of soft starts or VFD's for the successful operation of the four (4) 25 hp aerators:</u>

1) A copy of the first 6 pages of the Aeromix Operation and Maintenance Manual attached as Exhibit #6 (complete copy will be furnished upon request) which states in part page -6- very clearly in bold print"

**"AEROMIX highly recommends the use of soft starters or VFD's (optional) on units of 20 hp and higher. These considerably reduce power consumption at start up/operation, and add life to mechanical components, including the drive assembly."**

2) A review of the entire contract documents will find no mention anywhere of the soft starts or VFD's requirements.

3) <u>Question, what is a soft starter?</u>

To help explain, Motor soft starter from Wikipedia in 4 pages attached as Exhibit #7 page 3 of 4 in my opinion gives a very simple description stating in part:

"A soft starter continuously controls the three-phase motor's voltage supply during the start-up phase. This way, the motor is adjusted to the machine's load behavior. Mechanical operating equipment is accelerated in a gentle manner. Service life, operating behavior and work flows are positively influenced."

4) The question that should be asked of the City and SPI:

Why specify the four (4) Aeromix 25 hp aerators by brand name to "_ _ _ _ _ _ set a definite standard of equality or performance _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _."
<u>When not following the recommendation of Aeromix to install soft starts or VFD's?</u>

In fact, the City did answer this question. Mr. Steve Bartlett, PE, RPLS (Bartlett) City engineer for the City of Nacogdoches, Texas.

Exhibit #2. In my opinion, the facts will show Bartlett aided and abetted the <u>engineering conspiracy</u> either knowingly or ignorantly.

Bartlett's comments in his 3-19-2014 letter "While we now understand that the operations manual identified the use of a soft start device for Aeromix motors over 20 hp _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ thus should have served as notice that they were never considered to be a necessary part of the installation by our engineer based on their experience with many other similar devices. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Since the electrical startup cycles will be minimal for the life of these aerators, we do not intend to provide soft start devices at this time.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ."
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ."

Again, looking at the contract documents no mention of the use of soft starts. Further, Bartlett is now admitting that the Aeromix 25 hp aerators require the installation of soft starts per the recommendation of Aeromix, but the City has more knowledge than Aeromix and will go without the soft starts.

In my opinion, the City failure to install the Aeromix recommends soft starts clearly violated the warranty (1) mishandling (2) cause the aerators to suffer fatigue and (3) abuse of the aerators.

A simple telephone call, a fax or email to Aeromix would have confirmed this recommendation prior to specifying by brand name.

In my opinion, the City was negligent in its failure to install soft starts.

Engineering Negligence - Aeromix Re-install:

Bartlett's letter 3-19-2014 Exhibit #2 directing that the four (4) Aeromix 25 hp aerators be re-installed into the same position from which removed. The same position from which has come numerous failures:

Turn to Exhibit #1 1-31-2014 Dowtech letter to Bartlett and others with various emails from Aeromix:

1-31-2014 letter states in part:

"Clearly, someone from the City requested that Aeromix re-design its equipment to go back into the position of original intent. This is what Aeromix claims and supported by emails.

The meaning of the Aeromix emails are very clear to Dowtech, install the redesigned equipment at the original position shown on the drawings. (Not re-installing at the same position from which the Aeromix equipment was removed)."

Aeromix emails attached to letter 1-31-2014:

Aeromix emails 1-14-2014 states in part:

" _ _ _ _ _ _ _ _ _ _ _ _ _ _ . The units are designed to attached to the bridge mounts as originally designed. No more need for the mooring cable."

" _ _ _ _ _ _ _ _ _ _ _ _ _ _ . We were asked to make the original design work and the original bridge mount work for the customer. A Mooring line stretched across the ditch is not an adequate way to secure the unit."

"_____
_____. I would think are units would need to go back into their original location. This is the basis of our redesign."

"_____
_____ . This is however a change in what we designed around. We were asked to make the existing bridge mount system work with the new swing arms."

Aeromix has always recommended that soft starts be used with these 25 hp aerators Exhibit #6 page -6- in bold print.

Remember Exhibit #1 and the various emails from Aeromix stating that the four (4) 25 hp aerators had been re-engineered to be place back into the original position at the request of the City, not back into the position from which removed.

Bartlett's directions Exhibit #2 require that the four (4) Aeromix 25 hp aerators be placed back into the same position from which removed, all the while with Bartlett having the various emails from Aeromix about the re-engineered 25 hp aerators to go back into the original position, not the position from which removed. Bartlett's directions conflicts with Aeromix re-engineered 25 hp aerators instructions.

Bartlett's instructions clearly "designed to fail."

Does Bartlett really believe that the four (4) Aeromix 25 hp aerators have a chance to really work this time "pulling" on a stainless steel (ss) cable (not a substantial structure) when it clearly showed in the past failure after failure after failure.

Bartlett's instructions Exhibit #2 with a complete disregard (1) installation of soft starts (2) rejection of Aeromix mooring system and (3) Aeromix re-designed/re-engineered 25 hp aerators swing arms is pure "INSANITY".

Aeromix 25 hp Aerators Problems 2010:

Please note in Mann's Exhibit #19 "Dowtech furnished pricing information on September 16, 2010 to Aeromix for consideration."

Refer back to Exhibit #17, Dowtech submitted its pricing to SPI Attn: Mark Mann and not to Aeromix. Dowtech's contract is with the City and no other. Mann represents the City.

Dowtech never at any time agreed to work for Aeromix.

Dowtech has never been paid for the work in re-positioning the 25 hp aerators into "pulling" on a ss cable and other work demanded by the City.

<u>The City has breached the contract in its failure to pay Dowtech and hold Dowtech harmless from the actions and/or inactions of SPI, Mann, Bourque and others.</u>

1) 8-19-2010 one of the Aeromix 25 hp aerator started experiencing a problem " flexing of arms", Mann telephoned Dowtech to check it out / confirmed by Mann email 8-30-2010 attached as Exhibit #8.

Dowtech responded / checked / tightened bolts at a cost of $2,313.67 attached as Exhibit #9 <u>Work Memo – Nacogdoches.</u>

2) Caudle email to Mann 8-26-2010 attached as Exhibit # 10 which states in part:

"Since the Monsoon destructed we are hesitant to run the other one. _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ."

Mann email to Caudle 8-26-2010 in reply stating in part:

"
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Dowtech is discussing this situation with Aeromix to get a resolution. Dowtech has indicated that it will get resolved one way or another (with out without Aeromix)."

3) Mr. Josh Perfetti (Perfetti), Aeromix email to Mann 8-30-2010 attached as Exhibit #11 states:

" I spoke with customer support and they wanted you to view the attached drawing. It shows that the MONSOON has to be mounted pulling on the swing arms. _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ."

Mann email to Perfetti later in day Exhibit #11 which states in part:

"Per our conversation this morning, and the conversations you have had with Dowtech the new units installed are being added to an EXISTING UNIT WITH EXISTING EQUIPMENT AND FLOW PATTERN. The new units are being installed as supplimental to the existing aerator units so they must match the same flow pattern. The new aerators can only be installed in the locations as shown on the contract drawings with the unit pushing (compression) on the arms because the existing equipment prohibits any other location.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

The units must run with arms in compression.

Please coordinate with Dowtech if you have any further questions."

Please take time to read and understand email Exhibit #11 attached.

<u>The Aeromix 25 hp aerators are engineered to "pull" on the swing arms"</u>

The units specified by SPI, Mann and the City must run with arms in compression "pushing" on the swing arms.

<u>Engineering Negligence -</u> specified the four (4) Aeromix 25 hp aerators which are engineered to "pull" on the swing arms by <u>brand name</u> without performing or conducting any type of engineering or technical due diligence.

<u>A simple telephone call / fax to / or email inquiry to Aeromix would have ruled out</u>
<u>Aeromix as a aerator supplier.</u>

SPI, Mann and others were negligent.

<u>All of SPI, Mann and other CO-CONSPIRATORS actions and/or in-actions come from</u>
<u>the failure of SPI to perform or conduct any type of engineering or technical due</u>
<u>diligence to discover that the Aeromix 25 hp aerators specified by brand name "pull on</u>
<u>the swing arms" and will not work in compression "pushing."</u>

<u>In my opinion, Mann has just come to realized that SPI had made negligent</u>
<u>misrepresentation to all bidders including Dowtech, but was not ever going to admit it.</u>
<u>From this point on Mann is going to work to try to cover-up. This is the start of the</u>
<u>engineering conspiracy to cover-up the engineering negligence of SPI and Mann along</u>
<u>with other CO-CONSPIRATORS to protect the reputation of SPI and Mann.</u>

4) Per information from Dowtech and the file, Mann called via telephone Dowtech and informed that the contract would be modified and pricing of the modification would be needed. Mann email to Dowtech 9-2-2010 with attached drawings for Dowtech to submit its pricing attached as Exhibit #12.

Clearly from a review of the drawings, Mann is going to try and re-position the four (4) Aeromix 25 hp aerators to <u>pull</u> on a stainless steel cable.

Mann email to Dowtech later 9-2-2010 with cable information attached as Exhibit #13.

Mann email to Dowtech 9-7-2010 changing the post size from 4" diameter to 8" attached Exhibit #14.

Pate email to Dowtech 9-7-2010 mooring cable and mooring anchor plates attached as Exhibit #15.

Mann email to Dowtech 9-14-2010 with attached drawing attached as Exhibit #16.

Dowtech email to Mann 9-16-2010 with break down of pricing per the City request 9-2-2010 attached as Exhibit #17.

This pricing shown is Exhibit #17 is to re-position the four (4) Aeromix 25 hp aerators into a pulling on a ss cable. Dowtech's price for this work is a total of $41,746.00. Dowtech expects to be paid. Exhibit #17 confirms Mann's telephone call that the contract was being modified.

5) Mann email 10-7-2010 to Dowtech threatening liquidated damages for the Aeromix 25 hp aerators delays attached as Exhibit #18 stating in part:

"Rick is out of the office today _ _ _ _ _ _ _ _ _ _."

Rick is Bourque a co-conspirator. SPI, Mann Bourque and the City are not acting in good faith.

Mann email to Dowtech 10-11-2010 with attached letter attached Exhibit #19. Several items need to be noted. (1) tested and reviewed by the manufacturer's representative on August 5, 2010 and put into use following. (2) flexing conditions (3) damaged the mooring arm (4) Aeromix requested that the aerator units be mounted in a position which would pull _ _ _ _ (5) _ _ _ Schaumburg & Polk furnished an alternative aeration mounting plan to Dowtech for use in pricing to revise the aerators for a tension mounting setup as requested by Aeromix (6) Dowtech furnished pricing information on September 16, 2010 to Aeromix for consideration. (7) _ _ _ _ _ since August 20, and is requesting that a resolution be expedited _ _ _ _ (8) _ _ _ _ _ _ the City has the right to impose liquidated damages on the project, and (9) Please expedite a written plan to us for review and submission to the city indicating the dates and completion time for the revised mounting _ _ _ _.

Clearly, Mann and SPI are trying to cover-up their own engineering negligence.

Mann directs Dowtech to proceed with the modification and Dowtech expects to be paid. (Exhibit #17)

Mann email 10-13-2010 to Perfetti Aeromix attached Exhibit #20 Approval of 8" post and directions to coordinate with Dowtech.

Mann email to Dowtech 10-26-2010 attached as Exhibit #21 in part stating:

"Please let me know the scheulde with Aeromix."

Dowtech email to Perfetti Aeromix 11-3-2010 attached as Exhibit #22 stating in part:

"_ _ _ _ _ . THE CITY IS IN A BIND."

Dowtech email 11-12-2010 to Perfetti Aeromix attached Exhibit #23 states in part:

"JOSH, WITH THE PROBLEMS THAT HAVE OCCURED, I WOULD HIGHLY RECOMMEND THAT A REP. BE ON SITE _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _."

Mann email to Dowtech 11-19-2010 attached Exhibit #23A with drawing.

Page 14

Dowtech email 11-24-2010 Exhibit #23A to Mann stating:

"MARK, AEROMIX HAS NOT RESPONDED TO EMAIL CONCERNING LATEST DRAWINGS."

Seems to me, a Dowtech response in desperation.

Just think about the enormous pressure that this engineering conspiracy is placing upon Downing and the employees of Dowtech.

Perfetti Aeromix email to Dowtech 11-24-2010 attached Exhibit #24 which states in part:

"The original brackets should be used."

Dowtech responds email to Aeromix email earlier Exhibit #24:

"The original brackets can not be used because welded on. When they cut them off they can not be reused."

Aeromix responded email Exhibit #24 in part:

"We will ship you the brackets. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _."

6)  On 11-29-2010 Dowtech is working to install the Aeromix 25 hp aerators into the newly engineered position designated by SPI and Mann for the City. See Exhibit #9 Work Memo – Nacogdoches. Dowtech expects to be paid for this work.

Note, Dowtech's contract is with the city of Nacogdoches and on August 5, 2010 completed all work on the four (4) Aeromix 25 hp aerators and were accepted by SPI and the City. Warranty was transferred to the City on August 5, 2010. Again, Dowtech has no contractual obligation to re-position the four (4) Aeromix 25 hp aerators free of charge for the City or SPI.

Mann email to Dowtech 12-1-2010 attached as Exhibit #25 with instructions:

Note, "We discussed with David at the City and he is OK with this also." Mr. David Bartlett, PE, RPLS is now City Engineer.

Dowtech email to Perfetti Aeromix 12-1-2010 attached Exhibit #26 requesting material.

Aeromix responds Exhibit #26 in part stating:

" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ we are expecting Dowtech to reuse items _ _ _ _ _ _."

Dowtech responded to Aeromix Exhibit #26 stating:

"WE CAN'T REUSE BECAUSE THEY WERE TORE UP."

Dowtech email to Perfetti Aeromix 12-3-2010 attached Exhibit #27 requesting urgent materials.

Mann email to Dowtech 12-6-2010 attached Exhibit #28 stating in part:

"We just need to keep proceeding to finish work in a timely fashion, _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _."

7) On 12-17-2010, Dowtech completed the re-location of the four (4) Aeromix 25 hp aerators and started up.

James Davis, employee of Dowtech stated: "We turned on aerators on 12-17-2010. The aerators were moving around in the water. The City was not pleased at the movement of the aerators, Aeromix and the engineers were talking of other means of anchoring the aerators. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _." Exhibit #9.

Dowtech had spent a total of $31,711.94 at the end of the day 12-17-2010 Exhibit #17, Exhibit #9 <u>Work Memo – Nacogdoches</u> in performing the work at the direction of Mann to relocate the four (4) Aeromix 25 hp aerators to a position of pulling. The engineering of Mann required the installation of a stainless steel cable stretched approximately forty seven (47) feet between two (2) eight (8) inch diameter posts. The stainless steel cable will expand and contract with the daily temperature. <u>In my opinion, not a solid structure for the aerators to pull against.</u>

<u>Note, Dowtech has never been paid for this work.</u>

Dowtech email to Perfetti Aeromix 12-27-2010 attached as Exhibit #29 states in part:

"JOSH, HAVE NOT HEARD FROM AEROMIX CONCERNING THE EXISTING AERATORS
AFFECTING THE NEW AERATORS. WE NEED TO GET ALL ASPECTS WORKED OUT AND PUT AWAY ASAP."

Aeromix 12-28-2010 Exhibit #29 states in part:

"I spoke with our Engineering Manager. He suggested that two mooring cable supports be used. They should be installed diagonally from the MONSOON to the mooring cable that extends across the oxidation ditch. Attached is a quick sketch for your reference. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _."

Mann email Aeromix 12-30-2010 Exhibit #29 in part:

"I read their comments however this anomaly has not been seen for this type of mooring arrangement in large basins such as the aeration lagoons. Given the long length of those swing arms and the close presence of other equipment mixing in a rather narrow channel I would suspect those as being the causes for side movement. I think the solution to this, would be those diagonal stay cables I mentioned to you. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _."

Mann email to Aeromix 1-4-2011 Exhibit #29 in part:

"I have reviewed the drawings, please confirm that we should attached to the lifting points on the unit with the additional cables. The drawing does not say but I want to confirm before we do it."

Aeromix respones email to Mann 1-4-2011 Exhibit #29 in part:

"See comment below from our Engineering Department

""Yes, the cables should be attached to the lifting points on the monsoon frame.""

Thanks"

Aeromix 25 hp Aerator Problems 2011:

1) Dowtech returned to site 1-6 & 7-2011 to (1) tie off aerators (2) try and stabilize (3) re-hook /reset aerators and (4) tried to satisfy the City. This was at a cost to Dowtech of $2,899.92. Work Memo-Nacogdoches.

Note, Dowtech has never been paid for this work.

Mann email to Dowtech 1-7-2011 attached as Exhibit #30 states in part:

"The setup that Aeromix suggested is working and holds the aerators in position as they should. The City is acceptable with this arrangement.

Please coordinate with Aeromix on getting the supplies to permenantly setup all the aerators per their drawings.

Let me know when this might be scheduled"

In my opinion, Mann is working desperately to make the repositioning of the four (4) Aeromix 25 hp aerators work at the expense of Dowtech.

Remember now, this will be the second time that Mann and SPI has tried to make the use of stainless steel cable in place of a solid structure work for the 25 hp aerator to "pull" against.

2) City continues to hold Dowtech's contractually earned / owed money for the Aeromix 25 hp. aerators, attached as Exhibit #31   Mann email to Dowtech 1-17-2011, clearly showing that the City breached the contract.

Mann email to Dowtech 1-20-2011, Exhibit #32 attached states in part:

"_ _ _ _ _ _ _ _ Another unit has shut down from apparent gearbox failure. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _I will call you later this morning to discuss."

Mann email to Dowtech 1-31-2011, Exhibit #33 attached states in part:

"_ _ _ _ _ _ _ _ _ Third gearbox is now down. Wanted to give you the heads up before tomorrow. See ya'll in Nacogdoches."

Mann email to Perfetti Aeromix 2-2-2011 Exhibit #34 attached with copy to Dowtech states in Part:

"As a follow up to our meeting yesterday, _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Aeromix is going to provide four new gear boxes for all the units on site. The new gear boxes are going to be from Rossi. Aeromix is going to coordinate with Dowtech on delivery times, so the old gear boxes can be removed, and new units installed in the same trip. Dowtech will also install additional cables which arrived at WWTP yesterday during this trip. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _."

<u>Gearbox failure is a warranty item. Why is Mann demanding Dowtech performed warranty. Remember, City signed warranty agreement August 5, 2010 and agreed to follow the terms. The City agreed to perform this warranty work. See warranty Exhibit #4.</u>

3) Mann email 3-29-2011 to Dowtech attached as Exhibit #35 stating in part:

"_ _ _ _ _ _ _ _ _, I have attached a copy of our letter requesting a confirmed schedule on delivery and installation of the gear boxes by April 8.

I have CC Aeromix, but I suggest you forward the letter on to Aeromix so they can plan accordingly.

Thanks."

Mann is becoming very **BOLD** in his WRONGFUL demands to cover-up his and SPI engineering negligence.

SPI letter to Dowtech 3-29-2011 attached as Exhibit #36 with Mann making demands upon Dowtech to cover-up his and SPI's <u>engineering negligence</u> stating in part:

"_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _. After placement into initial operation there were delays in full utilization of the equipment pending resolution of the mounting details. The units have now experienced gear box failures occurring on September 15, 2010; January 20, 2011; January 31, 2011; and February 28, 2011 and are currently not in service.

A meeting was held on February 2, 2011 between representatives of Aeromix, Schaumburg & Polk, and the City of Nacogdoches to discuss the resolution of the gear box failures. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

<u>At this time the City is requesting a confirmed schedule be provided by April 8, 2011</u> _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Any cost incurred shall be considered measurable damages per Supplementary Conditions Section 12.

Please expedite a written plan to us for review and submission to the City _ _ _ _ _ _ _ _ _ _. You may also wish to include any assistance you can provide the City in meeting interim treatment (i.e. loaned equipment) while waiting on the gear box replacement. _ _ _ _ _ _ _ _ _ _ ."

Mann's letter clearly show his BOLDNESS in making demands upon Dowtech to cover-up his own and SPI engineering negligence.

Bartlett, now the City of Nacogdoches, Texas City Engineer receiving a copy, along with the City Attorney, Rob Atherton.

This letter Exhibit #36 is very threating to Dowtech in that (1) at the least liquidated damages in the amount of $500.00 per calendar days of delay or (2) the actual measurable damages to the Owner including penalties, or other fees which may be charged to the Owner for failure to meet the time requirements contained in the Owner's NPDES discharge permit for each and every day of delinquency.

Downing email to Aeromix in desperation 4-5-2011 attached as Exhibit #36A stating in part:

"JOSH, THIS IS TO ADDRESS THE CONVERSATION WE HAD TODAY. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _AS YOU ARE AWARE MARK ASK FOR A SCHEDULE BY 4/8/2011. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

NOT GETTING MARK THE SCHEDULE IS NOT HELPING OUR CAUSE. GERALD"

Aeromix email to Dowtech/Mann 4-6-2011 Exhibit #36A stating in part:

"The gearboxes are in our facility _ _ _ _ _ _ _ _ _ _ _ _ _ . Once testing is completed _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . I will arrange for a local contractor to install the equipment.

Thanks."

Dowtech trying to bring this contract to a conclusion.

   4)   Aeromix has employed another local contractor, Mckinney and Moore to re-install the gear boxes.

Mann email to Perfetti Aeromix 6-9-2011 Exhibit #37 attached states in part:

"_ _ _ _ _ _ _ _ gear boxes were being shipped out on Tuesday this week. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ so that I can inform the City."

Aeromix responded:

"_ _ _ _ _ _ _ _ _ _ projected deliver date 6/13/2011. The city will have to off load the equipment. _ _ _ _ _ _ _ _ _. I am coordinating with a local contractor to install the equipment."

Mann responded to Aeromix:

"You need to have the contractor responsible for the offload also. City has not accepted project as complete yet, so the City should not have to perform any work."

Note, this statement by Mann is not correct. The City accepted the Aeromix 25 hp aerators and the aerators are operating under warranty. The City under the warranty agreement signed is responsible for this work.

Dowtech email to Aeromix 6-15-2011 Exhibit #38 states in part:

"JOSH, WHERE ARE WE ON MOTORS AND GEAR BOXES."

Aeromix email to Dowtech 6-15-2011 attached as Exhibit #38 states in part:

"They are being install today and tomorrow."

Mann email to Dowtech 6-16-2011 attached as Exhibit #39 states in part:

"_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _. Aeromix's sub-contractor has run into two separate difficulties.

1) The gear box bolt locations do not align _ _ _ _ _ _ _ _ _. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _.

2) There are no motors for the gear box units. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

City request a response by Monday June 20 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _.

If there is no reply by Monday, or the delivery of the motors is more than 1 to 2 weeks, the City will view this as failure to provide equipment per the last notification provided by the City."

Mann threatening Dowtech.

Mann email 6-17-2011 to Dowtech Exhibit #40 attached stating in part:

"All city cares is that there is a solution by Monday."

Mann threatening Dowtech.

5) Dowtech email to Aeromix 6-20-2011 7:30 am Exhibit #41 attached stating in part:

"I AM NOT SURE THAT AEROMIX IS TAKING THIS AS SERIOUSLY AS THEY SHOULD."

Mann has Dowtech under extreme pressure with his threats and Mr. Downing with sleelpness nights.

6) Mann email to City with copy to Dowtech 6-20-2011 3:29 pm attached as Exhibit #42 stating in part:

"I spoke with Josh at Aeromix about 20 minutes ago. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Aeromix is going to instruct Mckinney and Moore to have the aerator frames set-up for new mounting _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Aeromix will honor warranty of this work with the units.

If this is agreeable with City please let me know _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ."

Bartlett for the City responds in part:

"Move forward as described.

"I am, however, expecting an earthquake and/or a hurricane to overturn the truck delivering the 2 replacement motors, which will subsequently wash out to sea. Please contact me when they are recovered. I also do not want to discount the possibility of alien attacks where the motors will be abducted onto a spaceship for research."

Thanks Mark.......Hang in there."

Bartlett JOKING about a very serious situation. A situation causing Dowtech monetary losses and damages and being forced to complete work beyond the scope of the contract. Downing having countless nights losing sleep, worrying, trying to keep Dowtech's reputation UNINJURED.

Dowtech is clearly being forced by Mann, SPI, Bartlett and others to complete work beyond the scope of the Contract, work that was not anticipated.

For the record, note any contractor that would have received this contract would have faced the same situation.

Mann, SPI, Bartlett and others have been **RUTHLESS**.

Steve Bartlett, PE RPLS City Engineer had an obligation to the citizens of the City of

Page 21

<u>Nacogdoches to investigate at the time coming on-board as the City Engineer why so many problems with the four (4) Aeromix 25 hp aerators? The numerous problems should have raised the question.</u>

<u>With all the problems with the 25 hp aerators, surely someone with the City should have investigated.</u> Had Bartlett made an investigation into the numerous problems with the four (4) Aeromix 25 hp aerators would have found:

1)  The City had specified by <u>brand name</u> the Aeromix 25 hp aerator without performing or conducting any type of engineering or technical due diligence; and

2)  The Aeromix 25 hp aerator is engineered and manufactured to "pull" on the swing arms; and

3)  The type of 25 hp aerator the City required on this contract must "push" on the swing arms; and

4)  The Aeromix 25 hp aerator is not <u>usuable</u> on this contract and the City was negligent in the specifying by brand name; and

5)  That Mann, Bourque, SPI were negligent in the preparation of the contract documents when specifying the Aeromix 25 hp aerators without performing or conducting any type of engineering or technical due diligence; and

6)  That the City, Mann, Bourque, SPI was working to cover-up their negligence in the specifying of the Aeromix 25 hp aerator by brand name at the expense of Dowtech; and

7)  Dowtech was being forced by <u>numerous threats</u> to perform work without compensation to cover-up the negligence of the City, Mann, Bourque, SPI and possible others; and

8)  After having discovered the engineering or technical information on or about August 30, 2010 that the Aeromix 25 hp aerator can only be placed into a position of "pull" on the swing arms, the City should have made the right and honorable decision and replaced the four (4) Aeromix 25 hp aerators with the correctly engineered and manufactured 25 hp aerators that "push" on the swing arms with contract modificationor paid Dowtech and receive new bids; and

9)  Or in the alternate to save the already purchased Aeromix 25 hp aerators the City:

    (1) Should have installed the four (4) Aeromix 25 hp aerators "pulling" on a more substantial structure such as a steel I beam; and
    (2) Installed soft starts per recommendation of Aeromix; and
    (3) Install the Aeromix 25 hp aerator per the mooring recommendation of Aeromix; and

(4) Paid the contractor to perform the work.

10) That the City was gross negligent and breached the contract numerous times in forcing Dowtech to perform work without compensation; and

11) That most probably, Mann, Bourque, SPI, Bartlett and others have violated the Texas Professional Engineers Conduct and Ethics Code.

It appears, that Bartlett nor anyone else representing the City of Nacogdoches, Texas made any type of investigation into the numerous problems of Aeromix 25 hp aerators. This is very puzzling.

7) Dowtech email to Aeromix 6-20-2011 Exhibit #43 attached stating in part:

"BUDDY, I CAN NOT BELIEVE THAT AFTER BEING TOLD WE HAD TO HAVE INFORMATION TODAY THAT YOUR COMPANY IS NOT RETURNING PHONE CALLS OR LETTING US KNOW WHAT IS HAPPENING, WE ARE MAKING A BAD SITUATION MUCH WORSE."

This email appears to be written by Downing under stress from the SPI threats.

On 6-21-2011 at 7:03 am Dowtech email to Mann Exhibit #44 states in part:

"MARK, WHAT ABOUT THE TWO GEAR BOXES? DO THEY KNOW WHERE THEY ARE?

Mann email to Dowtech 6-21-2011 7:32 am attached as Exhibit #44 states in part:

"Thats the strange part. _____
_____
City is good with two new motors _____
_____."

Mann email to Bartlett and others with copy to Dowtech 6-22-2011 Exhibit #45 attached states in part:

"_____ that the aerator motors are to be shipping out today."

Mann email to Bartlett and others with copy to Dowtech 6-27-2011 Exhibit #46 attached stating in part:

"Please see update from Aeromix on aerators. It appears we will see them function before end of the year."

Aeromix email to Mann 6-27-2011 Exhibit #47 attached stating in part:

"_____. He will be on site this week to drill the mounting

Page 23

holes to fix the alignment problem. Mckinney & Moore will finish the installation on Thursday & Friday.

------------------------------------------------------------
------------------------------------------------------------ "

8) Dowtech email to Mann 7-5-2011 Exhibit #48 attached stating in part:

"MARK, WHAT HAS HAPPENED AT NAC."

Mann responds in part; Exhibit #48 attached:

"Two units are in and hooked up

Additional shims were ordered for last two units _____ "

Dowtech email to Mann 7-7-2011 Exhibit #49 attached which clearly shows Dowtech's desperation in trying to get past this contract with its reputation UNINJURED. Believing this NIGHTMARISH contract nearly over.

Mann email to Dowtech 7-24-2011 attached Exhibit #50 states in part:

"
------------------------------------------------------------ "

"Any pressure you can put on them is appreciated"

And

Caudle email to Mann 7-22-2011 Exhibit #50 which states in part:

"As usual we have a dollar waiting on a dime........"

Dowtech email to Mann 7-25-2011 Exhibit #51 attached states in part:

"
_____ if Mckinney has received approval on the instillation. If Mckinney will email me the parts they need I will supply them. Gerald"

Again, Downing in desperation trying to get this NIGHTMARISH contract completed.

Mann email to Aeromix 7-25-2011 Exhibit #52 attached stating in part:

"
_____ are sitll not 100% comlete, with the cabling left to complete. Mckinney and Moore has indicated that they are awaiting confirmation from Aeromix on some additional cable clamps and authrization from Aeromix to perform the work.

We need this completed as it is still holding up the close out of the project."

Aeromix email to Mann 7-27-2011 Exhibit #53 attached stating in part:

"_____
_____. Once they receive them they will complete the installation."

Dowtech email to Mann 8-1-2011 Exhibit #54 attached stating in part:

"MARK, WHAT IS THE LATEST HEARD ON PARTS ETC."

Mann responds Exhibit #54:

"Aeromix has talke to their sub and has ordered 36 cables end clamps to ship to Nacogdoches.

This is all that is left."

9) Mann email to Aeromix 8-3-2011 Exhibit #55 attached stating in part:

"The City of Nacogdoches has reported a problem _____
_____
_____

I suggest that aeromix get a rep for the gear boxes to make a site visit to examine this unit, and that the motor situation be resolved ASAP.

Please Keep us informed."

Caudle email to Bartlett with copy to Mann dated 8-3-2011 stating in part:

"_____. What he found was a rusty used motor and gear box installed. The gear box is leaking oil with only a few minutes run time. This is unacceptable. I know I have no authority on what the contractors or engineers do, but I would demand all new equipment or refunds on this. Attached you will find photos documenting this." Exhibit #55

Clearly, Dowtech's reputation is suffering from the City's WRONGFUL actions and/or inactions in gross negligence and breaching of the contract numerous times.

Dowtech email to Mann 8-22-2011 Exhibit #56 attached stating in part:

"MARK, WHAT IS LATEST AT NACOGDOCHES?

Mann email Exhibit #56 to Dowtech 8-22-2011 states in part:

"I got email from the City on Thursday last week and spoke with TJ at Mckinney and Moore as well.

Here is what I know. There are 3 items which we need to finish.

_____
_____

The motor is the biggest issue. I would suggest you sit on Josh to get a course of action and schedule. The 75 ft of cable and the pontoon adjustment is up to you. _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ .

I should be in all week if we need to discuss."

Dowtech email to Perfetti Aeromix 8-23-2011 Exhibit #57 attached stating in part:

JOSH, THERE SEEMS TO BE THREE _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . MCKINNEY AND MOORE WILL
NEED INSTRUCTION ON HOW AEROMIX RECOMMENDS THIS ADJUSTMENT
BE ACCOMPLISHED."

<u>Dowtech is working against all odds to try and complete this contract to save its
reputation. Requiring countless man hours of Downing and Carlile.</u>

Mann email to Dowtech 9-8-2011 Exhibit #58 attached stating in part:

"Here is email from TJ on payment."

TJ Mckinney email to Dowtech 9-12-2011 Exhibit #59 attached stating in part:

"
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ I want our money, but I also cherish our relationship with the city
and don't want to be the bad guy here. If this truly hurting everyone involved, we will
move forward with installation."

Dowtech emails Aeromix 9-12-2011 Exhibit #59 stating in part:

JOSH, EVERYONE IS TRYING TO GET THE PROJECT COMPLETED. _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ PLEASE LET EVERYONE KNOW WHAT YOUR PLAN OF ACTION IS SO WE
CAN PLAN ACCORDINGLY. _ _ _ _ _ _ _ ."

Aeromix email to Mckinney & Moore 9-20-2011 Exhibit #60 attached stating in part:

"
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . Your money was sent last Friday."

Mann called Dowtech that aerator #2 was not turning and Carlile went to Nacogdoches.
9-28-2011 and 9-29-2011 to repair units under engineering negligence at a total cost of
$4,655.36 which remains unpaid. See Exhibit #9 <u>Work Memo – Nacogdoches.</u>

Dowtech email to Mann 9-30-2011 Exhibit #61 attached stating in part:

"I am not sure how the bolts could have became sheared. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . If that don't work,

we go to the third option and remove the hub and send it to a machine shop to be tapped and died."

Dowtech went back to complete work on site 10-10-2011 to 10-13-2011 at a total cost of $8,854.26 which remains unpaid. See Exhibit #9 Work Memo – Nacogdoches.

Caudle email to Bartlett, Mann and others 11-3-2011 Exhibit #62 attached stating in part:

"Here we go again."

10) Dowtech email to Aeromix 11-4-2011 Exhibit #62 stating in part:

"What can be causing this, they say nothing got in the aerator. It sheared the bolts and the coupling this time. Does Aeromix engineers have any suggestions of what could be causing this to happen? _ _ _ _ _ _ _ _ _ _ _ _ _."

Aeromix responded to Dowtech 11-4-2011 Exhibit #62 stating in part:

"Our Engineering Department requested pictures of the failed aerator. Photos of the coupling and sheared bolts.

Can the on site personnel send these pictures? Engineering needs a starting point."

Dowtech responded to Aeromix Exhibit #62 stating in part:

" _ _ _ _ _ _ _ _. I have sent pictures of the sheared bolts last time. Do they want an aerial photo or what. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
Please advise I am confused on what your asking for."

In my opinion, the frustration of Dowtech can be viewed in the on-going never ending emails with problems surrounding the four (4) Aeromix 25 hp aerators. Which have been specified by brand name and now having been changed to a position "pulling" on a stainless cable (an engineered designed to fail position) to cover-up the engineering negligence of SPI, Mann and others in specifying the Aeromix aerators without performing or conducting any type of engineering or technical due diligence.

Just stop and think about the pressure this breach of contract by the City of Nacogdoches has placed upon Downing and the other employees of Dowtech just responding and coordinating the numerous repairs for the 25 hp aerators and the man hours spent.

Mann email to Dowtech 11-23-2011 from a site visit with Aeromix representative on 11-22-2011 with problems listed and photos attached as Exhibit #63 which has three (3) units down with one unit functioning and with the comment of the photo "The southeast unit was in great condition. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _."

11) Mann email to Aeromix 11-23-2011 attached as Exhibit #64 stating in part:

"Please let us know what corrective actions and the schedule for this work to be done per yesterdays site visit and report from Charles."

Aeromix email to Mann 11-29-2011 Exhibit #64 stating in part:

"We are in the process of setting up the equipment and personnel to fix the problems on site. What I need from you or Steve is a local machine shop that you recommend to perform some work."

Mann email to Aeromix 12-5-2011 Exhibit #64 stating in part:

"I do not know if the City got back with you, but the only Machine Shop in Nacogdoches is

Derby Machine Shop - 936-569-8595

Please let me know when you have a time line worked out."

12) Mann email to Dowtech 12-5-2011 attached as Exhibit #65 in response to Dowtech's final payment request stating in part:

"I spoke with the City on this. The following is response from City Engineer:

"Since the price of the 4 aerators ($142,800) far exceeds the outstanding 5% retainage ($36,145) and also the remaining balance due on the whole contract, my thought is to withhold the remaining $75,355.45 until the alignment issue is resolved. The aerators are a critical item to this project and the repeated failures we have had could be construed as liquated damages. I would be in agreement to releasing the remaining funds within 10 days or less upon completion of the alignment correction. I would like to avoid moving this into a warranty issue until the bolt problems is solved"

Note, Mann is quoting Bartlett.

Further note, the City had no right under the contract not to pay Dowtech its $75,355.45 as it had already been earned. The City breached the Contract in its failure to pay Dowtech.

The City of Nacogdoches is not acting in good faith and the four (4) Aeromix 25 hp aerators are already under warranty 8-5-2010 Exhibit #4.

What is clear, Bartlett for the City is making the decision not to pay Dowtech.

13) Dowtech email to Aeromix 12-6-2011 attached as Exhibit #66 stating in part:

"JOSH, ON NOV. 28 YOU WROTE MARK THAT AEROMIX PERSONNEL WOULD ALIGHN THE MOTORS AND GEAR BOXES AT NACOGDOCHES. AS OF 12/6/2011 WE HAVE NOT HEARD FROM YOU. THE CITY IS NOT REAL HAPPY WITH THE SITUATION. PLEASE LET MARK AND I KNOW WHEN YOUR MEN CAN BE ON SITE. THANKS"

Aeromix email to Dowtech 12-6-2011 in response Exhibit #66 stating in part:

"We are working on having a person down there next week. We are trying to arrange a crane."

Mann email to Dowtech 12-13-2011 attached as Exhibit # 67 stating in part:

"FYI

A contractor has been sent here, by himself, to remove, repair and re-install the three aerators in need of repair. Apparently Aeromix has volunteered our personnel to assist him with this operation. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _

In my humble opinion, I believe it is long overdue for the City of Nacogdoches to take action to correct this situation up to and including legal action. Our Race Track has been out of service for two years this month due to this contract. This is unacceptable for proper operations at this plant.

Steve C. Caudle"

<u>Dowtech's excellent reputation is being injured daily with the City and its employees, causing Dowtech to suffer damages.</u>

Mann email to Aeromix 12-13-2011 attached as Exhibit #68 stating in part:

"After our discussion this morning, I spoke with the City concerning the lack of communication and/or understanding of the work being performed on-site torealign shafts/replace bolts on three units and repair of gear box. It would be helpful, in the future, to holdat least a conference call in advance of work (one to two weeks) to discuss with the City coordination and assistance that may be required.

This e-mailis intended to layout the concerns and hopefully provide clarification.

1) Labor and Equipment: The City is not in a position to assist with laborand equipment in the repairs. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ .

2) Gear Box Repair: It is our understanding the gear box is to bereturned to the gear box manufacturer in Kentucky. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ .

3) Installation of Repaired Units: We understand it is the goal to repair and reinstall two of the units this week. Aeromixshould arrange for the necessary labor and equipment to reinstall the units.

If you have any other questions please contact us or the City.

Mark Mann, P.E.
Project Manager"


Mann boldly and brazenly giving Aeromix written instructions about repairs to the aerators when Mann, Bourque and SPI should be APOLOGIZING to Dowtech, Aeromix, and the City and making the proper RESTITUTION for the damages caused.

In my opinion, Mann is believing by now that SPI and his own engineering negligence has been very successful covered-up with all of the complaints falling upon Dowtech. SPI, Mann, Bartlett and others have damaged the reputation of Dowtech. Just look again at Exhibit #67.

14) Aeromix started repairs to the down 25 hp aerators on 12-13-2011 and put all back into service.

Mann email to Aeromix 12-19-2011 attached Exhibit #69 stating in part:

"I received your message Friday that your repair contractor completed work on all three units and they are reinstalled and operating. I would like to receive a copy of the service repair report or other paperwork on this for our files."

Aeromix responds to Mann Exhibit # 69 stating in part:

"Mark,

Report attached."

Mann email to Aeromix 12-27-2011 attached Exhibit #70 stating in part:

"I just got word from the City of Nacogdoches that Aerators #2 and #3 have suffered the bolt failure again on the shaft on the drive hub. The City has shutdown and locked out these units. Unit #1 and #4 are still ok and operating. The City is going to check the bolts on these weekly.

_ _ _ _ _ _ _ _ _ _ _ _ . We would like a written course of action to review and share with the City prior to any work happening.

Thanks.

Mark Mann, P.E."

Mann emailed Dowtech 12-28-2011 Exhibit #70A stating in part:

"For now we plan to meet Wednesday, Jan 4 at 1:00 pm at City Hall _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ . We will meet with Steve Bartlett and Jason Smith

Gerald, you may aslo want to send a email to Felix or Josh at Aeromix and tell them not to schedlue or perform any work on these other bolts until they hear from you.

Below is the contact info. Bucky Richardson at EI2 is the local Rep/Vendor for House. Or you can contact Matt at House directly which ever you want.

—————————
—————————
————————,"
—————————."

Mann is acting even more boldly knowing that his scheme is working to cover-up his and SPI engineering negligence. Mann is WARNING Dowtech, what's coming.

    15) Aeromix email to Mann 12-30-2011 attached as Exhibit #71 states:

"Hello Mark,

Our field personnel will be on site the second week of January.

They are currently scheduled to be in the Dominican Republic next week.

We have identified a solution for the bolt issue and will resolve the problem on site.

Thanks for your cooperation.

Josh Perfetti
Aeromix"

Closing out the year 2011.

Warranty of Aeromix VOID:

From the WRONGFUL actions and/or in-actions of the City and SPI the warranty of Aeromix has been BREACHED and made VOID:

The Aeromix warranty Exhibit #4 states in part:

"This warranty is subject to the following conditions:

    1)  Purchaser understands, agrees and accepts this warranty. _____
        ————————————————————————————————————
        ————————————————————————————————————

    2)  This warranty is made for the benefit of Purchaser (Municipality or end user) __
        ————————————————————————————————————
        ————————————————————————————————————

Page 31

3) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

4) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . It also excludes; mishandling by Purchaser, excess
wear, excessive corrosion, fatigue, abuse, _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ."

Clearly in my opinion, the numerous bolts shearing / motor failures / gear box failures /
alignment problems are caused by:

The City of Nacodoches mishandling, excess wear, fatigue, abuse and misuse of the four
(4) Aeromix 25 hp aerators was clearly caused by failure (1) to place the 25 hp aerator
inot a position of "pulling" on a substantial structure (2) install soft starts and (3) to
follow the unit mooring plan per the recommendations of Aeromix, for which in my
opinion violated the Aeromix warranty.

The City breached the Aeromix warranty.

## City Numerous Breach of Contract:

Under the Contract Specifications Article 6 – CONTRACTOR'S RESPONSIBILITIES
para. 6.06 Concerning Subcontractors, Suppliers, and Others which states in part:

"D. Contractor shall be solely responsible for scheduling and coordinating the Work of
Subcontractors, Suppliers and other individuals or entities performing or furnishing any
of the Work under a direct or indirect contract with Contractor.

E. Contractor shall require all Subcontractors, Suppliers and such other individuals or
entities performing or furnishing any of the Work to communicate with Engineer through
Contractor."

Further under Article 9 – ENGINEER'S STATUS DURING CONSTRUCTION para.9.09
Limitations on Engineer's Authority and Responsibilities which states in part:

"A. Neither Engineer's authority or responsibility under this Article 9 or under any other
provision of the Contract Documents nor any decision made by Engineer in good faith
either to exercise or not exercise such authority or responsibility or the undertaking,
exercise, or performance of any authority or responsibility by Engineer shall create,
impose, or give rise to any duty in contract, tort, or otherwise owed by Engineer to
Contractor, any Subcontractor, any Supplier, any other individual or entity, or to any
surety for or employee or agent of any of them.

B. Engineer will not supervise, direct, control, or have authority over or be responsible
for Contractor's means, methods, techniques, sequences, or procedures of construction, or
the safety precautions and programs incident thereto, _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ."

Upon Mann coming to the realization of the engineering negligence of SPI, Mann,
Bourque and possible others, on or about 8-30-2010, that the four (4) Aeromix 25, hp

Page 32

aerators would only "pull" on the swing arms, became very <u>desperate</u> to cover-up the <u>engineering negligence.</u>

Mann, Bourque, SPI and possible others devised a scheme to cover-up, working directly with Aeromix Exhibit #'s 11, 13, 14, 20, 23, 23A, 30, 33, 34, 37, 42, 44, 45, 46, 47, 51, 52, 53, 55, 56, 58, 62, 63, 64, 68, 69 and 70.

Now reviewed Exhibit #19 SPI letter with demands upon Dowtech and notice "Dowtech furnished pricing information on September 16, 2010 to Aeromix for consideration."

Dowtech furnished the pricing to Schaumburg & Polk, Inc. Attn: Mark Mann upon the belief that it was the City making the request for a modification to the contract per the earlier telephone conversation.

Mann for the City directed in SPI letter 10-11-2010 Exhibit #19 for the modification work to proceed, when stated in part:

"
_____
_____ Per the Contract
_____ Document General Conditions Article 14 and Supplementary Conditions Section 12; the City has the right to impose liquidated damages on the project.

Please expedite a written plan to us for review and submission to the City indicating the dates and completion time for the revised mounting of the units. If you have any questions please contact me."

Dowtech prepared an estimate for Mann for the work required Exhibit #17 for a total price of $41,746.00.

Aeromix made a decision to furnish some of the materials and Dowtech agreed with

Mann for a cost plus type modification see Exhibit #9 attached in the amount of $48,121.48.

<u>The City never paid the $48,121.48.</u>

Clearly, SPI, Mann and Bourque did not act on this contract in <u>good faith</u> after the discovery of its engineering negligence in specifying the four (4) Aeromix 25 hp aerators by brand name. Clearly, in the engineering conspiracy SPI, Mann, Bourque, City and others acted in bad faith causing Dowtech to suffer monetary losses, damages and damages to its reputation.

Each and every time the City through it's <u>bad faith</u> acting engineers, SPI, Mann, Bourque and others, demanded that Dowtech perform work on the four (4) Aeromix 25 hp aerators after August 5, 2010, in my opinion was a separate breach of contract. Each of the City's breach of contract caused Dowtech to suffer monetary losses, damages and damages to it's reputation:

1) The City of Nacogdoches contract specified the four (4) Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence Exhibit #3 Specifications pages 780 – 1 of 3, 780 – 2 of 3, and 780 - 3 of 3; and

2) Aeromix 25 hp aerators are manufactured to "pull" on the swing arms Exhibit #11. The City installed into a position of "push" on the swing arms Exibit #11; and

3) After failure, the City designed a method for the Aeromix 25 hp aerator to pull on a ss cable stretched approximately forty seven (47') feet across the oxidation ditch (not an adequate structure to pull against.); and

4) City had Dowtech to re-install the four (4) Aeromix 25 hp aerators to pull on the ss cable Exhibit #17 for which the City never paid Dowtech; and

5) The City refuses to mount the four (4) Aeromix 25 hp aerators per the mooring recommendations of Aeromix; and

6) The City continues to try and WRONGFULLY use the four (4) Aeromix 25 hp aerators under the Rule 11 Agreement; and

7) The City continues to refuse to install soft starts per recommendations of Aeromix. (Exhibit #2)

Year 2012:

Mann email to Dowtech 1-2-2012 attached as Exhibit #71 stating in part:

"Please notify Aeromix not to perform any work until you notify them"


Meeting City Hall:

On 1-4-2012 Downing attends the meeting at City Hall, Nacogdoches, Texas set-up by Mann and/or the City:

This was Downing first in person meeting with Mann and the meeting was handled by (Downing did not remember his name) probable City Engineer Bartlett.

Downing estimated that there were 6-7 persons present representing the City.

The person handling the meeting assured Downing that there was no problems with the work of Dowtech.

A question to Downing:

"Mr. Downing, you know all about aerators, don't you?

For which Downing replied "no", with Downing stating:

"We put in what's specified, they always work and we never hear from them."

Meeting ended.

CITY DEMANDS 2012:

On or about January 6, 2012 SPI sent to Bartlett, City Engineer, City of Nacogdoches its letter of January 6, 2012 attached as Exhibit #72 with copy to Dowtech and City Attorney signed by Mann and Bourque which stated in part:

"

_____. Subsequent to the start up date the units could not be placed in continuous service pending revisions to the mounting of the units to allow the units to "pull" instead of "push" on the swing arms. Sway cables were also required to be installed which was accomplished on December 5, 2010. Since that time numerous problems and failures have occurred. _____

_____

_____

_____.

We recommend that the City of Nacogdoches provide written notice to Dowtech under Article 13.06 of the General Conditions that this work is considered defective, and should be removed from the job. Dowtech should also be notified that the work is to be replaced, and all labor to remove and install new equipment be furnished at no additional cost to the City per Article 13 of the General Conditions, _____

_____."

Dowtech on 2-1-2012 received a certified letter dated 1-30-2012 from the City of Nacogdoches, City attorney Mr Rob Atherton (Atherton) with a copy of SPI letter 1-6-2012 attached as Exhibit #73 stating in part:

"As set forth in the letter of January 6, 2012 by Schaumburg & Polk, Inc. to City Engineer, Steve Bartlett, of which you were copied (copy attached), Schaumburg & Polk ("S&P") as project engineer, has rejected the work under the Contract associated with the provided aerators in accordance with Article 13 of the General Conditions of the Contract.

This is written notice from the City of Nacogdoches to Dowtech under Article 13.06 of the General Conditions of the Contract that the work related to the provided aerators is defective and rejected. Demand is here made for the removal and replacement of the aerators with approved alternative aerators. This removal and replacement work should be done as soon as possible to avoid all claims, losses, and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution cost) arising out of such removal and replacement including but not limited to all costs of repair, removal, and replacement of the work of others.

Page 35

In doing the removal and replacement work, you should take no action which would void or impair the City's warranty and guarantee on said work.

The removal of the condemned work should also be done in compliance with the provisions of Special Conditions Section 21.

Further note that proper functioning of the aerators is essential to public health, safety, and welfare of the citizens of Nacogdoches as well as down stream persons. The defective aerators may also results in violation of permits held by the City with resulting civil or criminal penalties.

_____
_____, Please feel free to call either myself or City Engineer Steve Bartlett, or have your legal counsel contact me."

After receiving this document from the City of Nacogdoches and the statement:

"The defective aerators _____
_____ with resulting civil or criminal penalties"

City THREATENS Downing with CRIMINAL:

Caused Mr. Downing a lot of sleepless nights worrying over the possibility of criminal charges being filed against him for some crime.

Downing considered it a threat that the City would file criminal charges.

In my opinion, it appears as a "THREAT" of Criminal filing, why else would Atherton mention it to: **ATTN: Gerald Downing, President**

Downing had committed no criminal act.

Again, the City is trying to force Dowtech to perform at their directions with the use of THREATS.

Downing had spent countless nights worrying and countless man hours trying to bring this contract to a successful conclusion and save its already TARNISHED (by this contract) reputation.

In my opinion, Atherton is aiding and abetting the engineering conspiracy to cover-up the engineering negligence either knowingly or ignorantly.

A copy of Atherton's letter Exhibit #73 is sent to:

Jim Jeffers, City Manager
Steve Bartlett, City Engineer
Schaumburg & Polk, Inc,
Attn.: Mark Mann, P.E.
Attn.: Ricky J Bourque, P.C.

The person receiving Exhibit # 73 and would not understand that the demands put forth or not the contractual obligations of Dowtech is Jim Jeffers, City Manager which would damage the reputation of Dowtech with the City and others.

Dowtech Moves to Collect its $75,355.45 Earned:

1) Mr. Charles C. Self (Self) attorney with the law firm of Whitten, Hacker, Hagin, Anderson, Allen & Self, P.C. representing Dowtech responded to SPI letter to Bartlett Exhibit #72 on March 6, 2012 attached as Exhibit #74 stating in part:

   " _____
   _____

   What the timeline also fails to discuss is that, on or about January 31, 2011 Dowtech suggested a plan that called for possible replacement of the aeration units. At that time, the City refused to consider same, stating that they were "good units."

   _____
   _____

   There is no dispute that Dowtech installed the aeration units preferred by the City of Nacogdoches exactly as they were required to be installed. _____
   _____
   _____ informs me that they are owed the balance of contract, approximately $75,355.45. Please advise as to when payment will be made. Failure to promptly do so will result in charges for interest being added thereto.

   _____."

   No response from the City.

2) Self letter dated March 27, 2012 attached as Exhibit #75 stating in part:

   " _____.Please recall our prior letter of March 6, 2012 _____
   _____

   As of the date of this letter, approximately two weeks after the date of your receipt of our prior letter, our client has neither received the monies due and owning to it or even been provided with the courtesy of a reply to our prior letter.

   _____
   _____
   Be that as it may, our client is due final payment of $75,355.45 _____

   _____
   _____. As we set forth in our prior March 6, 2012, since the monies have not been forthcoming, we believe that not only is Dowtech entitled to that sum, but also entitled to interest on same. _____
   _____.

Page 37

3) Self received an answer from City of Nacogdoches City Attorney, Atherton, on July 25, 2012 attached as Exhibit #76 stating in part:

" _ _ _ _ _ _ _ _ Mark Mann of Schaumburg & Polk rejected the Aeromix aerators that have been installed on this project and determined that the existing aerators should be removed and replaced with new units. I so notified Dowtech by my letter dated January 25, 2012. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _, notwithstanding the extraordinary defects and failures of the Aeromix equipment.

The City of Nacogdoches is not willing to pay the balance to Dowtech because the Aeromix equipment has been rejected by the engineer. At the present time two of the units are not in operation and the City Engineer is worried that one or both of the remaining units may break down at any time.

There is no excuse for the unreliability of the Aeromix equipment or the poor service provided by Aeromix in servicing the units. As a result, the city has been reluctant to accept new Aeromix units or to allow Aeromix to attempt to repair the existing units.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Notice, the wording in the City's letter of July 23, 2012 "_ _ _ _ _ the extraordinary defects and failures of the Aeromix equipment.

There is no excuse for the unreliability of the Aeromix _ _ _ _ _ _ _ _ _ _ _ _ ."

The word "extraordinary defects and failures" should have brought to the attention of Atherton that an investigation into the <u>WHY?</u> The extraordinary defects and failures.

But there is no record, for which shows that the City of Nacogdoches, Texas made any type of investigation into the numerous failures of the four (4) Aeromix 25 hp aerators specified by <u>brand name</u>. <u>WHY?</u>

<u>Seems to me, that the City of Nacogdoches, Texas has been gross negligent with the Citizens and American tax payer funds, and all persons working for and on behalf of the City should be held accountable for their negligent actions and/or inactions.</u>

4) Self response to City Attorney Atherton's July 23, 2012 letter with his letter dated August 3, 2012 Exhibit #77 stating in part:

" _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ to my client and he has had extensive discussions with Aeromix regarding this matter.

_ _ _ _ _ _ _ _ _ _ such discussions with Aeromix and other have been ongoing

prior to the receipt of your letter. We understand and appreciate the nature of the offer. We are not necessarily rejecting the offer at this time, but we do have a proposed remedy that might be cheaper and/or acceptable to the City.

_____ my understanding that Aeromix has new people who have been brought in and are involved on this matter. _____ _____ to take care of problems such as these.

_____ too much torque exists on the monsoon year box and shaft during the start up of the units. Specifically, the units go from a dead stop to complete torque. _____ if Aeromix is allowed to install the "soft starts" on the units, this would relieve the torque, _____ _____ Aeromix is proposing that they would do this work at their cost _____ _____. We believe that this would remedy the problem at minimal costs to all involved.

Mr. Gerald Downing forwarded this information on to Mark Mann, the project engineer. However, his reply to Mr. Downing was that we need to send this information to you for consultation and review. _____ _____, please do not hesitate to contact me."

5) Dowtech comes to the state of realization that after numerous demands upon the City of Nacogdoches, Texas for payment of its earned money $75,355.45, that the City is not going to pay.

   Dowtech files breach of contract lawsuit against the City of Nacogdoches, Texas and Aeromix trying to resolve the contract and collect it's money earned.


Year 2013 City Demands:

1) The City of Nacogdoches, Texas filed its answer and counter claim 1-25-2013 attached as Exhibit #78 stating in part:

   " _____. The aerators were installed on August 5, 2010. Within two weeks after installation, a problem was observed with the aerator's mounting system, and it was redesigned to prevent damage to the equipment. _____ _____ the gear boxes on all of the other aerators failed. New gearboxes were installed on all of the units in June, 2011, but shortly thereafter the bolts on the hub and center shaft assembly of two of the aerators failed and rendered the units unusable. _____ _____ the Engineer on the project, Schaumburg & Polk, Inc., notified the City, Dowtech and Aeromix by letter _____ that the aerators were rejected and

recommended that the City notify Dowtech that the aerators are defective and must be removed from the project. The Engineer further recommended that the City notify Dowtech that it is required under the construction contract to replace the aerators at no additional cost to the City. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ .

The City, in accordance with the provisions of the Construction Contract, has refused to pay Dowtech the balance of the contract price until the aerators are replaced with new aerators that are approved by the Engineer.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Dowtech did not comply with the Construction Contract, failed to complete the work and failed to correct and replace the defective work, _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ .

Dowtech is not entitled to recover the unpaid balance of the contract sum because Dowtech failed to satisfy one or more conditions _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . First, Dowtech failed to notify the Engineer that the work is substantially complete _ _ _ _ _ _ _ _ . Secondly, the Engineer did not issue a Certificate of Substantial Completion _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . Thirdly, Dowtech did not submit to the Engineer a final application for payment _ _ _ _ _ _ _ . Fourthly, the Engineer did not issue a final recommendation for payment _ _ _ _ _ _ _ _ _ _ _ _ _ _ . Finally, Dowtech failed to comply with the Engineer's recommendation or the City's requirement for removal and replacement of the aerators _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ .

## COUNTERCLAIM

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Dowtech breached its obligations under the Construction Contract _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ However, the time allowed for completion of the work under the Construction contract has long passed, but Dowtech still has not completed the work _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ .

Dowtech breached its obligations under the Construction Contract by failing to systematically and energetically complete the work and by failing to promptly correct the defects in the work.

As a direct and proximate result of Dowtech's breaches of the Construction Contract _ _ _ _ _ the City has sustained financial harm and has lost the benefits _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ . Therefore, the City request that the Court award judgment against Dowtech for damages _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ .

The City's answer and counterclaim filed by Mr. Thomas L Belanger (Belanger) with law firm of ADAMS, BELANGER, ATHERTON & LOSTRACCO, P.C.

Belanger notes all of the problems with the four (4) Aeromix 25 hp aerators; but, never at any time investigated according to the filing.

In response to the City of Nacogdoches filing of original answer and counterclaim:

In my opinion, with as many problems as the four (4) Aeromix 25 hp aerators were experiencing it was very imperative that the City of Nacogdoches have conducted an independent investigation to fine the source of the problems.

In my opinion, an independent investigation would have come to the same conclusion as set forth hereinafter:

1) The City of Nacogdoches employed SPI to perform the engineering services; and

2) Dowtech was low bidder and awarded the general contract; and

3) Dowtech does no engineering and relied upon the City and SPI; and

4) The four (4) Aeromix 25 hp aerators were specified by brand name; and

5) The four (4) Aeromix 25 hp aerators were never at anytime "defective"; and

6) The City, SPI, Mann, Bourque and possible others were negligent in their failure to have the four (4) Aeromix 25 hp aerators (1) installed with the swing arms "pulling" on a substantial structure (2) installed with the usuage of soft starts or VFD's per the recommendation of Aeromix and (3) installed using the Aeromix recommended mooring system Exhibit #6; and

7) The City never should have specified the four (4) Aeromix 25 hp by brand name. The Aeromix 25 hp aerator "pulls" on the swing arms. This contract required "pushing" (compression) on the swing arms. The City, SPI, Mann, Bourque and possible others were negligent; and

8) The City, SPI, Mann, Bourque and possible others either knowingly or ignorantly were solely responsible for all of the problems with the four (4) Aeromix 25 hp aerators; and

9) Dowtech completed all work under the contract for the installation of the four (4) Aeromix 25 hp aerators on August 5, 2010 (1) the City accepted and (2) the City signed the warranty of Aeromix; and

10) All warranty problems with the four (4) Aeromix 25 hp aerators were the sole responsibility of the City and Aeromix; and

11) That under the contract Dowtech (1) submitted its final payment request in the amount of $75,355.45 (2) Mann and SPI acknowledge the final payment request and (3) the City of Nacogdoches, Texas acknowledged the final payment request (Exhibit #65); and

12) Mann, Bourque, and possible others conspired together to cover-up the engineering negligence in the specifying of the four (4) Aeromix 25 hp aerators by <u>brand name</u> without performing or conducting any type of engineering or technical due diligence; and

13) The City was solely responsible for the actions and/or inactions of SPI, Mann, Bourque, and possible others regarding this contract; and

14) <u>Dowtech never breached the contract</u>; and

15) "City has sustained financial harm and has lost the benefits expected to be received if Dowtech had performed under the Construction Contract as promised. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ." Any financial harm or lost benefits to the City strictly belong to no other, but the City; and

16) Having to file a lawsuit and go public has injured the reputation of Dowtech; and

17) <u>The City has breached the contract numerous times causing Dowtech to suffer monetary losses</u>; and

18) The City has had sufficient time to investigate and do the right thing, but failed.

<u>SWORN VERIFICATION of Steve Bartlett, PE:</u>

Attached to the City of Nacogdoches Original Answer and Counterclaim is the <u>SWORN VERIFICATION</u> of City Engineer, Bartlett under oath stating in part:

"
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ that the claim of Dowtech as set forth in the Plaintiff's Original Petition is not just or true in whole or in part, is not due, and all just and lawfull offsets and credits have not been allowed; and every statement contained in Paragraphs 1, 2, 3, 6, 9, 10, 11 and 12 of such pleading is within his personal knowledge and is true and correct."

1) Bartlett's statement: "_ _ _ _ _ _ and that the claim of Dowtech as set forth in the Plaintiff's Original Petition is not just or true in whole or in part, is not due, and all just and lawful offsets and credits have not been allowed; _ _ _ _

\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ .” From my investigation, this statement is <u>UNTRUE;</u> and

2) Bartlett's verification of the statement: "Dowtech is not entitled to recover the unpaid balance of the contract sum because substantial completion of the work under the Construction Contract was not achieved \_ \_ \_ \_ \_ \_ \_ ." (Exhibit #65). From my investigation, this verification is <u>UNTRUE;</u> and

3) Bartlett's verification of the statement: "Dowtech is not entitled to recover the unpaid balance of the contract sum because the City is entitled to offset against Dowtech's claim the cost that the City would incur to replace the rejected aerartors, \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ .” From my investigation, this verification is <u>UNTRUE.</u>

The <u>WRONGUL</u> and <u>UNTRUE SWORN STATEMENTS</u> of Bartlett clearly show the <u>WRONGFUL ACTIONS</u> of the City of Nacogdoches, Texas for which has caused severe monetary losses and damages to Dowtech.

In my opinion, Bartlett signed and swore to this <u>SWORN VERIFICATION</u> trying to protect the <u>engineering conspiracy</u> and support the <u>WRONGFUL</u> position of the City.

<u>In my opinion, a false sworn verification.</u>

<u>No investigation by the City:</u>

City Attorney, Belanger wrote to David D. Peden, attorney for Aeromix March 6, 2013 Exhibit #79 attached stating in part:

"
\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_
\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_
\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ .

At this point we do not even know why all of the units failed or if it is necessary to ship the entire units to Minnesota to be repaired (as opposed to repairing them in Nacogdoches). Prior to the filing of this lawsuit, Aeromix agreed to take one of the units to its facility in Minnesota to determine the source of the problem, but so far the City has not received any explanation for the failure of all of the units.

\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_
\_ \_ \_ \_, but it is becoming apparent that Aeromix does not know how to repair the units or that the units cannot be repaired because of a basic structural defect. \_ \_ \_ \_ \_ \_ \_ \_
\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ .”

Belanger is very critical of Aeromix and the four (4) 25 hp aerators, blaming Aeromix for all of the problems and raise the question "\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ we do not even know why all of the units failed \_ \_ \_ \_ \_ \_ \_ \_ \_ .”

Why, didn't Belanger request that the City conduct an independent investigation into "\_ \_ \_ \_ \_ why all of the units failed \_ \_ \_ \_ \_ \_ \_ .”

Atherton's letter July 23, 2012 Exhibit #76 noting "_ _ _ _ _ _ _ _ _ _ the extraordinary defects and failures of the Aeromix equipment."

Why didn't Atherton request that the City conduct a independent investigation into "_ _ _ _ _ _ _ _ the extraordinary defects and failures _ _ _ _ _ _ _ _ ."

Converstions with Aeromix:

During this investigation, had several telephone conversations with officers and employees of Aeromix discussing the numerous problems with the 25 hp aerators at Nacogdoches, Texas:

Doug Reeves (Reeves) Construction & Service Manager for Aeromix in January 2014 stated "that the City had requested that the 25 hp aerators be placed back into their original position and that Aeromix had redesigned to go back into the original position."

Reeves stated in April 2014 "Aeromix would never recommend that the 25 hp aerator "pull" on a stainless steel cable as it is not a substantial structure to pull on and most certainly not without the usage of soft starts."

Bob Mangaudis, VP Engineering & Operations, USA Operations for Aeromix in June 2014 stated: "Aeromix did not have a 25 hp aerator pulling on a steel cable any place in the USA excepting Nacogdoches, Texas" and "that the 25 hp aerator must pull on a substantial structure."

Reeves and/or Mangaudis would have discussed the problems at Nacogdoches with any City of Nacogdoches representative to resolve the problems.

Why didn't a representative of the City talk to Aeromix's Reeves or Mangaudis?

Found nothing in the City of Nacogdoches, Texas documentation that indicated Dowtech, its officers, it's employees and attorney had any SUSPICION that Dowtech was the VICTIM of an on-going engineering conspiracty to cover-up the engineering negligence SPI, Mann, Bourque and possible others on this contract in the specifying of the four (4) Aeromix 25 hp aerators without performing or conducting any type of engineering or technical due diligence.

In my opinion, Dowtech has been the VICTIM of an on-going conspiracy to cover up engineering negligence which has caused the City of Nacogdoches, Texas to breach the contract numerous time causing Dowtech to suffer monetary losses and damages to its reputation.

Engineering Conspiracy KNOWN:

In my opinion, the mention of "CRIMINAL" in Atherton's 1-30-2012 letter (Exhibit #73) was "INTENTIONAL" to "THREATEN" Dowtech to comply with the City of Nacogdoches "DEMANDS".

<u>Closing:</u>

Every problem with the Aeromix 25 hp aerator stems from the City failures in specifying the Aeromix 25 hp aerator by brand name without performing or conducting any type of engineering or technical due diligence; and the City's failure to follow the recommendations of Aeromix.

In my many years of construction experience, have never seen or witnessed a product specified by <u>brand name</u> so <u>MISUSED</u> and <u>ABUSED</u> by professional engineers and the City.

All of these problems and grief could have been avoided with a simple (1) telephone call, or (2) fax message, or (3) email to Aeromix with a simple question:

"Does your 25 hp. Aerator "push" or "pull" on the swing arms?"

Why didn't someone from the City make this <u>inquiry</u> prior to specifying the four (4) Aeromix 25 hp aerators by <u>brand name</u>?

Respectfully Submitted,

Bob Click
(325) 893-9116

Note: <u>Have underlined certain statements, fact and opinion for emphasis.</u>

## TABLE #1 ESTIMATED ACTUAL MAN HOURS – DOWNING

Estimated actual average man hours (MH) per week, directly caused by the City of Nacogdoches numerous breach of contract which caused Mr. Downing to spend countless man hours desperately trying to bring this contract to a successful completion:

| Year 2010: | Man Hours |
|---|---|
| From September 1, 2010 to December 31, 2010 Estimated actual average MH per week 28 X 16 weeks = | 448 |
| Year 2011: | |
| Estimated actual average MH per week 22.5 X 52 weeks = | 1,170 |
| Year 2012: | |
| Estimated actual average MH per week 12 X 52 weeks = | 624 |
| Year 2013: | |
| Estimated actual average MH per week 9.5 X 52 weeks = | 494 |
| Year 2014: | |
| Estimated actual average MH per week 8.5 X 22 weeks = | 187 |
| Total Estimated Actual Man Hours............................................................ | 2,923 |

Notes:

1) During my investigation and the finalizing of this report, have had support services of Dowtech's employees, Mr. Clint Carlile, Ms. Donna Alston and Mr. Downing working countless man hours to help provide documentation.

2) These are man hours Mr. Downing never anticipated nor could have fore-seen when bidding this contract.

3) I believe that this is a very reasonable estimate of the actual average man hours spent by Mr. Downing on this contract.

## TABLE #2 ESTIMATED ACTUAL MAN HOURS – CARLILE

Estimated actual average man hours (MH) per week, directly caused by the City of Nacogdoches numerous breach ofcontract which caused Mr. Clint Carlile (Carlile)to spend countless man hours desperately trying to bring this contract to a successful completion:

| Year 2010: | Man Hours |
|---|---|
| From September 1, 2010 to December 31, 2010 Estimated actual average MH per week (unbilled) 16 X 16 weeks = | 256 |
| Year 2011: | |
| Estimated actual average MH per week (unbilled) 14 X 52 weeks = | 728 |
| Year 2012: | |
| Estimated actual average MH per week (unbilled) 6 X 52 weeks = | 312 |
| Year 2013: | |
| Estimated actual average MH per week (unbilled) 5 X 52 weeks = | 260 |
| Year 2014: | |
| Estimated actual average MH per week (unbilled) 12 X 22 weeks = | 264 |
| Total Estimated Actual MH................................................................. | 1,820 |

Notes:

1) Carlile is the general superintendent of Dowtech and has been actively involved in this contract.

2) I have had numerous conferences with Carlile as to his involvement in the contract and his knowledge.

3) These are estimated actual average man hours of Mr. Carlile that was never anticipated nor could have been fore-seen when the bidding of this contract.

4) Carlile rate of pay for this period of time was $30.00 per man hour.

5) Dowtech had Carlile covered with workman compensation, liability, social security, unemployment, etc. and all insurance required during this period of time.

# EXHIBIT 46

# WHITTEN, HACKER, HAGIN, ANDERSON, ALLEN & SELF, P.C.

ATTORNEYS AT LAW
500 CHESTNUT STREET, SUITE 1402
ABILENE, TEXAS 79602

CHARLES C. SELF, III
Tel: (325) 672-7824
Fax: (325) 672-2158
cself@whittenfirm.com

PLEASE REPLY TO:
P.O. Box 208
Abilene, Texas 79604

July 25, 2014

VIA FED EX

Mr. Thomas L. Belanger
Adams, Belanger, Atherton & LoStracco, P.C.
305 E. Main
Nacogdoches, Texas 75963

> Re: Dowtech Speciality Contractors, Inc. v. City of Nacogdoches and Aeromix Systems, Inc.; No.C1228865; In the 145th District Court of Nacogdoches County, Texas

Dear Tom:

First, let me apologize for taking so long to get back to you. I have been waiting on some information from my client and it has delayed my reply. For that, I apologize.

I would ask that you recall my letter of April 15, 2014. You will recall in that letter I went through a number of concerns my client has about this matter.

You will recall that I closed that letter with voicing the concerns of my client that we believe that the Rule 11 Agreement had in fact been violated.

My client has now had the opportunity to have the entire matter reviewed. That review has resulted in a letter addressed to me which contains a document titled Construction Investigation Report – Conclusion which references a number of exhibits. At the present time, I am only forwarding to you the letter addressed to me along with the report. If you would like to view the exhibits, I will be happy to forward same to you. However, the exhibits are probably two inches thick and I wanted to get this to you as quickly as possible.

The letter and the accompanying construction investigation report are being sent to you for settlement discussion purposes only. AS SUCH, WE CONSIDER THEM TO BE PRIVILEGED PURSUANT TO THE TEXAS RULES OF EVIDENCE AND THE TEXAS RULES OF CIVIL PROCEDURE. I note that we have a Mediation deadline of August 11, 2014. I am hopeful, however, that we can possibly resolve this matter without the need of a mediator.



As you can see, my client believes that they have been out a large amount of money on this project and believe that the actions of the City, along with the City's outside engineering firm, have greatly contributed to this.

I would like to discuss this matter with you. As such, I am hopeful you will contact me on Monday, July 28th 2014 so that we can discuss this matter further and hopefully come to a resolution of same.

Thank you for your attention to this matter. Should you have any questions or comments, please do not hesitate to contact me.

Sincerely,

WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.

By: _____
Charles C. Self, III

CCS:tp

w/enc.

C:      Gerald Downing

# EXHIBIT 47

NO. C-12-28865

FILED
NACOGDOCHES COUNTY
TEXAS
2014 AUG -8 AM 9: 43

DISTRICT CLERK

DOWTECH SPECIALTY          §   IN THE DISTRICT COURT
CONTRACTORS, INC.          §
                           §
        PLAINTIFF          §
                           §
                           §
v.                         §   OF NACOGDOCHES COUNTY, TEXAS
                           §
CITY OF NACOGDOCHES, TEXAS §
AND AEROMIX SYSTEMS, INC., §
                           §
        DEFENDANTS         §   145th JUDICIAL DISTRICT

## NOTICE OF REVOCATION OF CONSENT TO RULE 11 AGREEMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Comes Now Dowtech Specialty Contractors, Inc. (hereinafter referred to as "Plaintiff"),

and gives notice to this Court that Plaintiff has revoked its consent to the Rule 11 Agreement

entered into between Plaintiff and the City of Nacogdoches (hereinafter referred to as

"Defendant Nacogdoches") and Aeromix Systems, Inc. (hereinafter referred to as "Defendant

Aeromix") on or about July 2, 2013, and in support, Plaintiff respectfully shows this Court the

following:

### I. FACTS

1.      Plaintiff was hired by Defendant Nacogdoches as a general contractor on a

project known as the Wastewater Treatment Plant, Oxidation Ditch and Clarifier Improvements

Project (hereinafter referred to as the "Nacogdoches Project"). This project was undertaken by

Defendant Nacogdoches in Nacogdoches County, Texas, for the benefit of Defendant

Nacogdoches and the citizens thereof. As part of the Nacogdoches project, Plaintiff installed

four aeration units which were manufactured by Defendant Aeromix. The Aeromix aeration

units were specifically selected by Defendant Nacogdoches in the original plans and

specifications and were not chosen by Plaintiff.

---

Motion to Dissolve Rule 11 Agreement                    COPY            Page 1

2. Throughout the history of the Nacogdoches Project, the parties have experienced issues with the operation of the Aeromix aeration units. However, any issue or problem that the parties have experienced from the aeration units has not stemmed from the work performed on said units by Plaintiff. It is undisputed that Plaintiff installed the aeration units precisely as called for in the plans and specifications.

3. Because of the issues with Defendant Aeromix's aeration units, Defendant Nacogdoches failed and refused to pay Plaintiff for the work Plaintiff performed on Nacogdoches Project. This led to Plaintiff filing Plaintiff's Original Petition against Defendants and alleging the causes of action therein.

4. On or about July 2, 2013, the parties entered into a Rule 11 Agreement as a means to settle this dispute. This Rule 11 Agreement is attached as Exhibit "A" and incorporated by reference herein.

5. Plaintiff believes that Defendant Nacogdoches has not performed in good faith under this Rule 11 Agreement and has therefore breached said agreement.

6. The Rule 11 Agreement set forth, inter alia, that:

Pending the repair and installation and re-installation of the aerators, the claims between Dowtech and the city (Defendant Nacogdoches) in this lawsuit will be held in abeyance and will not be set for trial. If the aerators operate for a continuous period of 90 days after reinstallation, then the City (Defendant Nacogdoches) will release the remaining funds claimed by Dowtech in the amount of $75,355.45, and the claims between Dowtech and the City (Defendant Nacogdoches) in this lawsuit will be dismissed with prejudice.

7. Since the time the Rule 11 Agreement was entered into, new information regarding the design and operation of the Aeromix aeration units has been brought to the attention of all the parties. Defendant Aeromix has informed the parties that because the aeration needed to be redesigned and reengineered for the Nacogdoches project, Defendant Aeromix is recommending that soft starts be installed on the aeration units in order to ensure their proper

functioning. Defendant Nacogdoches has refused the installation of soft starts on the aeration units. Defendant Aeromix has further represented that it is consistent with company policy and industry standards to install soft starts on the type of aeration units used in the Nacogdoches Project, and further that not adding the soft starts would be "irresponsible" because the chance of the aeration units failing is highly increased without them.

8. Defendant Nacogdoches has further represented to Plaintiff that it wants to place the aeration units in their original position. Part of the reason the aeration units initially failed was because of their original positioning. In the original position the force of the water flow was too great on the aeration unit's swingarms. Defendant Aeromix redesigned and reengineered the aeration units based on the decision of the parties to position the aeration units where there is less compression on the swingarms. Defendant Aeromix has represented to all the parties that the greater the amount of compression on the swingarms, the higher the potential for failure. Defendant Nacogdoches has blatantly disregarded these warnings by Defendant Aeromix and has instructed Plaintiff to install the aeration units in their original position which places the greatest amount of compression on the swingarms. Because of these decisions, Defendant Nacogdoches is setting up Project Nacogdoches to quickly fail once again.

9. Plaintiff has complied with the terms of the Rule 11 Agreement and continues to stand ready and willing to comply. However, because of the decisions made by Defendant Nacogdoches to place the aeration units at a high risk of failure, Plaintiff contends that Defendant Nacogdoches is no longer acting in good faith in regards to the Rule 11 Agreement. If the aeration units are placed in their original position and if soft starts are not installed on the aeration units, then there is little chance for the aeration units to operate continuously for 90 days as required by the Rule 11 Agreement in order for Defendant Nacogdoches to have to pay Plaintiff. Defendant Nacogdoches' blatant disregard for these instructions given by Defendant

Aeromix to guarantee optimal performance of the aeration units is a bad faith breach of the Rule 11 Agreement on the part of Defendant Nacogdoches.

## II. ARGUMENTS AND AUTHORITIES

10.    A judgment based upon the agreement of the attorneys cannot be rendered by a court when consent of one of the parties thereto is wanting. *Quintero v. Jim Walter Homes, Inc.*, 654 S.W.2d 442, 444 (Tex.1983). The power to render an agreed judgment depends upon the substance of the consent at the time the judgment is rendered. *Id. See also, In re Caballero,* 2014 WL 1632522, at *7 (Tex.App.-El Paso 2014, orig. proceeding). Therefore, a party has the right to revoke his consent at any time before the rendition of judgment. *Id.* When a trial court has knowledge that a party to a suit does not consent to a judgment, it should refuse to sanction the agreement by making it the judgment of the court. *Sohocki v. Sohocki,* 897 S.W.2d 422, 424 (Tex.App.-Corpus Christi 1995, no writ). A pleading filed prior to rendition of the judgment which alleges a party's revocation of consent is sufficient to effectively withdraw consent to the agreement. *Id. See also, In re Caballero* at 7.

## III. CONCLUSION

Plaintiff contends that Defendant Nacogdoches has breached the Rule 11 Agreement in bad faith. Because so, Plaintiff revokes its consent to the Rule 11 Agreement attached hereto. Plaintiff has the right to revoke its consent to the Rule 11 Agreement because this Agreement has not been rendered a judgment by this Court. Plaintiff requests that this Court take notice of its revocation of the Rule 11 Agreement attached hereto.

Respectfully submitted,

CHARLES C. SELF, III
State Bar No. 18007550
WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.
P. O. Box 208
Abilene, Texas 79604
(325) 672-7824
(325) 672-2158 – Fax

## CERTIFICATE OF SERVICE

This is to **CERTIFY** that a true and correct copy of the above and foregoing was delivered on the 7th day of August, 2014 as follows:

Mr. Thomas L. Belanger
Adams, Belanger, Atherton & LoStracco, P.C.
305 E. Main
Nacogdoches, Texas 75963
CMRRR#7013 2250 0002 1741 1323 and Via Fax

Mr. Harris Stamey
Porter Hedges, LLP
1000 Main Street, 36th Floor
Houston, Texas 77002

Charles C. Self, III

# EXHIBIT 48

NO. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC. | § § § | IN THE DISTRICT COURT |
| PLAINTIFF | § § | |
| v. | § § | OF NACOGDOCHES COUNTY, TEXAS |
| CITY OF NACOGDOCHES, TEXAS AND AEROMIX SYSTEMS, INC., | § § § § | |
| DEFENDANTS | § | 145TH JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED PETITION

Comes now DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff in the above entitled

and numbered cause (hereinafter referred to as Plaintiff) complaining of the City of Nacogdoches,

(hereinafter referred to as Defendant Nacogdoches) and Aeromix Systems, Inc. (hereinafter referred to

as Defendant Aeromix), and for causes of action would respectfully show this Court the following:

### I. DISCOVERY CONTROL PLAN

1. Plaintiff intends to conduct discovery under Level 2, Rule 190.3 of the Texas Rules

of Civil Procedure.

### II. PARTIES

2. Plaintiff, Dowtech Specialty Contractors, Inc. is a corporation organized and existing

under the laws of the State of Texas with its principal location in Baird, Callahan County, Texas.

3. Defendant, Nacogdoches is a municipality located in Nacogdoches County, Texas,

may be served with process by serving its City Secretary, Lila Fuller, at 202 East Pilar Street,

Nacogdoches, Texas, 75961, under the authority of Texas Civil Practice and Remedies Code §

17.024(a).


COPY

## III. JURISDICTION AND VENUE

4.     This Court has jurisdiction of this matter for the reason that the Texas Legislature waived Defendant's immunity from suit when it enacted Tex. Loc. Gov't Code § 271.151 et seq. allowing Plaintiff to sue Defendant Nacogdoches for breach of contract and related causes of action and the facts which are the subject of this lawsuit occurred in Texas

5.     Venue of this matter is mandatory in Nacogdoches County under Texas Civil Practice and Remedies Code § 15.0151 because this suit involves as a party a municipality located in a County, which has a population of less than 100,000 people. Venue is further proper in Nacogdoches County because all or substantially all of the cause of action accrued in Nacogdoches County.

## IV. FACTS

### 1. PROJECT HISTORY

6.     Plaintiff was chosen to act as the general contractor on a project known as the Wastewater Treatment Plant, Oxidation Ditch and Clarifier Improvements Project (the Nacogdoches project). This project was undertaken by Defendant Nacogdoches in Nacogdoches County, Texas, for the benefit of Defendant Nacogdoches and the citizens thereof.

7.     As part of the Nacogdoches project, Plaintiff installed four aeration units which were manufactured by Aeromix Systems Inc. (Aeromix).     Aeromix was specified as the preferred aerator of Defendant Nacogdoches, as noted by the fact that the plans and specifications of the Nacogdoches project set forth a requirement of Aeromix aerators or equivalent.     The aeration units were installed by Dowtech exactly according to the plans and specifications provided by Nacogdoches' engineer on the project, Schaumburg & Polk, and also installed according to such plans and specifications as were provided by Aeromix. During the

installation of the aerators on the project, Aeromix's agent, Mr. Brett Pate of Water & Wastewater Technical Services, Inc., the Texas representative of Aeromix, approved the installation prior to the start-up of the units and gave the go ahead for the units to be used as installed. Such installation was also supervised and/or approved by Defendant Nacogdoches' engineer. This occurred on or about August 5, 2010.

8. On or about August 19, 2010, Defendant Nacogdoches reported to Plaintiff Dowtech a flexing condition in one of the units. Shortly thereafter, one of the mooring arms of the units disconnected and caused damage to one of the aeration units.

9. Plaintiff Dowtech advised Aeromix of these problems. Aeromix instructed Plaintiff Dowtech to mount the aeration units in the opposite direction so that they would pull (put into tension the mooring arms, as opposed to pushing), which Plaintiff did. Once again, such installation was approved by Defendant Nacogdoches' engineer. This was done by Plaintiff Dowtech, after Plaintiff Dowtech had completed all work required per the terms of the agreement between the parties.

10. The re-worked aerators were activated on December 17, 2010. However, Defendant Nacogdoches expressed concern regarding movement of the aerators. Apparently, after consultation between Aeromix and Defendant Nacogdoches' engineers, a new type of anchoring system for the aerators was devised and once again, Plaintiff was requested to do the work on same. Plaintiff traveled to the job site and ran temporary anchors so Defendant Nacogdoches could see how different type anchor points would affect the aerators. Once again, this work was requested by Defendant Nacogdoches and was work outside the scope of the agreement. Immediately thereafter, the gear boxes on the aerators began to fail. Eventually, all four gear boxes of the aerators failed. At this point Aeromix hired McKinney and Moore, a

construction company near Nacogdoches, to pull the aerators and replace all gear boxes and reset the aerators.

11.     In September of 2011, the engineer on the project contacted Plaintiff to advise that the number two (2) aerator was not operating correctly. Plaintiff Dowtech dispatched its employees to the site and found that bolts on the shaft had sheared off. Plaintiff pulled and repaired the aerators and then reset same. While on site, Plaintiff noticed that there were many things that were not completed by McKinney and Moore so that the project could be finalized. Plaintiff completed all items so that Defendant Nacogdoches was satisfied. Once again, this was work performed by Plaintiff Dowtech which was outside the scope of the agreement between the parties.

12.     At a later time, beginning in October of 2011, Plaintiff Dowtech was once again called to the project to perform service work on the aerators. This necessitated four additional days of work on the aerators. Plaintiff Dowtech on this occasion, and on other occasions as set forth above, provided work on the project at the request of Defendant Nacogdoches, and at great expense to Plaintiff Dowtech. Plaintiff Dowtech provided services and materials to Defendant Nacogdoches outside the scope of the contract, which Plaintiff Dowtech estimates is in the approximate amount of $48,121.48.

## 2. NON-PAYMENT BY DEFENDANT CITY OF NACOGDOCHES

13.     In a letter dated January 6th, 2012, Defendant Nacogdoches' engineer from Schaumburg & Polk advised Defendant Nacogdoches that two of the aerators were faulty and/or defective, thereby failing to perform in accordance with the contract. Because of the faulty and/or defective condition of these two aerators, Defendant Nacogdoches' engineer rejected the work associated with the aerators pursuant to Article 13 of the General Conditions of the contract

between Plaintiff and Defendant. It was Defendant's position that Plaintiff must remove and replace all work performed on the job, with all costs paid to be paid by Plaintiff Dowtech.

14. In a letter dated on or about January 30th, 2012, Plaintiff received official, written notice from Defendant Nacogdoches, that Plaintiff's work had been rejected as defective and demanded that Plaintiff remove and replace the aerators, with all costs to be incurred by Plaintiff.

15. Upon receiving this notice from Defendant Nacogdoches, Plaintiff notified Aeromix of Defendant Nacogdoches' determination that the aerators and accompanying work were defective. In a letter dated on or about February 20th, 2012, Aeromix President, Peter Gross, informed Plaintiff that Aeromix would stand behind its warranty of the defective aerators and replace them for free, after said aerators had been returned to Aeromix. It is Plaintiff's belief that Defendant Nacogdoches rejected this offer.

16. Upon learning that Aeromix would stand behind its warranty, in a letter dated on or about March 6th, 2012, Plaintiff informed Defendant Nacogdoches of the following:

a. That Plaintiff objected to Defendant's claim that Plaintiff's work was defective. Plaintiff asserted that Plaintiff's work could not be defective pursuant to certain definitions and other applicable language contained within the contract between Plaintiff and Defendant Nacogdoches;

b. That Aeromix stood ready, willing and able to make good on their warranty and replace the two defective aerators at little to no cost to Defendant Nacogdoches thereby satisfying Defendant Nacogdoches' need to replace the defective aerators; and

c. That in consideration for the services, materials and labor Plaintiff has provided for the Nacogdoches Project, Defendant Nacogdoches had promised, and became bound

and liable to pay Plaintiff, the sum of $75,355.45, as per the terms of the agreement between the parties.

20.     Defendant Nacogdoches has acknowledged that the sum of $75,355.45 is due and owing to Plaintiff.  In an email dated December 5th, 2011, Defendant Nacogdoches' engineer from Schaumburg and Polk stated to Plaintiff that Defendant Nacogdoches would pay Plaintiff the remaining balance of $75,355.45 owed to Plaintiff, ten (10) days after the alignment issue with the aerators had been corrected.  (A copy of this email, redacted, is attached hereto as Exhibit "A").

21.     On or about March 27th, 2012, Plaintiff sent Defendant Nacogdoches a letter demanding payment of the $75,355.45, plus interest, due and owing to Plaintiff, for the balance of the monies due to Plaintiff per the terms of the agreement on the Nacogdoches Project.  This demand letter is attached as Exhibit "B" and incorporated by reference herein.  Plaintiff reminded Defendant Nacogdoches  that Defendant Nacogdoches' engineer had stated to Plaintiff that payment would be received ten (10) days after the mooring  issue with the aerators had been corrected.  Plaintiff corrected this issue, but has still not been paid.

22.     Defendant Nacogdoches has failed and refused and continues to fail and refuse to pay Plaintiff the balance, due and owing to Plaintiff, pursuant to the contract entered into between the parties, for the work performed by Plaintiff on the Nacogdoches Project.   In addition, Plaintiff Dowtech is entitled to recover monies due to Plaintiff Dowtech for the work performed and materials and services provided by Plaintiff Dowtech outside the scope of the agreement, such work having been performed at the request of Defendant Nacogdoches.

## V. CAUSES OF ACTION

## (1) QUANTUM MERUIT

## ALTERNATIVE CLAIM)

23.     Plaintiff would incorporate the facts as set forth above.

24.     Plaintiff provided Defendant Nacogdoches with valuable services, materials and labor as the general contractor of the Nacogdoches Project. Defendant accepted the services, materials and labor that Plaintiff had provided. In addition, Plaintiff Dowtech provided services, materials and labor to Plaintiff Nacogdoches that were outside the scope of any agreement or contract by and between the parties. Such labor, materials and services were provided at the request of and/or the insistence of Defendant Nacogdoches. In spite of same, Defendant Nacogdoches has not paid Plaintiff Dowtech for such labor, materials and services to the damage of Plaintiff Dowtech.

25.     Plaintiff provided the services, materials and labor for Defendant Nacogdoches' benefit. As the general contractor, Plaintiff initiated the installation of the aerators and once installed, maintained the same, which benefitted Defendant Nacogdoches. In addition, Defendant Nacogdoches insisted and demanded that Plaintiff provide additional labor, materials and services outside the scope and of the agreement between the parties.

26.     Defendant Nacogdoches had reasonable notice that the Plaintiff expected compensation for the services, materials and labor as Plaintiff had contracted with Defendant, Nacogdoches to be paid for installing and maintaining the aerators, and Plaintiff Dowtech had informed Defendant Nacogdoches that it expected to be paid for the additional labor, materials and services provided outside the scope of the agreement.

27. Because Plaintiff expected compensation, Defendant Nacogdoches' acceptance of the services, materials and labor without payment resulted in the following damages to Plaintiff:

a) Plaintiff provided services, materials and labor in excess of the amount of $75,355.45. Although Defendant Nacogdoches has paid Plaintiff some monies for the services, materials and labor provided, Defendant Nacogdoches has not paid Plaintiff the $75,355.45 still due and owing to Plaintiff. Plaintiff requests that Defendant Nacogdoches be ordered to pay to Plaintiff.

b) The sum of $48,121.48 for the additional labor, materials and services provided to Defendant Nacogdoches by Plaintiff Dowtech outside the scope of any agreement which Plaintiff Dowtech had no obligation to provide, which were requested by Defendant Nacogdoches.

28. Plaintiff further seeks unliquidated damages within the jurisdictional limits of this Court.

29. Attorney's Fees. As a result of Defendant Nacogdoches' failure to pay to Plaintiff the amount as previously set forth herein, Plaintiff has been compelled to seek the services of the undersigned firm of attorneys to recover this debt. Plaintiff would further show that more than thirty (30) days will have expired at the time of trial since said debt has been presented to Defendant Nacogdoches for payment, and that as of the date of filing of this petition, payment for this just amount owing has not been tendered to Plaintiff by Defendant Nacogdoches. Plaintiff would show that it will necessarily incur the expense of reasonable attorney's fees to prosecute its claim; and, pursuant to Section 38.001, et seq., of the Texas Civil Practice and Remedies Code, Plaintiff herein seeks reimbursement for such fees expended in its behalf.

## (2) SUIT ON SWORN ACCOUNT

## (ALTERNATIVE CLAIM)

30.    Plaintiff would incorporate the facts as set forth above.

31.    Plaintiff provided services, materials and labor to Defendant Nacogdoches on an open account.  Defendant Nacogdoches accepted the services, materials and labor becoming bound to pay Plaintiff its designated charges.  The prices charged for such services, materials and labor were just and true because they are the usual, customary and reasonable prices that Plaintiff normally charges and that are normally charged by similarly situated Plaintiffs in providing such services, materials and labor.  The designated charges were also reasonable and customary according to the terms of the parties' contract.

32.    Plaintiff attaches hereto the affidavit of Gerald Downing, agent of Plaintiff Downing Specialty Contractors, Inc. and incorporates it by reference herein.  The account accurately sets forth the services, materials and labor Plaintiff provided to Defendant Nacogdoches, the date of delivery and performance, and the cost of such services, materials and labor.  The account represents a record of the series of transactions that is similar to records Plaintiff systematically keeps in the ordinary course of business.  All services, materials and labor furnished by Plaintiff were reasonable and necessary, and the amounts charged by Plaintiff for same are reasonable charges.

33.    This claim is just and true, and after applying all just and lawful offsets, payments and credits to the amounts charged by Plaintiff, the amount remains unpaid.  The amount is a liquidated amount, in the sum of $75,355.45.  In addition, the affidavit further sets out the liquidated amount of $48,121.48 as the value of the labor, materials and services provided.  Plaintiff Dowtech is also entitled to recover that amount.

34. Plaintiff attaches to this petition its verification, as Exhibit "C", stating that the charges are reasonable and necessary and swearing and/or affirming as to same.

35. As set forth above, Plaintiff has been damaged in the amount of $75,355.45 as the amount due per the agreement of the parties and Plaintiff has also been damaged in the amount of $48,121.48 as the amount of labor, materials and services provided by Plaintiff Dowtech outside the scope of the contract, for which Plaintiff Dowtech herein sues

36. Attorney's Fees. As a result of Defendant Nacogdoches' failure to pay to Plaintiff the amount as previously set forth herein, Plaintiff has been compelled to seek the services of the undersigned firm of attorneys to recover this debt. Plaintiff would further show that more than thirty (30) days will have expired at the time of trial since said debt has been presented to Defendant for payment, and that as of the date of filing of this petition, payment for this just amount owing has not been tendered to Plaintiff by Defendant Nacogdoches. Plaintiff would show that it will necessarily incur the expense of reasonable attorney's fees to prosecute its claim; and, pursuant to Section 38.001, et seq., of the Texas Civil Practice and Remedies Code, Plaintiff herein seeks reimbursement for such fees expended in its behalf.

### (3) BREACH OF CONTRACT
### (ALTERNATIVE CLAIM)

37. On or about November 3rd, 2009, Plaintiff and Defendant Nacogdoches executed a valid and enforceable written contract. Plaintiff attaches a copy of the contract as Exhibit "D" and incorporates by reference herein. The contract stated that Plaintiff would be general contractor on the Nacogdoches Project and provide services, materials and labor for the installation and maintenance of aerators. The contract stated that Defendant Nacogdoches would pay Plaintiff for its work as general contractor.

38.    Plaintiff tendered performance of Plaintiff's contractual obligations. Plaintiff performed its job as general contractor of the Nacogdoches Project by providing services, materials and labor to install and maintain aerators for the Nacogdoches Project.

39.    Defendant Nacogdoches materially breached the contract by failing to pay Plaintiff for its performance and provision of services, materials and labor in accordance with the terms of the contract.

40.    Defendant Nacogdoches' breach caused injury to Plaintiff, which resulted in the following damages:

a)    Plaintiff has provided services, materials and labor in the total amount of $75,355.45, for which Plaintiff requests that Defendant Nacogdoches be ordered to pay to Plaintiff.

41.    Plaintiff seeks liquidated damages in the amount of at least $75,355.45, which is within the jurisdictional limits of this Court.

42.    Attorney's Fees. As a result of Defendant Nacogdoches' failure to pay to Plaintiff the amount as previously set forth herein, Plaintiff has been compelled to seek the services of the undersigned firm of attorneys to recover this debt. Plaintiff would further show that more than thirty (30) days will have expired at the time of trial since said debt has been presented to Defendant for payment, and that as of the date of filing of this petition, payment for this just amount owing has not been tendered to Plaintiff by Defendant Nacogdoches. Plaintiff would show that it will necessarily incur the expense of reasonable attorney's fees to prosecute its claim; and, pursuant to Section 38.001, et seq., of the Texas Civil Practice and Remedies Code, Plaintiff herein seeks reimbursement for such fees expended in its behalf.

## (4) PROMISSORY ESTOPPEL

## (ALTERNATIVE CLAIM)

43.     Defendant promised Plaintiff that Defendant Nacogdoches would pay Plaintiff for the services, materials and labor it provided as the general contractor on the Nacogdoches Project.

44.     Plaintiff relied on Defendant Nacogdoches' promise by providing services, materials and labor at the up-front cost to Plaintiff for the installation and maintenance of the aerators for the Nacogdoches Project.

45.     Defendant Nacogdoches knew or reasonably should have known that Plaintiff would rely on Defendant's promise. Defendant Nacogdoches and Plaintiff entered into a valid and enforceable written contract, which its terms provided that in exchange for Plaintiff providing services, materials and labor as general contractor for the Nacogdoches Project, Defendant Nacogdoches would pay Plaintiff an agreed upon rate and or sum.

46.     Injustice to Plaintiff can only be avoided if Defendant Nacogdoches' promise is enforced. Plaintiff has provided Defendant with services, materials and labor at the up-front cost to Plaintiff. If Defendant Nacogdoches' promise is not enforced, then Plaintiff will go uncompensated for the work Plaintiff did at the request of Defendant Nacogdoches and for Defendant Nacogdoches' benefit.

47.     Plaintiff's reliance on Defendant Nacogdoches' promise caused injury to Plaintiff, which resulted in the following damages:

a)      Plaintiff has provided services, materials and labor in the total amount of $75,355.45, for which Plaintiff requests that Defendant Nacogdoches be ordered to pay to Plaintiff.

b) The sum of $48,121.48 for the additional labor, materials and services provided by Defendant Nacogdoches outside the scope of any agreement which Plaintiff Dowtech had no obligation to provide.

48.     Plaintiff seeks unliquidated damages within the jurisdictional limits of this Court.

49.     <u>Attorney's Fees.</u> As a result of Defendant Nacogdoches' failure to pay to Plaintiff the amount as previously set forth herein, Plaintiff has been compelled to seek the services of the undersigned firm of attorneys to recover this debt. Plaintiff would further show that more than thirty (30) days will have expired at the time of trial since said debt has been presented to Defendant for payment, and that as of the date of filing of this petition, payment for this just amount owing has not been tendered to Plaintiff by Defendant Nacogdoches. Plaintiff would show that it will necessarily incur the expense of reasonable attorney's fees to prosecute its claim; and, pursuant to Section 38.001, <u>et seq.</u>, of the Texas Civil Practice and Remedies Code, Plaintiff herein seeks reimbursement for such fees expended in its behalf.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that upon final hearing Plaintiff recover:

1. Judgment against Defendant Nacogdoches in the amount of $75,355.45, as the total amount due and owing for the services, materials and labor furnished and delivered to Defendant Nacogdoches by Plaintiff;

2. Judgment against Defendant Nacogdoches in the amount of $48,121.44 for labor, materials and services provided by Plaintiff Dowtech to Defendant Nacogdoches as requested by Defendant Nacogdoches which were outside the scope of the work required per the agreement of the parties.

3. Judgment against Defendant Nacogdoches for reasonable attorney's fees expended by Plaintiff to recover its damages as set forth in this Petition;

4. Judgment against Defendant Nacogdoches for pre-judgment interest at the rate allowed by law.

5. Judgment against Defendant Nacogdoches for post-judgment interest as allowed by law;

6. Judgment against Defendant Nacogdoches for costs of court; and

7. Such other and further relief both general and special, both at law and in equity, as Plaintiff may be shown to be justly entitled to receive.

Respectfully submitted,

CHARLES C. SELF, III
State Bar No. 18007550
WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.
P. O. Box 208
Abilene, Texas 79604
(325) 672-7824
(325) 672-2158 – Fax

## CERTIFICATE OF SERVICE

This is to **CERTIFY** that a true and correct copy of the above and foregoing was delivered on the 7th day of August, 2014 as follows:

Mr. Thomas L. Belanger
Adams, Belanger, Atherton & LoStracco, P.C.
305 E. Main
Nacogdoches, Texas 75963
CMRRR#7013 2250 0002 1741 1323 and Via Fax

Mr. Harris Stamey
Porter Hedges, LLP
1000 Main Street, 36th Floor
Houston, Texas 77002

Charles C. Self, III

# EXHIBIT 49

COPY

| | | |
|---|---|---|
| **DOWTECH SPECIALTY CONTRACTORS, INC.,** | § § § | **IN THE DISTRICT COURT** |
| **PLAINTIFF** | § § § | |
| **v.** | § § | **OF NACOGDOCHES COUNTY, TEXAS** |
| **CITY OF NACOGDOCHES, TEXAS AND AEROMIX SYSTEMS, INC.,** | § § § | |
| **DEFENDANTS** | § § | **145th JUDICIAL DISTRICT** |

## PLEA TO JURISDICTION, FIRST AMENDED ANSWER AND COUNTERCLAIM OF DEFENDANT, CITY OF NACOGDOCHES, TEXAS

NOW COMES Defendant, the City of Nacogdoches, Texas, and files this Plea to the Jurisdiction, First Amended Answer and Counterclaim, and would show the Court as follows:

### FACTS

1.

This action arises from a construction project between the Plaintiff, Dowtech Specialty Contractors, Inc. ("Dowtech"), and the Defendant, City of Nacogdoches, Texas ("the City"), for improvements of the City's wastewater treatment plant, oxidation ditch and clarifier system. Dowtech and the City entered into a contract dated September 15, 2009, under which Dowtech, as general contractor, agreed to make the improvements for a total contract price (with approved changes) of $722,905.77. The contract included Standard General Conditions ("General Conditions"), Special Conditions of the Agreement ("Special Conditions"), Specifications and various other Contract Documents as defined in the General Conditions (herein collectively referred to as the "Construction Contract"). All of such documents comprising the Construction Contract are incorporated in this pleading by reference.

tb\dowtech.v.City#2

1

2.

A major component of the project provided for in the Construction Contract was the installation of four aerators. The aerators are large pieces of equipment manufactured by Defendant, Aeromix Systems, Inc. ("Aeromix"), and delivered to the project for installation in the oxidation ditch. The aerators were installed on August 5, 2010. Within two weeks after installation, a problem was observed with the aerator's mounting system, and it was redesigned to prevent damage to the equipment. While the mounting system was being changed, there was a gearbox failure on one of the aerators, and then before that issue was resolved, the gearboxes on all of the other aerators failed. New gearboxes were installed on all of the units in June, 2011, but shortly thereafter the bolts on the hub and center shaft assembly of two of the aerators failed and rendered the units unusable. Despite various attempts to fix the sheared bolts by Aeromix, the problems with the hub and center shaft assembly continued to re-occur shortly after each attempted repair.

3.

As a result of the defect in the hub and center shaft assembly and various other defects in the aerators that appeared while unsuccessful efforts were being made to repair the hub and center shaft assembly, the Engineer on the project, Schaumburg & Polk, Inc., notified the City, Dowtech and Aeromix by letter dated January 6, 2012, that the aerators were rejected and recommended that the City notify Dowtech that the aerators are defective and must be removed from the project. The Engineer further recommended that the City notify Dowtech that it is required under the construction contract to replace the aerators at no additional cost to the City. A copy of the Engineer's letter dated January 6, 2012, is attached as Exhibit A to this pleading and incorporated herein by reference. On the Engineer's recommendation, the City notified Dowtech by letter dated January 30, 2012, that the aerators must be removed and replaced. A copy of the City's letter to Dowtech dated January 30, 2012, is attached as Exhibit B to this pleading and incorporated herein by reference. In accordance with the provisions of the Construction Contract, the City refused to pay Dowtech the balance of the contract price until the aerators

are replaced with new aerators that are approved by the Engineer. The unpaid balance of the contract price the subject of this lawsuit is substantially less than the amount that the City paid Dowtech for the defective aerators.

4.

During the course of this litigation, Dowtech and the City entered into a written settlement agreement which is set forth in a letter dated July 2, 2013, from the attorney of record for the City of Nacogdoches addressed to counsel for Dowtech and counsel for Aeromix (a co-Defendant that was subsequently dismissed from this action). The letter represented that it is a "Rule 11 Agreement", and it was executed by the attorney of record for Dowtech, the attorney of record for the City and the attorney of record for Aeromix. A copy of such letter (herein the "Rule 11 Agreement") was filed among the papers in this cause on July 11, 2013. A true and correct copy of the Rule 11 Agreement is attached to this pleading as Exhibit C and incorporated herein by reference. The Rule 11 Agreement is a binding contract between the parties, enforceable under Rule 11 of the Texas Rules of Civil Procedure, and supported by adequate consideration being the mutual promises set forth therein.

5.

Pursuant to the Rule 11 Agreement, the Plaintiff transported the aerators to Aeromix's plant in Minneapolis, Minnesota, for repairs, and after the repairs were complete Dowtech returned the aerators to the City's sewer plant. However, a disagreement arose between the City and Dowtech regarding the proper method of re-installing the aerators. As a result, the City on May 13, 2014, agreed in writing to waive the requirement in the Rule 11 Agreement that the aerators operate for a continuous period of 90 days, and instead the City agreed to pay Dowtech the amount specified in the Rule 11 Agreement of $75,355.45 within 20 days after the aerators were re-installed. At all times the City was and continues to be ready, willing and able to perform its obligations under the Rule 11 Agreement, including but not limited to payment of the sum of $75,355.45 to Dowtech upon re-installation and start up of the aerators, without the requirement that the aerators operate for a continuous period of 90 days.

6.

On August 7, 2014, Dowtech filed a document entitled Notice of Revocation of Consent to Rule 11 Agreement which purported to revoke the Rule 11 Agreement. As grounds for attempting to revoke the Rule 11 Agreement, Dowtech alleged that the City acted in bad faith in requiring that the aerators be re-installed in a manner contrary to the manufacturer's recommendations. According to Dowtech, re-installation of the aerators contrary to the manufacturer's recommendations placed the "units at a high risk of failure" and "there is little chance for the aeration units to operate continuously for 90 days as required by the Rule 11 Agreement in order for the Defendant Nacogdoches to have to pay Plaintiff". However, the entire basis for Dowtech's attempted revocation of the Rule 11 Agreement is false because when the disagreement arose regarding the method of re-installation the City agreed to waive the requirement that the units operate continuously for 90 days, and the City agreed to pay the Plaintiff in full within 20 days after re-installation and start up of the aerators. Dowtech's Notice of Revocation of Consent To Rule 11 Agreement constituted an absolute repudiation of Dowtech's obligations under the Rule 11 Agreement, and such repudiation by Dowtech was without just cause because the City agreed to pay the contract balance whether or not the aerators operated for a continuous period of 90 days.

## PLEA TO JURISDICTION

7.

The City objects to the court's exercise of subject matter jurisdiction over the cause of action, except to the extent that sovereign immunity is waived by Sec. 271.152 of the Texas Local Government Code, because the City is a municipality and is protected from suit by sovereign immunity.

## GENERAL DENIAL

8.

The City denies each and every, all and singular, the allegations of the Plaintiff's First Amended Petition and demands strict proof thereof as required by law.

## DENIAL OF SWORN ACCOUNT

### 9.

With regard to Dowtech's sworn account action, the City denies each and every item in the account because Dowtech did not comply with the Construction Contract, failed to complete the work and failed to correct and replace the defective work, failed to comply with conditions precedent to this claim, and failed to comply with the Rule 11 Agreement, all as set forth more particularly in this pleading. Therefore, Dowtech's sworn account claim is not just or true in whole or in part, is not due and all just and lawful offsets and credits have not been allowed. The City demands strict proof of all items in the account. Subject to the foregoing, the City is ready, willing and able to perform the Rule 11 Agreement and pay Dowtech the amount set forth therein, provided that Dowtech re-installs and starts up the aerators as agreed.

### DEFENSES

### 10.

Dowtech's claims against the City, other than for breach of the Construction Contract, are barred by the doctrine of sovereign immunity from liability

### 11.

Dowtech's claim for damages against the City is barred except to the extent of those awards specifically allowed under Sec. 271.153 of the Texas Local Government Code.

### 12.

Dowtech is not entitled to recover the unpaid balance of the contract sum because Dowtech failed to satisfy one or more conditions precedent to recovery of the final payment under the Construction Contract. First, Dowtech failed to notify the Engineer that the work is substantially complete as required by Art. 14.04A of the General Conditions. Secondly, the Engineer did not issue a Certificate of Substantial Completion of the project as required by Article 14.04(C) of the General Conditions. Thirdly, Dowtech did not submit to the Engineer a final application for payment as required by Art. 14.07A of the General Conditions. Fourthly, the Engineer did not issue a final recommendation for payment of the

unpaid contract sum, as required by Art. 14.07(B) of the Construction Contract. Finally, Dowtech failed to comply with the Engineer's recommendation or the City's requirement for removal and replacement of the aerators as required by Art. 13.06 and 13.07 of the General Conditions and Art. 21 of the Special Conditions.

13.

Dowtech is not entitled to recover the unpaid balance of the contract sum because substantial completion of the work under the Construction Contract was not achieved in that the aerators were rejected by the Engineer prior to substantial completion of the project, and Dowtech did not replace the rejected aerators.

14.

Dowtech is not entitled to recover the unpaid balance of the contract sum or for additional labor, materials and services provided by Dowtech because Dowtech breached the Construction Contract in failing to correct defective work on the project that was identified by the Engineer prior to acceptance of the entire work, as required by Art. 13.06 and 13.07 of the General Conditions and Art. 21 of the Special Conditions of the Construction Contract. Specifically, Dowtech failed to replace the defective aerators with aerators that were not defective after notice from the Engineer and the City that such aerators were rejected.

15.

Dowtech is not entitled to recover for additional labor, materials and services allegedly provided by Dowtech because such labor, materials and services were warranty work required to be performed by Dowtech under the Construction Contract and included in Dowtech's obligations under the following provisions of the Construction Contract:

A.  Under Art. 6.19A of the General Conditions of the Construction Contract, Dowtech warranted and guaranteed to the City that all of the work under the Construction Contract "will not be defective". In Art. 6.19B of the Construction Contract, Dowtech agreed that its "obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute." Art. 6.06C of the General Conditions of the Construction Contract provides that Contractor shall be fully responsible ... for all acts and omissions of the Subcontractors, Suppliers and other individuals or entities performing or furnishing

any of the Work just as Contractor is responsible for Contractor's own acts and omissions."

B.  Under Art. 13.06 of the General Conditions, Dowtech agreed to promptly correct all defective work "whether or not fabricated, installed, or completed", and further agreed to remove defective work rejected by the Engineer and replace it with work that is not defective. Dowtech's obligation to correct or remove and replace defective work continued for one-year after substantial completion under Art. 13.07 of the General Conditions. Likewise, under Art. 21 of the Special Conditions of the Construction Contract, Dowtech agreed to remove any "equipment or material ... found to be imperfect ... at any time prior to acceptance of the entire work done under this contract", and then replace such material or equipment at Dowtech's own cost and expense.

16.

Dowtech is not entitled to recover on its claim for additional labor, materials and services allegedly provided to the City in the amount of $48,121.48 because such labor, materials and services were not provided by Dowtech under circumstances that notified the City that Dowtech expected payment over and above the balance of the contract price under the Construction Contract. Prior to filing this lawsuit, Dowtech did not demand that the City pay for labor, materials and services over and above the balance of the contract price under the Construction Contract, and therefore the City did not have notice that Dowtech expected to be paid an additional amount. Furthermore, the Plaintiff's Original Petition filed by Dowtech in this lawsuit did not seek recovery for additional labor, materials and services allegedly provided by Dowtech, but only for the balance of the contract price under the Construction Contract. To the extent that any of such additional labor, materials and services were provided by Dowtech in fulfillment of its obligations under the Rule 11 Agreement, Dowtech is not entitled to recover for such labor, materials and services because the Rule 11 Agreement did not provide for any additional amount to be paid by the City for such labor, materials and services, and therefore the City did not have notice that Dowtech expected to be paid for such labor materials and services in addition to the amount that the City agreed to pay Dowtech under the Rule 11 Agreement.

## 17.

Dowtech has not performed a condition precedent to recovery of damages from the City for breach of the Construction Contract. Specifically, Dowtech agreed in the Rule 11 Agreement to re-install and start up the aerators, but Dowtech failed and refused to do so in violation of the Rule 11 Agreement.

## 18.

Dowtech is not entitled to recover damages in excess of $75,355.45 because in the Rule 11 Agreement Dowtech agreed to dismiss its claims against the City with prejudice upon payment by the City of the sum of $75,355.45, and the City stands ready to pay such sum to Dowtech after it completes its obligations under the Rule 11 Agreement. Furthermore, Dowtech waived its claim for damages in excess of $75,355.45 by voluntarily and intentionally executing the Rule 11 Agreement under which it relinquished its claims for damages in excess of $75,355.45 by agreeing to dismiss this lawsuit with prejudice upon receipt of such sum.

## 19.

Dowtech waived its claim to recover attorney fees or court costs by voluntarily and intentionally executing the Rule 11 Agreement under which it relinquished its claims for attorney's fees and court costs.

## 20.

The City pleads accord and satisfaction of Dowtech's claim in that Dowtech and the City entered into the Rule 11 Agreement, which is a valid and binding, written settlement agreement, supported by adequate consideration. Under the Rule 11 Agreement, Dowtech is not entitled to recover damages in excess of $75,355.45 or attorney fees or court costs, and Dowtech is obligated to dismiss this lawsuit with prejudice upon receipt of such sum of $75,355.45. The City is ready, willing and able to perform the terms of the settlement set forth in the Rule 11 Agreement subject to Dowtech performing its obligation to re-install and start up the aerators as agreed.

21.

Dowtech's claim for additional labor, materials and services provided to the City is barred by Sec. 10.02 of the General Conditions of the Construction Contract because such alleged additional labor, materials and services were within the scope of the work under the Construction Contract, and were not covered by a change order under Sec. 3.04 of the General Conditions.

22.

Dowtech is not entitled to recover on its claim for additional labor, materials and services provided to the City because Dowtech failed to comply with Sec. 10.05 and 12.01(A) of the General Conditions to the Construction Contract which is a condition precedent to recovery on such claim. Specifically, Dowtech failed to submit its claim for additional labor, materials and services to the Engineer as required by Sec. 10.05 and 12.01(A) of the General Conditions.

23.

If Dowtech contends that it complied with the claim procedure in Sec. 10.05 and 12.01(A) of the General Conditions, which this Defendant denies, Dowtech nevertheless has failed to comply with a condition precedent to its right to recover on its claim for additional labor, materials and services in that Dowtech has failed to request mediation of such claim as required by Sec. 16.01(A) of the General Conditions.

24.

The Engineer's letter dated January 6, 2012, attached to this pleading as Exhibit A, constituted a decision by the Engineer denying Dowtech's claim for additional cost for replacement of the aerators. The City promptly notified Dowtech of the Engineer's decision. However, Dowtech failed to invoke the dispute resolution procedure set forth in Sec. 16 of the General Conditions of the Construction Contract within 30 days after the Engineer's decision was rendered. Under Sec. 10.05(E) of the General Conditions of the Construction Contract, the Engineer's decision that Dowtech must replace the aerators at no additional cost to the City is therefore final and binding upon Dowtech under the terms of the Construction Contract.

25.

The Rule 11 Agreement was an amendment of the Construction Contract insofar as it pertained to Dowtech's obligation to re-install and start up the aerators, and the City's obligation to pay Dowtech the contract balance upon completion of the re-installation and start up. By repudiating the Rule 11 Agreement without just cause, Dowtech breached a material term of the Construction Contract, as amended, and continues to stand in breach of the Construction Contract in that Dowtech has failed to complete the work that it agreed to perform and the work is not complete. Being in breach of a material term of the Construction Contract and having failed to complete the work, Dowtech is not entitled to recover on its claim against the City for the balance owing under the Construction Contract or for any extra work allegedly performed by Dowtech under the Construction Contract or otherwise.

## COUNTERCLAIM

26.

By way of counterclaim, the City complains of Dowtech, and the allegations set forth in Paragraphs 1, 2, 3, 4, 5 and 6 of this pleading are incorporated by reference as part of this counterclaim.

27.

The Rule 11 Agreement was an amendment of the Construction Contract insofar as it set forth Dowtech's obligations to complete the work, and the terms under which the City would pay the contract balance to Dowtech. Under the Rule 11 Agreement, Dowtech specifically agreed that: "Upon returning the repaired aerators to the City's facility, Dowtech will re-install and start-up the aerators".

28.

Dowtech breached its obligations under the Construction Contract, as amended by the Rule 11 Agreement, as set forth in the preceding paragraphs, by repudiating the Rule 11 Agreement without just cause and refusing to re-install and start up the repaired aerators as agreed.

tb\dowtech.v.City#2                    10

29.

Dowtech's above described breach of the Construction Contract, as amended by the Rule 11 Agreement, has caused the City to suffer damage being the cost that the City will have to incur to re-install and start up the repaired aerators.

30.

All conditions precedent to this Counterclaim have been performed or occurred.

31.

As a result of Dowtech's repudiation and breach of the Rule 11 Agreement as set forth above, the City has been compelled to seek the services of the undersigned attorney to enforce its rights under the Rule 11 Agreement and the Construction Contract and to recover damages for Dowtech's refusal to re-install and start up the aerators as promised. Furthermore, as a result of Dowtech's repudiation of the Rule 11 Agreement, the City has incurred attorney fees for the defense of Dowtech's claim for additional labor, material and services allegedly provided by Dowtech. More than 30 days will have expired at the time of trial since said debt and obligation has been presented to Dowtech for payment, and that as of the date of filing of this counterclaim payment for this just amount owing has not been tendered to the City by Dowtech. The City would show that it will necessarily incur the expense of reasonable attorney's fees to prosecute and defend such claims; and, pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code, the City seeks recovery from Dowtech of such fees expended in its behalf.

WHEREFORE, the City prays that upon final trial of this case the Court render judgment

1.      That Dowtech take nothing on its claim to recover from the City in excess of $75,355.45, and that Dowtech take nothing on all other claims against the City for additional costs for labor, materials and services, attorney fees and court costs;

2.      That the City recover judgment against Dowtech for damages for the cost of re-installing the aerators;

3.      That the City recover judgment against Dowtech for its attorney fees incurred as a result of Dowtech's breach and repudiation of the Rule 11 Agreement;

4. That the City recover judgment against Dowtech for costs of court, prejudgment and postjudgment interest and such other and further relief to which the City may be justly entitled;

5. In the alternative, if the Court declines to enforce the Rule 11 Agreement, that Dowtech take nothing and that the City recover its costs of court; and

6. That the City have such other and further relief to which it may be justly entitled..

Respectfully submitted,

ADAMS, BELANGER & LOSTRACCO, P.C.

BY: _____

THOMAS L. BELANGER
Texas Bar No. 02060400
P.O. Box 631248
Nacogdoches, Texas 75963-1248
Tel. (936)564-4315
Fax. (936)560-0280
Attorney for Defendant,
CITY OF NACOGDOCHES, TEXAS

## VERIFICATION

STATE OF TEXAS §

COUNTY OF NACOGDOCHES §

BEFORE ME, the undersigned Notary Public, on this day personally appeared STEVE BARTLETT, who, being by me duly sworn on oath deposed and said that he is the City Engineer of the City of Nacogdoches, Texas, and is authorized to make this affidavit on behalf of the City of Nacogdoches, Texas; that he has read the above and foregoing pleading of the City of Nacogdoches, Texas; and that the claim of Dowtech as set forth in the Plaintiff's First Amended Petition is not just or true in whole or in part, is not due, and all just and lawful offsets and credits have not been allowed; and every statement contained in Paragraphs 1, 2, 3, 4, 5, 6 and 9 of such pleading is within his personal knowledge and is true and correct.

_____
STEVE BARTLETT, P.E.

SUBSCRIBED AND SWORN TO BEFORE ME on the 13th day of November, 2014, to certify which witness my hand and official seal.



MARIE A. HUGHES
Notary Public, State of Texas
My Commission Expires
November 06, 2016

_Marie A. Hughes_
Notary Public, State of Texas

## CERTIFICATE OF SERVICE

I certify that on this 25 day of November, 2014, a true and correct copy of this Plea to Jurisdiction, First Amended Answer and Counterclaim of the City of Nacogdoches, Texas, was served by certified mail, return receipt requested on the following:

CHARLES C. SELF, III
Whitten, Hacker, Hagin, Anderson,
     Allen & Self, P.C.
P. O. Box 208
Abilene, Texas 79604

THOMAS L. BELANGER

# EXHIBIT 50

C12-28865

Nacogdoches County - District Clerk

Filed 1/6/2015 9:53:46 AM
Loretta Cammack
District Clerk
Nacogdoches County, TX

JESSICA HILL

## NO. C-12-28865

| | |
|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC. | § IN THE DISTRICT COURT |
| | § |
| | § |
| PLAINTIFF | § |
| | § |
| v. | § OF NACOGDOCHES COUNTY, TEXAS |
| | § |
| CITY OF NACOGDOCHES, TEXAS AND AEROMIX SYSTEMS, INC., | § |
| | § |
| | § |
| DEFENDANTS | § 145th JUDICIAL DISTRICT |

### ANSWER TO DEFENDANT, CITY OF NACOGDOCHES, TEXAS' COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Dowtech Specialty Contractors, Inc. and files this its Original Answer to the Counterclaim of Defendant City of Nacogdoches, Texas, and in response thereto would respectfully show the Court the following:

### I. GENERAL DENIAL

1.      Plaintiff Dowtech would, pursuant to Rule 92 of the Texas Rules of Civil Procedure, file this its general denial, denying each and every, all and singular, the material allegations contained in Defendant City of Nacogdoches' Counterclaim and would demand strict proof thereof by a preponderance of the evidence.

### II. SPECIFIC DENIALS

2.      Plaintiff Dowtech would deny that it has breached its obligations under the construction contract, as is alleged in paragraph 28 of Defendant, City of Nacogdoches' Counterclaim and would demand strict proof thereof by a preponderance of the evidence.

3. Plaintiff Dowtech would deny that Defendant, City of Nacogdoches has suffered damages as the result of any alleged breach of construction contract by Plaintiff Dowtech and would demand strict proof thereof by a preponderance of the evidence.

4. Plaintiff Dowtech would deny that all conditions precedent to the Counterclaim of Defendant, City of Nacogdoches have been performed or have occurred and would demand strict proof thereof by a preponderance of the evidence.

5. Plaintiff Dowtech would deny that Defendant, City of Nacogdoches is entitled to recover attorney's fees, as is alleged in paragraph 31 of Defendant, City of Nacogdoches' Counterclaim and would demand strict proof thereof by a preponderance of the evidence.

WHEREFORE PREMISES CONSIDERED, Plaintiff Dowtech prays that Defendant City of Nacogdoches take nothing by its Counterclaim and that Plaintiff Dowtech be discharged with its costs, and for such other and further relief, both general and special, both at law and in equity, to which Plaintiff Dowtech may be justly entitled to receive.

Respectfully submitted,

CHARLES C. SELF, III
State Bar No. 18007550
WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.
P. O. Box 208
Abilene, Texas 79604
(325) 672-7824
(325) 672-2158 – Fax

## CERTIFICATE OF SERVICE

This is to **CERTIFY** that a true and correct copy of the above and foregoing was sent on the 5th day of January, 2015, as follows:

Mr. Thomas L. Belanger
Adams, Belanger, Atherton & LoStracco, P.C.
305 E. Main
Nacogdoches, Texas 75963
**CMRRR#7013 2630 0001 3848 8970**


Charles C. Self, III

| DOWTECH SPECIALTY CONTRACTORS, INC. | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| | § | |
| v. | § | OF NACOGDOCHES COUNTY, TEXAS |
| | § | |
| CITY OF NACOGDOCHES, TEXAS | § | |
| AND AEROMIX SYSTEMS, INC., | § | |
| | § | |
| DEFENDANTS | § | 145th JUDICIAL DISTRICT |

## ANSWER TO DEFENDANT, CITY OF NACOGDOCHES, TEXAS' COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Dowtech Specialty Contractors, Inc. and files this its Original Answer to the Counterclaim of Defendant City of Nacogdoches, Texas, and in response thereto would respectfully show the Court the following:

### I. GENERAL DENIAL

1.     Plaintiff Dowtech would, pursuant to Rule 92 of the Texas Rules of Civil Procedure, file this its general denial, denying each and every, all and singular, the material allegations contained in Defendant City of Nacogdoches' Counterclaim and would demand strict proof thereof by a preponderance of the evidence.

### II. SPECIFIC DENIALS

2.     Plaintiff Dowtech would deny that it has breached its obligations under the construction contract, as is alleged in paragraph 28 of Defendant, City of Nacogdoches' Counterclaim and would demand strict proof thereof by a preponderance of the evidence.

3.      Plaintiff Dowtech would deny that Defendant, City of Nacogdoches has suffered damages as the result of any alleged breach of construction contract by Plaintiff Dowtech and would demand strict proof thereof by a preponderance of the evidence.

4.      Plaintiff Dowtech would deny that all conditions precedent to the Counterclaim of Defendant, City of Nacogdoches have been performed or have occurred and would demand strict proof thereof by a preponderance of the evidence.

5.      Plaintiff Dowtech would deny that Defendant, City of Nacogdoches is entitled to recover attorney's fees, as is alleged in paragraph 31 of Defendant, City of Nacogdoches' Counterclaim and would demand strict proof thereof by a preponderance of the evidence.

WHEREFORE PREMISES CONSIDERED, Plaintiff Dowtech prays that Defendant City of Nacogdoches take nothing by its Counterclaim and that Plaintiff Dowtech  be discharged with its costs, and for such other and further relief, both general and special, both at law and in equity, to which Plaintiff Dowtech  may be justly entitled to receive.

Respectfully submitted,

CHARLES C. SELF, III
State Bar No. 18007550
WHITTEN, HACKER, HAGIN,
ANDERSON, ALLEN & SELF, P.C.
P. O. Box 208
Abilene, Texas  79604
(325) 672-7824
(325) 672-2158 – Fax

## CERTIFICATE OF SERVICE

This is to **CERTIFY** that a true and correct copy of the above and foregoing was sent on the 5th day of January, 2015, as follows:

Mr. Thomas L. Belanger
Adams, Belanger, Atherton & LoStracco, P.C.
305 E. Main
Nacogdoches, Texas 75963
**CMRRR#7013 2630 0001 3848 8970**

Charles C. Self, III

# EXHIBIT 51

## dowtech

From:      "Chad House" <chad@houseindustriesinc.com>
To:        <dowtech@windstream.net>
Sent:      Thursday, January 15, 2015 11:42 AM
Subject:   soft starts: 15hp and greater

Bob,

Per our conversation, we recommend soft starts on all 15hp and above floating brush aerators.  The start-up torque and shock load on the gear reducers will reduce the life of the gear reducer without using soft starts.

Thanks,

Chad House
CEO, ECS House Industries, Inc.

(870) 945-0880 cell
(870) 588-3773 office
(870) 588-4669 fax

chad@houseindustriesinc.com
www.houseindustriesinc.com

1/15/2015

# EXHIBIT 52



Cause No. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC., *Plaintiff* | § § § § | IN THE DISTRICT COURT |
| v. | § § § | OF NACOGDOCHES COUNTY, TEXAS |
| CITY OF NACOGDOCHES, TEXAS AND AEROMIX SYSTEMS, INC., *Defendants* | § § § § | 145TH JUDICIAL DISTRICT |

PLAINTIFF'S SUPPLEMENTAL FIRST AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Dowtech Specialty Contractors, Inc., complaining of Defendant City of Nacogdoches and files this Supplemental First Amended Petition and respectfully shows the Court as follows:

## I. INTRODUCTION

1. Plaintiff supplements Plaintiff's First Amended Petition pursuant to Tex. R. Civ. P. 69, and incorporates by reference herein all allegations, averments, claims, requests, and exhibits of Plaintiff's First Amended Petition.

2. Plaintiff incorporates by reference herein all allegations, averments, claims, requests, and exhibits of Plaintiff's Notice Of Revocation Of Consent To Rule 11 Agreement.

3. Plaintiff intends to conduct discovery under Level 3 pursuant to Tex. R. Civ. P. 190.4

4. This case is about engineers working for Defendant City of Nacogdoches (hereinafter "Defendant Nacogdoches") who negligently engineered / designed (hereinafter

*Supplemental First Amended Petition*

"design or designed") and implemented a plan to install four 25 horsepower (hereinafter "25 hp") aeration units (large machines used for wastewater treatment). This plan was doomed for failure from the start for several reasons. First, Defendant Nacogdoches' engineers lacked familiarity and experience with the aerators that they specified by brand name. Second, Defendant Nacogdoches' engineers lacked product knowledge of the aerators manufactured by Aeromix Systems, Inc. (hereinafter "Aeromix"), even though they specified this product by brand name, thereby mandating its use for the project. Third, Defendant Nacogdoches' engineers blatantly disregarded instructions and recommendations of the manufacturer, Aeromix, regarding the proper use and installation of 25 hp Aeromix aerators. Rather than accepting responsibility for their negligence, these engineers entered into a conspiracy to cover their tracks and hide their negligent conduct by blaming Plaintiff Dowtech Specialty Contractors, Inc. (hereinafter "Plaintiff Dowtech"), the general contractor on the project, for problems that were clearly caused by the engineers' faulty design plan.

## II. ADDITIONAL FACTS

5.      Plaintiff Dowtech entered into a construction contract with Defendant Nacogdoches to perform work at the Wastewater Treatment Plant, Oxidation Ditch and Clarifier Improvements Project per the drawings and specifications prepared by the engineering firm Schaumburg & Polk, Inc. (hereinafter "SPI"). The construction contract, page 780 – 2 of 3 paragraph 4 pertaining to the FLOATING ELECTRIC BRUSH AERATOR, states, in part, the following: "A. General: The Contractor shall furnish and install a total of 4, 25 hp floating electric brush aerators as a part of this project. Aeromix Systems, ECS House Industries, or approved equal shall manufacture the floating electric brush aerators." Furthermore, the governing provisions of the construction contract are contained in the "Special Conditions of the

Agreement." Paragraph 8 of the "Special Conditions of the Agreement," which pertains to MATERIALS AND WORKMANSHP, states, in part, the following: "Where material or equipment are specified by a trade or brand name, it is not the intention of the Owner to discriminate against an equivalent product of another manufacturer, but rather to set a definite standard of equality or performance . . . unless a substitute shall be approved in writing by the Engineer, and the Engineer shall have the right to require the use of such specifically designated material, article, or process." Therefore, under the construction contract Defendant Nacogdoches represents and claims to have superior knowledge of the Aermomix Systems and ECS House Industries 25 hp aerators. On August 5, 2010 Plaintiff Dowtech had substantially completed all work related to the 25 hp aerators and, significantly, Defendant Nacogdoches had accepted and signed the warranty. Defendant Nacogdoches flagrantly materially breached the construction contract continually after August 5, 2010 exercising complete and total control of the work related to the four Aeromix 25 hp aerators (1) directing and demanding that additional work be performed, thereby increasing the costs (2) causing delays and accelerations of the work, thereby increasing costs and (3) keeping Plaintiff Dowtech's president and employees on a continual standby at all times, thereby increasing the costs. Plaintiff Dowtech continually performed the work at the direction of Defendant Nacogdoches, trying to protect its excellent reputation. Defendant Nacogdoches had knowledge at all times that the work directed and demanded was causing Plaintiff Dowtech to spend its monetary resources and suffer monetary damages. Defendant Nacogdoches with unclean hands cannot rely upon the provisions of the contract and its governmental immunity to deny payment for the work directed and demanded.

6. Defendant Nacogdoches is solely liable and responsible for the conduct of its engineers. Since Defendant Nacogdoches' engineers knew and were aware of their own conduct

at all times, such knowledge and awareness is imputed to Defendant Nacogdoches. Therefore, Defendant Nacogdoches knew and was aware at all times and is liable for the arbitrary and capricious conduct of its engineers against Plaintiff Dowtech, including its active interference and bad faith scheme to materially breach the construction contract with Plaintiff Dowtech and blame Plaintiff Dowtech for its own negligence, thereby greatly increasing the cost incurred by Plaintiff Dowtech on the original contract and depriving Plaintiff Dowtech of the amounts owed to it under the original contract.

7.     Specifically, in March 2014, a thorough and detailed investigation undertaken by Bob Click (hereinafter "Click"), a new employee of Plaintiff Dowtech with over sixty years of experience in the construction industry, brought to light newly discovered evidence clearly indicating an engineering conspiracy aimed at covering up the negligence of Defendant Nacogdoches' engineers. Indeed, Defendant Nacogdoches' engineers Mark Mann, P.E. (hereinafter "Mann"), and Ricky Bourque, P.E. (hereinafter "Bourque"), of SPI exercised great effort and authority to wrongfully blame Plaintiff Dowtech in an attempt to cover their own negligence and gross negligence. Furthermore, Click discovered that Defendant Nacogdoches' engineers were not familiar with a product they specified by brand name (*i.e.*, the four, 25 hp Aeromix aerators) and Defendant Nacogdoches' engineers did not even perform any type of engineering or technical due diligence on this product. Indeed, Click's written report explains in detail Defendant Nacogdoches' engineers' negligent actions. Furthermore, Click discovered that Plaintiff Dowtech had unknowingly been the victim of the on-going engineering conspiracy. Bob Click's *Construction and Investigation Report* is attached as Exhibit #1.

8.     Click discovered in his investigation that the contract documents had the Aeromix 25 hp aerators swing arms mounted to the bridge in a "pushing" position (original position).

This was the position that the Aeromix 25 hp aerators operated on August 5, 2010 and was accepted by Defendant Nacogdoches as substantially complete and the warranty signed. On or about August 20, 2010 one of the 25 hp aerator's swing arms started "flexing" and "broke / disconnected." Defendant Nacogdoches' engineers, in communication with Aeromix on or about August 30, 2010, discovered that the Aeromix 25 hp aerator swing arms must "pull." This is clear evidence that Defendant Nacogdoches had specified the Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

9.      Defendant Nacogdoches' engineers, in an effort to hide their negligent conduct, issued its proposed modification to Plaintiff Dowtech on September 2, 2010 and requested pricing. On September 16, 2010, Plaintiff Dowtech submitted its pricing for the modification in the amount of $41,746.00 to Defendant Nacogdoches' engineers. The proposed modification would relocate the Aeromix 25 hp aerators into a position of "pulling" on a stainless steel cable stretched approximately forty-seven feet between two steel posts.

10.     Defendant Nacogdoches' engineers ordered the modification work to proceed on October 11, 2010 in writing. Plaintiff Dowtech completed all work on the modification on December 17, 2010, in strict accordance with Defendant Nacogdoches' engineers' drawings and instructions. The four Aeromix 25 hp aerators never operated successfully in this position from December 17, 2010 through December 2011. Plaintiff Dowtech was never paid for the modification and subsequent work ordered by Defendant Nacogdoches.

11.     Furthermore, in January 2014, Click, through his investigation, discovered that the usage of a stainless steel cable stretched approximately forty-seven feet between two steel posts, which was the design mandated by Defendant Nacogdoches' engineers, does not

constitute the "substantial structure" that is required for an Aeromix 25 hp aerator to pull and operate properly; most certainly not without the usage of soft starters (hereinafter "soft starts") and proper mooring (anchoring) of the aerators. Indeed, Doug Reeves (hereinafter "Reeves"), the Construction & Service Manager at Aeromix, stated the following on January 14, 2014: "A Mooring line stretched across the ditch is not an adequate way to secure the unit." See Exhibit #2.

12. The Vice President of Engineering & Operations at Aeromix, Bob Mangaudis, confirmed that a 25 hp aerator must pull on a "substantial structure" and did not know of a single location in the United States in which a 25 hp aerator was operating on a cable, as Defendant Nacogdoches' engineers mandated. See Exhibit #1.

13. Click also discovered that Aeromix recommends the use of soft starts or Variable Frequency Drives (herinafter "VFDs") on aeration units of 20 hp or greater, as is clearly indicated on page 6 of the Aeromix Installation, Operation, and Maintenance Manual. He also discovered that mooring (anchoring) of the 25 hp aerator is required, as per page 4 of the Aeromix Manual. Even though Defendant Nacogdoches' engineers were using 25 hp Aeromix aerators, which they specified by brand name, they failed to utilize soft starts and they failed to use mooring (anchoring). Defendant Nacogdoches' engineers have never referenced soft starts in their drawings and specifications. Indeed, Defendant Nacogdoches' City Engineer Steve Bartlett, P.E., (hereinafter "Bartlett") confirms the rejection of the soft starts. See Exhibit #3 and #4.

14. The use of soft starts by Defendant Nacogdoches' engineers could have avoided some, if not all, of the problems with the 25 hp Aeromix aerators. Indeed, in a phone

conversation in 2014 with Click, Reeves of Aeromix confirmed that problems associated with the Aeromix aerators could have been avoided had Defendant Nacogdoches' engineers simply utilized soft starts, as Aeromix clearly recommends. See Exhibit #1.

15.     Mooring (anchoring) of the 25 hp Aeromix aerators could have also avoided many of the problems associated with the Aeromix aerators and is recommended by the Aeromix Installation, Operation, and Maintenance Manual. In fact, Defendant Nacogdoches' engineers' contract specifications, page 780 – 3 of 3, states the following: "O. Anchoring System: Anchoring system shall hold the aerator firmly in position. The type of anchoring system to be used is determined by the placement of the aerator(s) as indicated on the ENGINEER'S Plans . . . The anchoring system shall not restrict the unit's floatation and shall allow for continuous aerator operation with fluctuations in the water surface elevation up to (plus / minus) three feet (± 3ft)." Why Defendant Nacogdoches' engineers refused to permit the Aeromix 25 hp aerators to be anchored / moored is unknown to Plaintiff Dowtech. The only explanation given to Plaintiff Dowtech for the failure of Defendant Nacogdoches' engineers to use proper anchoring is that "it would not permit the aerator to settle to the floor level when the water is drained." This statement illustrates that Defendant Nacogdoches' engineers do not understand the product they specified by brand name. Defendant Nacogdoches' engineers specified Aeromix aerators by brand name or ECS House Industries (hereinafter "House") aerators by brand name and, in November 2014, Plaintiff Dowtech discovered that even the House 25 hp aerators require an anchoring system that "shall hold the aerator firmly in position." The House 25 hp aerators require that "[t]he anchoring system shall not restrict the unit's floatation and shall allow for continuous aerator operation with fluctuations in the water surface elevation up to (plus / minus) three feet (± 3ft)." Clearly, the House aerator, similar to the Aeromix aerator, will not settle to

the floor level when the water is drained. In January 2015, Plaintiff Dowtech also discovered that House recommends soft starts with aerators over 15 hp. This indicates that Defendant Nacogdoches' engineers specified Aeromix aerators or House aerators by brand name without performing or conducting any type of engineering or technical due diligence. This also shows Defendant Nacogdoches' engineers were negligent for not permitting the Aeromix 25 hp aerators to be anchored. See Exhibit #3, #5, and #6.

16.  Even Defendant Nacogdoches' City Engineer admitted to gross negligence on March 19, 2014, in response to Plaintiff Dowtech's January 31, 2014 letter. See Exhibit #4.

17.  <u>Simply put, the Aeromix 25 hp aerators were not defective, as alleged by Defendant Nacogdoches in its pleadings, and the problems experienced were the sole result of Defendant Nacogdoches' negligent engineers who misused and abused the Aeromix aerators by (1) failing to have the aerator pull on a substantial structure, (2) failing to utilize soft starts or VFD's, and (3) failing to utilize mooring (anchoring) of the aerator.</u>

18.  Plaintiff Dowtech, as the general contractor, strictly followed the contract documents and instructions of Defendant Nacogdoches' engineers, who were solely responsible for the design plan, on this project. Plaintiff Dowtech did everything the engineers told it to do with speed, precision, and accuracy.

19.  Defendant Nacogdoches' engineers, looking for a scapegoat, unjustly blamed Plaintiff Dowtech for the problems arising out of their negligent design. Defendant Nacogdoches, based on the recommendations of their negligent engineers, then refused to pay Dowtech the remaining amount of money owed to it under the contract.

20.     In January 2012, Defendant Nacogdoches' engineers Mann and Bourque sent a SPI letter to Defendant Nacogdoches City Engineer Bartlett recommending that the alleged defective aerators be removed and replaced. Defendant Nacogdoches' City Attorney sent its demand letter on January 30, 2012 to Plaintiff Dowtech, demanding that the alleged defective aerators be removed and replaced, in an attempt to cover-up Defendant Nacogdoches' engineers' negligent conduct, at the expense of Plaintiff Dowtech at an estimated cost of $175,000. Clearly, this constitutes a breach of contract and an unconscionable act by Defendant Nacogdoches.

21.     In December 2012, after making every effort to resolve this matter amicably, Plaintiff Dowtech filed suit for breach of contract to collect the money owed.

22.     In July 2013, Plaintiff Dowtech, Defendant Nacogdoches, and Aeromix (who was a Defendant in this case at the time) entered into a Rule 11 Agreement. See Exhibit #7.

23.     The July 2, 2013 Rule 11 Agreement represents the entire agreement between the parties and has never been amended or supplemented. In May 2014, Defendant Nacogdoches attempted to amend the Rule 11 Agreement, in an effort to cover up the engineering negligence, but Plaintiff Dowtech rejected the proposed amendment and never agreed to the terms of it.

24.     Plaintiff Dowtech received no consideration whatsoever for entering into the Rule 11 Agreement. Furthermore, Plaintiff's attorney at the time was negligent for even entering into the Rule 11 Agreement.

25.     Defendant Nacogdoches materially breached the Rule 11 Agreement and for other reasons, which will be elaborated upon herein, the Rule 11 Agreement between the parties is null, void, unenforceable, and invalid as a matter of law.

26.     Because the Rule 11 Agreement was materially breached, Plaintiff Dowtech desires to rescind the Rule 11 Agreement so it can proceed toward a public trial on the merits of this case.

27.     Because the Rule 11 Agreement is ambiguous, unconscionable, and the product of a mistake and / or fraud, Plaintiff Dowtech desires the Rule 11 Agreement be set aside in the interest of fairness and justice.

28.     It is in the interest of fairness and justice that the Rule 11 Agreement be rescinded so the parties may proceed to trial. Because Defendant Nacogdoches materially breached the Rule 11 Agreement, Plaintiff Dowtech seeks to set aside the Rule 11 Agreement in the interest of fairness and justice, so the parties may proceed to a trial on the merits.

29.     Importantly, on July 2, 2013, Plaintiff Dowtech entered into the Rule 11 Agreement with Defendant Nacogdoches and Aeromix, which was never amended. See Exhibit #7.

30.     The July 2, 2013 Rule 11 Agreement, taken as a whole, constitutes the entire agreement of the parties pertaining to this matter. See Exhibit #7.

31.     The terms of the Rule 11 Agreement clearly and unequivocally mandate the aerators be "re-installed" by Plaintiff Dowtech. The term "re-installed" means the aerators must be placed back into the position from which they were removed. Specifically, section 9 of the July 2, 2013 Rule 11 Agreement states that "[u]pon returning the repaired aerators to the City's facility, Dowtech will re-install . . . the aerators" (i.e., place the aerators back into the position from which they were removed). See Exhibit #7.

32.    "Re-install" means one puts the aerators in the same place he took it out.

33.    In January 2014, after having returned the repaired aerators to Nacogdoches, Plaintiff Dowtech discovered that Defendant Nacogdoches had flagrantly materially breached the Rule 11 Agreement by requesting that Aeromix redesign / repair the four, 25 hp aerators to be mounted to the original bridge mount position, not re-installed into the position from which removed under the Rule 11 Agreement. Plaintiff Dowtech also discovered that Aeromix had complied with Defendant Nacogdoches' request. Plaintiff Dowtech promptly notified Defendant Nacogdoches of this discovery on January 31, 2014   See Exhibit #8; with no response from Defendant Nacogdoches again on March 18, 2014 see Exhibit #9.

34.    In violation of the Rule 11 Agreement, Defendant Nacogdoches ordered Aeromix to design / repair the aerators to be installed in the original bridge mount position. See Exhibit #2, #8, #9, and #10.

35.    Installation in the original bridge mount position clearly violates the terms of the Rule 11 Agreement. See Exhibit #7.

36.    Furthermore, Defendant Nacogdoches attempted to deceive Plaintiff Dowtech by not informing it that a flagrant material breach of the Rule 11 Agreement (requiring the aerators to be installed in the original bridge mount position) had taken place. Indeed, Defendant Nacogdoches acted dishonestly by attempting to conceal this important fact that violated the Rule 11 Agreement from Plaintiff Dowtech, as Plaintiff Dowtech only discovered Defendant Nacogdoches was materially breaching the Rule 11 agreement through communications with Aeromix, the manufacturer, as a result of its investigation. See Exhibit #2, #8, #9, and #10.

37.     Plaintiff Dowtech would not have entered into the Rule 11 Agreement if it required the aerators to be installed in their original bridge mount position. See Exhibit #7.

38.     Installing the aerators in the original bridge mount position would cost Plaintiff Dowtech substantially more money and manpower than re-installing them in the position from which they were removed.

39.     The terms of the Rule 11 Agreement also mandate that Aeromix, a former Defendant in this lawsuit, pay Plaintiff Dowtech $1,000.00 when Plaintiff Dowtech picks up the repaired aerators at its facility in Minnesota. Specifically, section 7 of the July 2, 2013 Rule 11 Agreement states "[u]pon Dowtech picking up the repaired aerators at Aeromix's facility, Aeromix will pay Dowtech $1,000.00 toward the cost of transporting the aerators to and from Aeromix's facility." See Exhibit #7.

40.     It is important to understand that Plaintiff Dowtech was required to utilize substantial resources and incur expense in the process of shipping the aerators, weighing approximately 5,000 pounds each, to Minnesota for repairs and then shipping them back to Nacogdoches. Plaintiff Dowtech drove to Nacogdoches and loaded the aerators on a truck with a crane to be shipped over 1,000 miles to Aeromix's facility in Minnesota. After the repairs were made, Plaintiff Dowtech paid for the four aerators to be shipped back to Nacogdoches. Plaintiff Dowtech then unloaded the four aerators in Nacogdoches, placing them on the ground where they presently sit. The total cost of shipping was approximately $14,000.

41.     Plaintiff Dowtech picked up the aerators January 10, 2014, but did not receive the Aeromix $1,000.00 payment until after April 2, 2014. See Exhibit #11 and #12.

42.     In violation of the Rule 11 Agreement, Defendant Aeromix was more than 90 days late in paying Plaintiff Dowtech.  See Exhibit #12.

43.     Plaintiff Dowtech was required to undertake collection efforts to obtain the payment.  See Exhibit #12.

44.     Plaintiff Dowtech would not have entered into the Rule 11 Agreement if it had known that Aeromix would substantially delay payment.  See Exhibit #7.

45.     Aeromix also flagrantly materially breached the Rule 11 Agreement by complying with Defendant Nacogdoches' request that the aerators be redesigned / repaired for installation in the original bridge mount position rather than the position from which they were removed, as required under the Rule 11 Agreement.

46.     Plaintiff Dowtech would not have entered into the Rule 11 Agreement if it had known that Aeromix would comply with Defendant Nacogdoches' request that the aerators be redesigned / repaired for installation in the original bridge mount position, breaching the Rule 11 Agreement.  See Exhibit #7.

47.     There is no dispute that the construction contract states that the engineers are responsible for the design, not the general contractor.  *See* Standard General Conditions of the Construction Contract paragraph 6.21, Delegation of Professional Design Services: "E. Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents."  Thus, it is clear that under the terms of the construction contract Plaintiff Dowtech is not liable for the negligence of the engineers.  See Exhibit #1

48. Plaintiff Dowtech did exactly what Defendant Nacogdoches' engineers instructed it to do. See Exhibit #1.

49. Plaintiff Dowtech's responsibility for the aerators ended on August 5, 2010, when the four aerators were installed precisely as the contract required, accepted by Defendant Nacogdoches as substantially complete, and the Aeromix warranty was signed. See Exhibit #13.

50. Defendant Nacogdoches' engineers took advantage of Plaintiff Dowtech's excellent reputation with "threats" (1) to withhold liquidated damages of $500 per calendar day and (2) to verbally call the bonding company, demanding and forcing Plaintiff Dowtech to perform additional work after August 5, 2010 related to the aerators, thereby materially breaching the construction contract and increasing the costs. See Exhibit #1.

51. Furthermore, Defendant Nacogdoches' engineers withheld contract payments in ransom, demanding and forcing Plaintiff Dowtech to perform additional work after August 5, 2010 related to the aerators, thereby materially breaching the contact and increasing the costs. See Exhibit #1.

52. Plaintiff Dowtech was forced to make numerous trips to Nacogdoches relating to the aerators after August 5, 2010 and, as a result, suffered significant financial loss. See Exhibit #1.

53. Plaintiff Dowtech should not suffer financial loss and damage to its reputation because of Defendant Nacogdoches' negligent engineers.

54. Plaintiff Dowtech never at any time breached the original construction contract as alleged by Defendant Nacogdoches in its pleadings.

55. Plaintiff Dowtech never at any time breached the Rule 11 Agreement as alleged by Defendant Nacogdoches in its pleadings.

56. Defendant Nacogdoches with unclean hands is prohibited from using the provisions of the contract to try and avoid payments to Plaintiff Dowtech for the additional work and the increased costs. "[W]hen one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *X Technologies, Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 413 (5th Cir. 2013)(citing *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)).

57. For the foregoing reasons, Plaintiff Dowtech filed a Notice Of Revocation Of Consent To Rule 11 Agreement. See Exhibit #14.

58. Again, in January 2014, after having returned the repaired aerators to Nacogdoches, Plaintiff Dowtech discovered that Defendant Nacogdoches had flagrantly materially breached the Rule 11 Agreement by requesting that Aeromix redesign / repair the four, 25 hp aerators to be mounted to the original bridge mount position, not re-installed into the position from which removed as required under the Rule 11 Agreement. Plaintiff Dowtech also discovered that Aeromix had complied with Defendant Nacogdoches' request. Plaintiff Dowtech promptly notified Defendant Nacogdoches of this discovery on January 31, 2014. See Exhibit #8; with no response from Defendant Nacogdoches again on March 18, 2014 see Exhibit #9.

59. To be clear, the original position shown on the construction contract drawing was with the aerators mounted to the bridge. This was not the position from which the Aeromix aerators had been removed and shipped to Aeromix for repairs under the Rule 11 Agreement.

60.    Defendant Nacogdoches claims in its latest pleading that Plaintiff Dowtech was without "just cause" in the revoking of the Rule 11 Agreement, after Defendant Nacogdoches agreed to pay the contract balance whether or not the aerators operated for a continuous period of 90 days.

61.    Defendant Nacogdoches' flagrant material breach of the Rule 11 Agreement was in fact "just cause" for Plaintiff Dowtech's revoking of the agreement. *See X Technologies, Inc. v. Marvin Test Sys., Inc., supra,* ("[W]hen one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform.").

## III. ADDITIONAL CAUSES OF ACTION

### BREACH OF CONTRACT

62.    In Texas, Rule 11 agreements are treated as contracts with contract law governing. *See Trudy's Texas Star, Inc. v. City of Austin*, 307 S.W.3d 894, 914 (Tex.app. – Austin 2010, no. pet.).

63.    Plaintiff Dowtech and Defendant Nacogdoches entered into a valid, enforceable contract (hereinafter also referred to as the "Rule 11 Agreement" or the "agreement"). Plaintiff Dowtech and Defendant Nacogdoches bargained for an agreement which would include Plaintiff Dowtech's re-installing the aerators (*i.e.*, placing them in the position from which they were removed) in exchange for receiving $75,355.45 owed to it by Defendant Nacogdoches. Plaintiff performed under the terms of the contract (agreement) by shipping the aerators from Texas to Aeromix in Minnesota and then shipping the repaired aerators from Aeromix to Texas and by preparing to re-install the aerators (i.e., place the aerators in the position from which they were removed as per the terms of the contract / agreement). Plaintiff Dowtech discovered in January

2014 that Defendant Nacogdoches materially breached the contract (agreement) by ordering Aeromix to design / repair the aerators to be installed in the <u>original bridge mount position</u> and otherwise making arrangements to ensure that the aerators be installed in the original bridge mount position. Plaintiff Dowtech has been damaged as a result of Defendant Nacogdoches' material breach of contract (agreement) and seeks all available damages in law and equity, including rescission.

## BREACH OF CONTRACT – RESCISSION SOUGHT (BASED ON MATERIAL BREACH)

64.   Texas law permits a party to rescind a contract based upon a material breach. *See Atkins v. Beasley*, 544 S.W.2d 505, 507 (Tex.App.-Waco 1976, no writ); *Kaiser v. Northwest Shopping Center, Inc.*, 587 SW2d 454, 457 (Tex.App-Dallas 1976, writ ref'd n.r.e); *Smallwood v. Singer*, 823 S.W.2d 319, 321 (Tex.App-Texarkana 1991, no writ).

65.   Rescission voids the contract and returns the parties to their earlier positions as though no contract existed. *See Hunt Cty. Oil Co. v. Scott*, 67 S.W.451, 452 (Tex.App-Austin 1902, writ ref'd); *City of the Colony v. North Tex. Nun. Water Dist.*, 272 S.W.3d 699, 732 (Tex.App-Fort Worth 2008, pet. dism'd).

66.   Plaintiff Dowtech and Defendant Nacogdoches entered into a valid, enforceable contract (the Rule 11 Agreement). Plaintiff Dowtech and Defendant Nacogdoches bargained for an agreement which would include Plaintiff Dowtech's <u>re-installing</u> the aerators (*i.e.*, placing them in the position from which they were removed) in exchange for receiving $75,355.45 owed to it by Defendant Nacogdoches. Plaintiff performed under the terms of the contract by shipping the aerators from Texas to Aeromix in Minnesota and then shipping the repaired aerators from

Aeromix to Texas and by preparing to re-install the aerators (i.e., place the aerators in the position from which they were removed as per the terms of the contract / agreement). Defendant Nacogdoches materially breached the contract (agreement) by ordering Aeromix to design / repair the aerators to be installed in the original bridge mount position and otherwise making arrangements to ensure that the aerators be installed in the original bridge mount position. Plaintiff Dowtech has been damaged as a result of Defendant Nacogdoches' material breach of contract (agreement) and seeks rescission.

67.    There is no adequate remedy at law for damages sustained by Plaintiff Dowtech. Rescission is the only remedy that will allow Plaintiff Dowtech to seek justice for damages through a public trial.

68.    Plaintiff Dowtech is not in breach of the contract. Plaintiff Dowtech took a substantial step toward installing the aerators in the position from which they were removed. It was Defendant Nacogdoches who breached the contract (agreement) by design / repair of the aerators to be installed in the original bridge mount position.

69.    Defendant Nacogdoches' breach constitutes a material breach because requiring Plaintiff Dowtech to install the aerators in their original position would cause it to expend substantially more money and manpower; moreover, Plaintiff Dowtech would never have agreed to install the aerators in their original position in exchange for the $75,355.45. Indeed, the terms of the Rule 11 Agreement clearly and unequivocally mandate the aerators be re-installed, meaning placed in the position from which they were removed. Specifically, section 9 of the July 2, 2013 Rule 11 Agreement states that "[u]pon returning the repaired aerators to the City's facility, Dowtech will re-install . . . the aerators" (i.e., place the aerators back into the position

from which they were removed). See Exhibit #7. In a glaring violation of the Rule 11 Agreement, Defendant Nacogdoches made arrangements to install the aerators in their original bridge mount position, instead of being re-installed in the position from which they were removed. Plaintiff Dowtech agreed to re-install the aerators (*i.e.*, place them in the position from which they were removed) and would have never agreed to install them in their original bridge mount position because such installation would cost Plaintiff Dowtech substantially more money and manpower. Precisely for this reason, the Rule 11 Agreement specified that Plaintiff Dowtech would re-install the aerators (place them in the position from which they were removed) and excluded installation in their original bridge mount position.

70.     Plaintiff Dowtech did not receive any benefits of the contract (agreement) and / or has refused the benefits of the contract (agreement) after learning of the grounds for rescission. Indeed, Plaintiff Dowtech has never received the $75,355.45 payment under the contract (agreement) nor has Plaintiff Dowtech benefited from the contract (agreement) in any way.

71.     Plaintiff Dowtech does not have any consideration in its possession to return to Defendant Nacogdoches, as Defendant Nacogdoches never paid Plaintiff Dowtech $75,355.45 and the aerators are currently in Defendant Nacogdoches' possession.

72.     Plaintiff Dowtech has clean hands in this transaction. Indeed, Plaintiff Dowtech's actions exceed what was required of it. For example, Plaintiff Dowtech shipped the aerators to and from Minnesota (incurring expense, as transporting large equipment down the road is a major task), even though Plaintiff Dowtech was not promptly paid by Aeromix, in violation of the contract (agreement), and has otherwise made every effort to work with Defendant

Nacogdoches to fulfill the agreement. It was Defendant Nacogdoches who flagrantly materially breached this contract (agreement).

## BREACH OF CONTRACT – RESCISSION SOUGHT (BASED ON MUTUAL MISTAKE)

73. Texas law permits a party to rescind a contract based upon a mutual mistake. *See Martin v. Cadle Co*, 133 S.W.3d 897, 903 (Tex.App.-Dallas 2004, pet. denied); *Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 751 (Tex.2009); *City of the Colony v. North Tex. Nun. Water Dist.*, 272 S.W.3d 699, 732 (Tex.App-Fort Worth 2008, pet. dism'd).

74. Rescission voids the contract and returns the parties to their earlier positions as though no contract existed. *See Hunt Cty. Oil Co. v. Scott*, 67 S.W.451, 452 (Tex.App-Austin 1902, writ ref'd); *City of the Colony v. North Tex. Nun. Water Dist.*, 272 S.W.3d 699, 732 (Tex.App-Fort Worth 2008, pet. dism'd).

75. Plaintiff Dowtech and Defendant Nacogdoches entered into a contract (the Rule 11 Agreement). Plaintiff Dowtech and Defendant Nacogdoches bargained for an agreement. Plaintiff Dowtech believed the term "re-install" in the agreement to mean Plaintiff Dowtech would place the aerators in the position from which they were removed in exchange for receiving $75,355.45 owed to it by Defendant Nacogdoches. On the other hand, Defendant Nacogdoches believed the term "re-install" in the agreement to mean Plaintiff Dowtech would place the aerators in the original bridge mount position in exchange for receiving $75,355.45 owed to it by Defendant Nacogdoches. Both parties had a misconception of this material fact. The evidence indicates that both parties were acting under the same misunderstanding of the same material fact (i.e., the position in which the aerators would be placed).

76.     There is no adequate remedy at law for damages sustained by Plaintiff Dowtech. Rescission is the only remedy that will allow Plaintiff Dowtech to seek justice for damages through a public trial.

77.     Plaintiff Dowtech is not in breach of the contract (agreement). Plaintiff Dowtech took a substantial step toward installing the aerators in the position from which they were removed. It was Defendant Nacogdoches who materially breached the contract (agreement) by requiring the aerators to be installed in the original bridge mount position.

78.     Plaintiff Dowtech did not receive any benefits of the contract (agreement) and has refused the benefits of the contract (agreement) after learning of the grounds for rescission. Indeed, Plaintiff Dowtech has never received the $75,355.45 payment under the contract nor has Plaintiff Dowtech benefited from the contract (agreement) in any way.

79.     Plaintiff Dowtech does not have any consideration in its possession to return to Defendant Nacogdoches, as Defendant Nacogdoches never paid Plaintiff Dowtech $75,355.45 and the aerators are currently in Defendant Nacogdoches' possession.

80.     Plaintiff Dowtech has clean hands in this transaction. Indeed, Plaintiff Dowtech's actions exceed what was required of it. For example, Plaintiff Dowtech loaded the aerators on a truck and shipped them to Aeromix in Minnesota for repairs. Upon notification by Aeromix that the repairs were complete, Plaintiff Dowtech transported the aerators to Nacagdoches and unloaded them, even though Plaintiff Dowtech was not promptly paid by Aeromix, in violation of the contract (agreement), and has otherwise made every effort to work with Defendant Nacogdoches to fulfill the agreement. It was Defendant Nacogdoches who flagrantly materially breached this contract (agreement).

## BREACH OF CONTRACT – RESCISSION SOUGHT (BASED ON FRAUD)

81.     Texas law permits a party to rescind a contract based upon fraud. *See Martin v. Cadle Co*, 133 S.W.3d 897, 903 (Tex.App.-Dallas 2004, pet. denied);*Bank One v. Stewart, 967 S.W.2d 419* (Tex.App.-Houston [14th Dist.] 1998, pet. denied);; *City of the Colony v. North Tex. Nun. Water Dist.*, 272 S.W.3d 699, 732 (Tex.App-Fort Worth 2008, pet. dism'd).

82.     Rescission voids the contract and returns the parties to their earlier positions as though no contract existed. *See Hunt Cty. Oil Co. v. Scott*, 67 S.W.451, 452 (Tex.App-Austin 1902, writ ref'd); *City of the Colony v. North Tex. Nun. Water Dist.*, 272 S.W.3d 699, 732 (Tex.App-Fort Worth 2008, pet. dism'd).

83.     Plaintiff Dowtech and Defendant Nacogdoches entered into a contract (the Rule 11 Agreement). Plaintiff Dowtech and Defendant Nacogdoches bargained for an agreement which would include Plaintiff Dowtech re-installing the aerators in the position from which they were removed in exchange for receiving $75,355.45 owed to it by Defendant Nacogdoches. Defendant Nacogdoches falsely stated that Plaintiff Dowtech could re-install the aerators in the position from which they were removed in exchange for the $75,355.45 to induce it to sign the contract (agreement), knowing that Plaintiff Dowtech would never agree to install the aerators in the original bridge mount position. Defendant Nacogdoches then secretly ordered Aeromix to design / repair the aerators to be installed in the original bridge mount position, without notifying Plaintiff Dowtech, and making arrangements to ensure that the aerators be installed in the original bridge mount position. This was done to trick Plaintiff Dowtech into installing the aerators in the original bridge mount position. Consequently, the contract (agreement) is marred by fraud and must be set aside.

84. There is no adequate remedy at law for damages sustained by Plaintiff Dowtech. Rescission is the only remedy that will allow Plaintiff Dowtech to seek justice for damages through a public trial.

85. Plaintiff Dowtech is not in breach of the contract (agreement). Plaintiff Dowtech took a substantial step toward installing the aerators in the position from which they were removed. It was Defendant Nacogdoches who breached the contract (agreement) by requiring the aerators to be installed in the original bridge mount position.

86. Plaintiff Dowtech did not receive any benefits of the contract (agreement) and has refused the benefits of the contract after learning of the grounds for rescission. Indeed, Plaintiff Dowtech has never received the $75,355.45 payment under the contract (agreement) nor has Plaintiff Dowtech benefited from the contract (agreement) in any way.

87. Plaintiff Dowtech does not have any consideration in its possession to return to Defendant Nacogdoches, as Defendant Nacogdoches never paid Plaintiff Dowtech $75,355.45 and the aerators are currently in Defendant Nacogdoches' possession.

88. Plaintiff Dowtech has clean hands in this transaction. Indeed, Plaintiff Dowtech's actions exceed what was required of it. For example, Plaintiff Dowtech shipped the aerators to and from Minnesota (incurring expense, as transporting large equipment down the road is a major task), even though Plaintiff Dowtech was not promptly paid by Aeromix, in violation of the contract (agreement), and has made every effort to work with Defendant Nacogdoches to fulfill the agreement. It was Defendant Nacogdoches who flagrantly materially breached this contract (agreement).

## AMBIGUITY

89. Texas law recognizes that contracts may be ambiguous. When a contract is determined to be ambiguous, the intended meaning of the language becomes a fact issue for the trier of fact. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. Of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 224 S.W.3d 369, 379 (Tex.App-Houston [1st Dist.] 2006, not pet.).

90. In the alternative, Plaintiff Dowtech and Defendant Nacogdoches entered into a contract (the Rule 11 Agreement) which is ambiguous because it is susceptible to more than one interpretation.

91. The contract used the term "re-install," a term that is susceptible to more than one meaning or interpretation, to describe the placement of the aerators. "Re-install" could mean the aerator must be placed in the "position from which it was last removed," but it could also mean the aerator must be placed in the "original bridge mount position." More specificity than the term "re-install" is needed to describe in detail where the aerators should be placed. The term is not defined and is subject to multiple interpretations (i.e., ambiguous).

92. The contract used the term "re-install" or "re-installation" in an attempt to specify if the aerators should be placed in the "original bridge mount position" or in the "position from which it was last removed." Since this is an engineering contract, more specificity is needed to describe in detail precise placement of the aerators. The term is not defined and are subject to multiple interpretations (i.e., ambiguous).

93.     Since the contract (agreement) between Plaintiff Dowtech and Defendant Nacogdoches is ambiguous, it is up to the trier of fact to determine its meaning. Therefore, it should not be used as a basis to prevent Plaintiff Dowtech from going to trial.

## UNCONSCIONABILITY

94.     Texas law recognizes the doctrine of unconscionability. *See Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys.*, 997 S.W.2d 803, 815 (Tex.App.-Dallas 1999, no pet.); *Besteman v. Pitcook*, 272 S.W.3d 777, 788 (Tex.App-Texarkana 2008, no pet.). This issue of unconscionability is determined by the trier of fact. *Id.*

95.     Plaintiff Dowtech entered into a contract (agreement) which is unconscionable because it requires Plaintiff Dowtech to undertake an action (i.e., re-installing the aerators in the position from which they were last removed) that is doomed for failure and has repeatedly failed in the past.

96.     Albert Einstein, in a famous quote, once said that "[t]he definition of insanity is doing the same thing over and over again and expecting a different result."

97.     Enforcing the contract (agreement) which demands that Plaintiff Dowtech re-install the aerators in the position from which they were removed is not only unconscionable, but also insane, because this has been attempted several times and failed. This is particularly true because Defendant Nacogdoches refused to utilize soft-starters, even though they are recommended by the manufacturer. On the other hand, requiring Plaintiff Dowtech to install the aerators in the original bridge mount position is unjust because the terms of the contract (agreement) clearly state the aerators are to be re-installed in the position from which they were removed.

98. Specifically, the Aeromix 25 hp aerators have never worked in the position from which removed. Using a stainless steel cable stretched approximately forty-seven feet between two steel posts, which was the design mandated by Defendant Nacogdoches' engineers, does not constitute the "substantial structure" that is required for an Aeromix 25 hp aerator to pull and operate properly. Reeves, the Construction & Service Manager at Aeromix, stated the following on January 14, 2014: "A Mooring line stretched across the ditch is not an adequate way to secure the unit." Mooring (anchoring) of the 25 hp aerator is required. Since Defendant Nacogdoches' engineers refuse to use soft starts and refuse to properly anchor the units, the aerators will not work if re-installed in the position from which removed. It is unconscionable to force Plaintiff Dowtech to implement a re-installation exercise that is guaranteed to fail.

99. The contract (agreement) is unconscionable because Defendant Nacogdoches ordered that Aeromix design / repair the aerators for installation in the original bridge mount position and Aeromix complied with this request. It is, therefore, unconscionable to mandate that Plaintiff Dowtech attempt to re-install the aerators in the position from which they were removed when the aerators have now been designed / repaired for installation in the original bridge mount position.

100. The contract (agreement) is unconscionable because it requires that Plaintiff Dowtech spend $15,000 to $20,000 of its own working capital to re-install four aerators in a position for which the aerators were not designed / repaired, for installation into a position in which the aerators have never functioned successfully. This amounts to requiring Plaintiff Dowtech to spend $15,000 to $20,000 of its own working capital to aid Defendant Nacogdoches' engineers in their efforts to cover up their own negligence and continue to perpetrate a fraud on Plaintiff Dowtech and the Citizens of Nacogdoches, Texas.

101.    The contract is also unconscionable because, taken as a whole, it is very one-sided in favor of Defendant Nacogdoches. Indeed, Plaintiff Dowtech receives nothing of value from this contract but is forced to utilize its resources and manpower to undertake a major task and receives nothing in exchange for it. The agreement for Plaintiff Dowtech to receive $75,355.45 (which it never received) under the contract (agreement) cannot be construed as a benefit to Plaintiff Dowtech because it is entitled to this amount under the original construction contract for the work it has already performed and is in no way required to engage in further labor on this project at its own expense. This contract (agreement) is grossly unfair because it is, in essence, taking advantage of Plaintiff Dowtech by requiring it to undertake a major project in exchange for the amount that is already owed to it. In a word, this unconscionable contract requires Plaintiff Dowtech to work for free.

102.    The contract (agreement) is also unconscionable because it is grossly unfair to Plaintiff Dowtech because, after requiring additional work from Plaintiff Dowtech, it resolves this matter for $75,355.45. This is unjust because it is a mere fraction of the amount of damages Plaintiff Dowtech is seeking. In a word, this contract (agreement) requires Plaintiff Dowtech to do extra work and then settle the case for nuisance value or "for peanuts." Plaintiff Dowtech suffered significant damages far in excess of $75,355.45 as a result of Defendant Nacogdoches' outrageous conduct and numerous material breaches of the contract. It is a great injustice to settle this matter for a mere $75,355.45.

103.    Since the contract (agreement) is unconscionable, Defendant Nacogdoches must not be allowed to assert it to avoid a trial on the merits of this case.

## INEFFECTIVE ASSISTANCE OF COUNSEL

104. Plaintiff Dowtech was formerly represented by Attorney Charles Self. Ineffective assistance of counsel is arguably an equitable factor that, when considered in light of the other unjust elements of the contract, favors a finding the contract (Rule 11 Agreement) is invalid. Charles Self's performance as an attorney regarding this case was deficient and his deficient performance prejudiced the case.

105. Charles Self recommended resolving this matter for $75,355.45, which had already been earned by Plaintiff Dowtech, and is way too small a settlement for this case. In the event this case were to settle for such an extremely low amount, Self should never have recommended Plaintiff Dowtech sign an agreement that required even more work by Plaintiff Dowtech. Looking at the contract and looking at this case, *res ipsa loquitur*: the thing speaks for itself. An effective attorney would NOT settle this case so unfavorably to his client, Plaintiff Dowtech. No effective attorney would allow his client to pay an estimated $30,000 to receive $75,000. No effective attorney would enter into an agreement for his client to receive $75,000 at a later date without interest on the money. Additionally, there is circumstantial evidence that supports Self's being an ineffective attorney. For example, Self allowed the opposing attorney to draft the contract (agreement) but did not make one change to it.

106. After having reviewed the Aeromix warranty for Plaintiff Dowtech, Self was apparently not aware of the forum selection clause in the warranty which required litigation against Aeromix to take place in Minnesota. Self filed suit against Aeromix in Nacogdoches only to be surprised and broadsided by the forum selection clause in the warranty.

107. Plaintiff Dowtech is now faced with being the victim of an agreement that is unfair and unjust to it because Plaintiff Dowtech was not effectively represented by an attorney who understood this complex case. It is in the interest of justice that Plaintiff Dowtech not have to suffer because Plaintiff Dowtech was represented by an ineffective attorney.

## DECLARATORY RELIEF

108. An actual controversy has arisen and now exists between Plaintiff Dowtech and Defendant Nacogdoches regarding the respective rights and duties, in that Plaintiff contends that Defendant Nacogdoches does not have a valid, enforceable Rule 11 Agreement (contract) because Defendant Nacogdoches has materially breached the Rule 11 Agreement, thereby rendering it void by operation of law based on Texas contract law. Additionally, Plaintiff Dowtech contends that the contract is not enforceable because it is marred with fraud and / or is the product of a mutual mistake. Furthermore, Plaintiff Dowtech contends the contract cannot be enforced because it is ambiguous and unconscionable. Therefore, the purported power of Defendant Nacogdoches to enforce this agreement no longer applies and is not effective, and as such the power to enforce this contract does not exist at present.

109. Plaintiff Dowtech requests this Court pursuant to the Uniform Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code Chapter 37 *et seq.* declare the rights, status, and other legal relations as between it and Defendant Nacogdoches associated with the Rule 11 Agreement (contract).

## IV. EQUITY REQUIRES THE AMENDED RULE 11 AGREEMENT

## NOT BE ENFORCED

110. Defendant Nacogdoches' proposed Amended Rule 11 Agreement (hereinafter "bad faith proposal") dated May 13, 2014 is a bad faith and unconscionable proposal to cover-up the on-going engineering negligence and misconduct. See Exhibit #15.

111. Plaintiff Dowtech never agreed to this bad faith proposal. Defendant Nacogdoches now comes with unclean hands requesting enforcement of its bad faith and unconscionable May 13, 2014 Amended Rule 11 Agreement proposal.

112. Defendant Nacogdoches' references the bad faith proposal in its latest filing stating the following: "However, a disagreement arose between the City and Dowtech regarding the proper method of re-installing the aerators. As a result, the City on May 13, 2014, agreed in writing to waive the requirement in the Rule 11 Agreement that the aerators operate for a continuous period of 90 days . . ."

113. The evidence will indicate that Defendant Nacogdoches' bad faith proposal is put forth to cover-up the engineering negligence, bad faith, and unconscionable conduct of Defendant Nacogdoches' engineers along with the numerous breaches of the contract and to avoid a public trial on the merits.

114. Plaintiff Dowtech will show that there was no "disagreement" as alleged by Defendant Nacogdoches in its latest pleadings. After returning the repaired 25 hp aerators to Nacogdoches and unloading them, based on communications in January 2014 with Aeromix, Plaintiff Dowtech discovered that Defendant Nacogdoches had flagrantly materially breached the Rule 11 Agreement.

115. Defendant Nacogdoches flagrantly, materially, and in bad faith requested and Aeromix complied with its request to redesign / repair the four Aeromix 25 hp aerators for installation to the bridge mount, the original position. This is not the position from which the four Aeromix 25 hp aerators were removed and shipped to Aeromix for repairs under the Rule 11 Agreement. Plaintiff Dowtech notified Defendant Nacogdoches of this discovery with its letters of January 31, 2014 and March 18, 2014. See Exhibit #8 and #9.

116. Defendant Nacogdoches City Engineer Bartlett admitted engineering negligence in his letter of March 19, 2014, which was written in response to Plaintiff Dowtech's letter of January 31, 2014. See Exhibit #4.

117. City Engineer Bartlett's letter, Exhibit #4, is newly discovered evidence and a statement against self interest admitting that Defendant Nacogdoches' engineers (1) failed to perform or conduct any type of engineering or technical due diligence prior to the specifying of the Aeromix 25 hp aerators by brand name; (2) that Defendant Nacogdoches had placed the Aeromix 25 hp aerators into a position of push; (3) that the Aeromix 25 hp aerator pulls; (4) that Plaintiff Dowtech performed additional work installing the Aeromix 25 hp aerators into a position of pulling; (5) that Aeromix recommended soft starts for aerators over 20 hp; (6) that the usage of soft starts can result in an energy cost savings and extend the motor life; (7) that Defendant Nacogdoches had no intention of installing soft starts; and (8) that Defendant Nacogdoches had Aeromix to design and reconfigure the aerators to be installed in their original position, flagrantly breaching the Rule 11 Agreement.

118. For the foregoing reasons, it would be manifestly unjust and contrary to the interest of justice to enforce the Amended Rule 11 Agreement, depriving Plaintiff Dowtech and the Citizens of Nacogdoches, Texas a public trial on the merits.

## V. DEFENDANT NACOGDOCHES CITY ENGINEER BARTLETT BLATANTLY ADMITTED NEGLIGENCE IN A STATEMENT AGAINST SELF INTEREST

119. Defendant Nacogdoches City Engineer Bartlett's letter of March 19, 2014 was sent to Plaintiff Dowtech's attorney in response to Plaintiff Dowtech's earlier letter dated January 31, 2014. Plaintiff Dowtech had just discovered in its communications with Aeromix that Defendant Nacogdoches had blatantly, materially breached the Rule 11 Agreement. Defendant Nacogdoches had blatantly requested and Aeromix had complied to re-design / repair the four (4) Aeromix 25 hp aerators for installation to the original bridge mount position. The bridge mount was the original position for which the 25 hp aerators had been installed as shown on the construction drawings.

120. Plaintiff Dowtech requests the Court take judicial notice that all documentation clearly indicates that four (4) Aeromix 25 hp aerators have been re-designed / repaired for installation in the original bridge mount position. (Not re-designed / repaired for the position from which removed and shipped to Aeromix for repairs under the Rule 11 Agreement).

121. Both Defendant Nacogdoches and Aeromix have blatantly materially breached the Rule 11 Agreement in their clear admission that the four (4) Aeromix 25 hp aerators have been re-designed / repaired for installation in the original bridge mount position. Defendant Nacogdoches City Engineer Bartlett stating " . . . we are requesting that the repaired and reconfigured aerators be returned to their original position using the mounting hardware supplied by Aeromix and installed by Dowtech" is a clear admission that Defendant Nacogdoches requested and Aeromix complied to re-design /repair the 25 hp aerators for the original bridge mount position. Defendant Nacogdoches has admitted that it blatantly materially breached the Rule 11 Agreement.

122. Defendant Nacogdoches City Engineer Bartlett stated the following: "While we now understand that the operations manual identified the use of soft start device for Aeromix motors over 20 hp, neither Aeromix nor Dowtech made this clear during the bid phase or when the equipment submittals were reviewed." This is a clear admission that Defendant Nacogdoches failed to perform or conduct any type of engineering or technical due diligence prior to specifying the Aeromix 25 hp aerators by brand name. This is a clear and undeniable admission of Defendant Nacogdoches engineers' negligence.

123. Defendant Nacogdoches City Engineer Bartlett states the following: "This tapering of an electrical load can result in an energy cost savings and also extended motor life." Further, acknowledging Aeromix recommendations of soft start, he states that ". . . we do not intend to provide soft start devices at this time." Thus, Defendant Nacogdoches admitted its failure to perform or conduct any type of engineering or technical due diligence prior to specifying the Aeromix 25 hp aerators by brand name. This is a clearly an admission of Defendant Nacogdoches engineers' negligence.

124. Defendant Nacogdoches City Engineer Bartlett states the following: "Aeromix has commented that the aerators need to be repositioned within the basin and turned where they pull, not push, on the swing arm mounts." This is clear evidence that the aerators had been installed in a "push" position. This is clearly an admission that the contract drawings had the Aeromix 25 hp aerators installed in a "push" position. Furthermore, it is clearly an admission that the Aeromix 25 hp aerator must be placed into a "pull" position. It is also a clear admission that Defendant Nacogdoches had specified the four (4) Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence. It constitutes a clear admission of Defendant Nacogdoches engineers' negligence.

125. Defendant Nacogdoches City Engineer Bartlett admits that Plaintiff Dowtech had performed additional work at the direction of Defendant Nacogdoches to reposition the aerators within the basin into a "pull" position. It is noteworthy that Defendant Nacogdoches never paid Plaintiff Dowtech for relocating the four (4) Aeromix 25 hp aerators from a "push" to a "pull" position.

126. Throughout the period after August 5, 2010 Defendant Nacogdoches flagrantly materially breached the contract with Plaintiff Dowtech ordering and demanding that work be performed to cover-up the engineering negligence. Plaintiff Dowtech was never paid for the additional work.

## PLAINTIFF'S PRAYER FOR RELIEF

WHEREFORE Plaintiff Dowtech asks for the following for each Cause of Action sustained:

1. Damages in an amount to be determined by proof at trial.

2. For Special Damages in an amount to be determined by proof at trial.

3. For General Damages in an amount to be determined by proof at trial.

4. For Declaratory Relief.

5. Reasonable and necessary attorney's fees.

6. For any prejudgment or other interest according to law.

7. Any other and further relief that the Court considers just and proper.

Plaintiff Dowtech further requests all other relief to which it is entitled, whether in law or equity.

Respectfully submitted,

LAW OFFICE OF BLAKE C. NORVELL
37 Cypress Point St.
Abilene, Texas 79606
325-695-1708 tel
325-695-1708 fax

By: _____
Blake C. Norvell
State Bar No. 24065828
**ATTORNEY FOR PLAINTIFF**

<div align="center">

## CERTIFICATE OF SERVICE

</div>

I certify that on this ___11___ day of March, 2015, a true copy of Plaintiff's Supplemental Original Petition was served by certified mail, return receipt requested on the following:

THOMAS L. BELANGER
P.O. Box 631248
Nacogdoches, Texas 75963

_____
BLAKE NORVELL

EXHIBIT L

EXHIBIT L

NO. <u>C1228865</u>

| | |
|---|---|
| **DOWTECH SPECIALTY CONTRACTORS, INC.** Plaintiff, | § IN THE DISTRICT COURT § § |
| V. | § § 145TH JUDICIAL DISTRICT |
| **CITY OF NACOGDOCHES** Defendant. | § § § OF NACOGDOCHES COUNTY, TEXAS |

## <u>AFFIDAVIT OF THOMAS L. BELANGER</u>

BEFORE ME, the undersigned authority, personally appeared THOMAS L. BELANGER, who being duly sworn, deposed as follows:

"My name is Thomas L. Belanger. I am a licensed attorney in the State of Texas and attorney of record for the City of Nacogdoches, Texas, Defendant in the above entitled lawsuit. I am at least 18 years of age and of sound mind. I have personal knowledge of the facts herein stated and they are all true and correct. I hereby swear that the following statements in support of Defendant's Supplemental Motion for Partial Summary Judgment (herein the "Motion for Summary Judgment") in the above entitled cause are true and correct.

1.    "The copy of the letter attached to this Supplemental Motion as "Exhibit J" is a true and correct copy of a letter dated April 15, 2014, that I received the letter from Charles C. Self III, Dowtech's attorney of record in this lawsuit.

2.	"Mr. Self sent me the letter attached as Exhibit J to this Supplemental Motion after I sent him the letter dated March 19, 2014, from Steve Bartlett, City Engineer, a true and correct copy of which is attached as "Exhibit C" to the Motion.

3.	"Exhibit K to this Supplemental Motion is a true and correct copy of the Plaintiff's Supplemental First Amended Petition filed herein on March 13, 2015.

4.	"Charles C. Self, III, was the attorney of record for Dowtech Specialty Contractors, Inc., from the beginning of this case until the Court granted his Motion to Withdraw as Counsel for Dowtech by Order entered on March 2, 2015."

_____
THOMAS L. BELANGER, Affiant

**SUBSCRIBED AND SWORN TO BEFORE ME** on ___June 3___,
2015, by THOMAS L. BELANGER.

MARIE A. HUGHES
Notary Public, State of Texas
My Commission Expires
November 06, 2016

_____
Notary Public, State of Texas

Exhibit "K"

NO. C1228865

| | | |
|---|---|---|
| DOWTECH SPECIALTY CONTRACTORS, INC. Plaintiff, | § § § | IN THE DISTRICT COURT |
| | § | |
| V. | § | 145TH JUDICIAL DISTRICT |
| | § | |
| CITY OF NACOGDOCHES, TEXAS and AEROMIX SYSTEMS, INC., | § | |
| Defendants. | § | OF NACOGODCHES COUNTY, TEXAS |

## DEFENDANT'S RESPONSE TO
## REQUESTS FOR ADMISSIONS
## OF PLAINTIFF DOWTECH SPECIALTY CONTRACTORS, INC.

TO: DOWTECH SPECIALTY CONTRACTORS, INC., Plaintiff, by and through Plaintiff's attorney of record, BLAKE NORVELL

NOW COMES CITY OF NACOGDOCHES, TEXAS, Defendant, and responds to the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. pursuant to Rule 198 of the Texas Rules of Civil Procedure. The CITY OF NACOGDOCHES makes the following General Objection to all of the Requests for Admissions:

### GENERAL OBJECTION

The CITY OF NACOGDOCHES objects generally to all of the Requests for Admissions propounded by DOWTECH SPECIALTY CONTRACTORS, INC. because the Rule 11 Agreement between the parties dated July 2, 2013, provides that this lawsuit will be held in abeyance pending re-installation of the Aeromix aerators by Dowtech, but Dowtech has not re-installed the aerators as agreed. Submission of these Requests for Admissions is a breach of the Rule 11 Agreement by Dowtech, and the CITY OF NACOGDOCHES should not be required to respond to this or any discovery that violates the Rule 11 Agreement. Furthermore, Dowtech has submitted a total of 276 separate requests for Admissions which is excessive, abusive,

unreasonable, vexatious and designed to harass the CITY OF NACOGDOCHES.

Subject to the General Objection set forth above and the specific objections set forth below, and without waiving any of such objections, the CITY OF NACOGDOCHES submits the following Responses to Requests for Admissions.

Respectfully submitted,

ADAMS, BELANGER, & LOSTRACCO, P. C.

By: _____
THOMAS L. BELANGER
Texas Bar No. 02060400
Email: tom@abal-law.com
P. O. Box 631248
Nacogdoches, TX 75963
Tel. (936) 564-4315
Fax. (936) 560-0280
Attorney for Defendant
CITY OF NACOGDOCHES, TEXAS

## CERTIFICATE OF SERVICE

I certify that on June 19, 2015 a true and correct copy of Defendant's Response to Requests for Admissions was served by fax on BLAKE NORVELL at (325)695-1708.

THOMAS L. BELANGER

## RESPONSES TO REQUESTS FOR ADMISSIONS

1.    The engineering firm of Schaumburg & Polk, Inc. (hereinafter "SPI") was employed by the City of Nacogdoches, Texas (hereinafter "Defendant Nacogdoches") as the engineers for the Wastewater Treatment Plant, Oxidation Ditch and Clarifier Improvements Project (hereinafter "WWTP").

**RESPONSE:** ADMITTED

2.    Mark Mann, P.E. (hereinafter "Mann") was the SPI engineer working on the Defendant Nacogdoches' WWTP.

**RESPONSE:** ADMITTED

3.    Ricky Bourque, P.E. (hereinafter "Bourque"), Vice President of SPI, was Mann's supervisor for SPI on the WWTP.

**RESPONSE:** ADMITTED

4.    SPI was responsible for the engineering work on Defendant Nacogdoches' WWTP.

**RESPONSE:** ADMITTED

5.    SPI was responsible for the contract documents pertaining to the WWTP.

**RESPONSE:** ADMITTED

6.    SPI was responsible for the technical specifications pertaining to the WWTP.

**RESPONSE:** ADMITTED

7.    SPI was responsible for the drawings pertaining to the WWTP.

**RESPONSE:** ADMITTED

8.    Mann was the engineer responsible for the engineering work on Defendant Nacogdoches WWTP.

**RESPONSE:** ADMITTED to the extent that Mann was one of the engineers responsible for the engineering work.

4

9.   Mann was the engineer responsible for the contract documents pertaining to the WWTP.

**RESPONSE:**  ADMITTED to the extent that Mann was one of the engineers responsible for contract documents.

10.   Mann was the engineer responsible for the technical specifications pertaining to the WWTP.

**RESPONSE:**  ADMITTED to the extent that Mann was one of the engineers responsible for the technical specifications.

11.   Mann was the engineer responsible for the drawings pertaining to the WWTP.

**RESPONSE:**  ADMITTED to the extent that Mann was one of the engineers responsible for the drawings.

12.   Defendant Nacogdoches accepted bids with a public bid opening for the award of the construction contract on the WWTP.

**RESPONSE:**  ADMITTED

13.   Plaintiff Dowtech Specialty Contractors, Inc. (hereinafter "Plaintiff Dowtech") was the lowest bidder for the construction contract for the WWTP.

**RESPONSE:**  ADMITTED

14.   Plaintiff Dowtech was awarded the construction contract for the WWTP.

**RESPONSE:**  ADMITTED

15.   Defendant Nacogdoches was responsible for design and engineering on the WWTP.

**RESPONSE:**  DENIED

16.   Plaintiff Dowtech was not responsible for design and engineering on the WWTP.

**RESPONSE:**  ADMITTED

17.   SPI was responsible for the inspection of the construction work on the WWTP.

**RESPONSE:**  DENIED

5

18. Mann was the engineer responsible for the on-site inspection of the construction work on the WWTP.

**RESPONSE:** DENIED

19. SPI, Mann, and Bourque are responsible to Defendant Nacogdoches for their act or acts on the engineering and inspection of the construction of the WWTP.

**RESPONSE:** ADMITTED as to engineering, but DENIED as to inspection because inspection was not the responsibility of SPI or its employees.

20. SPI is responsible to Defendant Nacogdoches for its act or acts on the engineering and inspection of the construction of the WWTP.

**RESPONSE:** ADMITTED as to engineering, but DENIED as to inspection because inspection was not the responsibility of SPI.

21. Mann is responsible to Defendant Nacogdoches for his act or acts on the engineering and inspection of the construction of the WWTP.

**RESPONSE:** ADMITTED as to engineering, but DENIED as to inspection because inspection was not the responsibility of Mann.

22. Bourque is responsible to Defendant Nacogdoches for his act or acts on the engineering and inspection of the construction of the WWTP.

**RESPONSE:** ADMITTED as to engineering, but DENIED as to inspection because inspection was not the responsibility of Borque.

23. Defendant Nacogdoches is responsible for the acts of SPI, Mann, and Bourque on the engineering and inspection of the construction of the WWTP.

**RESPONSE:** DENIED

24. Defendant Nacogdoches is responsible for the acts of SPI on the engineering and inspection of the construction of the WWTP.

**RESPONSE:** DENIED

25. Defendant Nacogdoches is responsible for the acts of Mann on the engineering and inspection of the construction of the WWTP.

**RESPONSE:** DENIED

6

26.    Defendant Nacogdoches is responsible for the acts of Bourque on the engineering and inspection of the construction of the WWTP.

**RESPONSE:** DENIED

27.    SPI, Mann, and Bourque had the authority to act in all matters pertaining to Defendant Nacogdoches' WWTP contract with Plaintiff Dowtech.

**RESPONSE:** DENIED

28.    SPI had the authority to act in all matters pertaining to Defendant Nacogdoches' WWTP contract with Plaintiff Dowtech.

**RESPONSE:** DENIED

29.    Mann had the authority to act in all matters pertaining to Defendant Nacogdoches' WWTP contract with Plaintiff Dowtech.

**RESPONSE:** DENIED

30.    Bourque had the authority to act in all matters pertaining to Defendant Nacogdoches' WWTP contract with Plaintiff Dowtech.

**RESPONSE:** DENIED

31.    SPI had the authority as engineers to specify Aeromix Systems (hereinafter "Aeromix") 25 hp aerators by brand name in the WWTP contract documents.

**RESPONSE:** ADMITTED

32.    SPI had the authority as engineers to specify the Aeromix Systems (hereinafter "Aeromix") 25 hp aerators by brand name under the terms of the WWTP contract.

**RESPONSE:** ADMITTED

33.    Defendant Nacogdoches specifically requested that SPI insert the name of the Aeromix Systems 25 hp aerators as a potential supplier.

**RESPONSE:** ADMITTED

34.    The WWTP contract documents page 780 – 2 of 3 Technical Specifications specified the usage of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** ADMITTED

7

35.    The WWTP contract Technical Specifications specified the usage of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** ADMITTED

36.    Plaintiff Dowtech completed the installation of the four Aeromix 25 hp aerators on August 5, 2010 per the contract documents.

**RESPONSE:** ADMITTED

37.    Plaintiff Dowtech had installed the four Aeromix 25 hp aerators per the contract documents on August 5, 2010.

**RESPONSE:** ADMITTED

38.    Plaintiff Dowtech had furnished the four Aeromix 25 hp aerators brand new.

**RESPONSE:** ADMITTED

39.    Plaintiff Dowtech had furnished all new material and equipment in the installation of the four Aeromix 25 hp aerators.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

40.    On August 5, 2010 Plaintiff Dowtech had complied with the contract documents in the furnishing, installing, and testing of the four Aeromix 25 hp aerators.

**RESPONSE:** ADMITTED insofar as Dowtech's obligations up to that date, but not after.

41.    On August 5, 2010 Plaintiff Dowtech had complied with "Contractor's General Warranty and Guarantee" page 00700-23 of the contract documents.

**RESPONSE:** DENIED

42.    Brand name is defined by the WWTP contract documents page SCA – 2 of 18, SPECIAL CONDITIONS OF THE AGREEMENT (hereinafter "SCA") "to set a definite standard of equality or performance."

**RESPONSE:** ADMITTED

43.    The WWTP contract documents "SPECIAL CONDITIONS OF THE AGREEMENT" is the governing specification.

**RESPONSE:** DENIED

44. The WWTP contract documents represents that Defendant Nacogdoches has knowledge of the Aeromix 25 hp aerator "equality or performance."

**RESPONSE:** ADMITTED

45. The WWTP contract documents represent that SPI has knowledge of the Aeromix 25 hp aerator "equality or performance."

**RESPONSE:** ADMITTED

46. The WWTP contract documents represents that Mann has knowledge of the Aeromix 25 hp aerator "equality or performance."

**RESPONSE:** ADMITTED

47. Defendant Nacogdoches had no knowledge about the Aeromix 25 hp aerator "equality or performance" prior to specifying by brand name.

**RESPONSE:** DENIED

48. SPI had no knowledge about the Aeromix 25 hp aerator "equality or performance" prior to specifying by brand name.

**RESPONSE:** DENIED

49. Mann had no knowledge about the Aeromix 25 hp aerator "equality or performance" prior to specifying by brand name.

**RESPONSE:** DENIED

50. Under the WWTP contract documents page 00700-18 para. 6. 05 A. the Aeromix 25 hp aerator is defined as "equipment."

**RESPONSE:** ADMITTED

51. Under the WWTP contract documents page 00700-18 para. 6. 05 A. Aeromix Systems is defined as a "particular supplier."

**RESPONSE:** ADMITTED

52. Under the WWTP contract documents page 00700-18 para. 6. 05 A. the Aeromix 25 hp aerator is defined as a name of a "proprietary item."

**RESPONSE:** ADMITTED

53.    The WWTP contract documents represents that Defendant Nacogdoches has knowledge of the Aeromix 25 hp aerator "type, function, appearance, and quality."

**RESPONSE:** OBJECTION, the City of Nacogdoches CANNOT ADMIT OR DENY because the clause or provision of the contract documents inquired about is not identified.

54.    The WWTP contract documents represents that SPI has knowledge of the Aeromix 25 hp aerator "type, function, appearance, and quality."

**RESPONSE:** OBJECTION, the City of Nacogdoches CANNOT ADMIT OR DENY because the clause or provision of the contract documents inquired about is not identified.

55.    The WWTP contract documents represents that Mann has knowledge of the Aeromix 25 hp aerator "type, function, appearance, and quality."

**RESPONSE:** OBJECTION, the City of Nacogdoches CANNOT ADMIT OR DENY because the clause or provision of the contract documents inquired about is not identified.

56.    Defendant Nacogdoches had no knowledge about the Aeromix 25 hp aerator "type, function, appearance, and quality" prior to specifying by brand name in the WWTP contract documents.

**RESPONSE:** DENIED

57.    SPI had no knowledge about the Aeromix 25 hp aerator "type, function, appearance, and quality" prior to specifying by brand name in the WWTP contract documents.

**RESPONSE:** DENIED

58.    Mann no knowledge about the Aeromix 25 hp aerator "type, function, appearance, and quality" prior to specifying by brand name in the WWTP contract documents.

**RESPONSE:** DENIED

59.    Plaintiff Dowtech submitted the Aeromix 25 hp aerator submittal to Mann at SPI for approval.

**RESPONSE:** ADMITTED

60.    Mann and SPI approved the Aeromix submittal on its 25 hp aerators and returned it to Plaintiff Dowtech.

**RESPONSE:** DENIED

10

61. Mann approved the Aeromix submittal on its 25 hp aerators.

**RESPONSE:** DENIED

62. SPI approved the Aeromix submittal on its 25 hp aerators.

**RESPONSE:** DENIED

63. Mann and SPI did not request any additional information from Aeromix prior to the installation of the 25 hp aerators.

**RESPONSE:** DENIED

64. Mann did not request any additional information from Aeromix prior to the installation of the 25 hp aerators.

**RESPONSE:** DENIED

65. SPI did not request any additional information from Aeromix prior to the installation of the 25 hp aerators.

**RESPONSE:** DENIED

66. Defendant Nacogdoches never requested any additional information about the Aeromix 25 hp aerator from Plaintiff Dowtech, prior to installation.

**RESPONSE:** ADMITTED

67. The WWTP contract documents page 00700 – 24 states in part: "E. Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents."

**RESPONSE:** ADMITTED

68. Plaintiff Dowtech has no responsibility under the terms and conditions of the WWTP contract documents for the Aeromix 25 hp aerators performance.

**RESPONSE:** ADMITTED as to "adequacy of performance" only, but DENIED as to defective work.

69. No person employed by Defendant Nacogdoches, including Mann, ever made any type of engineering or technical inquiry with Aeromix to discover that the 25 hp aerators are engineered/manufactured under patent with its swing arms to pull upon a substantial structure, prior to specifying by brand name.

**RESPONSE:** DENIED

11

70. Prior to August 5, 2010, no person employed by Defendant Nacogdoches every made an inquiry to Aeromix pertaining to if the swing arms of the 25 hp aerators "push" or "pull."

**RESPONSE:** DENIED

71. Prior to August 5, 2010, no person working on behalf of Defendant Nacogdoches every made an inquiry to Aeromix pertaining to if the swing arms of the 25 hp aerators "push" or "pull."

**RESPONSE:** DENIED

72. SPI has performed other engineering work for the Defendant Nacogdoches after the WWTP contract.

**RESPONSE:** ADMITTED

73. Man has performed other engineering work for Defendant Nacogdoches after the WWTP contract.

**RESPONSE:** ADMITTED

74. Defendant Nacogdoches is responsible for all WWTP contract payments to Plaintiff Dowtech.

**RESPONSE:** ADMITTED as to any contract payments that are due and payable per the terms of the contract.

75. Regarding the WWTP, contract payments to Plaintiff Dowtech were the responsibility of Defendant Nacogdoches.

**RESPONSE:** ADMITTED to the extent that contract payments may be due and payable per the terms of the contract.

76. Defendant Nacogdoches is responsible for all contract payments to Plaintiff Dowtech for any additional work ordered by Mann in writing on the WWTP contract.

**RESPONSE:** DENIED

77. Defendant Nacogdoches is responsible for all contract payments to Plaintiff Dowtech for any additional work ordered verbally by Mann on the WWTP contract.

**RESPONSE:** DENIED

12

78. Plaintiff Dowtech purchased, furnished, and installed the four Aeromix 25 hp aerators in accordance with the WWTP contract documents and Mann's verbal instructions that Defendant Nacogdoches did not want the aerators to be anchored/moored per the contact documents.

**RESPONSE:** DENIED

79. Plaintiff Dowtech complied with the terms of the WWTP contract documents and Mann's instructions regarding the installation of the four Aeromix 25 hp aerators.

**RESPONSE:** DENIED

80. Plaintiff Dowtech did not violate the terms of the WWTP contract documents regarding the installation of the four Aeromix 25 hp aerators.

**RESPONSE:** DENIED

81. Plaintiff Dowtech did not violate the instructions of Mann regarding the installation of the four Aeromix 25 hp aerators.

**RESPONSE:** OBJECTION, the City CANNOT ADMIT OR DENY because the statement particular instructions by Mann are not identified. However, ADMITTED insofar as the installation on August 5, 2010.

82. Mann stated that he did not want the aerators to be anchored/moored as required by the contract documents.

**RESPONSE:** DENIED

83. Mann opposed anchoring/mooring the aerators.

**RESPONSE:** DENIED

84. Defendant Nacogdoches did not want the aerators to be anchored/moored.

**RESPONSE:** DENIED

85. Defendant Nacogdoches did not want the aerators to be anchored/moored even though the contract required it.

**RESPONSE:** DENIED

86. Defendant Nacogdoches breached the contract by failing to permit the Aeromix 25 hp aerators to be anchored/moored.

**RESPONSE:** DENIED

13

87. Defendant Nacogdoches violated a condition of the contract by failing to permit the Aeromix 25 hp aerators to be anchored/moored.

**RESPONSE:** DENIED

88. Defendant Nacogdoches failed to permit the Aeromix 25 hp aerators to be anchored/moored.

**RESPONSE:** DENIED

89. The WWTP contract documents require the anchoring of the 25 hp aerator to hold firmly in position.

**RESPONSE:** DENIED

90. Aeromix recommended the mooring/anchoring of the aerator.

**RESPONSE:** ADMITTED

91. Defendant Nacogdoches never permitted the Aeromix 25 hp aerator to be anchored to hold firmly in position per the WWTP contract documents.

**RESPONSE:** DENIED

92. The Aeromix 25 hp aerator have never been anchored to a substantial structure.

**RESPONSE:** DENIED

93. None of the four Aeromix 25 hp aerators have never been anchored to a substantial structure.

**RESPONSE:** The City of Nacogdoches objects to the Request #93 because it is not possible to admit or deny a double negative statement.

94. Aeromix recommended soft starts or Variable Frequency Drives (hereinafter "VFDs") for aerators of 20 hp or higher.

**RESPONSE:** ADMITTED

95. The other name brand aerator in the WWTP contract documents, ECS House Industries (hereinafter "House"), requires the anchoring of its aerator to be held firmly in position.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

14

96. Defendant Nacogdoches was grossly negligent in its refusal to permit the anchoring of the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

97. Defendant Nacogdoches was negligent in its refusal to permit the anchoring of the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

98. Defendant Nacogdoches' refusal to permit the anchoring of the Aeromix 25 hp aerators was in contradiction of the recommendation of Aeromix.

**RESPONSE:** DENIED

99. Defendant Nacogdoches refusal to permit the anchoring of the Aeromix 25 hp aerators was in contradiction of the contract documents.

**RESPONSE:** DENIED

100. The other name brand, House, recommends soft starts on aerators 15 hp and higher.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

101. After a detailed review of the WWTP contract documents, no requirement for soft starts can be found.

**RESPONSE:** ADMITTED

102. Soft starts start equipment in a gentle manner.

**RESPONSE:** ADMITTED

103. Soft starts save power.

**RESPONSE:** DENIED

104. Defendant Nacogdoches was grossly negligent in its refusal to use soft starts with the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

105. Defendant Nacogdoches was negligent in its refusal to use soft starts with the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

106. Defendant Nacogdoches refusal to use soft starts with the Aeromix 25 hp aerators was in contradiction of the recommendations of Aeromix.

**RESPONSE:** ADMITTED

107. Defendant Nacogdoches breached the contract in the failure to follow the recommendations of Aeromix in the installation of soft starters or Variable Frequency Drives (hereinafter "VFDs")

**RESPONSE:** DENIED

108. Plaintiff Dowtech tested the Aeromix 25 hp aerators on August 5, 2010 in accordance with the WWTP contract documents.

**RESPONSE:** ADMITTED

109. Employees of Defendant Nacogdoches witnessed the testing of the Aeromix 25 hp aerators on August 5, 2010.

**RESPONSE:** ADMITTED

110. Mann was present on August 5, 2010 during the testing of the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

111. A representative of Aeromix inspected the 25 hp aerator installation prior to the August 5, 2010 start-up.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

112. A representative of Aeromix approved the 25 hp aerator installation prior to the August 5, 2010 start-up.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

16

113. A representative of Aeromix instructed the designated employees of Defendant Nacogdoches in the operation and maintenance of the Aeromix 25 hp aerators on August 5, 2010.

**RESPONSE:** ADMITTED

114. All of the Defendant Nacogdoches' designated employees present for the instructions on the operation and maintenance of the aerators had their own copy of the Aeromix 25-30 hp Monsoon Paddlewheel Surface Splash Aerator Installation, Operation, and Maintenance Manual (hereinafter "Manual").

**RESPONSE:** ADMITTED

115. Mann, acting on behalf of Defendant Nacogdoches, accepted the Aeromix 25 hp aerators, as substantially complete and ready for service on August 5, 2010.

**RESPONSE:** DENIED

116. On August 5, 2010, Mann indicated the aerators were ready for service.

**RESPONSE:** DENIED

117. Defendant Nacogdoches accepted and signed the Aeromix warranty on August 5, 2010.

**RESPONSE:** DENIED, because David Wolfgang was not authorized to sign on behalf of the City.

118. On August 5, 2010, Defendant Nacogdoches signed a warranty pertaining to the four, 25 hp Aeromix aerators.

**RESPONSE:** DENIED, because David Wolfgang was not authorized to sign on behalf of the City.

119. The WWTP.contract drawings show the four Aeromix 25 hp aerators installed with the swing arms pushing on the bridge.

**RESPONSE:** ADMITTED

120. The WWTP four Aeromix 25 hp aerators pushing on the bridge is the "original position."

**RESPONSE:** DENIED, because "original position" was used by the City to describe the position before the aerators were removed and sent to Aeromix for repairs.

17

121. On August 5, 2010, Plaintiff Dowtech had completed all work on the Aeromix 25 hp aerators.

**RESPONSE:** ADMITTED insofar as work that was required up to that date, but DENIED as to work that was subsequently required.

122. On August 5, 2010, Defendant Nacogdoches had accepted as complete all work on the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

123. On August 5, 2010, Defendant Nacogdoches accepted the four Aeromix 25 hp aerators as substantially complete and ready for service.

**RESPONSE:** DENIED

124. On August 5, 2010, Defendant Nacogdoches did not voice any concerns to Plaintiff Dowtech pertaining to the Aeromix 25 hp aerators.

**RESPONSE:** ADMITTED

125. On August 19, 2010, one of the Aeromix 25 hp aerator's swing arms started flexing.

**RESPONSE:** ADMITTED that the swing arms started flexing, but exact date swing arms began flexing is not known.

126. On August 19, 2010, Mann telephoned Plaintiff Dowtech to demand a response to the aerator swing arm that was flexing.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

127. On August 20, 2010, one of the swing arms of the Aeromix 25 hp aerator that was flexing broke and came loose.

**RESPONSE:** ADMITTED

128. On August 20, 2010, one of the swing arms of the Aeromix 25 hp aerator came loose.

**RESPONSE:** ADMITTED

18

129. On August 20, 2010, one of the swing arms of the Aeromix 25 hp aerator broke.

**RESPONSE:** ADMITTED that the swing arm broke, but the exact date unknown.

130. Plaintiff Dowtech responded immediately to Mann's August 19, 2010 demand regarding the aerator with the flexing swing arm that broke and came lose by determining that the arm would have to be replaced.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

131. The swing arm of the Aeromix 25 hp aerator that was flexing broke and came loose constitutes a warranty or performance issue.

**RESPONSE:** ADMITTED

132. Defendant Nacogdoches breached the contract on August 19, 2010 demanding Plaintiff Dowtech perform additional work on the Aeromix 25 hp aerator without compensation.

**RESPONSE:** DENIED

133. Defendant Nacogdoches, on August 19, 2010, demanded Plaintiff Dowtech perform additional work on the Aeromix 25 hp aerator without compensation.

**RESPONSE:** DENIED, because the work was not additional work and was compensated.

134. Defendant Nacogdoches breached the contract each and every time it demanded Plaintiff Dowtech perform additional work on the Aeromix 25 hp aerators after August 19, 2010.

**RESPONSE:** DENIED

135. Defendant Nacogdoches requested Plaintiff Dowtech perform additional work on the Aeromix 25 hp aerators after August 19, 2010.

**RESPONSE:** DENIED, because the work was not additional.

136. Defendant Nacogdoches had knowledge at all times relevant that Plaintiff Dowtech was performing additional work on the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

137. Defendant Nacogdoches was aware that Plaintiff Dowtech performed additional work on the Aeromix 25 hp aerators after August 19, 2010.

**RESPONSE:** DENIED

138. Regarding the Aeromix 25 hp aerators, Plaintiff Dowtech is not responsible for warranty or performance issues.

**RESPONSE:** DENIED

139. Regarding the Aeromix 25 hp aerators, Plaintiff Dowtech is not responsible for warranty issues.

**RESPONSE:** DENIED

140. Regarding the Aeromix 25 hp aerators, Plaintiff Dowtech is not responsible for performance issues.

**RESPONSE:** ADMITTED

141. Responding to Mann's August 19, 2010 demand regarding the aerator with the flexing swing arm that broke and came lose cost Plaintiff Dowtech money.

**RESPONSE:** DENIED insofar as the statement that "cost Plaintiff Dowtech money" means that Dowtech spent money that it was not contractually obligated to spend.

142. It costs Plaintiff Dowtech money to respond to Mann's demands.

**RESPONSE:** OBJECTION because the statement does not identify the particular demand made by Mann. Subject to such objection, DENIED insofar as the statement that "cost Plaintiff Dowtech money" means that Dowtech spent money that it was not contractually obligated to spend.

143. Responding to Mann's demands costs Plaintiff Dowtech loss of time.

**RESPONSE:** OBJECTION because the statement does not identify the particular demand made by Mann. Subject to such objection, DENIED insofar as the statement that "cost Plaintiff Dowtech loss of time" means that Dowtech spent time that it was not contractually obligated to spend.

144. Mann in communication with Aeromix on or around August 30, 2010 discovered that the Aeromix 25 hp aerator must be installed into a position with its swing arms pulling.

**RESPONSE:** ADMITTED

145. Mann had discovered that Defendant Nacogdoches was grossly negligent in requesting that the Aeromix 25 hp aerators be used by brand name.

**RESPONSE:** DENIED

20

146. Mann had discovered that Defendant Nacogdoches was negligent in requesting that the Aeromix 25 hp aerators be used by brand name.

**RESPONSE:** DENIED

147. Defendant Nacogdoches was grossly negligent in requesting that the Aeromix 25 hp aerators be used by brand name.

**RESPONSE:** DENIED

148. Defendant Nacogdoches was negligent in requesting that the Aeromix 25 hp aerators be used by brand name.

**RESPONSE:** DENIED

149. SPI and Mann were grossly negligent in specifying the four Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

**RESPONSE:** DENIED

150. SPI and Mann were negligent in specifying the four Aermix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

**RESPONSE:** DENIED

151. SPI was grossly negligent in specifying the four Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

**RESPONSE:** DENIED

152. SPI was negligent in specifying the four Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

**RESPONSE:** DENIED

153. Mann was grossly negligent in specifying the four Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

**RESPONSE:** DENIED

154. Mann was negligent in specifying the four Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

**RESPONSE:** DENIED

155. Bourque was grossly negligent in his supervision of Mann.

**RESPONSE:** DENIED

156. Bourque was negligent in his supervision of Mann.

**RESPONSE:** DENIED

157. Bourque failed to supervise Mann.

**RESPONSE:** DENIED

158. Mann telephoned Plaintiff Dowtech on September 2, 2010 to state that the WWTP contract was going to be modified and to request pricing.

**RESPONSE:** DENIED

159. Mann e-mailed the proposed WWTP contract modification to Plaintiff Dowtech on September 2, 2010.

**RESPONSE:** ADMITTED

160. The proposed WWTP contract modification, e-mailed to Plaintiff Dowtech on September 2, 2010, relocated the four Aeromix 25 hp aerators to pulling on a stainless steel cable (hereinafter "cable") stretched between two steel posts.

**RESPONSE:** ADMITTED

161. Mann proposed relocating the four Aeromix 25 hp aerators to pulling on a stainless steel cable (hereinafter "cable") stretched between two steel posts.

**RESPONSE:** DENIED

162. On September 7, 2010, Mann sent Plaintiff Dowtech an e-mail changing the post size from "4" to "8".

**RESPONSE:** ADMITTED

22

163. On September 7, 2010, Mann sent Plaintiff Dowtech an e-mail regarding the post size.

**RESPONSE:** ADMITTED

164. On September 16, 2010, Plaintiff Dowtech sent an e-mail to SPI marked "Attention Mark Mann" indicating the price for the WWTP contract modification would be $41,746.

**RESPONSE:** ADMITTED

165. On October 11, 2010, an SPI letter signed by Mann, with a copy mailed to Defendant Nacogdoches, demanded that Plaintiff Dowtech proceed with the modification of the work on the WWTP.

**RESPONSE:** ADMITTED insofar as the letter requested a plan for revised mounting of the units.

166. Defendant Nacogdoches received the October 11, 2010 letter from SPI, signed by Mann, demanding that Plaintiff Dowtech proceed with the modification.

**RESPONSE:** ADMITTED insofar as the letter requested a plan for revised mounting of the units.

167. Defendant Nacogdoches never instructed Plaintiff Dowtech not to proceed with the modification work as ordered by Mann at SPI in the October 11, 2010 letter.

**RESPONSE:** ADMITTED

168. At all times relevant, Defendant Nacogdoches' City Engineer had knowledge that SPI was demanding and directing Plaintiff Dowtech perform additional work.

**RESPONSE:** DENIED

169. At all times relevant, Defendant Nacogdoches' City Engineer had knowledge that Mann was demanding and directing Plaintiff Dowtech perform additional work.

**RESPONSE:** DENIED

170. Defendant Nacogdoches never at any time directed or instructed Plaintiff Dowtech in writing or verbally not to follow SPI's directions to perform additional work.

**RESPONSE:** ADMITTED

23

171. Defendant Nacogdoches never told Plaintiff Dowtech to disregard SPI's directions to perform additional work.

**RESPONSE:** ADMITTED

172. Defendant Nacogdoches never at any time directed or instructed Plaintiff Dowtech in writing or verbally not to follow Mann's directions to perform additional work.

**RESPONSE:** ADMITTED

173. Defendant Nacogdoches never told Plaintiff Dowtech to disregard Mann's directions to perform additional work.

**RESPONSE:** ADMITTED

174. The SPI letter dated October 11, 2010, signed by Mann, directed Plaintiff Dowtech to perform additional work.

**RESPONSE:** DENIED

175. On December 17, 2010, Plaintiff Dowtech completed the modification per the modification drawings e-mailed on September 2, 2010 by Mann.

**RESPONSE:** ADMITTED

176. On December 17, 2010, Defendant Nacogdoches inspected the modification work on the WWTP performed by Plaintiff Dowtech and approved it for operation.

**RESPONSE:** ADMITTED

177. Mann inspected and approved the modification work on the WWTP, performed by Plaintiff Dowtech, on December 17, 2010.

**RESPONSE:** DENIED

178. Both Mann and Defendant Nacogdoches inspected and approved the modification work on the WWTP, performed by Plaintiff Dowtech, on December 17, 2010.

**RESPONSE:** DENIED

179. Defendant Nacogdoches never paid Plaintiff Dowtech for the modification work on the WWTP ordered by Mann.

**RESPONSE:** DENIED

24

180. Defendant Nacogdoches never paid Plaintiff Dowtech for the work it performed between September 16, 2010 and December 17, 2010 pertaining to the WWTP.

**RESPONSE:** DENIED

181. Plaintiff Dowtech started up the four Aeromix 25 hp aerators on December 17, 2010.

**RESPONSE:** ADMITTED

182. On the December 17, 2010 start-up, Defendant Nacogdoches still refused to permit the 25 hp Aeromix aerators to be anchored/moored despite the WWTP contract documents.

**RESPONSE:** DENIED

183. On the December 17, 2010 start-up, Defendant Nacogdoches still refused to permit the 25 hp Aeromix aerators to be anchored/moored despite Aeromix's recommendation in favor of anchoring/mooring.

**RESPONSE:** DENIED

184. Upon starting the 25 hp Aeromix aerators on the December 17, 2010, the aerators were moving around in the water.

**RESPONSE:** ADMITTED

185. After the December 17, 2010 start-up, Defendant Nacogdoches ordered the shut-down of the aerators on or around December 18, 2010.

**RESPONSE:** ADMITTED, except the exact date of shut-down order not known.

186. Mann ordered Plaintiff Dowtech to return on the January 6, 2011 to tie-off the aerators per his direction.

**RESPONSE:** DENIED

187. Plaintiff Dowtech did return on the January 6, 2011 and worked on January 6, 2011 and January 7, 2011 to tie-off the aerators per Mann's instruction.

**RESPONSE:** DENIED

188. Defendant Nacogdoches has never paid Plaintiff Dowtech for the return and tie-off of the 25 hp Aeromix aerators in January 2011.

**RESPONSE:** DENIED

25

189. Defendant Nacogdoches tried and made every effort from December 17, 2010 through December 25, 2011 to make the four Aeromix 25 hp aerators perform pulling on a cable stretched between two steel posts.

**RESPONSE**: DENIED, because the work was performed by Dowtech and Aeromix.

190. Aeromix 25 hp aerators never operated successfully with the swing arms pulling on a cable stretched between two steel posts.

**RESPONSE**: DENIED

191. The four Aeromix 25 hp aerators never, at any time, performed successfully in the position with the swing arms pulling on a cable.

**RESPONSE**: DENIED

192. The cable stretched between two steel posts is not a substantial structure for the Aeromix 25 hp aerators swing arms to pull.

**RESPONSE**: DENIED

193. Defendant Nacogdoches' engineers kept the President and General Superintendent of Plaintiff Dowtech on a constant stand-by to perform additional work on the Aeromix 25 hp aerators from on or around August 19, 2010 through February 2012.

**RESPONSE**: DENIED

194. Plaintiff Dowtech performed on-site work at Defendant Nacogdoches' engineers directions from on or around August 19, 2010 through October 13, 2011.

**RESPONSE**: ADMITTED

195. Defendant Nacogdoches has not paid Plaintiff Dowtech for additional work ordered by Defendant Nacogdoches' engineers.

**RESPONSE**: DENIED because Nacogdoches did not order additional work, and Dowtech did not perform additional work.

196. Plaintiff Dowtech was not responsible for the Aeromix 25 hp aerators failure with the swing arms pushing on the bridge.

**RESPONSE**: DENIED

26

197. Plaintiff Dowtech was not responsible for the Aeromix 25 hp aerators failures operating with the swing arms pulling on the cable stretched between two steel posts.

**RESPONSE:** DENIED

198. Plaintiff Dowtech installed the four Aeromix 25 hp aerators per the drawings and specifications.

**RESPONSE:** ADMITTED

199. Plaintiff Dowtech filed a lawsuit against Defendant Nacogdoches and Defendant Aeromix to collect money owed to it.

**RESPONSE:** ADMITTED, except DENIED that any money was owed.

200. Plaintiff Dowtech, Defendant Nacogdoches, and Defendant Aeromix entered into a Rule 11 Agreement (hereinafter "Agreement")

**RESPONSE:** ADMITTED

201. Plaintiff Dowtech under the agreement removed and shipped the remaining three 25 hp aerators from the WWTP to Aeromix's facility in Minneapolis, Minnesota for repairs.

**RESPONSE:** ADMITTED

202. Under the Agreement, the repaired aerators are to be re-installed by Plaintiff Dowtech into the same position from which removed.

**RESPONSE:** ADMITTED

203. In early January 2014, Aeromix notified both Defendant Nacogdoches and Plaintiff Dowtech that the repairs had been completed.

**RESPONSE:** ADMITTED

204. Upon notification by Aeromix that the repairs had been completed, Plaintiff Dowtech transported the repaired aerators to the WWTP and unloaded them.

**RESPONSE:** ADMITTED

205. In communication with Aeromix, Plaintiff Dowtech discovered that Defendant Nacogdoches had requested and Aeromix had complied to re-design/re-manufacture for the 25 hp aerators to be installed in their original position mounted to the bridge.

**RESPONSE:** DENIED

27

206. The four Aeromix 25 hp aerators have been re-design/re-manufactured for the original bridge mount, not for the re-install into the position from which they were removed.

**RESPONSE:** DENIED

207. Defendant Nacogdoches requested of Aeromix that the aerators be re-design/re-manufacture to be installed in their original position mounted to the bridge.

**RESPONSE:** DENIED

208. Doug Reeves (hereinafter "Reeves"), Construction and Service Manager of Aeromix, informed Plaintiff Dowtech that the four Aeromix 25 hp aerators have been re-designed/re-manufactured for installation into the original location with the swing arms attached to the bridge, at the request of Defendant Nacogdoches.

**RESPONSE:** ADMITTED

209. Plaintiff Dowtech has advised Defendant Nacogdoches that Reeves had advised of the breach of the Rule 11 Agreement in that Defendant Nacogdoches requested and Aeromix complied to re-design/re-manufacture the 25 hp aerators to be mounted to the bridge in the original location.

**RESPONSE:** ADMITTED

210. Plaintiff Dowtech advised Defendant Nacogdoches that Reeves asserted that Defendant Nacogdoches requested that Aeromix re-design/re-manufacture the 25 hp aerators to be mounted to the bridge in the original location.

**RESPONSE:** ADMITTED

211. Plaintiff Dowtech advised Defendant Nacogdoches that Reeves asserted that Aeromix complied with Defendant Nacogdoches' request to re-design/re-manufacture the 25 hp aerators to be mounted to the bridge in the original location.

**RESPONSE:** ADMITTED as to what Dowtech advised Nacogdoches, but DENIED that Nacogbdoches made such request to Aeromix.

212. Aeromix breached the Rule 11 Agreement.

**RESPONSE:** DENIED

213. Defendant Nacogdoches breached the Rule 11 Agreement.

**RESPONSE:** DENIED

28

214.    Plaintiff Dowtech never at any time breached the Rule 11 Agreement.

**RESPONSE:** DENIED

215.    Defendant Nacogdoches City Engineer Steve Bartlett, P.E., R.P.L.S. (hereinafter "Bartlett"), in his letter of March 19, 2014 in response to Plaintiff Dowtech's letter of January 31, 2014 (hereinafter "Bartlett's letter"), admitted that Defendant Nacogdoches performed no inquiry with Aeromix to discover the 25 hp aerator's performance or function prior to specifying by brand name.

**RESPONSE:** DENIED

216.    Bartlett's letter admits that the 25 hp Aeromix aerators were relocated to a pull position.

**RESPONSE:** ADMITTED

217.    Bartlett's letter admits requesting Aeromix to re-design/re-manufacture the 25 hp aerators for installation into the original position.

**RESPONSE:** DENIED

218.    Bartlett's letter in stating "a mechanical torque reduction device for equipment" is referring to Variable Frequency Drives (hereinafter "VFDs").

**RESPONSE:** ADMITTED

219.    Bartlett never investigated the Aeromix 25 hp aerator failures.

**RESPONSE:** DENIED

220.    Aeromix recommend the use of soft starts or VFDs.

**RESPONSE:** ADMITTED

221.    Plaintiff Dowtech billed Defendant Nacogdoches on October 13, 2011 for the final payment on the WWTP contract in the amount of $91,619.78

**RESPONSE:** ADMITTED

222.    Defendant Nacogdoches never paid to Plaintiff Dowtech the $75,355.45 billed as part of the final payment on October 13, 2011 for the WWTP contract.

**RESPONSE:** ADMITTED to the extent that Nacogdoches never paid such amount.

29

223. Defendant Nacogdoches breached the contract with Plaintiff Dowtech in its failure to pay the $75,355.45.

**RESPONSE:** DENIED

224. Defendant Nacogdoches owes Plaintiff Dowtech $75,355.45 under the contract.

**RESPONSE:** DENIED

225. Defendant Nacogdoches breached the WWTP contract each and every time additional work was ordered on the Aeromix 25 hp aerators after August 5, 2010 without any payment or payments.

**RESPONSE:** DENIED

226. Defendant Nacogdoches owes Plaintiff Dowtech money for each and every time additional work was ordered on the Aeromix 25 hp aerators after August 5, 2010 but no payment was made.

**RESPONSE:** DENIED

227. Plaintiff Dowtech received no consideration for entering into the Rule 11 Agreement.

**RESPONSE:** DENIED

228. Defendant Nacogdoches filed its Plea to Jurisdiction, Original Answer, Counterclaim and Cross-Claim knowing that it contained false statements.

**RESPONSE:** DENIED

229. Bartlett made false statements under oath in Defendant Nacogdoches' Plea to Jurisdiction, Original Answer, Counterclaim and Cross-Claim.

**RESPONSE:** DENIED

230. Bartlett committed perjury before this Court.

**RESPONSE:** DENIED

231. Defendant Nacogdoches made demand upon Plaintiff Dowtech to remove and replace the alleged defective four Aeromix 25 hp aerators at Plaintiff Dowtech's cost.

**RESPONSE:** ADMITTED

30

232. It would cost Plaintiff Dowtech an estimated $175,000.00 to remove and replace the alleged defective four Aeromix 25 hp aerators with ECS House Industries 25 hp aerators.

**RESPONSE:** ADMITTED

233. ECS House Industries requires its 25 hp aerators to be anchored firmly in position.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

234. ECS House Industries recommends soft starts on aerators 15 hp or higher.

**RESPONSE:** UNABLE TO ADMIT OR DENY - LACK OF INFORMATION; after making a reasonable inquiry, the information known or easily obtained by City of Nacogdoches is insufficient to enable City of Nacogdoches to admit or deny the request.

235. Brice Clements, P.E. (hereinafter "Clements") was the City Engineer of Defendant Nacogdoches on August 5, 2010.

**RESPONSE:** ADMITTED, but he was interim City Engineer.

236. Russell Grubbs (hereinafter "Grubbs") was an employee of Defendant Nacogdoches on August 5, 2010.

**RESPONSE:** ADMITTED

237. David Wolfgang (hereinafter "Wolfgang") was an employee of Defendant Nacogdoches on August 5, 2010.

**RESPONSE:** ADMITTED

238. Clements received a copy of SPI's letter dated October 11, 2010, signed by Mann and addressed to Mr. Gerald Downing, President of Plaintiff Dowtech.

**RESPONSE:** ADMITTED

239. Clements never investigated the Aeromix 25 hp aerator failures.

**RESPONSE:** DENIED

240. Grubbs received a copy of SPI's letter dated October 11, 2010, signed by Mann and addressed to Mr. Gerald Downing, President of Plaintiff Dowtech.

**RESPONSE:** ADMITTED

31

241. The SPI's letter dated October 11, 2010, signed by Mann, admitted that the four Aeromix 25 hp aerators (hereinafter "aeration units") were tested on August 5, 2010.

**RESPONSE:** ADMITTED

242. The SPI's letter dated October 11, 2010, signed by Mann, admitted that the aeration units were put into use following August 5, 2010.

**RESPONSE:** ADMITTED

243. The SPI's letter dated October 11, 2010, signed by Mann, admitted that the aeration units had been accepted as substantially complete August 5, 2010.

**RESPONSE:** DENIED

244. The SPI's letter dated October 11, 2010, signed by Mann, admitted that the aeration units had been installed in compression ("push") position.

**RESPONSE:** ADMITTED

245. The SPI's letter dated October 11, 2010, signed by Mann, admitted that the aeration units could only be placed into a position of "pulling" tension.

**RESPONSE:** DENIED

246. The SPI's letter dated October 11, 2010, signed by Mann, admits the negligence of SPI in the specifying of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** DENIED

247. The SPI's letter dated October 11, 2010, signed by Mann, admits the negligence of Mann in the specifying of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** DENIED

248. The SPI's letter dated October 11, 2010, signed by Mann, admits the negligence of Bourque in the supervision of Mann in the specifying of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** DENIED

249. The SPI's letter dated October 11, 2010, signed by Mann, admits the negligence of Defendant Nacogdoches in the specifying of the Aeromix 25 hp aerators by brand name.

**RESPONSE:** DENIED

32

250. The SPI's letter dated October 11, 2010, signed by Mann, admits that Defendant Nacogdoches breached the contract with Plaintiff Dowtech in directing additional work with no intention of paying.

**RESPONSE:** DENIED

251. The SPI's letter dated October 11, 2010, signed by Mann, threatened Plaintiff Dowtech with liquidated damages.

**RESPONSE:** ADMITTED that the letter mentioned liquidated damages, but DENIED that a threat was made.

252. The liquidated damages under this contract is five hundred dollars ($500) per day of delay.

**RESPONSE:** ADMITTED

253. The four Aeromix 25 hp aerators were not defective.

**RESPONSE:** DENIED

254. The four Aeromix 25 hp aerators were misused by Defendant Nacogdoches' engineers.

**RESPONSE:** DENIED

255. Defendant Nacogdoches' engineers never followed the recommendations of Aeromix, for proper installation.

**RESPONSE:** DENIED

256. The SPI's letter dated October 11, 2010, signed by Mann, was the start of an engineering conspiracy to cover-up the engineering negligence of Defendant Nacogdoches, SPI, Mann, and Bourque in the specifying of the Aeromix 25 hp aerators by brand name without performing or conducting any type of engineering or technical due diligence.

**RESPONSE:** DENIED

257. The additional work ordered by Mann after August 5, 2010 on the Aeromix 25 hp aerators was an effort to cover-up the engineering negligence of Defendant Nacogdoches.

**RESPONSE:** DENIED

33

258. The additional work ordered by Mann after August 5, 2010 on the Aeromix 25 hp aerators was an effort to cover-up the engineering negligence of SPI.

**RESPONSE:** DENIED

259. The additional work ordered by Mann after August 5, 2010 on the Aeromix 25 hp aerators was an effort to cover-up the engineering negligence of Mann.

**RESPONSE:** DENIED

260. Defendant Nacogdoches proposed the Amended Rule 11 Agreement dated May 13, 2014, if enforced by the Court, would in fact cover-up the engineering negligence of Defendant Nacogdoches.

**RESPONSE:** DENIED

261. Defendant Nacogdoches proposed the Amended Rule 11 Agreement dated May 13, 2014, if enforced by the Court, would in fact cover-up the engineering negligence of SPI.

**RESPONSE:** DENIED

262. Defendant Nacogdoches proposed the Amended Rule 11 Agreement dated May 13, 2014, if enforced by the Court, would in fact cover-up the engineering negligence of Mann.

**RESPONSE:** DENIED

263. Bartlett never conducted an investigation into the reason or reasons for the Aeromix 25 hp aerators numerous failures.

**RESPONSE:** DENIED

264. No one representing Defendant Nacogdoches ever conducted an investigation into the numerous failures of the Aeromix 25 hp aerators.

**RESPONSE:** DENIED

265. Upon Defendant Nacogdoches' flagrant, material breach of the contract on August 19, 2010 demanding Plaintiff Dowtech respond, Plaintiff Dowtech was excused from having to perform or give notice under the contract.

**RESPONSE:** DENIED

34

266. Defendant Nacogdoches has had the submittal of Aeromix Systems, Inc. (hereinafter "Aeromix Submital") submitted by Plaintiff Dowtech in hand since before October 22, 2009.

**RESPONSE:** ADMITTED

267. The Aeromix Submital submitted by Plaintiff Dowtech includes the Installation, Operation, and Maintenance Manual.

**RESPONSE:** ADMITTED

268. The Aeromix submittal had a copy of the warranty attached to it.

**RESPONSE:** ADMITTED

269. The Aeromix submittal clearly showed the recommendation of mooring/anchoring the aerators.

**RESPONSE:** DENIED

270. The Aeromix submittal clearly showed the recommendation for the installation of soft starters or VDFs.

**RESPONSE:** ADMITTED, except not clearly shown

271. The Aeromix submittal clearly showed the 25 hp aerator "pulls."

**RESPONSE:** DENIED

272. The warranty of the Aeromix 25 hp aerators was transferred from Plaintiff Dowtech to Defendant Nacogdoches on August 5, 2010.

**RESPONSE:** DENIED

273. Any warranty item of the four Aeromix 25 hp aerators after August 5, 2010 was the responsibility of Defendant Nacogdoches and Aeromix.

**RESPONSE:** DENIED

274. Any warranty item of the four Aeromix 25 hp aerators after August 5, 2010 was not the responsibility of Plaintiff Dowtech.

**RESPONSE:** DENIED

35

275.    Bartlett's letter of March 19, 2014 states an untruthful statement "…when the equipment submittals were reviewed."

**RESPONSE:** DENIED

276.    Bartlett's letter of March 19, 2014 states an untruthful statement: "…No discussions, suggestions, or qualifications as to the necessity of the softer starters for proper operation of the aerators, was ever presented to our engineer by Aeromix or by Dowtech."

**RESPONSE:** DENIED